IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| MEIER JASON BROWN | : | |
| Petitioner, | : | CIVIL ACTION |
| | : | |
| vs. | : | No. 4-07-CV-85(BAE)(GRS) |
| | : | |
| UNITED STATES OF AMERICA | : | CAPITAL HABEAS CORPUS |
| Respondent. | : | |
| | : | |

MOTION TO VACATE OR SET ASIDE
MADE PURSUANT TO 28 U.S.C. §2255

Mr. Brown is a prisoner under sentence of death in the custody of the

United States being held at the United States Penitentiary, Terre Haute, Indiana.

He was convicted and sentenced to death in violation of the Constitution and laws

of the United States and therefore respectfully moves this Court, pursuant to 28

U.S.C. §2255, to vacate, set aside or correct his conviction and sentence.  In

support of this Motion, Mr. Brown shows and states as follows:

## I.  JURISDICTION

This Court has jurisdiction to grant the requested relief pursuant to 28

U.S.C. §2255.

## II.  PROCEDURAL HISTORY

1.  On December 5, 2003, Mr. Brown was arrested and charged by federal authorities in a criminal complaint with the November 30, 2003 murder of part-time post mistress, Sallie Gaglia.

2.  Being found indigent, the court ultimately appointed two lawyers, William Bell and Richard Darden, both of Savannah.

3.  On January 6, 2003, a grand jury for the Southern District of Georgia, returned a three (3) count indictment alleging that Mr. Brown: "within the special territorial jurisdiction of the United States, with malice aforethought, ... unlawfully killed Sallie Louise Gaglia... in the knowing and willful perpetration of a robbery" in violation of 18 U.S.C. 7(3) and 1111 (a) and (b) (Count I);  with malice aforethought ... kill[ed] Sallie Louise Gaglia, ... an employee of the United States ... while she was engaged in the performance of her official duties" in violation of 18 U.S.C. 1114 and 1111(a) (Count II);  and assault on "Sallie Louise Gaglia, a person having lawful charge, custody and control of the United States Mail matter ..." in violation of 18 U.S.C. 2114(a) (Count III).

4.  The indictment also contained special findings that made the case potentially capital.

5.  On May 9, 2003, a Grand Jury returned a superseding indictment and

superseding penalty certification.  (Doc. 137 & 138).  The only difference between the original and superseding indictment was the addition of a seventh special finding, that Mr. Brown "committed the offense in the expectation of the receipt of anything of pecuniary value (18 U.S.C. 3592(c)(8))."

6.  The trial on guilt began on the afternoon of November 4, and concluded on November 6, 2003, when the jury returned a verdict of guilty on all counts (Doc. 272; Doc. 293 at 1050-51).

7.  Also on November 6, 2004, the penalty phase of the trial was started and concluded.  The jury retired for the evening without having reached a verdict and on November 7, 2003, the jury returned a verdict finding all of the statutory and non- statutory aggravating circumstances had been proven beyond a reasonable doubt and that the aggravating factors outweigh any mitigating factors,  and recommended the sentence of death be imposed.

8.  On November 11, 2003, in accordance with the jury's binding recommendation, the district court sentenced Mr. Brown to death on Counts I and II, and a term of 300 months in custody on Count III.  (Doc. 276)

9.  On November 12, 2003, Mr. Brown timely filed a Motion for New Trial which was denied on January 13, 2004.  (Doc. 277 & 289).

10.  On January 20, 2004, Mr. Brown timely filed his notice of appeal.

3

(Doc. 297).

11.  Thereafter, on April 15, 2004, the district court granted trial counsel's Motion to Withdraw and appointed Donald F. Samuel and Jeffrey L. Ertel to represent Mr. Brown on appeal.

12.  On August 16, 2004, Mr. Brown filed a Motion to Unseal Files which was granted on August 25, 2005.  (Doc. 306 & 307).

13.  On December 6, 2005, the Eleventh Circuit granted a Motion to Remand to Reconstruct the Record and on February 10, 2005, without conducting a hearing or providing notice to the parties, this Court concluded there were no missing portions of the record.

14.  On March 13, 2006, the Eleventh Circuit affirmed Mr. Brown's convictions and sentences.  *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006).   A timely filed Motion for Rehearing and Suggestion for Rehearing *En Banc* was denied on May 19, 2006.  *United States v. Brown,* 180 Fed.Appx. 147 (11th Cir. 2006).

15.  A timely filed Petition for Writ of Certiorari was denied on January 22, 2007.  *Brown v. United States*, 127 S.Ct. 1149 (2007), and a Petition for Rehearing was denied on March 19, 2007.  *Brown v. United States*, 127 S.Ct. 1870 (2007).

16.  On May 18, 2007, Mr. Brown submitted a Motion to Appoint Counsel, Mark Evan Olive and Jeffrey L. Ertel, to pursue post-conviction remedies pursuant to 28 U.S.C. §2255.

17.  On June 18, 2007, this Court granted in part and denied in part the Motion to Appoint, naming only Mr. Ertel as appointed counsel for Mr. Brown in 2255 proceedings.

18.  On January 14, 2008, Mr. Brown filed a Motion to Proceed *In Forma Pauperis* which was denied as moot by the magistrate court.

### III.  CLAIMS FOR RELIEF

The following Claims for relief are predicated on violations of Petitioner's Fifth, Sixth, and Eighth Amendment rights during the pre-trial, trial, sentencing and appellate proceedings in this case.  Mr. Brown is filing an Appendix with this Motion containing some of the documents relevant to the claims contained herein. However, Mr. Brown also seeks an evidentiary hearing and other record expansion in order fully to present his claims for relief.

In accordance with Rule 2 of the Rules on Motion Attacking Sentence under Section 2255, this Motion sets forth only the facts and claims entitling Mr. Brown to relief.  It does not contain legal argument or citation.  Petitioner will shortly file a separate motion seeking permission and a schedule by which to file a

5

Memorandum of Authorities in Support of this Motion.

## CLAIM I

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE LOCAL PROSECUTORS' AGREEMENT THAT THIS OUGHT NOT TO BE A DEATH PENALTY CASE**

This Claim is evidenced by the following facts:

1.  All other allegations in this Motion are incorporated into this Claim by specific reference.

2.  A defendant in a criminal case is guaranteed the right to counsel and to the effective assistance of counsel.  Counsel provide ineffective assistance under the Fifth, Sixth, and Eighth Amendments if: (a) counsel performs unreasonably, *i.e.*, contrary to professional norms, and (b) prejudice results, *i.e.*, confidence in the outcome of the proceeding is undermined.

3.  Petitioner contends that his right to effective assistance of counsel was denied during pre-trial, trial, sentencing, and appellate proceedings.  Relief is required based upon each of the unreasonable and prejudicial actions by counsel set forth *infra*, and/or, considered cumulatively, counsel's actions require a new trial and sentencing.

4.  Counsel were ineffective with respect to the fact that the local

6

Government attorneys agreed at the outset of this case that a life sentence was the appropriate punishment.

5. In January, 2003, William Frentzen and Joseph Newman, the local Assistant United States Attorneys, agreed to accept a life sentence as punishment in this case in return for Mr. Brown pleading guilty. Appendix A. This plea was "conditional" in that the Department of Justice was required to approve the agreement before the plea could go forward. The Department of Justice (Attorney General John Ashcroft) did not approve the agreement.

6. Defense counsel were ineffective in their treatment of the fact that the local prosecutors viewed this case as not requiring a death sentence. Defense counsel were also ineffective in their presentation of the fact that the Defendant wished to enter a guilty plea and had agreed to do so.

7. The fact that the local prosecutors have agreed to a life sentence in a capital case is a fact which might cause a reasonable juror to impose a sentence less than death. Appendix B. As such, it is a fact that is mitigating and a capital defendant is entitled to receive juror consideration of that fact. Defense counsel unreasonable failed to present this argument as a basis for admission of the prosecutor's agreement to a life sentence.

8. The fact that Mr. Brown agreed to accept responsibility, plead guilty, and

receive a life sentence also was not effectively presented by counsel.  The parties

entered into a stipulation that was read to the jurors during sentencing.  The

stipulation was:

> The defendant in the above-named indictment, Meier Jason Brown,
> agreed to plead guilty to the charges set forth in the indictment in
> exchange for a life sentence with no possibility of parole.

T. 1167.  This stipulation did not say *when* Petitioner had agreed to plead guilty;

it could have been after the guilt/innocence proceedings had concluded.  Indeed,

the foreperson of the jury reports that the manner in which the stipulation was

presented actually angered the jurors:

> 3.  After we found Mr. Brown guilty we went on to the penalty
> phase of the trial.  Almost the first thing we heard from the defense
> was that Mr. Brown had agreed to plead guilty in exchange for a
> sentence of life without parole.   It was our understanding from the
> stipulation the defense read that Mr. Brown offered to plead guilty
> only after the case went to the jury and we were deliberating whether
> he was guilty.  A number of us were angered by the fact that Mr.
> Brown only offered to plead after he had heard the evidence against
> him.
>
> 4.  I have been advised that the jurors were mistaken about Mr.
> Brown offering to plead only after all of the evidence was presented
> during the guilt proceeding.   Representatives of Mr. Brown have
> informed me that Mr. Brown actually offered to plead guilty well
> before the trial began.  That was never made clear to us and had we
> known that it would have had a considerable impact on my decision
> to sentence Mr. Brown to death.  This is so because by offering to
> plead guilty early on, Mr. Brown demonstrated his willingness to
> accept responsibility for what he had done and would have shown me

that he was remorseful for his actions.

Appendix B.[1]

9.  Thus, the manner in which the "facts" were presented by the defense suggested that, after having put the jurors, the court, the victim's family, and the public through a trial, Mr. Brown attempted to trick his way out of a death sentence.  Worse, because the stipulation carried with it the inescapable conclusion that the Government had refused Mr. Brown's offer, the sentencers were left with the materially inaccurate  "fact" that the prosecutors presenting the case had said "no" to life.  In fact, they had agreed to a life sentence, only to be overruled by Washington.  This was unreasonable and prejudicial conduct by defense counsel.

---

[1]Counsel stated in closing argument to the jurors that Mr. Brown had agreed to plead guilty "in December of last year" (T. 1180) and that "[h]e submitted an offer to the government, and said 'look, we won't go to trial, I will do the rest of my life in prison.'" T. 1189.  But argument of counsel is not evidence, and what the jurors relied upon was the evidence that the defense agreed to, *i.e.*, the stipulation.

## CLAIM II

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE VICTIM'S HUSBAND'S (AND OTHER FAMILY MEMBERS') AGREEMENT WITH A SENTENCE OF LIFE IN THIS CASE**

This Claim is evidenced by the following facts:

1.  All other allegations in this Motion are incorporated into this Claim by specific reference.

2.  Counsel were ineffective with respect of the fact that the victim's surviving spouse and other family members did not want the death penalty and had agreed to a sentence of life imprisonment.

3.  Members of the victim's family testified at the sentencing proceeding. They testified about the impact of the victim's life on them, and about the special qualities the victim had possessed.   This testimony carried with it the necessary implication that the family of the victim wanted the jurors to impose a life sentence.[2]

_____

[2]The foreperson of the jury, Bruce Little, states that:

> During the sentencing deliberations the jurors talked a good deal about what the family of Sally Gaglia would have wanted us to do. There were some of her family who testified about their loss.  They never said if they wanted Mr. Brown to be sentenced to death, but they were testifying for the Government at the penalty phase of the trial so we assumed they wanted a death sentence.

4. In fact, the victim's husband and other family members did not want a death sentence in the case and had agreed to a life sentence; that was one of the reasons that the conditional plea agreement had been entered into in January, 2003. Defense counsel ineffectively and prejudicially failed to argue appropriately that the victim's survivor's position on the appropriate sentence was life in prison. Had the jurors known this, there is a reasonable probability the result in the case would have been different.[3]

5. In addition, defense counsel unreasonably failed to elicit mitigating evidence from the victim's survivors who testified. These Government witnesses had knowledge about Mr. Brown's background and social history, and about the manner in which the Brown family had reached out to the victim's family, that

---

App. B.

[3]Again, the foreperson of the jury reports that "[i]f we had been told that Ms. Gaglia's husband and other family members had agreed to allow Mr. Brown to plead guilty in exchange for being sentenced to life without parole it would have had a significant impact on my decision on whether to impose a death sentence. I do not think I would have." App. B.

Counsel also unreasonably failed to explain that the victim's survivors would be satisfied with a life sentence without the possibility of parole in their letter to Attorney General Ashcroft. Appendix C. What the victim's survivors want to happen ought to be one of the "principle reasons why you should not authorize the United States to seek the death penalty," *id.*, at 1, but the fact that the survivors did not want the death penalty is not set out in defense counsel's letter.

11

would have been compelling and relevant.

6. For example, Kathyren Webb, the victim's sister, testified at sentencing regarding the impact of her sister's death. T. 1084. Defense counsel did not cross-examine her. Ms. Webb had been interviewed by Postal Inspector T.E. Barnell.[4] She told him that she knew the Brown family and that they "have a lot of problems....She said she knows there have been some problems with drugs, fighting among themselves, and alcohol abuse. She said a toddler drowned in the septic tank on the property several years ago." One of them, Richard, she taught in school and she knew "that he had mental problems." "She said she knows a lot of things because Fleming is a small community and 'people talk.'" She said the Brown kids "had no motivation for school, no home base. She said the Morgan (Brown) kids were basically left to their own devices." Appendix D.

7. She also said that "Leo Morgan went to Joe Gaglia's (Sallie's husband's)

---

[4]Postal Inspector T.E. Barnell of the Postal Inspection Service, Southeast Division, conducted a "Background Investigation of Meier Jason Brown," and prepared an "Inspection Service Report" dated February 26, 2003. Appendix D. This report contained significant evidence in mitigation of punishment but it was not provided to counsel for the defense until thirteen days before trial, November 20, 2003. Appendix E. The Government violated Petitioner's Fifth, Sixth, and Eighth Amendment rights by concealing this report for nine months, and defense counsel unreasonably and prejudicially (a) failed to request a continuance so as to better prepare in light of the information contained in the report, (b) failed to utilize the information that was contained in the report during sentencing.

house after the homicide with Reverend Smith and apologized for the incident. She said Leo told Joe Gaglia that if they had knowledge that Meier Jason would do something like this (the homicide) they would have tried to prevent it from happening." Appendix D. Outreach from the defendant's family to the victim's family is mitigating evidence and counsel unreasonably failed to present it.[5]

8. David Clark, the victim's brother, also testified at sentencing for the Government. He discussed the victim's attributes and personality and how dearly she was missed. T. 1093. PI Barnell interviewed Mr. Clark and his wife Mary. Mary reported that "all of the Brown kids were expelled a lot and given little supervision." She said that "at one time there were 11 children from the Morgan group on her bus, 11 children on another bus, and still some running around the trailers in diapers." She said "the children never appeared to be taken care of properly with torn clothes, torn shoes, and no coats in the winter time." David Clark said that at the Brown residence they would "always have parties during the week and weekend. He said you can hear the loud music." Appendix D.

---

[5]PI Barnell also interviewed Rev. Booker T. Smith who said after the homicide the church had been praying for the Gaglia and Brown families. He said he and others from the congregation went to visit Mr. Gaglia. He said Gaglia was pleasant and asked them to come into his house. Reverend Smith said Gaglia told that them, 'What's done is done.'"
Appendix D.

9.  Defense counsel ineffectively handled the mitigating evidence available from the victim's survivors.

## CLAIM III

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED DETECTIVE WOODALL'S CONCLUSION AS A SEASONED DETECTIVE THAT, FROM THE EVIDENCE AND MEIER BROWN'S HISTORY, THE VICTIM'S DEATH WAS NOT PLANNED, AND THAT WOODALL AGREED WITH THE LOCAL PROSECUTORS THAT LIFE IN PRISON WAS THE APPROPRIATE PUNISHMENT**

This Claim is evidenced by the following facts:

1.  All other allegations in this Motion are incorporated into this Claim by specific reference.

2.  Counsel were ineffective regarding their presentation of Detective Woodall's testimony and their failure to object to improper closing argument by the Government regarding Detective Woodall.

3.  Defense counsel presented the testimony of Detective Woodall at sentencing.  He testified briefly (2 pages) about the compound where Meier grew up and the poverty and crime that existed there.  T. 1162-63.   The Government objected when it appeared that the Detective might be about to say that he thought a proper punishment for Meier would be life imprisonment.  T. 1163.  The defense changed the subject and asked about remorse, and Detective Woodall testified that

14

Meier was remorseful during his confession to him about the murder in this case.
T. 1164.  The prosecution then cross-examined the Detective, established that he knew Meier very well through their "long history," and even asked him his opinion on whether Meier knew right from wrong ("Yes, sir, absolutely."  T. 1165.).  Defense counsel offered no redirect.

4.  In closing argument, Mr. Newman, the prosecutor, attacked Detective Woodall.

> Detective Woodall's power doesn't extend beyond the confines of Liberty County.  And you as a jury sitting here representing not only the Savannah Division of Federal Court with people from Liberty, Bryan, and Effingham and Chatham Counties, you speak a verdict for the Southern District of Georgia.

> Judge Edenfield is a Judge of the United States District Court for the Southern District of Georgia.  Mr. Frentzen and I are prosecutors for the United States Attorney Office for the Southern District of Georgia.  You do not take your marching orders from Detective Chuck Woodall of the Liberty County Sheriff's office.

T. 1197.  Defense counsel unreasonably and prejudicially did not object to this argument, move for a mistrial, or ask to offer evidence in rebuttal to it.

5.  The argument was improper and unconstitutional for two reasons.  First, these jurors had one task – to impose a sentence in accordance with the instructions of the Court.  They were not commissioned by the Federal Government to speak *for* any person or *against* any person, much less to foreswear

15

loyalty to state law enforcement officers and pledge allegiance to federal ones. The Government's argument that Detective Woodall wanted one thing and the Assistant United States Attorneys wanted another was inflammatory and reached beyond the record – the objection to Woodall saying what he might want to happen stopped him from doing so.

6. Second, the argument was improper and unconstitutional because it cast the facts in a false light. Mr. Newman's suggestion that he vehemently disagreed with and resented Detective Woodall's purported belief that life imprisonment was the proper punishment in this case had himself, just months before, *agreed* that life imprisonment was a proper punishment. Appendix A (conditional plea agreement). Counsel unreasonably failed to object to this improper argument and to proffer the fact that not only had the defendant offered to plead guilty but also that the Government, in the voice of the same Mr. Newman, had wanted to accept that plea in return for a life sentence. The Government's argument was fundamentally unfair, as well as not reflecting the full and accurate facts, in violation of the Fifth and Eighth Amendments

7. Defense counsel also performed unreasonably by not presenting additional compelling testimony from Detective Woodall. Detective Woodall states that he first met Meier (who he also calls Jason) when Meier was a teenager.

He has made countless calls on the Morgan property during his career.  Detective Woodall spoke with the defense lawyers prior to the trial but he never before spoke with a mitigation investigator in the case.  He spoke to the mitigation specialist for current counsel on January 10, 2008.  He said that he knows Meier well and would have testified that the murder was completely out of character for Meier and that he does not believe Meier took the knife to the post office with the intent to stab anyone. Detective Woodall is a seasoned Detective and has been around many criminals and has made professional judgments about them for prosecutors for years.  He knows Meier not to be a violent offender.  Meier had never done anything to make Woodall expect he could or would be a danger to anyone.  His opinion as a law enforcement officer is that something happened at the crime scene that got Meier flustered.  (Detective Woodall Interview, January 10, 2008.)

8.  Detective Woodall reports that he and Meier talked for several hours before the confession.  They talked about all kinds of things until Meier felt comfortable enough to tell Woodall what had happened to the victim.  Meier came to it slowly. Woodall knew Meier was "in a world of hurt" and he needed someone to talk to.  He trusted Woodall. When he was ready he told Woodall he had "screwed up."  He said he had not meant to kill Ms. Sallie and that he was only

17

trying to help Dianne.  He said he was sorry for what he had done and he accepted full responsibility for Ms. Sallie's death.  (Detective Woodall Interview, January 10, 2008.)

9.  Had counsel performed reasonably with respect to Detective Woodall and that to which he could have testified,[6] there is a reasonable probability that the result in this case would have been different.[7]

---

[6]Counsel were also ineffective for not presenting Detective Woodall in support of their submissions to the Department of Justice in January, 2003. Appendix C.

[7]The foreperson of the jury, Bruce Little, states:

> 7.  I remember Detective Woodall testifying and I recall he appeared to have a good relationship with Mr. Brown.  All Det. Woodall testified to was that he believed Mr. Brown was remorseful for his crime.  I would have been impressed and influenced in my decision-making if I had been made more fully aware that Detective Woodall, a seasoned police officer, believed that Mr. Brown did not go into this crime with the intention of killing Ms. Gaglia.  I most likely would have voted for a life sentence if I had been aware that Detective Woodall did not believe Mr. Brown should be sentenced to death and the reasons why.

Appendix B.

### CLAIM IV

**DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO CONDUCT THE DILIGENT INVESTIGATION INTO MEIER BROWN'S BACKGROUND AND SOCIAL HISTORY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS REQUIRE**

This Claim is evidenced by the following facts:

1. All other allegations in this Motion are incorporated into this Claim by specific reference.

2. Counsel were ineffective with respect to their obligation to gather and present a complete and meaningful social history of the Petitioner in mitigation at capital sentencing. Defense counsel at capital sentencing has an obligation to investigate and to present all of the mitigating circumstances that exist in a client's background and social history. Defense counsel unreasonably and prejudicially did not present Mr. Brown's complete and compellingly mitigating life history.

3. The following was readily available for presentation:

_____

Meier Brown was born in the small Georgia town of Hinesville in 1970. He and his poor, extended, African-American, family lived on a "compound" crammed into a cluster of ragged, ramshackle trailers. This compound was over-run with violence, alcohol, drugs, poverty, chaos and "social blight." (Interview

19

with Detective Charles Woodall 1-10-08).  Meier Brown steeped in this alcohol and drug cesspool, becoming an alcoholic and a drug addict himself, but he was not and is not a violent person.   He is a good person who got caught up in an unfortunate set of circumstances;  he is not what the prosecutor unconstitutionally called "that sorry excuse for a human being." T. 1198.

## A.  The nasty compound

Meier's mother was Sadie Morgan Brown of Fleming, GA.  Between 1960 and 1970, Sadie had seven children, all of whom were boys and had different fathers (except two who were twins).  Their names are (in birth order):  Roy Morgan, Leo Morgan, Levi Morgan, Dexter Morgan, Sir Kay Morgan, Nita Brown and Meier Brown.[8]  Sadie  was married to Pelham Brown when Meier was born and Meier grew up believing Pelham was his father.[9] (Interview with Mary Alice Blizzard and Vancile Morgan on 11/01/07).  Pelham fathered Sadie's sixth child, Nita, who was about 18 months old when Meier was born.  When Meier was

---

[8]The father of some of these children occasionally came around, but they did not support their children.  Henry Green drank heavily, and his sons,  Leo and Levy do as well.   Pelham is an alcoholic as is  Roy's father.   Dexter's father is Jack Johnson and Dexter drinks and does drugs.  (Interview with Ollie Morgan Smith on 10/12/07).

[9]Other family members say that another man was really Meier's father, Clarence Jackson.  Meier has never met Mr. Jackson.

fourteen, Sadie had another son, Ralton Brown, whose father was a man named Leland Frazier.

Meier's family lived on what is known as the Morgan compound where Sadie had been raised.   She had a trailer next door to her mother and father, Bernice and Sam Morgan, Sr.   Sadie was one of thirteen children.  Many of her siblings and their children lived, and still live, on the property.  Meier has more than seventy first cousins. (Interview with Willie Bell Williams 9-15-07).[10]  At least nineteen people lived next door to Meier in his grandmother's house until he reached ninth grade, when the house burned down.[11]

The police were always concerned when a woman got pregnant at the Morgan property.   Detective Woodall knows it well.  The Morgan property was no place to raise a family. It was not a safe environment for children.  The poverty

---

[10]Bernice and another aunt, Mary Alice Blizzard, and her children lived there. Mary Alice still lives next door to the trailer where Sadie used to live.   Mary Alice lived at Bernice's with her children Antonio (a.k.a. Tony), Latoya, Robert and Keon. Another sister, Vancile, lived at Bernice's with her children Margaret Ray, Cedric, Edward and Richard Morgan.  Ollie Morgan Smith and her children Alphonso, Richard and Tyrone Blige lived on the compound as well, as did Willie Bell and her husband, Anthony Williams, with their children Connie, Marilyn, Gregory and Jeston.  (Interview with Willie Bell Williams 9-15-07)

[11]*See also* Inspection Service Report, Interview of Sadie Brown on January 14, 2003.  "There are many relatives residing on the Morgan property."  Appendix D.

21

was extreme. When you were there, you could tell there was no clean living going

on. The able bodied men did not work at regular jobs because they sold drugs

instead. Nutrition and medical attention were very poor. There was no

intellectual stimulation for a child. The homes were filthy dirty with holes in the

floors and rooms crammed full of junk so dense you could not walk through. The

carpets were threadbare. It was "nasty, sordid, disgusting." (Telephone interview

with Detective Charles Woodall 1-10-08).[12]

Children were completely unsupervised,[13] and they were always in danger.

*Id.*[14]

---

[12]Sara Flynn, who has a Masters Degree in Social Work, compiled this background and social history in her capacity as the mitigation specialist for counsel in this post-conviction proceeding. Appendix F. She also prepared a video of the Morgan compound that can be accessed at Appendix G. It, more vividly than words, shows the poverty and squalor. Ms. Flynn can testify to all of the information in the background and social history here presented, and can document where she obtained this information. Appendix F.

[13]Ironically, the victim's family was well aware of the mitigation that existed on the Morgan compound. *See* Claim II, para. 6-8, *supra*.

[14]For example, one child drowned in the septic tank at the compound. The child had "wandered off." No charges were brought against Janice Richardson, the child's aunt who was supposed to be babysitting at the time. The sheriff's office assisted with the search for the child and speculated that the child was chasing a ball that was found floating in the septic tank. (Telephone interview with Detective Dennis Davis 1-08-08). In another incident, when Meier was in the ninth grade, Ralton and Keon were preschool age. They were together and Meier fell asleep. When he awoke, he called for Ralton and Keon but could not find the

## B. Drunk children smoking crack

Almost every male in Meier's family drank, and still drinks, alcohol excessively on the compound. All of Meier's uncles--the men on the compound--drank excessively. Many of Ralton's male (and several female) first cousins are excessive drinkers. (Interview with Ralton Brown on 9/24/07).

Almost everybody on the Morgan property smoked marijuana and sold drugs at one point or another. People drank and smoked marijuana underneath the tree in the front yard every day. *See* Exhibit G (the video). "Caretakers" were drunk and high all day.[15] (Interview with Ralton Brown on 9/24/07).

All of the children living in the cluster of trailers where Meier grew up drank alcohol during childhood. Meier started drinking when he was 12 years old. Meier, Chester, Tyrone and sometimes Richard would take lunch money and buy beer at the Short Cut store. They drank to get drunk several days every week. By

---

boys anywhere. He finally found them in his mother's bedroom which was in flames. The all got out before the trailer was consumed in flames. This happened the same year Uncle Junior caught the house next door on fire. After the trailer burned, Meier and Ralton moved in with their maternal grandmother for awhile until their mother could get another trailer.

[15]PI Barnell interviewed Phil Arp, Meier's probation officer. He said that he "has had many dealings with the Brown family .... [and] Roy, Daryl, Jason, and Sam Morgan." "He said there is 'a party going on at the trailers almost every weekend with a lot of drinking.'" Appendix D.

age 18 or 19, Meier was drunk *every* day.

Roy, Meier's oldest sibling, "took care of" Meier when adults were not to be found.[16]   Roy was a drug user who started out smoking marijuana and moved on to crack cocaine.   He encouraged his younger brothers to develop drug habits because he thought that if they were using drugs he would always have some. (Interview with Rosalee Morgan and Beverly Garcia on 9-22-07).

In this environment, Meier also started smoking marijuana when he was twelve years old.   By age eighteen he was a daily marijuana and crack smoker.   In 2000, he began smoking considerably more crack than he had before.   Ralton knew Meier had a crack problem  from the time Ralton was 17 or 18 years old, *i.e.*, at the time of the crime in this case.

Meier was given drugs by many relatives on the compound.   Cedric, Tony, Glen (a.k.a. Sir Kay), Uncle Anthony, cousin Roger Underwood, all sold crack cocaine,  powder cocaine, and marijuana – mostly to people from Richmond Hill. They had many customers and made enough money to support the Morgan clan's own drug habits. (Telephone interview with Det. Woodall on 1-10-08).  All of this happened in front of and around every person living on that property, including

---

[16]When PI Barnell interviewed social worker Gloria Boyd, she told him that on the compound "[o]lder boys were trouble and there was no father figure around.  The older children were raising the younger ones alone."  Appendix D.

the children. (Telephone interview with Det. Woodall on 1-10-08).[17]

## C. Bullets and knives

Meier's father Pelham moved out of the compound after he shot Meier's older brother, Roy. On the night of the shooting, Meier, who was seven years old, was with his mother in her bedroom when he heard Roy and Pelham arguing in the bathroom. They began to "scuffle" and Meier heard a gunshot. The police came and took his father to jail. Pelham never lived there again, but would visit the compound to "party." Pelham says Roy would have cut his throat with a razor if he had not shot him. (Interview with Pelham Brown on 9/7/07).

Detective Woodall first met Meier when Meier was a teenager. The Sheriff's Office was called to the Morgan property then two or three times every week, and often five times a week. The Morgans/Browns and law enforcement officials knew each other so well they were on a first name basis. The calls to the Sheriff's office were about drugs, domestic violence, shootings, stabbings, robberies and burglaries. At the time, there were people living in four trailers on the property. Detective Woodall recalls a typical call: Sam Morgan and Deborah Jenkins got into an argument and one shot or stabbed the other. When Detective

---

[17]Sam Walthour also sold drugs at the Morgan property. Sam Walthour was severely beaten, hog tied, shot and killed in 1998 the same night that Edward Morgan, Meier's cousin, was murdered at Sam's house.

Woodall responded to the call, Meier was in the trailer where the attacks had occurred. (Telephone interview with Det. Woodall on 1-10-08).

The following incident reports present a day in the life on Meier Brown on the compound:[18]

08/02/95 – An incident report was filed in Liberty County Sheriff's Office in reference to maintaining a disorderly house on the compound. Curtis Morgan is the offender and the complainant is E. Eason.

12/17/95 – An incident report was filed in Liberty County Sheriff's Office in reference to criminal trespassing at the compound. Debra Morgan is charged with Criminal Trespass; Roy Morgan is the complainant.

04/07/96 – An incident report was filed in the Liberty County Sheriff's Office concerning a burglary at St. Paul's Missionary Baptist Church on the compound. Roy Morgan is charged with Burglary. Samuel Scott is the complainant. Someone kicked the church door in, stole two amplifiers, and left.

06/10/96 – An incident report was filed in the Liberty County Sheriff's Office concerning a battery at the compound. Sadie Brown and Ralton Brown witnessed Roy Morgan assault a child. When Officer Pike reported to the ER, a DFACS worker, Ms. Freeman, was on the scene. Thirteen year old Ralton

---

[18]The incident reports are contained at Appendix H.

Morgan had been punched and kicked by his older brother, Roy, for no apparent reason.  A DFACS worker told Sadie Brown that if Roy Morgan was allowed to remain in the home, then Ralton would be removed.  Sadie Brown promised to press charges against Roy in order to keep Ralton in the home.[19]

2/24/97 – An incident  report for Maintaining a Disorderly House was filed by the Liberty County Sheriff's Office regarding crimes on the compound.   The complainant was Shawn Fields.   Sam Morgan and Debra Jenkins were reported to the police and were both found intoxicated (Debra registered .25 and Sam .15 on a Breathalyzer) when officers responded to the scene.   It was the second time officers had reported to the scene that day (they had been there an hour earlier).

03/29/98 – An incident report was filed in the Liberty County Sheriff's Office concerning an aggravated assault at the compound.   Sam Morgan had been punched in the head by Tony Blizzard.  Blizzard had demanded that Sam give him $40.00 he owed him.  When Sam said he would have to pay the next day, Tony

---

[19]Meier's family members fought with each other violently all of the time. Almost everybody in the family was involved in regular episodes of inter-familial violence. (Interview with Ralton Brown on 9/24/07).  Recalling this specific incident, Ralton reports that he sustained a serious blow to his head (in the left temporal lobe area).   He was taken to the emergency room and stayed in the hospital for two hours. To this day Ralton does not know why Roy beat him. He was told he had been bad, but he could not understand what he had done wrong. (Interview with Ralton Brown on 9/24/07).

attacked him.

05/31/98 – An incident report was filed in the Liberty County Sheriff's Office concerning a battery at the compound. Sam Morgan and Debra Jenkins were drunk and fighting. The report reads: "I walked to the bedroom where I located both Debra Jenkins and Sam Morgan. Mr. Morgan had the knife to Debra's chest area and stated that I'm going to fucking kill you. I was right next to Mr. Morgan when I walked into the bedroom. I told Mr. Morgan to put the knife down and he switched hand s and then threw it on the bed." Debra Jenkins admitted that she had scratched Sam on the chest with her fingernails. Levi Morgan said Debra had walked over to where Sam was talking with friends and hit him in the eye. Both Sam and Debra were drunk.

08/01/98 – An incident report is filed in Liberty County Sheriff's Office. Tony Blizzard is charged with Strong Arm Robbery and Battery at the compound. Sinclair Williams is the victim. Sinclair Williams had gone to Tony's house with a gun and an argument erupted. Williams shot his gun into the air. Tony and three others forcibly removed the gun from Mr. Williams by beating him repeatedly about the head and shoulders, emptied the firing chamber by shooting into the ground, threw the gun into the woods, and told Williams to leave.

08/08/98 – An incident report was filed in the Liberty County Sheriff's

Office concerning disorderly conduct at the compound.   Debra Jenkins and Sam Morgan were arguing when Sam called the police. When the police arrived, Debra was using a lot of profanity and the officer advised her to calm down or he would take her to jail. She retorted, "You ain't going to do a fucking thing." The officer arrested her and took her to jail where she registered  .297 and .300 on the intoxilyzer.

10/02/98 – A Family Violence Incident Report was filed by the Liberty County Sheriff's Office in reference to a battery at the compound.  Glenn Morgan is charged with battery. The victim is Roy Morgan.  Glen had punched Roy in the face several times before leaving the property.

10/07/98 – An incident report was filed by the Liberty County Sheriffs Office at the compound.  Glen Morgan is charged with battery. The victim is Donald Pyett.

02/04/99 – A police officer was dispatched to the compound when Sam Morgan called to report Debra Jenkins for stealing his food stamps.  When the officer arrived, both Sam and Debra were drunk.

02/05/99 – Family Violence Incident Report at the compound filed.  Sam Morgan fired a shotgun at Debra Ann Jenkins at their residence.  Sam said Debra had hit him and spoken disparagingly of his deceased mother.  Sam was arrested

29

and taken to the Liberty County Jail.

03/10/99 – An Incident Report was filed in Liberty County Sheriff's Office in reference to a battery at the compound.   Deak (a.k.a. Detrickson Davis) punched Gregory Carter in the mouth and tore his shirt when the victim refused to pay Deak $20.00 he said the victim owed him.

04/08/99 – A Family Violence Incident Report was filed by the Liberty County Sheriff's Office in which Roy Morgan was the complainant and Patricia Akpan (Dexter's wife) was the offender.  When the officers arrived at 6724 Leroy Coffer Highway, Roy and Patricia were fighting over a TV remote control.  The officer's report says: "**This is a continuous situation at this residence.**"  They were told that if they were summoned to the residence again that night, Disorderly House charges would be pursued.

04/27/99 – A Misc. Incident Report was filed by the Liberty County Sheriff's Office about crime at the compound.  Roy Morgan summoned the police to the compound because he wanted his brother removed from the residence.

09/06/99 – An Incident Report was filed by the Liberty County Sheriff's Office in reference to an aggravated assault at the Compound.  Ernestine Morgan called the police when Alice Harley stabbed the victim, Cathy West.  West was later treated at St. Joseph Hospital in Savannah and required 27 stitches.

09/11/99 – The Liberty County Sheriff's Office recorded an incident report at the compound.  The complainant, Wesley Miller, had been attending a funeral at St. Paul's Missionary Baptist Church when Darryl Morgan, Glen Morgan, James Harley and Vinnie Miller attacked and beat him.   They also broke out his car windows with his wife and three month old baby in the vehicle.

11/03/99 – An incident report was filed by the Liberty County Sheriff's office concerning a burglary at the compound.   The complainant, Sam Morgan, said Janice Richardson (his sister-in-law) had stolen a TV from his trailer.

12/15/99 – An incident report was filed by the Liberty County Sheriff's Office concerning a theft at the compound.   Kia Robinson reported that Nick Morgan (a.k.a. Nicholas Johnson) and Rodney Morgan (a.k.a. Ralton Brown) had stolen a CD from her car.

01/02/00 – An incident report was filed by the Liberty County Sheriff's Office concerning a robbery at the compound.  It reads:  "Investigation disclosed that… [Eddie] Robinson and [Jeffrey Charles] Miller while en route to Savannah, GA, stopped at 6700 Leroy Coffer Highway, Fleming, GA, (Morgan residence) to purchase a crack-rock (crack-cocaine).  During the transaction negotiations, things got out of hand and Robinson was beat and asked to render his wallet.  Miller was also assaulted and robbed of $120.00 and a cell phone.   They identified three

31

offenders." (Clifford John Smiley, Roy Lornell Morgan, and Jeffrey Charles Miller).  Tony Bizzard was arrested for robbery and criminal attempt to possess and use crack.

01/06/00 – A Family Violence Incident report was filed by the Liberty County Sheriff's Office regarding crime at the compound.  Roy Morgan called the police because his cousin, Tyrone Blige, had struck him with a fire poker.  Apparently they had been arguing over some food (macaroni). Mr. Blige was not present when the police arrived on this date but he was arrested the next day after he confessed to the crime.

01/09/00 – An incident report was filed by the Liberty County Sheriff's Office in reference to a theft at the compound.  Darryl Morgan robbed Tony Blizzard and stole $110.00 from him while he was asleep. Everyone had been drinking the night before. Tony and Darryl then got into a fight and the police arrived at 7:00 a.m.   Detective Woodall was notified.

05/05/00 – An incident report was filed by the Liberty County Sheriff's Office in reference to a report of public drunkenness at the compound. The offender was Sam Morgan and the complainant was Ben Towery.  When the police arrived, Sam Morgan was in the yard yelling at everyone.  After a warning by the police, he went inside but the police were later called again and had to

32

return to the residence because Sam had resumed his yelling.  They arrested him and took him to the Liberty County Jail.

07/30/00 – An incident report was filed by the Liberty County Sheriff's Office regarding a battery at the compound.  Darryl Morgan had climbed into a window and beaten Margie Loretta Morgan while she was asleep in her bed.  He also took $160.00 out of her rear pocket and attempted to pull at her pants.  The offender then fell asleep on the couch and that is where he was when the police arrived.  Both parties were drunk.   The police did not find any money on Darryl Morgan. Margie Morgan said she had been drinking all day, beginning in the morning.

10/18/00 – An incident report was filed in the Liberty County Sheriff's Office concerning an aggravated assault at the compound.  Sinclair Williams shot at Sam Morgan when they were arguing over a woman.  Detective Woodall was called to the scene.  Roy Morgan, Sadie Brown and Roger Blizzard were all present when Det. Woodall arrested Williams and took his shotgun.

11/04/00 – An incident report was filed in the Liberty County Sheriff's Office concerning "accidental damage" at the compound.   Mary Alice Blizzard and Nicholas Johnson report to the police that they heard gunshots outside their residence and one of the bullets entered the house and lodged in the wall.

05/19/01 – An incident report was filed by the Liberty County Sheriff's Office in reference to a battery at the compound. Gregory Morgan said that Tony Blizzard asked him not to tell people Gregory was his brother. They argued and Tony hit Morgan in the face and head.

10/22/01 – A Family Violence Incident Report was filed by the Liberty County Sheriff's Office in reference to a battery at the compound. Sam Morgan called the police because his common law wife, Debra Jenkins, had scratched him on the back of his neck and torn his shirt off during a drunken argument. This was the second visit to the residence the police had made that day.

These are representative incident reports. There were also many other incidents of violence that simply went unreported. For example, Debra Jenkins stabbed Sam Morgan, Jr., in the eye. He chose not to report it to the police for fear that Debra would be incarcerated. He did not even go to the doctor for treatment. He is now blind in that eye. (Interview with Rosalee Morgan Johnson 9-22-07).

**D. DFACS describes "a chaotic and disorganized lifestyle"**

When Ralton and Keon were 10-11 years old, DFACS found Keon in the house unsupervised. Keon was removed from his mother's custody and placed in foster care for 24 hours until his mother could be located. (Interview with Ralton Brown on 9/24/07). Keon's DFACS caseworker, Michelle Holtzclaw, filed a CPS

34

crisis intake report after she determined that Keon was being left alone for long periods of time.  When Ms. Holtzclaw subsequently interviewed Keon's mother, Mary Alice Blizzard, she found that she "did not see the seriousness of her choice to leave Keon alone.  She told Ms. Holtzclaw that she thought he was old enough to look after himself."   The court placed Keon under DFACS supervision for six months.  (DFACS reports dated 7/20/94 – 1/95)(Appendix I).

Ms. Holtzclaw noted that the family was living a "**chaotic and disorganized lifestyle**."  She noted that Mary Alice's parenting skills were inadequate in that she: "ignores situations that pose a danger to her child; there is a lack of stimulation in the home environment; there is no apparent plan or routine to child rearing; and she has an aversion to parenting or household responsibilities."  She noted a lack of impulse control in that: "family members seek immediate gratification without regard to long term consequences;  act without thinking; and neglect children through consistent attempts to meet their own needs first."  She noted problem solving skills in that: "the parent places all responsibility for solving problems on the child;  there is a chaotic rather than systematic approach to problems;  and parents do not seem to learn from experience.  Further, the parent's unmet needs take precedence over attending to the needs of the child."  (McBell Chester Child Protective Services Family

35

Assessment and Social Summary, Case #089-14188)(Appendix I).

Dorothy (a.k.a. Dot) Morgan Miller, one of Meier's maternal aunts, also had children but they lived off of the compound, although not far from the rest of the Morgan clan.  However, Dot did not allow her children to spend any time at their grandmother's house or on the Morgan property in general. She did not believe it was an appropriate environment in which to raise children and she would not allow her children to go there without her supervision.  Though they lived less than a mile from the property, Dot's children knew nothing about the events that occurred there because their mother did not want them to experience the chaotic, irresponsible, drug and alcohol inflamed environment in which their cousins were being reared. (Interview with Dorothy Miler 9-22-07)

### E.  Deaths

Death stalked Meier's family.  For example:

**Ponda Davis** – Ponda was Detrickson Davis' sister.  She was  murdered by being cut up with a machete.  This occurred in Hinesville in 2000.

**Robert (a.k.a. Boy) Johnson, Jr**.  – Boy was a maternal cousin and was murdered in Savannah in 1998.

**Deardrew Miller** – Deardrew was a maternal cousin and he was murdered at the age of 19.

**Edward Morgan** – Edward was a maternal first cousin.  He was murdered in 1998.

**Sam Walthour** – Sam was a close family friend who was severely beaten, hog tied, shot and killed the same night that Edward Morgan was murdered at Sam's house.

**Quincy Waye –** Quincy was the two year old son of Chester Morgan and Trena Waye who drowned in the septic tank.

**Errol Bizzard** – Errol was Mary Alice Blizzard's husband who died in 1983, when Meier was 13 years old.  He was killed in a truck wreck.

**Benjamin Blige** – Benjamin was the father of Ollie Morgan's children. He died in 1986 when a train hit his car and cut his head off.

**Curtis Morgan** – He drank himself to death when Meier was about 30 years old.  He was married to Debra Jenkins' mother, Margie.

**F.  Meier Brown was not violent but was caring and kind**

Despite his environment, Meier was and is a good person.

1.  Caring for ailing family members

Meier spent a lot of time with his Aunt Ernestine when he was very young. She was a lifelong alcoholic who also suffered from epilepsy, and she was very mean.  She stabbed more people than anyone could count.  She was jailed, but

never for more than a day.  She had the police cowed when she got out because she "raised cain" in the jail. (Interview with Ollie Smith on 10/12/07).  Sadie's children were scared of Ernie because she was "real strict."  She beat them. (Interview with Mary Alice (a.k.a. Al) Blizzard on 10/5/07).  She cut a step-granddaughter, Trena Waye, with a broken beer bottle one time.  Meier was holding Trena's face with a towel. (Interview with Ralton Brown on 9/24/07)

She had grand mal seizures starting sometime in the 1980s.  Meier was the only cousin who was not afraid to tend to her when she first started having the seizures.  The other children ran away but he stayed with her and she taught him how to care for her during a seizure.  He could tell when she was going to have one because her left arm would jump involuntarily.   He had to move the furniture and ask her to sit on the floor.   Afterward, he put rubbing alcohol on her temples and under her nose; he also put cold compresses on her forehead.  If he could get her red and white pill in time, he could sometimes prevent her from having a seizure.  The seizures lasted about twenty seconds.  She had the seizures regularly.

Meier also took care of his ailing mother.  Dr. Glenn Carter of Hinesville, GA, became Sadie's physician in December 1982, when Meier was twelve years old.  He attended her until shortly before her death in 2003.  Dr. Carter reports that Sadie was not well educated and did not understand her illness.  She seemed

intellectually slow.   She was an insulin dependent diabetic at age forty (when Ralton was born), and her diabetes was very aggressive.  She had difficulty complying with doctor's instructions.  Her kidneys failed in the mid 1990s (when Meier was about 25 years old).   Dr. Carter describes her as "one of those poor blacks."  (Interview with Dr. Glenn Carter on 10/05/07)

Meier took Sadie to the doctor and to her dialysis treatments on a regular basis.   He did more than anyone to make sure his mother got the medical attention she required.   (Interview with Glen Morgan, Cedric Morgan, Leo Morgan, Levy Morgan, Dexter, Morgan, Calvin and Connie Williams, Mary Alice Blizzard, Chester, Pelham Brown, Willie Bell Williams, Tony Blizzard, Nicholas Johnson on 9/6/07).    When she became completely disabled, Meier bathed her when she could not take care of herself.  (Interview with Glen Morgan, Cedric Morgan, Leo Morgan, Levy Morgan, Dexter, Morgan, Calvin and Connie Williams, Mary Alice Blizzard, Chester, Pelham Brown, Willie Bell Williams, Tony Blizzard, Nicholas Johnson on 9/6/07).  Meier also took Sadie to have laser surgery at the Emory Clinic in Atlanta in 1993.  Sadie was blind in both eyes before the surgery but afterward, she regained her sight in one eye.

2.  Meier was not a violent person

Unlike his father, uncles, and siblings, Meier was not violent and did not

fight.  He was scared of people on the compound.  Meier always avoided confrontation. He never fought.  He was very easily intimidated. (Interview with Glen Morgan, Cedric Morgan, Leo Morgan, Levi Morgan, Dexter Morgan, Calvin and Connie Williams, Mary Alice Blizzard, Chester, Pelham Brown, Willie Bell Williams, Tony Blizzard, Nicholas Johnson on 9/6/07).

Postal Inspector T.E. Barnell of the Postal Inspection Service, Southeast Division, conducted a "Background Investigation of Meier Jason Brown," and prepared an "Inspection Service Report" dated February 26, 2003.  The persons interviewed reported that Meier, unlike others on the compound, was not a violent person.  Appendix D.  For example,

"Both Glen Brown and Sadie Brown stated that Meier Jason Brown was not prone to violence and did not have a temper."

Rodney Brown stated that:  "Meier is a good kid and I don't know him to have a mean bone in his body."

Gregory Carter stated that:  "Meier  Brown wouldn't hurt a fly."

Employers said:

"Meier was extremely quiet and didn't bother people."  "No violent outrages and seemed very normal."

"Meier was well mannered and courteous and she saw no signs of violent or

40

erratic behavior."

"He said Meier was not a violent man and was a soft-spoken man."

"Meier always seemed like a calm, cool, collected guy. "He said he has never heard of any problems with Meier except maybe a suspended license and issues with drinking alcohol, but **never fighting or anything like that**."

His probation officer, Irving Frazier,

Described Brown as well mannered and polite. He said he never witnessed or had knowledge of any violent tendencies or erratic behavior by Brown.

PI Barnell interviewed six teachers from The Bradwell Institute where Meier went to school between 1984 and 1990 and they all said that "Brown did not stand out as a troublemaker;" "If Brown was a troubled student he would have remembered;" and Brown "never had any discipline problems."

## F. Education

Meier went to Liberty County Elementary School (the school is no longer in existence) from 1975-82. He was known to his friends and teachers as Jason. Gloria C. Boyd is a retired school social worker with the Liberty County Board of Education; she worked at Liberty County Elementary School from 1977-98. She personally met with Sadie Brown to discuss Meier's truancy problems (he missed three weeks of school in 2nd, 3rd, 4th and 6th grades). She got the impression that

Sadie had an illness that prevented her from competently managing her children. She reported the following to PI Barnell:

> She said she [Sadie] was concerned but she was ill and the older boys had to take care of the younger children. She said the older boys were trouble too and there was no father figure around. The older children were raising the younger ones alone… She said the mom was in the hospital many times when she visited the residence.

Ms. Boyd recently reaffirmed these observations and stated that there was nothing much that could have been done about truancy because Meier's mother was ill and the older siblings were responsible for making sure the younger siblings got on the bus in the morning.  However, the older siblings were young too and could not be held legally responsible for their younger siblings' absences at school. (Telephone interview with Gloria Boyd 10-18-07).

Meier attended Hinesville Middle School from 1982-84. The school no longer exists.  Meier attended high school at the Bradwell Institute from 1984-1990.  Linda Jones taught English at Bradwell from 1984-86 and remembers Meier well.  Meier failed the ninth grade once and passed the second time because she took pity on him – he had missed too many days when his mother's and grandmother's houses burned in unrelated incidents.  She told PI Barnell that "she got the impression that [Meier] was sad and had no one. She said he was a quiet student and stayed to himself. She said he did not do his homework."  Appendix

D.  When she contacted Meier's mother to talk with her about Meier's truancy, Sadie did not respond. (Interview with Linda Jones,  10/12/07)

Sometimes if Jason cut up in her class, Ms. Jones would tell him to come see her on the break.   He was always shy and quiet.   She cannot imagine Jason killing anyone.  He had a nice smile, but he rarely smiled.   She really cared about him. He would not take up for himself.   She reported, again, that he always looked sad, like no one cared about him.   It was almost like "this was supposed to happen to me."  She didn't see him in 10th grade. (Interview with Linda Jones on 10/12/07)

Joan Hollingsworth was the principal when Meier was at the Bradwell Institute. She recalls the general issue of truancy for many of the children living on the Morgan property.   She reports that there was a lack of parental guidance and there were family problems that prevented most of the children from doing well in school.  She said Sadie's children looked after themselves and did not attend school regularly. (Telephone interview with Joan Hollingsworth 10-22-07).

A school social worker, Vanessa Parker (who had previously taught Meier history), got involved with Ralton when he was excessively absent from school. She made home visits at Sadie's trailer on Leroy Coffer Highway.  She said some people would not have wanted to go inside the house.  It was easy to tell a lot of

people lived there. *The children circulated through the residences on the property but no one seemed to know what each child was doing.* No one was supervising their homework or their individual well-being. (Interview with Vanessa Montgomery Parker on 10/12/07)

Meier dropped out of school at age 19 to care for his mother;  he was in the eleventh grade.

### G.  Good  Employment History

PI Barnell interviewed a Ms. Lee who stated that Meier worked at the Richmond Hill County Services for 4 months in 1988.  She said he was courteous, but was terminated because he stole and pawned some tools.  Appendix D.

When Dexter, Meier's half-brother, finished high school (he dropped out in the 11th grade), Sadie took him to work with her and asked if he could help out in the maintenance department.   When he learned enough, he moved  to Atlanta where he worked as a maintenance man in an apartment complex.  (Interview with Carlton Dexter Morgan on 10/12/07).  Nita moved to Atlanta shortly after Dexter and they worked together at the apartment complex.  Later, Meier moved to Atlanta and worked in maintenance with his brothers for a while.

Meier moved to Atlanta in 1995, and stayed until 1996.  In 1996, he moved back to Fleming to take care of his mother who was in bad health.  (Interview with

Ralton Brown on 9/24/07).[20]    Her diabetes was worsening and she had lost a leg and one eye as a result.   Meier took her to doctor's appointments.  He made sure she took her medicine.  He cooked for her and cleaned the house.  He helped out a lot. (Interview with Willie Bell Williams 9-15-07).

Ralton and Meier worked for a tree cutting company together from 2001-2002.  They worked hard.  Meier encouraged Ralton to keep working. (Interview with Ralton Brown on 9/24/07).

Meier worked at the Ramada Inn in Richmond Hill for several months in 2002.  PI Barnell contacted Henna Mehta who stated that Meier was extremely quiet and did not bother people, but he was terminated because he did not perform his work satisfactorily.  Appendix D.

Meier worked for Wallette Proman doing yard work in August of 2002.  She told PI Barnell that he was a good worker and she was satisfied with his work, which he performed in the evenings after working at the Ranada Inn.  She said he was well-mannered and she saw no signs of violent behavior.  Appendix D.

Meier worked at Atlanta Underground during late 2002.  Greg Barfield was his supervisor.  He told PI Barnell that Meier was a "good guy" and was always

---

[20]After Meier moved back to Atlanta his brother Nita died of AIDS.  PI Barnell interviewed one of Meier's emplyers who reported that this death "was a big loss for Meier, and thet Meier took it hard."  Appendix D.

"calm, cool, and collected." He said that Meier was a good worker, but that they had a strict "three-strikes" rule on being late to work and that Meier was late several times and did not come to work once and so was terminated. He reported that the homicide was "a waste, because Meier was a good guy." Meier's foreman at Atlanta Underground said Meier was a good worker and "did anything he asked him to do." However, he was terminated because of his three strikes. Appendix D.

Meier worked for James Wainwright doing construction work off and on for four years. He told PI Barnell that Meier was not a violent man and that he was soft-spoken. Appendix D.[21]

When Meier was working, half of everything he made went to Sadie. He gave her half of his income for years. He thought she should not have to work since she was ill and needed to stay home.

### H.  Minimal criminal record, non-violent, drunken

Meier's criminal record before the offense in this case was not extensive or violent. It involved drugs and alcohol, and/or crimes to get money for each. In 1990 when he was 20 years old he was convicted of possession of marijuana. He

---

[21]Wainwright also told Barnett that Meier owed money to one of his cousins for crack and called him three times the day before the offense herein asking for work because he needed the money.  Appendix D.

was also convicted of DUI in 1990.  Two years later he was convicted of forgery.

He was also  convicted of driving without a license and DUI in 1992, and received

a 6 month suspended sentence.   In 1992, he was charged with his third DUI, and

with driving with a expired tag, no proof of insurance, and driving with a

suspended license.  Appendix  J.

In 1995, Meier was charged with his fourth DUI and driving without a

license.  In 1996 he was charged with robbery, forgery, theft by taking, and his

fifth DUI.  He received a five year sentence, and was paroled in 1999.  He was

charged with financial transaction card theft which was dismissed, but his parole

was revoked and he served several months in prison.  In 2002 he was arrested for

his sixth DUI.  He was arrested for the instant offense in December of 2002.

Appendix J.

### I.  Model Prisoner

Meir was incarcerated at the Liberty County Jail in 1991 when he spent 3

days there for a forgery charge prior to being released on his own recognizance.

In 1992 he served two days in the Liberty County jail as the result of his second

DUI conviction.  In 1995 he served 10 days in the Liberty County Jail for another

DUI and/or open container and/or driving on a suspended license conviction.

In 1996 he was incarcerated in the Liberty County Jail while awaiting the

resolution of charges including robbery (unarmed), forgery, theft by taking, and driving under the influence. He was sentenced on September 11, 1997, and went to prison.

Meier was first incarcerated at Coastal Correctional Facility (for classification) and then Muskogee State Prison (18 months). While at Muskogee State Prison, Meier was employed in the prison work force doing maintenance work for the City of Columbus under the Director of Public Services, Rufus Riggs. In this position, Meier would be picked up from the prison and taken off cite to a fuel station where he would work, without supervision, for his daily shift. Mr. Brown was reported to have "performed admirably," was "dependable," "conscientious," and "tried to do a good job every day." He was paroled June 14, 1999.

In September 2000, he was arrested for financial transaction fraud. While that charge was dismissed, his parole (from the 1996 charges) was revoked and he spend approximately 5 months in jail and then went to prison. In the Liberty County Jail, Meier's behavior and cooperation led to his being made a trustee and he was given access to less secure areas of the jail. A review of the Liberty County Jail records reveals that in his time there he was never cited for any incidents of any kind. Further, he was an active member in the religious programs

48

available.

Meier served his time for the parole revocation at Coastal Correctional Facility (for classification) and then Montgomery State Prison for 8 months. A review of Meier's Department of Corrections (which encompasses all of the facilities where he was housed) reveals that he had only two very minor non-violent citations, both in August of 2001, and both for failing to follow orders (failure to move bed as instructed and failure to clean showers as directed).

Meier's time at the Chatham County Jail was a result of his incarceration for the instant offense. He was jailed there from December 6, 2003 to July 29, 2003, and again from September 26, 2003 until his conviction and sentence resulted in his transfer to the United States Bureau of Prisons in November 2003. A review of the Chatham County Jail records again reveals that Mr. Brown received no disciplinary reports of any kind and presented no management problems.

The two month gap in Meier's Chatham County Jail stay was a result of a court ordered mental health evaluation that was conducted at the Federal Medical Center at Butner North Carolina. This facility was originally designed as an experimental treatment center for violent offenders. Although Meier was facing a capital murder prosecution, his history, demeanor and behavior led to his classification as low risk and placement in general population. Once again, Meier

49

presented absolutely no management or disciplinary problems while at the facility.

### J. His girlfriend

Meier met Diane Brown in May of 2002 when he flagged her down in traffic and they exchanged phone numbers. At the time Diane Brown had been a correctional officer working for the Georgia Department of Corrections at Coastal Correctional Facility for twelve years. She was forty three years old and Meier was thirty-two. They moved in together.

Diane, who had been involved in a series of abusive relationships, fell in love with Meier almost immediately. He was different than her husbands. He was mild-mannered, thoughtful, courteous and kind. He was especially fond of Whitney, Diane's daughter, and welcomed the role of acting as a loving father to her.

Diane and Meier also shared an addiction to alcohol. Both were heavy drinkers, drinking together every day with Meier drinking beer and Diane gin. Diane describes herself as a functional alcoholic, drinking too much but still holding down a job to support her family. In the beginning of their relationship Meier was also working, first for Kentucky Fried Chicken in Hinesville, then as a maintenance man for a Ramada Inn in Richmond Hill. Meier eventually lost his KFC job because he had a suspended license and could not get back and forth to

work.

Then in November of 2002, Diane was suspended without pay from her job with the Georgia Department of Corrections.  Her suspension stemmed from her arrest for providing false information to a police officer who arrested Meier in July of 2002.  With Meier not working, and Diane's ex-husband not current on his child support obligations, Diane told Meier that either he needed to start helping to support her and Whitney or he would have to move out.  Meier could not find work and moved back in with his mother, Sadie.  Although they were not living together every day, Diane and Meier continued to see each other regularly and were hopeful of reconciling.  She spent the night before the crime at Sadie's house, and she and Meier were together until his arrest on December 5, 2003.

### K.  Evaluation at Butner FCI

Meier was sent to FCI Butner for a mental health evaluation pre-trial because defense counsel had indicated that they intended to present mental health evidence at sentencing.  Meier arrived at Butner on August 4, 2003.  He was returned to Savannah September 26, 2003.  During his 50 + days of evaluation, he was seen by Sally Johnson, M.D. (a psychiatrist), and was also administered psychological and personality tests.  Progress notes were kept during the 8 weeks of evaluation.  The evaluation culminated in a report that was placed under seal

with the Court.

In her report, Sally Johnson documented that she had unsuccessfully sought collateral information about Meier's social history and background from trial and sentencing defense counsel. She also detailed that Meier is not an anti-social personality or a psychopath, and that he was not a risk to others in a prison setting. Relevant excerpts from her reports and progress notes include the following:

> At the outset of this evaluation, pertinent collateral information was requested from both the defense and prosecuting attorneys. A packet of information was promptly received from the U.S. Attorney's Office...Written and telephone requests for collateral information from Defense Attorney William Bell did not result in receipt of any collateral information. Report at 2.
>
> ......................
>
> Few sources of collateral information were available in regard to Mr. Brown's early history.
>
> ....................
>
> It appears that when Mr. Brown was not incarcerated he was a major source of support for his mother during her later years.
>
> ..................
>
> He denied any cocaine or prescription drug abuse. During the phone conversation with Attorney Darden, he mentioned Mr. Brown's use of cocaine. Mr. Brown was questioned again about his cocaine use. He then did admit that he had used cocaine. Again he denied that this was persistent drug abuse and stated that he had not used any for an extended period of time.
>
> ...........

Initially Mr. Brown was placed in the 1E seclusion unit with Mental Health Department as a result of the need for further observation given his current charges. During the early part of this evaluation it was the administrations decision that the study should take place in that environment. Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit. He completed the evaluation in that status....He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.

........

He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain his own safety and not impose on others.

........

Available history on Mr. Brown did not support evidence of a conduct disorder with onset before the age of 15. There is not sufficient evidence that he had a pervasive pattern of disregard for or violations of the rights of others since the age of 15, as indicated by the identified criteria for diagnosis of Antisocial Personality Disorder. He does have a persistent pattern of criminal behavior and the focus of his current clinical situation is his adult anti-social behavior, not specifically a mental disorder. Nonetheless, he does not demonstrate chronic history of organized criminal behavior; instead he has a history interspersed with a variety of relatively minor charges until the time of the alleged offenses.

.........................

Review of his behavior while incarcerated indicated [he] does not identify that he ever presented as a problematic inmate. Except for minor disciplinary infractions related to housekeeping issues, he has no history of problems with staff or other inmates.

53

Appendix K.  Progress notes included the following entries:

He was evaluated as a LOW risk to exhibit behavior that would pose a risk of harm to self or others ....After considering the above information, this patient may be housed in open population.

8/11/03        Pt does not appear to be a management problem.

8/14/-15/03  attempts to reach defense unsuccessful

8/15/03        explained unsuccessful attempts to reach attorneys and got names and numbers of some family members

8/20/03        Alcohol abuse (provisional)

8/21/03        phone interview with Darden tomorrow; "Darden's office was faxed requests for collateral as it is unclear whether attorney Bell ever forwarded this."

8/22/03        "He has not talked to attorneys or written to them since at Butner"

9/8/03          "Have not received collateral from attorney Darden.  Called him this a.m.

                    "Can tie up evaluation as soon as receive/review remaining collateral."

Appendix K.

_____

4.  Petitioner had Fifth, Sixth, and Eighth Amendment rights to have

sentencer consideration of the detailed, voluminous, and compelling mitigating

information set forth in this petition.  However, for reasons directly attributable to the defense, what was actually presented in mitigation at sentencing barely scratched the service of what was available, and/or was actually counterproductive.

5.  The defense in this case secured funding for a mitigation specialist, Laura Blankman, and that investigator was paid $7,500.00.  Sentencing counsel relied upon this investigator to compile mitigating evidence for sentencing.  This investigator did not complete that critical job.  Trial counsel report that the investigator simply did not do the work;  the mitigation investigator reports that trial counsel did not obtain sufficient time and resources to do the work properly.  Whatever the cause, both trial counsel and the mitigation specialist have conceded to post-conviction counsel that the necessary investigation for presenting a complete case in mitigation at sentencing was not done.

6.  Thus, as the trial and sentencing date approached, defense counsel scrambled.[22]  This scrambling resulted in an incomplete and, indeed, an inaccurate

---

[22]Defense counsel filed a motion for funds for a forensic social worker July 18, 2003, which was denied by the Magistrate Judge on August 14, 2003.  The Magistrate Judge noted that such an expert "would simply duplicate the work of" the mitigation specialist and the psychologist who had already been appointed.  This Court affirmed that ruling on September 18, 2003.  Doc. 213.   Defense counsel unreasonably and prejudicially failed to advise the Court that Ms. Blankman had not completed her work, and unreasonably failed to ask for a

and harmful representation of who Meier Brown is.  One anecdote demonstrates both the haste with which the sentencing case was put together, and the harm to Meier Brown therefrom.

7.  Thirteen days before trial, the Government provided defense counsel with the Postal Inspector Background Investigation Report that had been prepared 10 months earlier.  Appendix D.  The Government provided it because it contained "exculpatory" information.  Appendix E.  Defense counsel unreasonably did not ask for a continuance to investigate the people who the Postal Inspector had talked to.  It appears that the defense simply read the report, picked some witnesses to testify, and put them on the witness stand.[23]

8.  This method of litigating is dangerous and unreasonable.  For example, defense counsel had Vanessa  Montgomery Parker testify.  T. 1131.  She had been interviewed by the Postal Inspector.  Appendix D.   In her testimony she said that she was employed at the Liberty County Board of Education, that she knew Meier, that she had  served as a school social worker.  She said that in that capacity she

---

continuance of the upcoming, November 3rd, trial date based upon their lack of preparation.

[23]For example, Linda Jones was listed as a witness in the postal inspector report.  Appendix D.  Defense counsel had her testify and during her testimony counsel said:  "*I'm reading here* that you got the impression that he was sad."  T. 1120.  Counsel was reading from the Postal Inspector Report.

went and spoke with Meier's mother to assist the family in getting medication for Meier that he needed to take every day in school in order to do better.  She also testified that she did not know what grade Meier was in in school at that time "because in the alternative school, they work sort of like on paces.  So he could have been scheduled for one grade, and may be working on a couple of grades in order to catch up."  She also said that Meier was an angry child:  "there was a little anger, but it wasn't directed at me or the school officials.....a tenseness sort of anger."  T. 1133.

9.  Ms. Parker was confused and mistaken.  Meier never took medications in school.  His brother Ralton did, for ADHD.  And Ralton  had anger issues and he was a discipline problem, which was the reason for his medication.  And Meier did not go to the alternative school.  And Meier was not reported by anyone else as having any underlying anger as a child; just the opposite.  Ms. Parker was talking about Meier's brother, Ralton.  Not Meier.  Meier was sad, not angry.

10.  Counsel did not know that they were putting on evidence about the wrong child, did not know that their client was not in an alternative school, and apparently did not know that he was not angry as a child.  Had the requisite investigation been conducted, they would have known.

11.  In addition to presenting *wrong and harmful* information from the

Postal Inspector's Report, defense counsel failed to present *helpful* information from that report. For example, the victim's relatives knew about the horrible conditions at the Brown compound and sympathized. The victim's husband and family were visited by representatives of the Brown family who apologized for the crime and stated they wished they could have stopped it. Appendix D; *see* Claim II, *supra*. Defense counsel did not present this evidence.

12. Defense counsel did not present evidence that people in the community thought that Meier was a peaceable person who was not violent, which is fully documented in the Postal Inspector's Report. Appendix D; *see* para 3, F, *supra*.

13. Had counsel conducted the type of background investigation required by professional norms, and had counsel provided the jury with the evidence contained in paragraph 3, sub-sections A - K above (and contained in Claims I - III), there is a reasonable probability the result in this case would have been different.

## CLAIM V

**DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO PRESENT EXPERT MENTAL HEALTH TESTIMONY AND RECORDS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

This Claim is evidenced by the following facts:

1.  All other allegations in this petition are incorporated into this claim by specific reference.

2.  In capital cases, the defense team must have at least one member who is experienced in identifying and documenting a client's mental illness, mental diseases and defects, substance abuse disorders, and other mental conditions that might be pertinent to capital sentencing.  A defendant is entitled to present evidence of any mental condition that might provide the basis for a sentence less than death, and is entitled to the assistance of mental health experts to assess and present such evidence.  In this case defense counsel unreasonably and prejudicially failed to present expert evidence about Meier's mental make-up, in violation of the Fifth, Sixth, and Eighth Amendments.

3.  Defense counsel at trial sought the appointment of a mental health expert.   This Court approved the request and appointed James I. Maish, Ph.D. Dr. Maish does not remember what he did in the case and actually does not remember the case.  However, it is known that he saw Meier Brown briefly, and only once;   he administered no tests;   and he reviewed no social history regarding Mr. Brown.  Defense counsel provided this expert with no background materials.

4.  Defense counsel acted unreasonably and prejudicially by not providing background materials to Dr. Maish and by not ensuring that Dr. Maish had the

information and resources necessary for a competent evaluation and investigation into mitigating circumstances.

5.   Two mental health experts have been provided the extensive background materials contained in this petition and in the appendix to the petition, have evaluated Mr. Brown for several hours,  face to face, and have come to several expert conclusions about him.   These experts,  Marlyne K. Israelian, Ph.D., clinical psychologist (Appendix L) and Bhushan S. Agahgarkar, M.D. (Appendix M), have provided the following report to counsel regarding Mr. Brown:

> Despite an upbringing that was characterized by willful neglect, unpredictable and often-times life threatening violence, abject poverty, and a pervasive disregard for the physical and emotional care of others, Mr. Brown developed a strong sense of personal responsibility for the care of several family members.  From a young age and well into adulthood, Mr. Brown slept with his mother, Sadie, every night.  When she was disabled by diabetes and kidney failure, he fed and bathed her, took her to her dialysis appointments, and assumed responsibility for her medical care.  In addition to tending to her medical care, Mr. Brown was also financially responsible and generous, giving his mother half his pay on a regular basis.
>
> Perhaps most telling of his nurturing character is his care for his aunt, Ernestine Morgan, who suffered from grand mal seizures.  Mr. Brown was often left under her care and he, unlike the other children who were present, was the one to tend to her.  At most he was only ten years old at the time.
>
> Mr. Brown's history is full of similar examples of his inclination to

60

care for and tend to others.  This natural inclination to care for and tend to others is remarkable given the lack of appropriate models for such behavior in his life.  Such a natural altruistic disposition speaks to Mr. Brown's innately good character, which would have, had he been born in different circumstances to a different family, lead to a much different outcome.

Recently conducted neuropsychological testing confirmed that Mr. Brown is cognitively intact.  In addition, it revealed that he possesses areas of significant strength.  For instance, Mr. Brown, an individual who dropped out of high school in the 11th grade, performed within the superior range of functioning (99th Percentile) on a measure of mental arithmetic.  In addition, Mr. Brown demonstrated particular strength in his non-verbal reasoning abilities.

Mr. Brown was raised in an environment where drugs and alcohol were prevalent within the community in general and his family in specific.  His brothers and cousins sold drugs as their primary means of financial gain.  Not only was drug use condoned, it was almost expected.  For all intents and purposes, the use and abuse of both alcohol and drugs was Mr. Brown's birthright and he began using both before adolescence.  Ultimately, Mr. Brown became dependent on alcohol and crack cocaine.

These substances are known to have disinhibiting effects on cognitive functioning and could cause a person to act in uncharacteristically dangerous and impulsive ways.  In a rapidly escalating situation, a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might.

Not only was Mr. Brown born into this drug culture, he had no access to treatment.  It is unfortunate that he was never treated for his addiction problems as there are several treatment modalities available to address these issues.  Dr. Agharkar, as a former medical director of a residential treatment facility and in his active private practice, has seen first hand that patients with substance abuse problems can

61

improve with treatment and go on to lead successful lives.  It is unfortunate that Mr. Brown was never given a chance to address his substance abuse issues as this may have been pivotal in changing his life's trajectory.

By the accounts of those who knew him growing up, Meir Brown was described as an engaging and personable young man with a good sense of humor.  It was unlike him to assault or fight with others.  He is well-liked in his current incarceration setting and by previous psychiatric evaluations there is no evidence to suggest he is dangerous in a prison environment.  Remarkably, given the culture in which he was raised, it is noteworthy that Mr. Brown does not suffer from an antisocial personality disorder.  In fact, it is very telling that his evaluation through the Mental Health Department at the Federal Medical Center in Butner, North Carolina, confirmed that he did not meet criteria for a diagnosis of antisocial personality disorder, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision, of the American Psychiatric Association.  Dr. Sally Johnson and Dr. Carlton Pyant concurred that Mr. Brown did not meet criteria for either an Axis I or Axis II disorder.

At the root of his personality, Mr. Brown is an individual who is very much a "giver" in the sense that whatever he gained or earned was for the benefit of others (his frail mother, his single parent girlfriend.) He is not a self-serving, narcissistic, irreverent, individual void of empathy for others and an inability to form and sustain meaningful relationships.   Indeed, it is probably the strength of his relationship and the relentless desire to care for those he loves that, coupled with the effects of drugs and alcohol, lead to the crime for which he is now sentenced to death.  It could be argued that Mr. Brown is no less a causality of the depraved, dysfunctional, and damaging family as his cousin Quincy Waye was when he, as a result of negligent care and supervision, drowned in a septic tank at the age of 2.

In short, it is our opinion that Mr. Brown possesses a host of intellectual, intrapersonal and interpersonal strengths which, in a

healthier environment than the one he was born into, would have served him and society well. Given his strengths, had Mr. Brown been born and/or raised in a less teratogenic environment, not only would he have been less likely to engage in substance use and abuse, he would, had he been given the opportunity, benefitted from detoxification and rehabilitation, and could have lead a productive and rewarding life.

Report provided to counsel, January 21, 2008.

6. This type of expert testimony is extraordinarily mitigating, and it was available had counsel acted reasonably.

7. In addition, this evidence directly addresses and rebuts the aggravation introduced and argument made by the Government.   First, the Government introduced evidence of Mr. Brown's multiple DUI offenses.  He is an alcoholic – he was arrested and/or convicted of DUI six times,  and his drinking stems directly from his home environment, as these experts report.  This serves as rebuttal to, and provides mitigation concerning, the Government's aggravation.   Second, the Government argued that  Mr. Brown's state of mind was the most culpable possible, *i.e*., that he planned and intended to kill, and that that intent was settled and constant as he methodically stabbed the victim time and time again.  T.  1177 (prosecutor slowly counting stab wounds and arguing "*he continued to choose* to stab her....[Gesturing] That's ten.").  An intoxicated person having smoked crack, or an addict being deprived  (both of which are conditions Meir could be found in)

may well not act with such mindful coldness:  "[i]n a rapidly escalating situation, a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might." Israelian/Agahgarkar report, *supra.*  Inasmuch as defense counsel asked the jurors to find that "the defendant committed the killing upon sudden impulse and without substantial planning," T. 1222, that it was a robbery gone horribly wrong, expert testimony about an alcoholic's or drug addict's impaired functioning, impulse control, and reasoning during a rapidly escalating and dangerous encounter would be highly mitigating.

8.  Trial and sentencing counsel also acted unreasonably and prejudicially on the issue of Mr. Brown's lack of future dangerousness and Mr. Meier's prospects for positive adaptation to prison if he received a life sentence.   Defense counsel sought funds from the Court to hire an expert, James Evans Aiken, to assess future dangerousness.  Dr. Aiken is an expert in prison management and adjustment.   Appendix N.   This Court denied defense counsel's request because the Court believed that fact witnesses were sufficient to "fully present future non-dangerous mitigation evidence."  Doc. 213.  The Court also found that "the services of the previously provided mitigation specialist and psychologist are also available."  Doc. 213.

9. Defense counsel unreasonably and prejudicially failed properly to justify their request for an expert on non-dangerousness in the future. James Aiken would have been able to testify not only about how secure federal prison facilities are but also about his evaluation of Mr. Meier's personal history and actions. Mr. Aiken is an expert at prisoner classification and management. Appendix N. He has now examined the records from Mr. Brown's previous incarcerations and other background information and opines that he would have testified in 2003 that Mr. Brown was a "well-adjusted." Mr. Aiken explains that

> The term "well adjusted" reveals that the prisoner has not been involved in random and/or systemic disruptive violent and/or predator behaviors while in confinement status. Examples of prison predator behaviors may involve sexual predator aggression and/or violence, being a "shot caller" (gang or security threat group leader), demonstrating illicit or criminal power and control over other inmates, controlling contraband activities, lethal attacks upon staff and other inmates, escape using force and amassing weapons for violent predator acts.

Report to counsel, January 20, 2008. Mr. Aiken could have testified in 2003 that Mr. Brown would likely not be a danger in the future, and would have predicted that he would continue to be a well-adjusted inmate. Had counsel properly proffered Mr. Aiken's expertise in classifying and managing prisoners, and in determining at what security level to house inmates, there is a reasonable probability that the Court would have approved Aiken's expert services and that at

least one juror would have voted against a death sentence.

10.  Furthermore, defense counsel could have presented this mitigation through the Government expert at Butner who had evaluated Mr. Meier before trial.  This expert, Sally Johnson, M.D., contacted trial and sentencing defense counsel's offices repeatedly seeking collateral information about Mr. Brown's background and social history and defense counsel never provided any to speak of.[24]  Dr. Maish was provided none as well.

------

[24]*See* Appendix K:

> At the outset of this evaluation, pertinent collateral information was requested from both the defense and prosecuting attorneys.  A packet of information was promptly received from the U.S. Attorney's Office...Written and telephone requests for collateral information from Defense Attorney William Bell did not result in receipt of any collateral information.
>
> .......................
>
> Few sources of collateral information were available in regard to Mr. Brown's early history.

Report of Sally Johnson.  *See also* Progress Notes from Butner FCI:

> 8/14/-15/03  attempts to reach defense unsuccessful
>
> 8/15/03      explained unsuccessful attempts to reach attorneys and got names and numbers of some family members
>
> 8/21/03      phone interview with Darden tomorrow; "Darden's office was faxed requests for

11. Nonetheless, Dr. Johnson, other medical staff, and the Warden at Butner all concluded that Mr. Brown was a low security risk and, upon making that finding, kept him in general population for the rest of his 50 + days of incarceration at Butner.[25] Counsel had an obligation to determine how Mr. Meier

> collateral as it is unclear whether attorney Bell ever forwarded this."

9/8/03    "Have not received collateral from attorney Darden Called him this a.m.

"Can tie up evaluation as soon as receive/review remaining collateral."

App. K. Dr. Johnson reports that she did not receive collateral information from defense counsel.

[25]*See* Appendix K:

> Initially Mr. Brown was placed in the 1E seclusion unit with Mental Health Department as a the result of the need for further observation given his current charges. During the early part of this evaluation it was the administrations decision that the study should take place in that environment. Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit. He completed the evaluation in that status....He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.          ........

> He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain how own safety and not impose on others.
>                    ........

67

behaved while at Butner, how he was classified, and how the experts there

assessed his future dangerousness and potential for prison adaptability, and

counsel unreasonably failed to do so. Counsel could have spoken to, subpoenaed,

and/or introduced expert testimony from any mental health expert who had seen

Mr. Meier, *even the Government's own expert*, on the very issue that was the

defense position at sentencing – *low security risk* – and the failure to do so was

unreasonable and prejudicial.[26]

--------

> Review of his behavior while incarcerated indicated [he] does not
> identify that he ever presented as a problematic inmate. Except for
> minor disciplinary infractions related to housekeeping issues, he has
> no history of problems with staff or other inmates.

Report of Sally Johnson, M.D. See also Progress Notes:

Progress notes:

> "He was evaluated asa LOW risk to exhibit behavior that
> would pose a risk of harm to self or others," "After
> considering the above information, this patient may be
> housed in open population"

> 8/11/03     Pt does not appear to be a management problem.

Appendix K.

[26]In addition to finding Mr. Brown not to be a risk to others in a prison
setting, Dr. Johnson found that Mr. Brown did not suffer from any anti-social
personality disorder. Appendix K (report). The foreperson of the jury confirms
the mitigating value of such expert conclusions:

68

12.  Finally, had defense counsel performed reasonably with respect to their mitigation specialist there is a reasonable probability that the result in this case would have been different.  This Court directed trial counsel to their mitigation specialist "to present this strain of mitigation evidence."  Doc. 213.  Because defense counsel's mitigation specialist did not complete here work in this case, defense counsel did not have that option (and unreasonably failed to so advise the Court.).  The mitigation specialist who, in large measure, prepared the extensive background and social history of Mr. Brown that is presented in this petition and in the appendices to this petition, *see* Appendix F, is prepared to do what this Court ordered.

---

 I have been advised that Mr. Brown was evaluated by doctors at a
federal medical center.  I am told that the experts at this federal prison
administered psychological tests to Mr. Brown and that these tests
and experts  found that Mr. Brown was not anti-social, was not a
psychopath, and was classified as requiring low security measures
within a prison system.   Had the Government or the defense
presented such evidence that Mr. Brown did not fit the profile of a
person who would be dangerous in the future, I most likely would
have not voted to impose a death sentence.

Appendix B.

69

**CLAIM VI**

**THE PROSECUTORS COMMITTED MISCONDUCT IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS**

This claim is evidenced by the following facts:

1.  All other allegations in this petition are incorporated into this claim by specific reference.

2.  A defendant is entitled to a fundamentally fair trial that is not skewed in favor of the Government through prosecutorial misconduct.  The Government may not hamstring the defense by withholding exculpatory evidence, may not inject inflammatory and irrelevant considerations into sentencer determinations, and may not invoke prosecutorial expertise as a basis for a death sentence.  By doing all of these things in this case the Government violated the Fifth and Eighth Amendments.

3.  First, the Government withheld exculpatory evidence until the eve of trial having possessed it for months and months.  The Postal Inspector Report, a Background Investigation into Meier Brown, was completed February 26, 2003.  It was provided to defense counsel at the earliest 13 days before trial began. It is divided into six sections[27] and has 37 Exhibits.

---

[27]The report has an Introduction and then has detailed sections on Meier Brown's Family, Education, Community, Employment, and Probation and Parole

4.  This report reveals that Meier is not violent, had not been a troubled student, was using crack and drinking a lot of alcohol, was not a bad worker, and was a caring and kind person.  It was misconduct for the Government to conceal this report almost nine months.  This misconduct hamstrung the defense, and defense counsel failed to request a continuance.

5.  The prosecutor's closing argument rendered the proceedings fundamentally unfair, unconstitutionally injected the issue of victim-worth vs. defendant-worth, and cast the true facts in a false light.  The most egregious example was the Government's demand that the sentencers find the victim to be a worthier human being than Meier Brown and to condemn him to death for that reason.  The prosecutor called Mr. Brown "that sorry excuse for a human being," T. 1197, then described the victim's attributes and said *her* "life had more value than words can express."  T. 1198; *see also* T. 1199 (a death verdict will say "yes, your life has great value.") .  In the case of a black man convicted of killing a white women in rural Southeast Georgia, such comparisons of "worth" speak unconstitutional volumes.  And the prosecutor knew from the Postal Inspector Report, Appendix D, that Meier Brown was not a sorry excuse for a human being.

6.  The prosecutors also urged the jury to sentence Meier to death because

Services.  Appendix D.

71

that would be justice for the survivors of the victim: "Why is this justice?  The loss to Sallie Gaglia of her life and the loss to her family.  And you heard from the family...and about [her husband] Joe ... and why they could not be here."  T.  1175. In fact justice to the family was a sentence of life imprisonment, which they had agreed to at the outset of the case.  *See* Arguments I and II, *supra*.

7.  The prosecutor also urged the jurors to reject Detective Woodall's testimony because his "power doesn't extend passed the confines of Liberty County."  These federal jurors and federal prosecutors were above him: "You do not take your marching orders from Detective Chuck Woodall of the Liberty County Sheriff's Office."  T. 1197.

8.  The marching orders that the prosecutor had for these jurors were then set out.

> A community, a country can deal with dangers from without. December 7, 1941, we made a response.  I submit to you that September 11, 2001, we made a response.  I submit to you that November 30th, 2002, calls for, demands a response that sanctifies, recognizes the life of Sallie Louise Gaglia and says by your verdict of the ultimate punishment that yes, your life has great value.

T. 1198-99.

9.  Dangers from without?  Pearl Harbor?  The World Trade Center? Urging capital sentencers to march in a war, comparing this case to massive deaths

72

on a grand scale, and urging a war with jurors marching to proclaim that the victim

was a person of "great value" compared to "that sorry excuse for a human being?

T. 1197. This is fundamentally unfair and created an intolerable risk that the death

penalty was imposed for improper and unconstitutional reasons.

**CLAIM VII**

**THIS COURT AND THE GOVERNMENT VIOLATED
PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT
RIGHTS BY NOT DISCLOSING THE GOVERNMENT'S
MENTAL HEALTH EXPERT'S REPORT**

This Claim is evidenced by the following facts:

1.  All other allegations in this petition are incorporated into this claim by

specific reference.

2.  Sally Johnson, M.D., prepared and sent a report to this Court and it was

placed under seal. This report contained significant evidence in mitigation of

punishment. *See* Claim IV, 3, K, *supra*; Appendix  K.

3.  Dr. Johnson was a Government employee. The Government has a

responsibility to seek out and provide exculpatory evidence to a defendant. Either

the United States Attorney, or the personnel at Butner FCI, or this Court should

have discovered and alerted the defendant to this exculpatory evidence. The

failure to have done so rendered the proceedings fundamentally unfair and should

result in reversal.   Alternatively, there is a reasonable probability that the result in

this case would have been different had the exculpatory evidence been disclosed.

And the non-disclosure created an intolerable risk that the death penalty was

imposed despite the existence of factors known by Government actors but not

disclosed and which call for a less severe penalty.  These facts demonstrate

violations of the federal constitution, and resentencing should be ordered.

**CLAIM VIII**

**THE DEATH PENALTY IS IMPOSED IN AN ARBITRARY
AND DISCRIMINATORY MANNER UNDER THE FEDERAL
DEATH PENALTY ACT (FDPA)**

This Claim is evidenced by the following facts:

1.  All other allegations in this petition are incorporated into this claim by

specific reference.

2.  To be constitutional, the death penalty must be reserved for the least

mitigated and most aggravated cases, and must be imposed according to guidelines

that meaningfully and rationally distinguish between those few person who receive

the death penalty from the many who do not.  If there is a risk that a death

sentence has been imposed arbitrarily or discriminatorily, it must be set aside.

3.  By all accounts, this was not considered properly to be a death penalty

case by the relevant actors in Georgia.  *See* Claims I - III, *supra*.   The decision by

the Attorney General to require that a death sentence be sought was an arbitrary

Washington decision.  There have been many more aggravated and less mitigated

cases than this one, and the Attorney General and the Department of Justice cannot

posit any legitimate rationale for authorizing death for Meier Brown and not for

other far worse cases.

4.  In addition, the death penalty is imposed almost exclusively on indigent

defendants and disproportionately upon minorities, particularly minorities

convicted of killing white people.  Mr. Brown is a poor black man sentenced to

death for the murder of a prominent white female in rural Southeast Georgia.

5.  There is a direct correlation between the amount of money provided for

counsel, experts and other services, particularly the amount provided for

mitigation purposes, and whether the defendant receives a death sentence under

the FDPA.  There is a direct correlation between how much time counsel spends

on a capital case and whether the defendant receive a death sentence under the

FDPA.  Trial counsel unreasonably failed to spend sufficient time on this case,

and failed effectively to seek necessary funding to investigate and present

Petitioner's defense.  And this Court did not provide sufficient time for this case to

be prepared and presented, and did not provide sufficient  funding for the

mitigation experts and investigators and others who were requested by counsel.

6.  As a result, the tools for an effective defense were not provided to Petitioner.  In FDPA cases where sufficient time is spent by counsel investigating and preparing, and sufficient funding for mitigation investigation and other services is provided, the death penalty is significantly less often imposed than in cases with insufficient efforts and funding.

7.  Petitioner's death sentence is correlated to his race (black), the race of the victim (white), the amount of money that was provided by this Court (too little), the amount of time that was spent on the case by counsel (too little), and the standardless decisions of the Department of Justice.  These factors are arbitrary and discriminatory, and violate the Fifth, Sixth, and Eighth Amendments.

## CLAIM IX

### OTHER INSTANCES OF INEFFECTIVE ASSISTANCE OF COUNSEL

This claim is evidenced by the following facts:

1.  All other allegations in this Petition are incorporated into this claim by specific reference.

2.  At trial, the theory of defense was that someone other than Mr. Brown did the crime.  In this vein, defense counsel attempted to impeach the reliability of two witnesses who purportedly selected Petitioner's photo out of a photo array.

Defense counsel also attempted to demonstrate that Petitioner was observed in clothing different than the clothing on which the victim's DNA was found. Further, defense counsel pointed out that footprints and fingerprints found at the scene did not match Petitioner and that although the crime scene was very bloody, the shoes Petitioner was wearing that day contained no traces of blood. However, defense counsel's attempts were made more difficult as witnesses placed Petitioner and no one else at the post office at approximately the time of the killing.

3.  Trial counsel had in their possession a number of documents provided by the Government that contained information relevant, favorable, and consistent with the theory of defense presented at trial. However, trial counsel failed to investigate or otherwise utilize these documents in defense of Mr. Brown.

**Penny Banks**

4.  Ms. Penny Banks was interviewed by Postal Inspector Reeves and a summary of the interview was committed to a report. Appendix P . Ms. Banks revealed that she and her husband were driving past the Fleming Post Office at 10:45 a.m., (the approximate time of the offense) and they saw an unoccupied blue

car parked in front.[28]  The Government's case was that Mr. Brown fled the post office on a bicycle and that no one entered the post office between the time he left and the time Jennifer Zech found the body.  Ms. Banks had related information that someone other than Mr. Brown was at the scene at the time of the crime.  Trial Counsel failed to contact Ms. Banks to investigate further the critical information she possessed and trial counsel never subpoenaed her as a witness.

**Pastor Alfred Banks**

5.  On December 4, 2002, someone with law enforcement took a phone call and took contemporaneous notes from his call with Alfred Banks, a Pastor at Daniel Baptist Church in Richmond Hill, Georgia.  Appendix Q.  Pastor Banks related that he had information on Dean Gregory Carter that related to the Post-Office Killing.  In particular, Pastor Banks related that he was at the subject's (presumably Mr. Carter) house on Sunday (the crime occurred on Saturday) where he observed Mr. Carter as being stiff in the shoulder and upper body.  Pastor Banks also related that Mr. Carter told him that his aunt had told him that people get checks on Friday, and that the Post Office is busy with money orders on Saturdays and thus has a lot of money.  Mr. Carter's wife drives a white Chrysler

---

[28]Ms. Zech testified that her vehicle was parked "catercornered on the left-hand side of the Post Office."  (T. 584)

with tinted windows and Mr. Carter has a history of drug abuse. These notes (especially when taken in conjunction with the information from Alford Woods and about Levi Lecounte detailed below) supported the defense theory that someone other than Mr. Brown committed the offense. Yet trial counsel did nothing to further investigate the information provided by Pastor Banks.

**Alford Woods**

6. On December 1, 2002, Postal Inspectors Sims and Holder interviewed Alford Woods and subsequently wrote a report. Appendix R. Mr. Woods indicated that on November 30, 2002, he and his daughter were riding horses on Freedman Grove Road toward Highway 196 when they heard the sirens from the emergency vehicles responding to the homicide. Approximately 5 to 10 minutes after hearing the sirens, Mr. Woods saw a White Lincoln occupied by four black men flee from the direction of the homicide at a high rate of speed. Trial counsel did nothing to further investigate this information and did not subpoena Mr. Woods to trial.

**Levi Lecounte**

7. During its investigation of this crime, law enforcement discovered that Levi Lecounte, an individual who lived in the area and had previous convictions for possession of a firearm by a convicted felon, armed robbery, possession of

79

marijuana (1986), and armed robbery, aggravated assault and theft of a motor

vehicle (1977). Law enforcement learned that Mr. Lecounte drove a white

Lincoln and was at the Post Office on Saturday (presumably the date of the crime).

The handwritten notes and the information pertaining to his prior convictions was

disclosed to the defense but trial counsel did not investigate or otherwise use this

information. *See* Appendix S.[29]

**May 27, 2003 Laboratory Report**

8. Postal Inspector, Marla McClendon, submitted trace evidence to the

National Forensic Laboratory. Included in the trace evidence were "hairs

exhibiting Caucasian racial characteristics [] recovered from the clothing, body

and adjacent surroundings of the decedent." Additionally, "a single hair fragment

exhibiting Negroid racial characteristics was recovered from the decedent

transport sheet." Appendix T. Law enforcement apparently never attempted to

obtain a hair sample from Petitioner and therefore conducted no comparison

between the Negroid hair found at the scend and his.

---

[29]The cumulative effect of the Pastor Bank's information pertaining to Mr. Carter's statements and that he drives a white full size vehicle, coupled with the fact that Mr. Woods saw a white Lincoln speed away from the scene, and the fact that a convicted violent felon who also drives a white Lincoln was at the Post Office on the date of the crime undermines confidence in the outcome of the trial and when considered with the inconsistencies defense counsel were able to point out at trial puts the Government's case in an entirely different light.

9. Trial counsel had this information but did not use it. Clearly, the Government had the ability to do a comparison between Petitioner's hair and the one found on the transport sheet. The fact that it did not could have been used to demonstrate that the Government was not interested in finding the true perpetrator, but instead was trying to protect the case it had against Petitioner. Obviously, had they tested it and had it not matched Petitioner that fact could have and would have given rise to a reasonable doubt. Further, the Government had the ability to test the Caucasian hairs with EMT and others individuals who administered to Ms. Gaglia and/or her family to determine if they matched. A hair that did not come from law enforcement, the first responders, EMT's or others who attempted to assist her would have indicated the perpetrator could have been someone other than Mr. Brown - - *i.e.* a white person. Trial counsel did not attempt to have these items tested by an independent defense expert and did nothing with the information they did have. The quality of the Government's investigation could have been the subject of impeachment by demonstrating they were not doing the investigation they needed to determine if Petitioner was the real killer. Trial counsel were ineffective.

**The McClendon Affidavit in Support of Search Warrant**

10. Part of the probable cause proffer contained in Marla McClendon's

affidavit was that law enforcement had obtained information from a confidential

source that indicated Petitioner was involved in the crime.  The affidavit in

support of the search warrant for the Sadie Brown residence indicated:

> 6.      On December 3, 2002, a confidential source (CS) contacted the
> Liberty county Sheriff's Department and reported that he had
> information pertaining to this incident.  The source was subsequently
> interviewed by Detectives of the Liberty County Sheriff's Department
> as well as Inspectors for the US Postal Service.  A criminal history
> inquiry regarding the CS revealed a prior arrest by no conviction for a
> possession of narcotics charge in 1990.
>
> 7.      The source reported that he was a life long friend of MEIER
> JASON BROWN and had heard from an unidentified source on
> Monday night, 12-02-02, that Jason Brown was involved in the
> murder at the Fleming Post Office.  The CS stated his source provided
> the following information:
>
> > Jason Brown was at the residence of the Morgan family,
> > who reside on Leroy Coffer Highway, Fleming, GA, on
> > Saturday morning, 11-30-02, trying to obtain some
> > money.  He was refused and was overheard stating, "I
> > will go and get some."  Brown left the residence and
> > returned on a bicycle, appearing to be very nervous.
> > Brown used a telephone to call for a ride from his
> > girlfriend who lives off Quacco Road, Savannah,
> > Georgia, in Chatham County.  *Brown stated he went over
> > the counter in the Post Office and surprised the lady
> > coming from the restroom and had to kill her because
> > she knew him.  Brown threw the knife into a wooded
> > area while riding the bicycle from the Fleming Post
> > Office south on Fleming Loop Road back to the Morgan
> > residence.*

Appendix U (emphasis added).

82

11.  Trial counsel was also provided with two redacted reports (bate stamped 403-04 & 405-06) recounting law enforcement's interview of the CS. Appendix V & W.  Nowhere in either of the reports does the CI indicate (as it did in the affidavit) that Petitioner "*stated he went over the counter in the Post Office and surprised the lady coming from the restroom and had to kill her because she knew him.  Brown threw the knife into a wooded area while riding the bicycle from the Fleming Post Office south on Fleming Loop Road back to the Morgan residence.*"  Trial counsel could have used that glaring discrepancy to once again demonstrate how law enforcement was willing to go to great lengths, even misrepresent evidence to the Court, in order to further its prosecution of Mr. Brown.  Trial counsel could have elicited from Ms. McClendon, the Government's case agent, what she put in the search warrant and then showed how she misrepresented the CS's information.  Trial counsel were ineffective for failing to use the information provided them in the reports.

**Motion to Suppress statements**

12.  Trial counsel were ineffective for failing to ensure that Diane Brown was present at the hearing on Petitioner's Motion to Suppress Statements. Obviously a damaging piece of the Government's case was the fact that Petitioner gave a statement confessing to the crimes.  Diane Brown was subpoenaed to

83

appear but did not and counsel did not ask for a continuance nor did they seek the Court's authority to compel her appearance.  Instead, they relied solely on the testimony of Petitioner.   As expected, law enforcement's version of events differed dramatically from Petitioner's.  Diane Brown's testimony, however would have completely corroborated Petitioner's testimony and we know this because she testified at trial.

13.  Ms. Brown would have testified that a large number of agents/officers, at least one of whom was armed with a shot-gun, and others who were accompanied by dogs approached the residence. (Tr. 752).  When the door to the residence was opened, approximately 10 or 12 agents, with guns drawn, rushed past her into the home.  (*Id*. at 753).  One of the officers grabbed a chair from the dining room and placed it in the middle of the room telling Mr. Brown to "sit there and don't move."  (*Id*. at 754).  At the same time, another officer pushed Ms. Brown into another room while other officers roamed through her house.  *Id*.[30]

14.  During the search of the home, law enforcement discovered the receipts from two postal money orders which had been taken from the Post Office and from the floor of her bedroom, a pair of blue Lugz brand sneakers.  (*Id*. at 741;

---

[30]Although Ms. Brown allowed law enforcement to search her residence, she did so because she did not believe she had a choice in the matter.  Tr.  at 753.

84

905).  After discovering these items, Mr. Brown was questioned.  At all times during the search and subsequent questioning, he was escorted by law enforcement whenever he moved within the house, and at least two sheriff's deputies stood outside the home with shotguns drawn.  Because trial counsel failed to ensure this testimony was before the Magistrate judge who made credibility determinations and fact findings that were later relied upon by this Court and the Court of Appeals, they rendered ineffective assistance of counsel.  Further, to the extent trial counsel failed to seek this Court's reconsideration of the Suppression Motion *after* Ms. Brown testified at trial, counsel were ineffective.

**Erroneous Charge of the Court**

15.  At the conclusion of the guilt/innocence phase of the trial, the Court instructed the jury " If you find beyond a reasonable doubt that the offense occurred at the location alleged and described in the indictment, the U.S. Post Office, Fleming, Georgia, you are instructed that the location would be within the territorial jurisdiction of the United States." (Tr. 1040).  This instruction effectively directed a verdict on an essential element of the crime - - i.e., that the crime occurred on federal property.  The mere fact that the crime occurred in the Post Office does not necessarily dictate that the crime occurred on federal property.  More is needed, like the United States, rather than the State of Georgia,

85

own the property on which the Post Office was located, or that the Post Office property was being leased by the United States. Thus, the Court's instruction that if the crime occurred at the Post Office, *ipse dixit* federal jurisdiction is established relieved the Government of proving an essential element of the crime and trial counsel's failure to object constitutes ineffective assistance of counsel.

**Failing to Object or Preserve**

16. The Eleventh Circuit Court of Appeals, when reviewing Mr. Brown's convictions and sentences, noted a number of areas wherein trial counsel failed to timely object and thereby issues were waived or reviewed for plain error, a much more demanding standard.

17. First, trial counsel subpoenaed any and all DFACS records that pertained to Sadie Brown and/or residents of the Morgan Compound. The Magistrate Court upon Motion of DFACS quashed the subpoena and trial counsel did not appeal that ruling to this Court . When the issue of whether Mr. Brown's rights were violated by the Court denying him access to those records was raised, the Court of Appeals held that it "lacked jurisdiction to review the magistrate judge's order because Brown never appealed the ruling to the district court." *United States v. Brown*, 441 F.3d 1330, 1352 (11th Cir. 2006). There can be no reasonable strategy for trial counsel's failure to preserve this issue for appeal by

objecting to the magistrate court's ruling to the district court.  Had trial counsel appealed the magistrate's order there is a reasonable probability this Court would have ordered the records disclosed.  Given that current counsel has obtained DFACS records that were critical to the defense's penalty phase trial strategy, (*See* Appendix I) it is patent that Petitioner was prejudiced by counsel's deficient performance.

18.  Pretrial, trial counsel filed a Motion to Prevent Death Qualification Voir Dire that the magistrate judge denied. (Doc. 103; 171).  Trial counsel did not appeal the magistrate's ruling.  Consequently, when the issue was raised on appeal, the Court of Appeals found it was "without power to consider the argument."  *United States v. Brown*, 441 F.3d at 1353.  Trial counsel's failure to preserve this issue for appeal denied Petitioner effective assistance of counsel.

19.  Trial counsel also filed a Motion for Bifurcated Voir Dire (Doc. 95) which was denied by the magistrate.  (Doc 171).  Trial counsel did not appeal the magistrate's ruling to this Court and the Eleventh Circuit found that trial counsel's failure deprived them of "jurisdiction to consider the ruling on appeal."  *United States v. Brown*, 441 F.3d at 1353.  Trial counsel's failure to preserve this issue for appeal denied Petitioner effective assistance of counsel.

20.  This Court conducted the questioning during voir dire.  During the

*Witherspoon/Witt* individual sequestered voir dire the Court asked a series of questions in a manner that effectively shifted the burden in the penalty phase to Petitioner.  As to those jurors who actually determined Petitioner's sentence, the Court's questioning can be summarized as follows:

**Charles Capers**:  " Now, you understand you wouldn't have to [impose the death penalty].  You could say well, he was a good son, and he hasn't done bad things or not much, therefore, we should spare his life.  Could you do that? . . . And if the defendant needed not to be put to death, that he needed to be granted – you found him guilty, and there was evidence you thought that justified not taking his life, could you vote for life without parole?" (Tr. 66; 68). [This improperly suggests that death penalty is appropriate absent some countervailing evidence].

**Ms. Cota**: "The jury may consider mitigating factors, that there was something that made the death sentence not the appropriate sentence, but life without parole.  If you felt there [sic] was the appropriate punishment, could you vote for that?" (Tr. 135). [Suggests that there must be something to contradict propriety of death sentence once aggravating factors are established.  In addition, using the term "may" suggests that the jury does not have to consider mitigating factors.].

**Ms. Colson**: "[I]n making that decision, the jury consider aggravating circumstances surrounding the death, and all of the surrounding circumstances.  In other words, if there was something that even though the defendant were guilty that maybe the most appropriate sentence would be life imprisonment without possibility of parole.  Now, could you weigh those factors, aggravating and mitigating circumstances?" (*Id*. at 172)

**Helen McClinton**: "If there were mitigating circumstances, in other words, something about the defendant or the circumstances that you thought that should be considered, could you vote for a sentence other

88

than death?" (*Id*. at 178) [suggests the necessity of mitigating circumstances].

**Rose Mary Taylor**:  "If you are on the jury and you find him guilty, but you consider that there are certain mitigating circumstances that you think speak against the death penalty, could you find him guilty, but impose the lesser sentence of life without benefit of parole?" (*Id*. at 251). [This conveys the impression that absent mitigating circumstances, death is appropriate, as opposed to available].

**Paul Cooper**: "If you are convinced that he is guilty and that the most appropriate punishment would be life imprisonment without benefit of parole, could you vote that for that?"  (*Id*. at 256).

**Patricia Taylor**:  "Now, in making that decision, that jury may consider aggravating circumstances, things that were bad, out of the ordinary bad; or, they may consider mitigating circumstances.  In other words, even though he is guilty, nevertheless, there was something they found good or not so bad, and that a death sentence should not be imposed.  Now, under your oath, would you listen to the evidence, and could you, if you felt that the appropriate sentence was death, could you vote for a death sentence? . . . If you were not convinced, could you vote for life imprisonment without benefit of parole?  (*Id*. at 261). [Using terms "may consider" implies jury does not have to consider mitigation.  Also implies that a life without parole sentence can only be imposed if there is something "good or not so bad."]

**Mr. Polese**: "If you are convinced that he is guilty, but there's something in the background, there is some circumstances that would be a mitigating circumstance, could you vote to spare him death, and give him a life sentence without benefit of parole?" (*Id*. at 335-36). [This is improper suggestion that "sparing" him is only appropriate if mitigating circumstance is found].

**Ms. Knight**: "If you felt like even though he was guilty that was there were mitigating evidence, that is something good or not so bad that made life

89

imprisonment without the possibility of parole the better sentence, could you vote for that, too?" (Tr. 414-415) [improper suggestion of necessity of some evidence to support life sentence].

> **Mr. Little**: "If you decide that there is sufficient mitigating evidence, mitigating meaning less, or something that lessens the impact, could you vote for life imprisonment without benefit of parole?" (*Id*. at 428) [Explicitly states that there must be mitigating evidence to overcome propriety of death sentence].

> **Tamara Brewer**: "And if you were convinced that there were mitigating circumstances that made life imprisonment without benefit of parole the more appropriate sentence, could you vote for that? (*Id*. at 501) [Explicitly states that there must be mitigating circumstances to render life the more appropriate sentence].

Trial counsel never objected to the Court's questioning of these jurors. When the issue was raised on appeal, the Eleventh Circuit found that trial counsel's failure to object resulted in their review being only for plain error. *United States v. Brown*, 441 F.3d at 1354. Trial counsel's failure to object and/or otherwise preserve this error for review was deficient performance that prejudiced Petitioner.

21. During "voir dire" this Court informed juror Ms. Tamara Brewer (juror number 227), "Now, you understand that the defendant has entered a plea of guilty," and she responded that she did. (Tr. 499). Trial counsel did not object to the Court's statement and this erroneous instruction was never corrected. When the issue was raised on appeal, the Eleventh Circuit found that trial counsel's failure to object meant that appellate review would be for plain error. Trial

counsel's failure to object and/or preserve this issue for appeal was deficient performance that prejudiced Petitioner.

22. The record before this Court indicates that Dorothy Rentz, a juror who sat on Petitioner's capital jury, was never asked the *Witherspoon/Witt* questions by the Court or any counsel. During the direct appeal process the court reporter was contacted and she informed the parties that she had checked the tapes and there was nothing there to indicate Ms. Rentz had been questioned. The failure to ascertain Ms. Rentz's opinion on the death penalty on the record deprived Petitioner of his right to due process a reliable sentencing and to be free from cruel and unusual punishment. To the extent the deficient record resulted from trial counsel's failure to ensure that Ms. Rentz was questioned, their performance was deficient and Petitioner was prejudiced.

23. At the penalty phase of Petitioner's trial, the Court gave the following preliminary instruction: "A mitigating factor is any fact or circumstance that might indicate, or tend to indicate, that the sentence of death may not be justified." This instruction, like the Court's questioning during voir dire, presupposes that once a guilty verdict is reached, death is automatically the appropriate punishment and a life sentence can only be imposed if the jurors find mitigation that warrants it. This instruction alone and in conjunction with the Court's voir dire relieved or

lessened the  Government of its burden of proving that a death sentence is appropriate.  The Court's actions deprived Mr. Brown of his right to due process, equal protection and to be free from cruel and unusual punishments.  Trial counsel's failure to object to the court's instruction and voir dire deprived Petitioner of his right to effective assistance of counsel.

24.  During his penalty phase closing, the prosecutor argued:

> the postal inspectors led by Ms. McLendon here, who takes her job seriously, as did every Post Office employee that you saw take this stand, and just like a captain in the United States Army, when they have one of their people down in the field, they're going to bring them back and they're going to do everything they can do lawfully and properly so that justice is done, so that a proceeding like this is conducted by this Judge in a courtroom like this, with equipment like this, so you can make a fair, proper, reasoned, calm decision that follows the law that Judge Edenfield will soon give you . . .

(T. 1036).  This argument was improper in at least two ways.  First, the prosecutor, by making this argument is vouching for the credibility of his key witnesses including case agent, Marla McClendon.  Second, the reference to the U.S. Military, while the United States was engaging in the "War on Terror" after the attacks on the World Trade Center was a deliberate attempt to appeal to the passions and prejudices of the jury.  Trial counsel failed to object to this portion of the prosecutor's closing and thereby rendered ineffective assistance of counsel.

25.  During the trial of the case, the Government introduced the testimony of

92

Matthew Meuller, a DNA expert from Bode Technology Group. Mr. Meuller had done DNA testing on Government's Exhibit #5, a brown jacket obtained during the search of Sadie Brown's residence. During the introductory portion of his testimony, the Government elicited that Bode had done some of the DNA work during and after the September 11, 2001, attacks on the World Trade Center. The elicitation of this irrelevant testimony was a blatant attempt to inflame the passions of the jury. Trial Counsel's failure to object to this irrelevant and prejudicial testimony was deficient performance that prejudiced Petitioner.

26. Later in Mr. Meuller's testimony, the Government questioned him about his findings in relation to DNA evidence found on Government's Exhibit #5. Mr. Mueller testified that, based on his testing, he concluded the DNA found on the exhibit belonged to the victim. After eliciting this testimony, the Government went one step further and asked Mr. Meuller to quantify his results and the following exchange took place:

Q. What were your conclusions or your calculations with respect to the odds of this match?

A. Okay. I'm reading from Page 3 and 4 on the case report. The probability of randomly selecting an unrelated individual with the STR profile associated with Items 07 A and 07 B -- which are the cuttings from the jacket -- is one in 25 quadrillion from the Caucasian population, one in 100 quadrillion from the African-American population.

93

THE COURT:  What is a quadrillion?

A.   Well, a quadrillion is the next line of numbers if you are looking at powers of ten, you have a billions, millions, trillions, and then you have quadrillions. Another way of looking at it is –

THE COURT:  How many people are on earth presently?

A.   Presently on earth, there is roughly 6 billion people.

THE COURT:  Okay.

A.   In the neighborhood of 6.3 billion, I think at the last count I saw.

THE COURT:  And you say it is one in how many quadrillions?

A.   The calculation, yes, is one in 25 quadrillion from the Caucasian population.  And what that refers to is just if in fact that this match was not a true match and you were pulling it randomly this is how many people you would to look at.

THE COURT:  That would be –

A.   That is what that number looks at.

THE COURT:  -- five times the earth's population.

A.   It would be much greater than that.  It is roughly like 9 million times the current population.

(Tr. 873-75).  Trial counsel did not attempt to prevent Mr. Meuller from

quantifying his results and effectively informing the jury that there was absolutely

no chance the DNA could belong to anyone but the victim.[31]  Further, trial counsel failed to object once this testimony and subsequent exchange took place. Counsel's failures constitute deficient performance that prejudiced Petitioner.

28.     Counsel were ineffective for failing to object to a question by the prosecutor to Linda Jones, a schoolteacher.  The prosecutor asked Linda Jones if she was aware that Meier's supposed  IQ was 113.  T. 1130.  She said "no," that school records indicated an IQ of 99.  He asked again: "Were you aware that later on he was tested to have a 113 IQ." *Id.*  She again said "no."  No evidence of a 113 IQ score was introduced.  In closing argument, defense counsel stated "They talked about my client having an IQ of 113.  And I don't know if this is the case or not.  But I will say this.  My client doesn't have the ability to organize a murder." T. 1187.

29.  School records show that Meier's IQ is not above averge.   Testing at Butner by Government experts put his IQ at 90.  Appendix K.  Trial counsel's statement in closing argument that he did not know what his client's IQ was was unreasonable and prejudicial.[32]

---

[31]Especially in light of the subsequent revelation that Bode has a documented history of mistakes.  *See* Claim XI, *infra*.

[32]The jury foreman, Bruce Little, has provided his notes from jury service. Beside Linda Jones' name he has written "113 IQ Above Average."  Appendix O.

30.  Trial counsel's own closing argument at the penalty phase of the trial was deficient.  In his closing, counsel made disparaging remarks about his client, told the jury that even he could not forgive Meier for what he had done, and remarked how he hated to be before the jury arguing for Mr. Brown's life.

31.  Specifically, trial counsel argued: "We're not talking about forgiveness in this case either.  You know, there is only one person that can forgive that man.  And she's dead.  You can't forgive him. I don't forgive him.  *They don't forgive him*.  We shouldn't forgive him."  Tr. 1182.   Not only did counsel instruct the jury not to forgive (*i.e.*, do not sentence Petitioner to life), he misinformed the jury that the victim's family had not forgiven Meier when he knew the victim's husband had communicated his acceptance of the guilty plea to the prosecutors.  *See* Claims I and II, *supra*.

32.  Next, trial counsel, a moment later, referred to Mr. Brown as "the Killer."  Tr. 1184.  Finally, trial counsel informed the jury just how much he disliked representing the "killer" who should not be forgiven when he said: "I hate these days.  I've done this before and I absolutely hate it."  Tr. 1180.

33.  In addition to the above, trial counsel's ineffectiveness includes, but is not limited to, the following:

> *      Counsel failed to conduct an adequate pretrial investigation

into the Government's case and defenses available to Petitioner;

* Counsel failed to make adequate and timely requests for continuances in order to prepare for trial and failed to make use of time available to adequately investigate and prepare for trial;

* Counsel failed to make timely requests for the assistance of investigative and expert support;

* Counsel failed to make sufficient showing of need to obtain funds for expert assistance;

* Counsel failed to adequately use the investigative tools and services to which counsel had access;

* Counsel failed to provide the mental health experts with sufficient information so as to allow the experts to conduct a complete, accurate and reliable mental health evaluation;

* Counsel failed to demand that the Government make timely discovery disclosures;

* Counsel failed to obtain all records and files in the possession of government agencies to which Petitioner was entitled;

* Counsel failed to ensure that an adequate examination of potential jurors with regard to their understanding of the presumption

of innocence, potential bias regarding the death penalty and other issues during voir dire;

\* Counsel failed to adequately challenge the trial court's improper excusal of certain jurors for hardship reasons, failed to challenge jurors or the trial court's refusal to excuse certain jurors for cause;

\* Counsel failed to make proper *Witherspoon/Witt* objections;

\* Counsel failed to raise a challenge to the jury selection based on *Batson v. Kentucky* or *JEB v. Alabama*;

\* Counsel failed to make proper and meritorious challenges for cause;

\* Counsel failed to object to the admission of several items of evidence and testimony offered by the Government during the guilt/innocence and sentencing phases of trial and permitted the jury to receive and consider evidence that was improper, inadmissible, prejudicial, irrelevant, and/or false;

\* Counsel failed to raise proper and timely objections to improper prosecutorial argument at both phases of the trial, *See, i.e.,* Claim VI;

\*      Counsel failed to present a closing argument which adequately and meaningfully discussed the evidence favoring Petitioner;

\*      Counsel failed to prepare and adequately examine the defense witnesses called during the sentencing phase;

\*      Counsel failed to present material evidence that was reasonably available to counsel during Petitioner's guilt/innocence and aggravation/mitigation trials;

\*      Counsel failed to adequately cross-examine the Government's witnesses, including but not limited to the failure to impeach, the failure to explore questions of bias and motive on the part of the witnesses, the failure to correct or prevent false testimony;

\*      Counsel failed to present its case and arguments to the jury in a logical, effective manner;

\*      Counsel failed to adequately object and litigate that the trial court not charge the jury with inappropriate and inapplicable instructions in the guilt/innocence trial;

\*      Counsel failed to request and litigate appropriate and applicable jury instructions at the guilt/innocence and sentencing trials;

\*      Counsel failed to object to those portions of the trial court's charge which misled the jury;

\*      Counsel failed to make informed and competent opening statements and closing arguments in the guilt/innocence and aggravation/mitigation trials;

\*      Counsel failed to adequately prepare Petitioner's witnesses, failed to elicit relevant, mitigating evidence that the witnesses possessed, and failed to limit the scope of their testimony to relevant, mitigating evidence;

\*      Counsel failed to give, during the guilt/innocence trial, a closing argument prior to the prosecution's closing argument;

\*      Counsel failed to adequately object to and litigate the improper admission of certain evidence, including but not limited to photographs;

\*      Counsel failed to subpoena documents and witnesses in a timely and adequate manner;

\*      Counsel failed to adequately protect Petitioner's constitutional rights during all stages of Petitioner's trial, including, but not limited to, Petitioner's rights under the Confrontation Clause;

\*      Counsel failed to adequately object to and litigate improper testimony, including, but not limited to, testimony that was hearsay, irrelevant, cumulative, outside the personal knowledge of the witness, and testimony that was highly prejudicial;

\*      Counsel failed to object to improper and prejudicial statements made by the Government during opening and closing arguments of both the guilt/innocence and sentencing phases of the trial;

\*      Counsel failed to ensure that Petitioner was present for all proceedings;

\*      Counsel failed to ensure that all evidence in this case be preserved for use during Petitioner's habeas corpus proceedings;

34.  To the extent issues were preserved by trial counsel but not raised on direct appeal, appellate counsel were ineffective and their deficient performance prejudiced Petitioner in that appeal.  To the extent that plain error was not raised on appeal by appellate counsel, appellate counsel rendered ineffective assistance.

## CLAIM X

### THE GOVERNMENT SUPPRESSED INFORMATION FAVORABLE TO THE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION

This claim is evidenced by the following facts:

1.  All other allegations in this Petition are incorporated into this claim by specific reference.

2.  In the possession of the Government, and not disclosed to the defense, was a draft of an affidavit in support of a search warrant for Petitioner's mother's trailer.   On the draft were seventeen typewritten paragraphs and a series of handwritten notations.  Appendix X.  The draft containing the notes was not disclosed to the defense.   The final affidavit that was submitted to the Court in support of the search warrant (Appendix U) was turned over to the defense.

3.  A comparison of the draft and the final reveals that the Government was in possession of information favorable to the defense and did not disclose said information.  The suppressed draft affidavit contained a paragraph directly relevant to mitigation – life in the deplorable conditions Petitioner was raised.  In particular, the suppressed document indicates that Marla McClendon, the case agent for the Government, would have testified under oath that:

> During my investigation into this matter, I have coordinated closely with members of the Liberty County Sheriff's Department, Hinesville, Ga. They have reported to me during the past several years they have had many occasions to meet with and interview various occupants of the residence described in this affidavit. *It is the collective opinions (sic) of these local law enforcement officers that on nearly every instance there was excessive amounts of alcohol or illegal substances in use by persons residing or visiting the residence. On many of these occasions, the purpose of the visits by law enforcement were for crimes of violence in which weapons were often used to inflict serious harm to other persons at or in the residences.* On almost every occasion, persons in the residences routinely flee at the site (sic) of arriving law enforcement officers.

Appendix X (emphasis added). This information was not contained in the final affidavit disclosed to the defense and presented to the Court. Had this evidence been disclosed there is a reasonable probability the outcome of the sentencing would have been different.[33] The failure to disclose violated the Fifth, Sixth and Eighth Amendments.

---

[33]The Government also failed to disclose the identity of the CS to defense counsel who, had they been advised of his identity, could have conducted an investigation into his background to determine if he was reliable and if he was in position to obtain the information he purported to have.

**CLAIM XI**

**MR. BROWN'S CONVICTIONS AND DEATH SENTENCES WERE IMPOSED BASED UPON UNRELIABLE DNA EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

This claim is evidenced by the following facts:

1. All other allegations in this Petition are incorporated into this claim by specific reference.

2. At trial, the Government presented testimony and evidence that blood was found on the sleeve of a jacket obtained from a search of Petitioner's mother's home. This sample was submitted for DNA testing to Bode Laboratories where it was determined the blood on the coat belonged to the victim, Sallie Gaglia. The Government's expert, Matthew James Meuller, a Bode employee, testified that based on the laboratory's testing, there was a "one in 25 quadrillion from the Caucasian population, one in 100 quadrillion from the African-American population" that the match was in error.

3. Since that time it has been determined that analysis done at the Bode laboratories is unreliable. *See*, Illinois: STATE POLICE CANCEL DNA ANALYSIS PACT, Crime Control Digest, Aug 26, 2005. Because of Bode's incompetence, the State of Illinois revoked its contract with the company and

admitted that approximately 1,200 samples that Bode had previously tested in the criminal context, would have to be retested.

4. Because it has been determined that testing done at the Bode laboratories is unreliable, critical evidence of Petitioner's guilt is similarly unreliable and a conviction and/or death sentence cannot be predicated upon such unreliable evidence.[34]

**CLAIM XII**

**PETITIONER'S CONVICTIONS AND DEATH SENTENCE WERE UNCONSTITUTIONALLY OBTAINED AS A RESULT OF AN UNRELIABLE COERCED CONFESSION IN VIOLATION OF *MIRANDA V. ARIZONA*, AND THE FIFTH, SIXTH, AND EIGHTH  AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COUNSEL INEFFECTIVELY PRESENTED THIS ISSUE**

This claim is evidenced by the following facts:

1. All other allegations in this Petition are incorporated into this claim by specific reference.

2. Petitioner challenged the admissibility of statements he made to law

---

[34]To the extent trial counsel could have determined that the results of testing done by Bode Laboratories was unreliable, trial counsel performed deficiently. Further, had trial counsel performed reasonably and uncovered Bode's unreliability, there is a reasonable probability that the jury would not have found Petitioner guilty.  However, assuming *arguendo* the jury did find him guilty, the there is a reasonable probability that without the unreliable DNA testimony, the jury would not have recommended a death sentence.

enforcement agents on December 5 and 6, 2002.  He contended that these statements were obtained in violation of *Miranda v. Arizona*, and were involuntary.  A Motion to Suppress was filed and an evidentiary hearing was conducted on July 9, 2003.

3.  The evidence offered by the government during the July 9, 2003 hearing on the Motion To Suppress consisted of the testimony of four agents who participated in the search of the premises and the interrogation of Mr. Brown on December 5 and December 6, 2002.  There were three separate (though closely related) statements made by Mr. Brown:  First, the defendant was questioned over the course of several hours in the dining room of the residence of his girlfriend prior to being advised of his *Miranda* rights.  Immediately after he made a statement implicating himself in the robbery and homicide, he was formally arrested, then *Mirandized*, and he then gave a second statement that mimicked the first statement.  He was then brought to the Liberty County jail and housed overnight.  He was interrogated a third time the next morning, December 6, 2002 while still at the Liberty County jail, prior to being brought to the Magistrate for his first appearance.

4.  Prior to the encounter with Mr. Brown at the residence of his girlfriend, Diane Brown, there had been two prior contacts between Mr. Brown and the

police.  On both occasions – both of which were just days prior to the day the statements were made – Mr. Brown signaled his unequivocal desire not to talk to the police.  On one occasion, he expressly told the police that he did not want to talk to them, and when the police called him on the phone to ask some questions, he hung up the phone.

5.  Agent James Thomas Rushwin was a member of the task force that was investigating the murder of Sally Louise Gaglia.  (Tr. 30-31). On December 5, 2002, he participated in the search of the residence of Diane Brown at 131 Laurel Wood Drive.  (*Id.* at 31).  Seven law enforcement agents arrived to conduct the search.  *Id.*  There were two Chatham County officers in uniform; two postal inspectors wearing vests labeled "POLICE" and badges, one Liberty County officer, among others. (*Id*. at 32). When the officers approached the front door, the defendant opened the door.  (*Id*. at 33, 115).  Some of the officers were at the front door, while others were guarding the sides of the house.  (*Id*. at 66).  One officer remained in the front yard, visibly holding a shotgun (*Id*. at 64) and others also had their guns drawn (*Id*. at 120).  The officers promptly identified themselves as police and asked Diane Brown, who was sitting in the living room whether they could talk to her about searching the residence.  (*Id*. at 33).  Brown, according to the police, consented to a search, remarking that she was a corrections officer.  (*Id.*

at 34). Diane Brown signed a written consent to search form that was presented to her by the agents.

6. While Agent Rushwin was talking to Ms. Brown about signing the form, Mr. Brown remained in the living room with other agents for approximately 15-20 minutes (*Id*. at 37; 117). As the search commenced, Agent Rushwin located a pair of sneakers in Ms. Brown's bedroom which the agent believed matched the print that was lifted from the crime scene. (*Id*. at 39). He placed the sneakers back and then returned to the living room where Mr. Brown was still sitting, smoking a cigarette. (*Id*. at 40). Rushwin identified himself and explained that he was investigating the murder of Ms. Gaglia at the Fleming Post Office. He further stated that he was talking to everybody who might have been at the post office that day. (*Id*. at 41). Mr. Brown said that he would talk to them. *Id*. Rushwin also testified, "I advised him that he was not in custody. He wasn't under arrest, and that he was free to go at any time." *Id*.

7. Rushwin, however, did not want to conduct the interview at the home. Instead, he stated that the interview would occur at the Chatham County Police Department. *Id*. Rushwin testified that Mr. Brown responded, "Yes, I'll go. . . I have to get a pair of shoes on." Mr. Brown then headed into the bedroom where the sneakers had been found earlier. Rushwin would not let him go alone,

however, advising him, "I was coming with him. And I said for my safety and yours, for safety reasons." (*Id*. at 42). As they got into the bedroom, Agent Rushwin further advised Mr. Brown that he could not put on those sneakers, because he had already looked at them and they looked similar to the pattern of the shoe prints lifted from the Fleming Post Office and that they were being taken as evidence. (*Id*. at 42; 72). Rushwin then asked if he would go in his stocking feet, to which Brown responded, "No." (*Id*. at 43).

8. Rushwin then decided to question him at the house. *Id*. However, because the agents had decided that Officer Woodall with Chatham County police should participate in the interview, the interview did not begin for another forty minutes, while they remained in the house. (*Id*. at 44; 78-79). Rushwin stated that he again advised Mr. Brown that he was not under arrest, that he was free to go and was not in custody and repeated this again after Officer Woodall arrived. (*Id*. at 44 - 46). Nevertheless, whenever Mr. Brown moved from one room in the house to another during the nearly six hours prior to his formal arrest, he was accompanied by an agent at all times. (*Id*. at 69; 75).

9. Mr. Brown then made a statement that acknowledged that he had gone to the post office the morning of the murder. (*Id*. at 46-48). His story was inconsistent, however, and included, at first, a denial that he had gone the post

109

office twice, but he later, acknowledged a second trip to the post office. (*Id*. at 48).

10. At some point during the interview, the group moved to another room in the house, because there were several officers conducting the search and Diane Brown and Mr. Brown were making eye contact that disrupted the interview process. (*Id*. at 49-50).

11. During the course of the interview, at one point Office Woodall left and another postal inspector joined the interrogation and advised Mr. Brown that the officers did not believe that he was telling the truth. (*Id*. at 51; 118-119). This "good cop – bad cop" routine was strategically planned by the interrogating officers. (*Id*. at 118).

12. Mr. Brown did not reply, the other officer left and Woodall returned. (*Id*. at 52). Also during the interview, the officers told Mr. Brown, "You know, we found things in the house that indicates someone here is involved. And you know, you say you are not involved. You say Ms. Brown is involved (sic) You know, but things we have found indicate differently." (*Id*. at 54).

13. Thereafter, Mr. Brown confessed. He stated he went there to rob the postal clerk, not to kill her; that while jumping over the counter with the knife, he slipped and fell into her with the knife, killing her. (*Id*. at 53). Even after making

this statement, the officers stated to him again that he, "could do what he wanted to do, as he had been told throughout the interview." (Doc. 185 at 9).

14. During the course of the confession, Mr. Brown stated that he couldn't talk about the actual killing anymore and would discuss that the next day with the officers. (Doc. 302 at 56). The interrogation continued, however, after which Mr. Brown acknowledged that he took money from the victim's purse. (*Id*. at 56-57).

15. Needless to say, shortly after defendant's statement concluded, he was formally arrested. (*Id*. at 58).

16. Then, for the first time, at 9:17 p.m. – more than five and one-half hours after the seven agents arrived at the residence – Mr. Brown was advised of his *Miranda* rights. The agents then re-interrogated Mr. Brown, reviewing the entire confession that he had just given, including additional questions about the shoes that he was wearing that day. (*Id*. at 59).

17. The next morning, December 6, 2002, Officer Woodall and the postal inspectors met with Mr. Brown in the Liberty County jail and expressly told him that they "needed to go back over what he had discussed previously." (*Id*. at 87). He was then advised of his *Miranda* rights, which he waived and his statement to the police was then tape recorded.

18. At the conclusion of the government's evidence at the hearing on the

Motion to Suppress, Mr. Brown testified. (*Id*. at 123). He testified that when he answered the knocking at the door, the officer had his gun drawn and announced: "police, search warrant." (*Id*. at 124). He was ordered by an officer to sit down in a chair. *Id*. He testified that he was not free to move about the house at will (*Id*. at 125). While sitting on a chair in the middle of the living room (where the officer placed the chair), he could see the officer outside the window in the front yard with a shotgun.

19. Mr. Brown's testimony was corroborated at trial by the testimony of Diane Brown, who testified for the government. She testified that the officer kept banging on the door prior to coming in, and that when Mr. Brown opened the door, several officers came in with "guns drawn." (Doc. 292 at 752). "And when I [opened the door], that's when they rushed in. And they – one of them snatched the chair from my dining room table snatched it around and told Jason to sit there and don't move. . . Oh, it was very frightening." (*Id*. at 753).

20. Ms. Brown was subpoenaed to the suppression hearing but for some reason, failed to appear. Trial counsel was ineffective for failing to ensure that Ms. Brown was present to give testimony on this subject. On appeal, Mr. Brown asserted that the reviewing Court should consider Ms. Brown's testimony presented only at trial when reviewing the decision on a Motion to Suppress. *See,*

*United States v. Villabona-Garnica*, 63 F.3d 1051 (11th Cir. 1995); *United States v. Ramirez-Chilel*, 289 F.3d 744 n.5 (11th Cir. 2002). However, the Circuit Court pointed out that trial counsel never asked the district court to reconsider its earlier decision in light of Ms. Brown's testimony at trial. Trial counsel's failure to seek the district court's reconsideration in light of the new testimony presented at trial was deficient performance and Petitioner was prejudiced thereby in that had counsel performed competently there is a reasonable probability the outcome of the Motion to Suppress would have been different. If not for the Government being able to introduce evidence of Mr. Brown's purported confession, there is a reasonable probability that the jury would not have returned a verdict of guilty. However, assuming *arguendo* the jury did find Petitioner guilty, without the purported confession there is a reasonable probability that the jury would not have recommended a sentence of death.

21. It is clear that Mr. Brown was in custody immediately upon law enforcement entering Diane Brown's residence. The questioning that occurred in the home was clearly custodial and the fact that *Miranda* warnings were not administered renders any statements obtained during the questioning of December 5, 2003, unconstitutional. Further, any statement subsequently obtained on December 6, 2003, was tainted by the illegality of the December 5, 2003 arrest and

113

unconstitutional questioning and should likewise be suppressed.

## CLAIM XIII

**PETITIONER'S CONVICTIONS AND DEATH SENTENCE WERE IMPOSED BASED UPON UNRELIABLE EYEWITNESS IDENTIFICATIONS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

This claim is evidenced by the following facts:

1. All other allegations in this Petition are incorporated into this claim by specific reference.

2. At trial the Government introduced the testimony of Frank Kania and Chris Bowen who purportedly identified Mr. Brown as the person who they saw in the vicinity of the post office in and around the suspected time of the murder. Mr. Bowen, upon being shown a photo array, pointed to the photo of Petitioner and said "if anything, I would have to say this fella right here." Similarly, Mr. Kania, upon being shown the photo array, said "I'm leaning towards that one he was a slender fella."

3. Neither of these identifications was reliable and neither person affirmatively identified Petitioner as the person they saw in and around the post

office at the time Ms. Gaglia was killed.[35]  Therefore, Petitioner's convictions and

death sentence were predicated upon unreliable evidence in violation of the Fifth,

Sixth, and Eighth Amendments to the United States Constitution.

## CLAIM XIV

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO BE PRESENT AT ALL PROCEEDINGS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

This claim is evidenced by the following facts:

1.  All other allegations in this Petition are incorporated into this claim by

specific reference.

2.  A criminal defendant has the right to be present at all proceedings during

his capital trial.  *United States v. Parrish*, 427 F.3d 1345, 1348 (11th

Cir.2005)("Under the Due Process Clause, a defendant is guaranteed the right to

be present at any stage of the criminal proceeding that is critical to its outcome if

---

[35]To the extent trial counsel failed to properly litigate this issue at trial, counsel rendered ineffective assistance of counsel.  Had trial counsel properly litigated this issue, there is a reasonable probability that, without this eyewitness identification, the jury would not have found Petitioner guilty.  Moreover, even assuming *arguendo* the jury would have returned a guilty verdict, there is a reasonable probability that they would not have recommended a death sentence.  Further, to the extent this issue was preserved at trial and was not raised on direct appeal, appellate counsel performed deficiently and had the issue been raised on direct appeal there is a reasonable probability the outcome of the proceeding, *i.e.,* the conviction would not have been affirmed.

his presence would contribute to the fairness of the procedure." *See also*, F.R.Crim.Pro. 43.

3. On September 9, 2003 , the district court conducted a hearing wherein trial counsel discussed a number of critical issues, including funding for a future dangerousness expert (PTC at 6-7), introduction of evidence concerning Mr. Brown's offer to plead guilty (*id*. at 8-11), the decision not to present mental health evidence in mitigation (*id*. at 28-29), and a rather lengthy discussion between the Court and defense counsel about how they intended to thwart any ineffective assistance of counsel challenge in post-conviction proceedings. (*id*. at 35-38). The Court even went so far as to indicate he would require Mr. Brown to affirm he voluntarily waived his right to testify on the record in order to protect counsel. (*Id*. at 38). Petitioner was not present at this proceeding.

4. Further, Petitioner was not present for bench conferences and other critical stages of the proceedings wherein relevant and critical issues were discussed and decided.

5. Petitioner's absence from various aspects of his capital proceedings deprived him of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.[36]

_____

[36]To the extent Petitioner's absence from various stages of the proceedings was a result of trial counsel's failure to ensure his presence, trial counsel rendered

## CLAIM XV

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION VIOLATES THE EIGHTH AMENDMENT**.

This claim is evidenced by the following facts:

1.  All other allegations in this Petition are incorporated into this claim by specific reference.

2.  Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution.  This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

3.  While Petitioner's belief that the execution under the current Bureau of Prison protocols would violate the Eighth Amendment, he believes that for two reasons this challenge is not appropriate at this time, or in this pleading.

4.  First, since Petitioner's execution is far from imminent, the question is

constitutionally ineffective assistance of counsel.  To the extent trial counsel preserved this issue for appeal but appellate counsel failed to raise the issue of presence on appeal, appellate counsel was likewise ineffective.

117

not yet ripe.

5. Second, since the Supreme Court's decision in *Hill v. McDonough*, 126 S.Ct. 2096 (2006), a challenge to lethal injection can properly be brought in a separate civil rights action under 42 U.S.C. § 1983.

6. Petitioner will litigate this Eighth Amendment challenge in whatever forum is deemed appropriate. It would seem like a waste of resources to litigate it at this time, inasmuch as Petitioner believes he will not be executed, but instead he is entitled to relief. Petitioner nonetheless raises the claim herein to avoid a later claim of waiver, and he will amend it should either the Court or Government believe it should be litigated now.

### CLAIM XVI

**PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A RELIABLE CAPITAL SENTENCING PROCEEDING WHEN JUROR DOROTHY RENTZ WAS SEATED WITHOUT THE TRIAL COURT OR COUNSEL EXPLORING HER ATTITUDES ON THE DEATH PENALTY IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION**

This claim is evidenced by the following facts:

1. All other allegations in this Petition are incorporated into this claim by specific reference.

2. During the capital proceedings in this case, this Court determined it

would conduct all individual sequestered voir dire of jurors attitudes toward the death penalty.  In that regard, the Court, with counsel and the defendant present, individually questioned each juror, ***with the exception of Dorothy Rentz*** concerning their attitudes about the death penalty.  For some inexplicable reason, Ms. Rentz was never individually brought before the Court, counsel, and Petitioner and asked the *Witherspoon/Witt* type questions required by the Eighth Amendment.  Trial counsel were ineffective for not ensuring that this juror was qualified as a juror.

## CLAIM XVII

**PETITIONER WAS DENIED HIS RIGHT TO MEANINGFUL APPELLATE REVIEW BECAUSE OF AN INCOMPLETE RECORD COMPILED BY THE DISTRICT COURT IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION**

This claim is evidenced by the following facts:

1.  All other allegations in this Petition are incorporated into this claim by specific reference.

2.  After voir dire of all of the jurors, the Court and counsel retired to another room outside the presence of the jurors and each side exercised its peremptory strikes.  That process was not recorded thereby depriving Petitioner of his right to meaningful appellate review.  It also denied appellate courts the

119

opportunity to review challenges under *Batson*.

3.  As noted above, there is nothing in the record to indicate that Dorothy Rentz was questioned about her views on the death penalty.  Inquiry was made of the court reporter who indicated that she had reviewed the tapes (presumably audio) and found no such questioning.  Assuming *arguendo*, Ms. Rentz was questioned and that colloquy was not recorded, Petitioner was deprived of his right to meaningful appellate review.

## IV.  CONCLUSION AND PRAYER FOR RELIEF

Wherefore, Petitioner MEIER JASON BROWN, respectfully prays this Court will:

1.  Vacate his unlawfully obtained conviction and death sentence;

2.  Order that Mr. Brown be relieved from the illegal restraint of his liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence;

3.  Permit Mr. Brown a sufficient period of time within which to file such amendments to this Motion as might be necessary to bring all proper matters before the Court and avoid piecemeal litigation of his challenges to the legality and constitutionality of his death sentence;

4.  Grant Mr. Brown an evidentiary hearing on all claims contained herein;

5.  Pursuant to Rule 6 of the Rules Governing Section 2255 Cases in the United States District Courts, grant Mr. Brown leave to pursue such discovery as would be available under the Federal Rules of Civil

Procedure, pending a hearing on his claims; and

6.      Grant such other relief as law and justice require.[37]

Dated, this the 22nd day of January, 2008.

                Respectfully submitted,


                *s/Jeffrey L. Ertel*
                JEFFREY L. ERTEL
                State Bar No. 249966

                FEDERAL DEFENDER PROGRAM, INC.
                100 Peachtree Street
                Suite 1700
                Atlanta, Georgia 30303
                (404) 688-7530
                jeff_ertel@fd.org

                ATTORNEY FOR MR. BROWN
                *Pro Hac Vice*

---

[37]Out of an abundance of caution Petitioner is attaching, as Appendix Y, a completed form as provided in the appendix to the Rules Governing Section 2255 Proceedings.

CERTIFICATE OF ACCURACY/AUTHORITY

I, Jeffrey L. Ertel, Ga. Bar No. 249966, swear under penalty of perjury that the forgoing is true and correct.  I also swear under penalty of perjury that I am authorized to file this Motion on behalf of Mr. Brown.

Dated, this the 22nd day of January, 2008.


s/ Jeffrey L. Ertel

CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of the foregoing has been served upon counsel for Respondent, by placing a copy of same in the United States Mail, first class postage prepaid and addressed as follows:

Amy Lee Copeland, Esq.
Assistant United States Attorney
P.O. Box 8970
Savannah, Georgia 31412

Dated, this the 22nd day of January, 2008.

*s/Jeffrey L. Ertel*