# APPENDIX I-3

CONTACT SHEET

PAGE NO. _____

CASE NAME: _____    CASE ID NO.: _____

| Date<br>Staff Member<br>Type Contact/Activity | Individual(s) Contacted, Purpose, Content, and/or Results of Contact | |
|---|---|---|
| | TARGETED CASE MANAGEMENT | |
| | CLIENT: *Keon Bizzard* | |
| | MEDICAID# | |
| | BEGINNING DATE: | |
| | | |
| | This child/adult is in need of on-going services, | |
| | including targeted case management to provide | |
| | access to needed medical and related services in | |
| | order to meet defined needs and the delivery of | |
| | services prescribed in his/her case plan. | |
| | | |

Form 451 (Rev. 10-93)

Georgia Dept. [ ] nt of Human Resources
CHILD PROTECTIVE SERVICES

# FETY PLAN

| NAME: | CASE WORKER: | DATE: |
|---|---|---|
| ary Bizzard | Deborah Sawyer | 7-21-94 |

MARIZE THE ACTIONS, STEPS, SERVICES OR REFERRALS NEEDED TO CONTROL EACH MALTREATMENT / RISK

IFY WHO DOES WHAT, WHEN, HOW OFTEN AND WHERE.

TREATMENT / SAFETY ISSUE: Child left unattended for long eriods of time without an adult caretaker.

S: (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

Agency will assist Ms. Bizzard as with obtaining child care for Keon.

Mrs. Bizzard will return to Liberty County to live to provide care for Keon when she is not working or arrange for Keon to be left with a mature adult. Ms. Bizzard will ensure Keon completes Summer School. Child care will commence this date.

TREATMENT / SAFETY ISSUE: Same as above

S: (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

Ms. Bizzard will complete all forms necessary for child care for Keon.

Ms. Bizzard will apply for child medicaid for Keon.

Ms. Bizzard will obtain medical treatment for Keon for migraine headaches and sign release for Agency to obtain information.

SS (4-91)

PAGE ___ OF ___

MALTREATMENT / SAFETY ISSUE: — *Same as above* —

STEPS:       (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

1. Ms. Bizzard will work on cleaning the home daily. The home will meet minimum standards by 7-29-94.

2. Agency will assign a homemaker to assist with home management and teaching housekeeping skills.

3. Ms. Bizzard will cooperate with worker.

MALTREATMENT / SAFETY ISSUE: — *Same as above* —

STEPS:       (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

1. Mr. Brooks will move out of the home effective this date.

2.

3.

DATE DISCUSSED WITH PARENT(S)    7-21-94          AGREEMENT   ☒ YES   ☐ NO

COMMENTS: This family will receive Targeted Case Management Services to assist the family in gaining access to and managing needed medical, nutritional, social, educational, transportation, housing and other services.

| PARENT/GUARDIAN: | DATE: | SUPERVISOR: | DATE: |
|---|---|---|---|
| PARENT/GUARDIAN: Mary A. Regan | DATE: | WORKER: Deborah A. Sawyer | DATE: 7-21-94 |

Form 455 (4-91)                                                    PAGE          OF

## ADDITIONAL INFORMATION

1. Was Confidentiality preserved and explained?  ✓ Yes ___ No

   A. The identity of the reporter is not shared with the subject of the report. The reporter is given an explanation of his or her right to immunity to liability suits if the report is made in good faith. Also an explanation is given that he or she may be asked to appear in court if court action is necessary to protect the child.

   B. If reporter is mandated, is letter attached?

      ✓ Yes ___ No ___ N/A

2. Does a prior Social Services case exist?

   Case Found _____   Case Not Found ✓

3. Is case currently active for CPS or PLC?  If so, case record is attached.

   ___ Yes ✓ No ___ N/A

4. Were the PA (Food Stamp or AFDC) Files found and copy of basic data given to worker?

   Case Found _____   Case Not Found _____

   Attached ✓ Yes ___ No ___ N/A

Comments: _____
_____
_____
_____
_____
_____

## Georgia Department of Human Resources
## CHILD PROTECTIVE SERVICES
# INTAKE WORKSHEET

Date Received: 7/19/94    County: _Liberty_

Time Received: 8:30 AM.    Case #: 089-14188

Received By: C. Freeman

**PARENT OR HEAD OF HOUSEHOLD:**     **(EMPLOYMENT REVERSE SIDE)**

| MOTHER: LAST | FIRST | AGE | DATE OF BIRTH | RACE |
|---|---|---|---|---|
| Bizzard | Mary | | | B |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| Rte 2 Box 2m. | Midway | Grand Mathee Morga 884-5244 Bennett |

| FATHER: LAST | FIRST | AGE | DATE OF BIRTH | RACE |
|---|---|---|---|---|
| | | | | |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| | | |

| OTHER CARETAKER: LAST | FIRST | AGE | DATE OF BIRTH | RACE | RELATIONSHIP |
|---|---|---|---|---|---|
| | | | | | |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| | | |

Direction's to Parent's Home: Make left on Hwy 17 off 84 past Ida Mae + Joe's Cross two little bridges 1st house on rte.

| CHILD DATA: NAME | SEX | AGE | DATE OF BIRTH | RACE | MAL-TX | SCHOOL | WHEREABOUTS |
|---|---|---|---|---|---|---|---|
| 1. Bizzard Keon | m | 11 | 8/18/82 | B | N | Hinesville middle school | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |

**REPORTER INFORMATION:**

NAME: Frankie Thompson    RELATIONSHIP: Guidance Counselor.

ADDRESS: Hinesville Middle School 307 E Washington Ave    TELEPHONE: 876-8251

CONFIDENTIALITY EXPLAINED: YES ☐  NO ☐    MANDATED REPORTER LETTER  YES ☐  NO ☐

DISPOSITION: WITHIN 24 HOURS ☐    5 WORK DAYS ☒

SCREENED OUT: ☐    REASON: _____

| SUPERVISOR: HM | DATE: 7/19/94 | WORKER: NA Holtzclaw |
|---|---|---|

PAGE 1

## EMPLOYMENT INFORMATION

**MOTHER:**

| EMPLOYER: *Cracker Carrell* | ADDRESS: |
|---|---|
| PHONE: *912/ 927-6559* | SHIFT / SCHEDULE: |

**FATHER:**

| EMPLOYER: | ADDRESS: |
|---|---|
| PHONE: | SHIFT / SCHEDULE: |

**OTHER CARETAKER EMPLOYER:**

| EMPLOYER: | ADDRESS: |
|---|---|
| PHONE: | SHIFT / SCHEDULE: |

**OTHER EMPLOYMENT INFORMATION:**

Form 453 (4-91)    PAGE 1    *REVERSE SIDE*

 

**MALTREATMENT REFERRAL:**    WHAT FORM OF MALTREATMENT IS APPARENT?  CLARIFY WHO DID WHAT, WHEN, HOW OFTEN AND WHERE. WHAT ARE THE CIRCUMSTANCES SURROUNDING THE MALTREATMENT?

Child reported to three adults at summer school that his mother is living in Savannah with a friend for some time. Child was living with step father but he moved out of the home yesterday and there is no adult to provide supervision.

There is a older brother and sister living with other relatives.

The 17 yr. old sister is supposed to move back home and care for the child. Reporter is unaware of whether 17 yr. old can provide adequate supervision and offer medical treatment to child in light of his medical problems.

**CHILD INFORMATION:** HOW DOES THE PARENT DESCRIBE THE CHILD? HOW DOES THE CHILD BEHAVE? WHAT IS THE STATUS AND VULNERABILTIY OF THE CHILD?

Child has migraine headaches which make him vomit. The migraines are regular and he has dizzy spells frequently. Child reports taking Tylenol but it doesn't help.

**PARENT INFORMATION:**    WHAT ARE THE BEHAVIORS, FEELINGS, LEVEL OF COPING AND PROBLEM-SOLVING BY THE PARENT? WHAT IS THE HISTORY OF THE PARENT? HOW DO THEY RELATE TO OTHERS?

_____

_____

_____

_____

_____

**FAMILY INFORMATION:**    DESCRIBE THE COMPOSITION OF THE FAMILY, ITS HOME AND SURROUNDINGS.  HOW DOES THE FAMILY FUNCTION?

_____

_____

_____

**INTERVENTION INFORMATION:**    WHAT MIGHT INCREASE INTERVENTION EFFECTIVENESS?  HOW WILL THE FAMILY RESPOND TO INTERVENTION?

_____

_____

_____

LIST HIGH RISK INDICATORS ASSOCIATED WITH NEED FOR IMMEDIATE RESPONSE:

_____

_____

OTHER SOURCES OF INFORMATION REGARDING THE FAMILY:

_____

_____

_____

_____

_____

CASE-NUM: 47474  AFDC                          CNTY: 089  OFF: 114  SUP: 100  LOAD: 9
********  CASE-NAME / ADDRESS  *********            ****** CASE-STATUS *****
    LATOYA      T BIZZARD                          *         CODE: 6-ACTIVE
                                                   *        AS-OF: 050194
    RT. 2 BOX 2M                                   *       REASON: 027-RSM CHL
    MIDWAY          GA          313209601          *      BENEFIT:        $0
                                                   *     BENE-CHG: 040594
  PHONE: 000-000-0000                              *       ISSUED: 00/00
CENSUS:                                            *     HOLD-REA:
ETHNIC: 2-BLACK                                    *     HOLD-DTE:
                                                   *   PREV-STAT: 2-INT ELIG
                                                   *   PREV-BENE:        $0

*******************************  CASE NON-FINANCIAL  ****************************
  HOME-VISIT-DATE: 020894                          INIT-APP-DATE: 013194
                                                  INIT-INTV-DATE: 020894
  REDET-INTV-DATE:                               CLASS-OF-ASSIST: 24-RSM
     REASON-OPENED: 027-RSM CHLD                    FH-REQ-TYPE:
  AFDC-4-MO-PRIOR: NO                               FH-RESULTS:
  CATEGORICAL-REL: 01-AFDC                      FINAL-DISP-DATE: 040694
           XREF-ID:

                                                 NEXT-REDET-DATE: 10/94
DEPRESS THE "PF1" KEY TO SEE ADDITIONAL CASE INFORMATION, ELSE, "PF3" OR "PF4

SB                              SCRP             N              _          99
1-001 A0
 CLIENT-ID: 45022128            CLIENT SUMMARY
          CLIENT-NAME                SEX     BIRTHDATE         SSN      ST
 LATOYA      T BIZZARD              F      10/10/1976      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  V

 SS5-DATE  CITIZENSHIP    ETHNIC-GROUP   SSN-CLAIM-NO   SSI/SS    MEDICAID/SANC
           1-U.S. CTZ     2-BLACK                     0-NO BENE   0-INEL MED

 AFDC-RELATION  LIVING-ARRNGMNT  DEPRIV-CODE  MARITAL-STAT/DATE  TPR  DATE-DEA
  01-CHILD        01-HOME         01-DEATH                        N

 MAO-RESIDENCY   LEVEL-CARE   STUDENT   MEDICARE          REG-DATE

  IBIS-ID-NUMBER            WIN-STATUS/SANCTION      WORK-STATUS/SANCTION
                            18-XMLCKRSC              03-EXPT <18
------------------------- MEDICAID ELIGIBILITY ---------------------------------
08/93 09/93 10/93 11/93 12/93 01/94 02/94 03/94 04/94 05/94 06/94 07/94 08/94
                           N     N     N     N     N     N     N     N     N

**Liberty County Department of Family and Children Services**
P.O. Box 710 • Hinesville, Georgia 31313-0710
(912) 876-5174



Mrs. Sallie W. Richardson
Director

Date  11-07-94

Case No. _____

Ms. Mary Bizzard

Rt. 2 M

Midway, GA 31320

RE:_____

_____

Dear _____ :

Please note the items checked below:

( )   Please come to this office on _____

at _____ a.m./p.m. to see me.

( )   Please phone me at _____ as soon as
possible.

(XX)   I will visit your home on  Tuesday, November 15, 1994

at 5 pm

(XX)   Other    Please have Keon present during this visit.

We will be revising your case plan.

_____

_____

If the above is inconvenient, please phone me at 876-5174 wo
we can make other arrangements.

Sincerely,

Michelle A. Holtzclaw

Social Services Specialist I

## PETITION
## (DEPRIVATION)

**PRESS HARD
PLEASE
PRINT or TYPE**

IN THE JUVENILE COURT OF __Liberty__ COUNTY, GEORGIA



FILED
LIBERTY CO. CLERK'S OFFICE

94 AUG -2 PM 1:05

084-443-5516

**In the interest of**

Keon Bizzard _____ , SEX __M__ , AGE __12__ , DOB __8-8-82__ , CASE # __089-14188__

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

### A Child/Children Under 18 Years of Age

Your Petitioner alleges the Child(ren) named above to be of the sex(es) and age(s) and to have the name(s) there set forth above; that the (Putative) father of said Child(ren) is __Deceased__ _____ , who resides at _____ , the mother is __Mary Bizzard__ _____ who resides at __Rt. 2.M Midway, GA 31320__ _____ ; said child(ren) reside(s) at _____ , in said county and state, and is/are in the custody and control of __Mary Bizzard__ _____ , who resides at said place; that the said child(ren) is/are subject to the jurisdiction of this Court; that said child(ren) is/are in need of protection of this Court and is/are deprived (O.C.G.A. Section 15-11-2(8)) due to the following condition(s):

Child is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals;
Ms. Bizzard had moved to Savannah and had left her 12 year old son, Keon Bizzard, living in Midway by himself. Ms. Bizzard did not take the necessary actions to make sure that Keon was supervised during her absence.

That said child(ren) was/were (not) taken into custody under the provisions of O.C.G.A. Section 15-11-17-(a)(4).

That it is in the best interest of the child(ren) and the public that this proceeding be brought.

That said child(ren) is/are, is not/are not currently in shelter care facilities under the supervision of the __Liberty__ County Department of Family and Children Services, having been placed there at _____ m., on _____ , 19 _____

Petitioner prays that process issue, directed to the parties hereto , requiring them to appear before this Court to answer the allegations of this Petition.

__Michelle Holtzclaw, SSSI for Deborah A Saug__
Petitioner

Subscribed and sworn to before me, on information and belief this __2__ day of __August__ . 19 __94__ .

_____
Attesting Officer

The above Petition is approved to be filed in the best interest of the public and the named child.
This __2__ day of __August__ , 19 __94__

_____
Court Designee

## SUMMONS AND PROCESS

**PRESS HARD PLEASE PRINT or TYPE**

IN THE JUVENILE COURT OF FILED IN CLERK'S OFFICE
Liberty COUNTY, GEORGIA

94 AUG -2 PM 1: 05

To: _____ and _Mary Bizzard_____
                    Child                                              Parent

_____        Rt. 2 M (Hwy 17)_____
         Street Address                          Street Address

_____     Midway    Georgia    31320
   City        State        Zip            City      State      Zip

In the interest of                         Family File Number _____

| NAME | DOB | CASE # D89-94J-556 |
|------|-----|--------------------|
| Keon Bizzard | 8-08-82 | 089-14188 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Child(ren).

A petition has been filed in this Court concerning the above-child(ren). A copy of that petition is attached to this summons.

This is a summons requiring you to be in Court. If you fail to come to Court as required you may be held in contempt of Court and punished accordingly.

Now therefore, you, the parties named above, are commanded to be and appear on the date and time stated below, and to remain in attendance from hour to hour, day to day, month to month, year to year, and time to time, as said case may be continued, and until discharged by the Court, and you are commanded to lay any and all other business aside and to be and appear before the Juvenile Court of __Liberty_____ County, Georgia, located at _The Liberty County Court House, Hinesville,_ GA on the _11th_day of _August_____, 19_94_ at _8____ o'clock _a_ m., and you the said parent, guardian or legal custodian are likewise hereby commanded to be and appear with the aforesaid child(ren) in said court at the time and place above stated, each of you then and there to make defense thereto and to show cause why the said child(ren) and all parties named herein should not be dealt with according to the provisions of the law.

WITNESS the Honorable __Cavender_____, Judge of said court, this the _1st_ day of _August_____
_____, 19_94_.

_____
(Deputy) Clerk, Juvenile Court of _Liberty_____
County, Georgia

## READ CAREFULLY

This Summons requires you to be present at a formal hearing in the Juvenile Court.
The child or children and other parties involved may be represented by a lawyer at all stages of these proceedings.
If you want a lawyer, you may choose and hire your own lawyer. If you want to hire a lawyer, please contact your lawyer immediately
If you want a lawyer but are not able to hire a lawyer without undue financial hardship, you may ask for a ,lawyer to be appointed to represent you. The Court would inquire into your financial circumstances and if the court finds you to be financially unable to hire a lawyer, then a lawyer will be appointed to represent you.
If you want a lawyer appointed to represent you, you must let the Court or officer of this Court handling this case know that you want a lawyer immediately.

## SUMMONS AND PROCESS

PRESS HARD
PLEASE
PRINT or TYPE

IN THE JUVENILE COURT OF
____Liberty____ COUNTY, GEORGIA

To: _____ and __Mary Bizzard__
                Child                                   Parent
                                      Rt. 2 M (Hwy 17)
_____                _____
     Street Address                      Street Address
                                      Midway    Georgia    31320
_____                _____
   City    State    Zip               City      State      Zip

In the interest of                    Family File Number _____

| NAME | DOB | CASE # |
|------|-----|--------|
| Keon Bizzard | 8-08-82 | 089-14188 |
| | | |
| | | |
| | | |
| | | |

Child(ren).

A petition has been filed in this Court concerning the above-child(ren). A copy of that petition is attached to this summons.

This is a summons requiring you to be in Court. If you fail to come to Court as required you may be held in contempt of Court and punished accordingly.

Now therefore, you, the parties named above, are commanded to be and appear on the date and time stated below, and to remain in attendance from hour to hour, day to day, month to month, year to year, and time to time, as said case may be continued, and until discharged by the Court, and you are commanded to lay any and all other business aside and to be and appear before the Juvenile Court of __Liberty__ County, Georgia, located at__The Liberty County Court House, Hinesville,__ GA on the __11th__day of __August__, 19 __94__ at __8__ o'clock __a__ m., and you the said parent, guardian or legal custodian are likewise hereby commanded to be and appear with the aforesaid child(ren) in said court at the time and place above stated, each of you then and there to make defense thereto and to show cause why the said child(ren) and all parties named herein should not be dealt with according to the provisions of the law.

WITNESS the Honorable __Cavender__, Judge of said court, this the __1st__ day of __August__
_____, 19 __94__.

_____
(Deputy) Clerk, Juvenile Court of __Liberty__
County, Georgia

### READ CAREFULLY

This Summons requires you to be present at a formal hearing in the Juvenile Court.
The child or children and other parties involved may be represented by a lawyer at all stages of these proceedings.
If you want a lawyer, you may choose and hire your own lawyer. If you want to hire a lawyer, please contact your lawyer immediately
If you want a lawyer but are not able to hire a lawyer without undue financial hardship, you may ask for a ,lawyer to be appointed to represent you. The Court would inquire into your financial circumstances and if the court finds you to be financially unable to hire a lawyer, then a lawyer will be appointed to represent you.
If you want a lawyer appointed to represent you, you must let the Court or officer of this Court handling this case know that you want a lawyer immediately.

JUV-93-7

 

GEORGIA DEPARTMENT OF HUMAN RESOURCES

_____ **County Department**
of Family and Children Services

## AGREEMENT SUPPLEMENT

Case Number: _____
FOSTER HOME

I have this date (received into) (released from) my home

| Keon Bizzard | BORN: 8-18-82 | CASE NO. 14188 |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |

(from) (to) Michelle Hoatzclaw SSSI , Liberty County
(NAME OF PERSON)

Department of Family and Children Services (for) (from) foster care in accordance with the agreement with the

Liberty County Department of Family and Children Services to provide foster care.

Signed, _____
(FOSTER FATHER)

Mary A. Osborne
(FOSTER MOTHER)

Date: 7-20-94

Michelle Hoatzclaw SSSI
Representative of the Liberty
County Department of Family and Children Services

Form 40 (10-71)

## GEORGIA DEPARTMENT OF HUMAN RESOURCES
### FOSTER CHILD INFORMATION SHEET

Birthdate *8-18-1982*

Name child likes to be called *Keon "Short dog"*            Social Security Number _____

Medical history (disorders, allergies, dental history) *Child has migraine headaches which makes him vomit. Migraines are regular, also has frequent dizzy spell.*

Psychological and social history _____

School history (last school attended, achievement level, school adjustment) *Keon is currently going to summer school 6th Hinesville Middle School. 8 am.*

Why child is in foster care *Left unsupervised - Trying to locate his mother.*

History of foster care (other families: where (City or part of town), and why child was moved) *N/A.*

Does child have special toy or object? Is it in his possession now? *Super Soaker Water Gun*

Sleep patterns and rituals *Sleeps whenever he gets tired - no regular pattern - gets up a lot during the night.*

Food preferences and dislikes *Pizza - Twix Candy Bars - Caramel. Liver + Chitlins - Dislikes strongly.*

Are pictures of natural family available? Does child have them with him now? *No.*

Where is his natural family? *Midway Area - Mother is in Savannah.*

Who are the members? *Mother - Savannah - Aunts, uncles, grandmother Cousins, sisters, brothers - Midway.*

Are siblings in foster care? Where? *No.*

What are the plans for this child? *reunite w/ family - locate mother.*

Religious preferences (if any) *St. Paul's Church. (Baptist)*

Clothing preferences (colors and style) *likes the color red.*

Fears *none reported*

Special skills or achievements *doing well in summer school.*

GEORGIA DEPARTMENT OF HUMAN RESOURCES

_Liberty_ County Department
of Family and Children Services

## AGREEMENT SUPPLEMENT

Case Number: _____

FOSTER HOME

I have this date ~~(received into)~~ (released from) my home

| | | |
|---|---|---|
| Keon Bizzard | BORN: 8-18-82 | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |
| _____ | BORN: _____ | CASE NO. _____ |

~~(from)~~
(to) Deborah A. Sawyer, _Liberty_ County
(NAME OF PERSON)

Department of Family and Children Services ~~(for)~~ (from) foster care in accordance with the agreement with the

_Liberty_ County Department of Family and Children Services to provide foster care.

Signed, _____
(FOSTER FATHER)

_Mary A. Osba..._
(FOSTER MOTHER)

_Deborah A. Sawyer_
Representative of the _Liberty_
County Department of Family and Children Services

Date: 7-21-94

Form 40  (10-71)

## ORDER FOR SHELTER CARE

| PRESS HARD |
|---|
| PLEASE |
| PRINT or TYPE |

IN THE JUVENILE COURT OF
_____LIBERTY_____ COUNTY, GEORGIA

FILED
LIBERTY CO. CLERK'S OFFICE

94 JUL 21 PM 12: 41

File Number _____

In the interest of:

KEON BIZZARD_____ , SEX __M__ , AGE _11__ , DOB _8-18-82_ , CASE # 089-94J-556

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

_____ , SEX _____ , AGE_____ , DOB _____ , CASE # _____

WHEREAS a complaint has been made to the court concerning the above-named child(ren) and the court finding from information brought before it that continuation in the home at this time would be contrary to the welfare of said child(ren) and it is necessary for the protection of said child(ren) that he or she be placed in shelter care.

The court also finds that pursuant to Official Code of Georgia Annotated §15-11-41(b):

[ ]  reasonable efforts have/have not been made by the Department of Family and Children Services to prevent or eliminate the need for removal and to make it possible for said child to remain in the home.

[ X ]  reasonable efforts were not appropriate or in the best interest of the child to prevent or eliminate the need for removal.

[ ]  reasonable efforts have/have not been made since removal to reunite the child(ren) with the family.

It is therefore ordered that said child(ren) be placed in the custody of: _LIBERTY COUNTY DEPARTMENT_

OF FAMILY AND CHILDREN SERVICES

until further order of the court or until released by a person duly authorized by the court.

Said child(ren) is/ are being placed pursuant to Official Code of Georgia Annotated §15-11-18 for the following reason(s):

[ X ]  to protect the person or property of others or of the child;

[ ]  the child may abscond or be removed from the jurisdiction of the court;

[ ]  because he has no parent, guardian, or custodian or other person able to provide supervision and care for him and return him to the court when required;

[ ]  an order for his detention or shelter care has been made by the court pursuant to the Juvenile Proceedings Code.

It is further ordered that the placement shall be: _A LIBERTY COUNTY DEPARTMENT OF FAMILY AND CHILDREN_

SERVICES APPROVED FOSTER CARE PLACEMENT.

It is further ordered that the custodian be and hereby is authorized to obtain a physical examination, ordinary medical care, and such additional medical treatment and care which, in the opinion of a licensed physician, requires prompt treatment for the care of the said child(ren) while said child(ren) is/are in their custody.

ORDERED AND ADJUDGED

this __20__ day of __JULY_____ , 19 _94___ .

_____
Judge/Associate Judge of the Juvenile Court

**PRESS HARD
PLEASE
PRINT or TYPE**

# COMPLAINT
IN THE JUVENILE COURT OF

LIberty _____ COUNTY, GEORGIA

FILED

94 JUL 21 PM 12:41

State F. F. # _____    Case # 089-945-556    File # _____

| Name: (last, F, M) | | Age: 11 |
|---|---|---|
| AKA: Bizzard, Deon | | DOB: 8/18/82 |

| Race: B | Lives | | Res.: _____ |
|---|---|---|---|
| Sex: M | With: Mary Bizzard | | Bus.: _____ |
| | | (Name) | (Phone) |

Child's Address **Rt 2 Box 2M, Midway, Liberty, Georgia**

(Street)    (Apt. #)    (City)    (County)    (State)    (Zip)

| Mother's | | | Res.: _____ |
|---|---|---|---|
| Name: Mary Bizzard | | Phone: | Bus.: |
| | (Include Mother's Maiden Name in Parenthesis) | | |

Mother's Address **Rt 2 Box 2M, Midway, Liberty, Georgia**

(Street)    (Apt. #)    (City)    (County)    (State)    (Zip)

| Father's | | | Res.: _____ |
|---|---|---|---|
| Name: Earl Bizzard Sr. | | Phone: | Bus.: |

Father's Address **(Deceased)**

(Street)    (Apt. #)    (City)    (County)    (State)    (Zip)

| Legal | | | Res.: _____ |
|---|---|---|---|
| Custodian Mary Bizzard | | Phone: | Bus.: |

Custodian's Address **Same as above**

(Street)    (Apt. #)    (City)    (County)    (State)    (Zip)

| Complaint: N/A | | | |
|---|---|---|---|
| | (Code Section) | (Misd./Fel.) | (Date of Offense) |

| Complaint: N/A | | | |
|---|---|---|---|
| | (Code Section) | (Misd./Fel.) | (Date of Offense) |

| Complaint: N/A | | | |
|---|---|---|---|
| | (Code Section) | (Misd./Fel.) | (Date of Offense) |

Taken Into Custody:   Yes (X)   No ( )

By Whom: **Michelle Holtzclaw,    Liberty County DFCS**

(Name)    (Agency)

| Placement of Deprived Child **Liberty County DFCS Foster Home** | Date: 7-20-94 |
|---|---|
| | Time: 5:30 p.m. |

| Person Notified | | Date: |
|---|---|---|
| By: N/A | Via: | Time: |

| Detained:  Yes ( )  No ( ) | Place | Date: |
|---|---|---|
| Authorized By: N/A | Detained | Time: |

| Released To: | Date: |
|---|---|
| Relation: N/A | Time: |

| Co-Perpetrators: N/A | |
|---|---|

| Co-Perpetrators: N/A | |
|---|---|

| Victim's Name: | (Names and Ages) | Phone # |
|---|---|---|
| Victim's Address: N/A | | |

| Victim's Name: | | Phone # |
|---|---|---|
| Victim's Address: N/A | | |

PRESS HARD
PLEASE
PRINT or TYPE

FILED

94 JUL 21 PM 12: 41

CASE # 089-94J-556

FILE #_____

---

**Give Complete Details of Offense(s) or Complaints(s) and Apprehension:**

Child is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals;

Child reported that his mother has been living in Savannah with a friend for some time.

Child remained in the home with his stepfather. Stepfather moved out of the home and there is no adult to provide supervision to this child.

The child has two older siblings who reside in the home but they are unable to provide adequate supervision.

On 7/20/94, the agency made a home visit and found the child home alone. The child was unable to provide any specifics regarding his adult caretaker. An EPO was obtained and the child was placed in foster care.

---

| Investigating Officer: | Agency: P.D. Report # | Phone # |
|---|---|---|

| Complainant's Name: Michelle Holtzclaw | Complainant's Address: Liberty County DFCS P.O. Box 710 Hinesville, Ga. 31313 (912) 876-5174 |
|---|---|
| Signature: for Deborah W Saye   Date: 7-21-94 | Phone: |

2 of 2

IIIV-93-2

**Liberty County Department of Family and Children Services**
P.O. Box 710 • Hinesville, Georgia 31313-0710
(912) 876-5174

Mrs. Sallie W. Richardson
Director

July 19, 1994

Ms. Frankie Thompson, Counselor
Hinesville Middle School
307 East Washington Avenue
Hinesville, Georgia   31313

RE:  BIZZARD, Mary

Dear Ms. Thompson:

This letter is to acknowledge our receipt of your report of neglect and/or abuse of the child/children of the above-named parent(s). We thank you for your careful compliance with the Georgia Code, Section 74-111. Please be assured that we are responding to this report according to our regulations.

If we can be of further service, do not hesitate to let us know.

Insufficient identifying information in order to locate family:  Yes _____   No _____   N/A __XX__ .

Information Does Not Meet Child Maltreatment Definition: Yes _____   No _____   N/A __XX__ .

Information Does Not Indicate Risk: Yes ___ No ___ N/A __XX__ .

A.  Referral Accepted:   Yes__XX__   No _____ .

B.  Screened Out:  Yes _____   No __XX__ .

C.  Assigned to Michelle A. Holtzclaw.

Sincerely,

*(Mr.) Alfred L. Matchett*
Casework Supervisor Senior - Services

ALM/wrg

cc:  County File

```
                         CASE SUMMARY (PAGE 1)
CASE-NUM: 46882403-AFDC                CNTY: 089  OFF: 114  SUP: 100  LOAD: 900
*********  CASE-NAME / ADDRESS  *********       ****** CASE-STATUS *******
    LATOYA       T BIZZARD                       *      CODE: 6-ACTIVE
                                                 *     AS-OF: 010192
    RT 2 BOX 2-M                                 *    REASON: 026-RSM ADL
    MIDWAY            GA        313209802         *   BENEFIT:         $0
                                                 *  BENE-CHG: 121391
 PHONE: 912-884-5094                             *    ISSUED: 00/00
CENSUS:                                          *  HOLD-REA:
ETHNIC: 2-BLACK                                  *  HOLD-DTE:
                                                 * PREV-STAT: 2-INT ELIG
                                                 * PREV-BENE:         $0
*****************************  CASE NON-FINANCIAL  ****************************
  HOME-VISIT-DATE: 111391                       INIT-APP-DATE: 111391
                                                INIT-INTV-DATE: 111391
  REDET-INTV-DATE:                            CLASS-OF-ASSIST: 24-RSM
    REASON-OPENED: 026-RSM ADLT                  FH-REQ-TYPE:
  AFDC-4-MO-PRIOR: NO                            FH-RESULTS:
  CATEGORICAL-REL: 01-AFDC                   FINAL-DISP-DATE: 121691
          XREF-ID:

DEPRESS THE "PF1" KEY TO SEE ADDITIONAL CASE INFORMATION. ELSE, "PF3" OR "PF4"

SB                                                                      0-001
```

```
CLIENT-ID: 452773856              CLIENT SUMMARY
          CLIENT-NAME                  SEX    BIRTHDATE        SSN      S1
UNBORNONE      BIZZARD                 F    11/14/1991    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  O

SS5-DATE   CITIZENSHIP   ETHNIC-GROUP   SSN-CLAIM-NO     SSI/SS    MEDICAID/SANC.
 111491    1-U.S. CTZ    2-BLACK                                   O-INEL MED

AFDC-RELATION   LIVING-ARRNGMNT   DEPRIV-CODE   MARITAL-STAT/DATE   TPR   DATE-DEATH
 01-CHILD        01-HOME           02-OTH ABSN                       N

MAO-RESIDENCY   LEVEL-CARE   STUDENT   MEDICARE          REG-DATE
                                                          00/00
 IBIS-ID-NUMBER              WIN-STATUS/SANCTION        WORK-STATUS/SANCTION

---------------------------- MEDICAID ELIGIBILITY ----------------------------
 06/91 07/91 08/91 09/91 10/91 11/91 12/91 01/92 02/92 03/92 04/92 05/92 06/92
                             N     N     N     N     N     N     N     N
---------------------------- CASE-INFORMATION ----------------------------
* CASE-NUM/TYPE BENE-MO  STATUS    REASON    EFF-DT  CLIENT-DISP/STAT EFF-DT
  46882403-AFDC  01/92   ACTIVE  026-RSM ADLT 010192 INELIG /EXCL CH  010192


* FOR CASE INQUIRY, PLACE "X" NEXT TO CASE AND  "ENTER", ELSE, "PF3" OR "PF4"

SB                                                                      O-001
```

PRIOR CPS REPORTS

Georgia Department of Human Resources
CHILD PROTECTIVE SERVICES

# SAFETY PLAN

| CASE NAME: | CASE WORKER: | DATE: |
|---|---|---|
| Mary Buzzard | Diane Wilson | 5/7/93 |

SUMMARIZE THE ACTIONS, STEPS, SERVICES OR REFERRALS NEEDED TO CONTROL EACH MALTREATMENT / RISK AREA.

SPECIFY WHO DOES WHAT, WHEN, HOW OFTEN AND WHERE.

MALTREATMENT / SAFETY ISSUE: Received referral from hospital re: Baby may not have appropriate articles to take of baby

STEPS: (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

1. Baby will need clothing bassinette bottles, diapers & milk.

2. Ms. Buzzard needs to take Alison to baby check-up monthly for growth + wt. progress

3. Ms. Buzzard will take baby for required immunization shot.

MALTREATMENT / SAFETY ISSUE: _____

STEPS: (SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)

1.

2.

3.

Form 455 (4-91)

PAGE ___1___ OF ___1___

**MALTREATMENT / SAFETY ISSUE:** _____

_____

_____

**STEPS:**        *(SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)*

1. _____

_____

_____

2. _____

_____

_____

3. _____

_____

_____

**MALTREATMENT / SAFETY ISSUE:** _____

_____

_____

**STEPS:**        *(SPECIFY WHO WILL DO WHAT, WHEN, WHERE AND IN WHAT TIME FRAME)*

1. _____

_____

_____

2. _____

_____

_____

3. _____

_____

_____

**DATE DISCUSSED WITH PARENT(S)** *Mary A. Bizzaul*    **AGREEMENT** ☑ YES    ☐ NO

**COMMENTS:** _____ *Latoya Bizzaro* _____

_____

_____

| SUPERVISOR: | DATE: | WORKER: *Diane Wilson* | DATE: *5/1/9?* |

Form 455 (4-91)

PAGE _____ OF _____

AME: _____ CASE ID NO.: _____

| 1ember<br>:ontact/Activity | Individual(s) Contacted, Purpose, Content, and/or Results of Contact |
|---|---|
| | Social Services Block Grant |
| | Family is eligible to receive Child Protective |
| | Services based on acceptance of a report dated. |
| | _5 - 6 - 92_ . |
| | See Intake Form. |
| | The primary client is _Mary Bizzard_ |
| | National Goal III - Protection |
| | Services Provided without regard to Income |
| YES____ NO____ | A) Does this activity involve a child who has lived with his/her family within the past six months or a family with a child? If yes, continue to "B". |
| YES____ NO____ | B) Is the current service activity directly related to a crisis or emergency of the family/ child? If yes, continue to "C". |
| ___ NO____ | C) Is such child without resources immediately accessible to meet his/her needs? If yes, continue to "D". |
| YES____ NO____ | D) Has the agency provided this service activity for this current emergency for less than 31 consecutive days? If yes, continue to "E". |
| ___S____ NO____ | E) Is this the first agency service activity for a crisis/emergency for this child/family in the last twelve months? |
| | Client eligible ____ ineligible ____ for IVA Direct Casework Services from ____ through ____ . |
| E | |
| KER | |
| VISIT | |
| CE VISIT | |
| TO FACE | |

S
Form 12

CPS INTAKE/REFERRALS

NAME:  BIZZARD, Mary                    DATE OF REFERRAL:5/6/92

STREET:  Rt 2 Box M                         PHONE:  884-5094

CITY:  Midway             MILITARY:  No     NUMBER:  089-14188


TYPE OF PROBLEM:  Other               TIME FRAME:  5/7/92

DATE OF IDS:            DATE OF 431:            TIMELY:

WORKER:  D.Wilson                  DATE ASSIGNED:  5/6/92

DATE CLOSED:               DATE OF FIRST CONTACT:


Richmond
Hill
pass
I04 mar
go
sbridge
2nd bridge
1st house
n
nr
blue
home



## Georgia Department of Human Resources
### CHILD PROTECTIVE SERVICES
## INTAKE WORKSHEET

| | |
|---|---|
| Date Received: 5/6/92 | County: *Liberty* |
| Time Received: 9:56 AM | Case #: 089- 14188 |
| Received By: Diane Wilson | |

**PARENT OR HEAD OF HOUSEHOLD:**   **(EMPLOYMENT REVERSE SIDE)**

| MOTHER: LAST | FIRST | AGE | DATE OF BIRTH | RACE |
|---|---|---|---|---|
| Bizzard | Mary | ? | ? | Blk |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| RT 2 Box-M | Midway | 884-5094 |

| FATHER: LAST | FIRST | AGE | DATE OF BIRTH | RACE |
|---|---|---|---|---|
| ? There is a step-fa | | ? | ? | Blk |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| RT 2 Box-M | Midway | |

| OTHER CARETAKER: LAST | FIRST | AGE | DATE OF BIRTH | RACE | RELATIONSHIP |
|---|---|---|---|---|---|
| | | | | | |

| ADDRESS: STREET | CITY | TELEPHONE |
|---|---|---|
| | | |

**Direction's to Parent's Home:**

| CHILD DATA: NAME | SEX | AGE | DATE OF BIRTH | RACE | MAL-TX | SCHOOL | WHEREABOUTS |
|---|---|---|---|---|---|---|---|
| Bizzard, Latoya | F | 15 | 10-10-76 | B | O | | @ home |
| 2. | | | | | | | |
| 3. / 3 brothers | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |

**REPORTER INFORMATION:**

| | |
|---|---|
| NAME: Miriam Schuler MercyBlood | RELATIONSHIP: Social Worker |
| ADDRESS: St. Joseph Hospital | TELEPHONE: 925-4400 |

CONFIDENTIALITY EXPLAINED:   YES ☐   NO ☐      MANDATED REPORTER LETTER   YES ☒   NO ☐
DISPOSITION:   WITHIN 24 HOURS ☒   5 WORK DAYS ☒
SCREENED OUT: ☐   REASON: _____

| SUPERVISOR: Al Mathews | DATE: 5/6/92 | WORKER: D. Wilson |
|---|---|---|

Form 453 (4-91)     PAGE 1



**MALTREATMENT REFERRAL:**   WHAT FORM OF MALTREATMENT IS APPARENT?  CLARIFY WHO DID WHAT, WHEN, HOW OFTEN AND WHERE.  WHAT ARE THE CIRCUMSTANCES SURROUNDING THE MALTREATMENT?

15 yr B/F delivers baby on May 3, 1992
Mother get S.S. for dau + Brother.
Family is not prepared to necessary
items to the care of baby.
Concerns surround who will be
care taking for baby.
La toya will be out of school
wants teacher/tutoring services.

**CHILD INFORMATION:** HOW DOES THE PARENT DESCRIBE THE CHILD?  HOW DOES THE CHILD BEHAVE?  WHAT IS THE STATUS AND VULNERABILTIY OF THE CHILD?

PAGE 2

Form 453 (4-91)

**PARENT INFORMATION:**   WHAT ARE THE BEHAVIORS, FEELINGS, LEVEL OF COPING AND PROBLEM-SOLVING BY THE PARENT? WHAT IS THE HISTORY OF THE PARENT? HOW DO THEY RELATE TO OTHERS?

**FAMILY INFORMATION:**   DESCRIBE THE COMPOSITION OF THE FAMILY, ITS HOME AND SURROUNDINGS.   HOW DOES THE FAMILY FUNCTION?

**INTERVENTION INFORMATION:**   WHAT MIGHT INCREASE INTERVENTION EFFECTIVENESS?   HOW WILL THE FAMILY RESPOND TO INTERVENTION?

LIST HIGH RISK INDICATORS ASSOCIATED WITH NEED FOR IMMEDIATE RESPONSE:

risk to baby (0-6)   accessible to
unable to protect        mal treator.

OTHER SOURCES OF INFORMATION REGARDING THE FAMILY:

Form 453 (4-91)

**PAGE 3**

# APPENDIX  J

**Senter, Linda H**

| | |
|---|---|
| From: | fox@open_fox.uspis.gov |
| Sent: | Tuesday, December 10, 2002 1:27 PM |
| To: | LHSENTER@USPIS.GOV |
| Subject: | CR |

```
CR.GAIII0000.LHSENTER.
TXT
HDR/2L0169ROCUSPISONBMC
ATN/MCLENDON  ARN/
PART  1
THE FOLLOWING RECORD PERTAINS TO EID/GA1634080H
```

GEORGIA CRIMINAL HISTORY


| NAME | | STATE IDENT NBR | FBI IDENT NBR | REPORT DATE |
|---|---|---|---|---|
| BROWN, MEIER | | GA1634080H | 614455MA4 | 2002/12/10 |


| SEX | RACE | BIRTH DATE | HEIGHT | WEIGHT | EYES | HAIR | SKIN | BIRTHPLACE |
|---|---|---|---|---|---|---|---|---|
| M | B | 1969/07/04 | 5-06 | 140 | BRO | BLK | MBR | GEORGIA |


| SOC SECURITY | FINGERPRINT CLASS | HENRY | SCAR-MARK-TATTOO | MISCELLANEOUS NBR |
|---|---|---|---|---|
| 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 | AA AA SR SR 02 | 01 A | SC FACE | |
| | AA AA AA 02 01 | 01 A | | |


MISC COMMENTS-SCAR


```
ADDITIONAL IDENTIFIERS:
ALIAS NAMES------------------  BROWN, MEIER J
BROWN, MEIER JASON            BORWN, MEIER J
BROWN, ROLTON
```

| MISC NUMBERS | BIRTHDATES | SOCIAL SECURITY | SCAR-MARKS-TATTOOS |
|---|---|---|---|
| | 1970/07/04 | | |
| | 1982/12/01 | | |


```
** INTERSTATE IDENTIFICATION INDEX - SINGLE-STATE OFFENDER **
**************************************************************************
```


```
ARREST-01    ARREST DATE-1990/03/21     TRACKING NBR-26631673
    AGENCY-SAVANNAH POLICE DEPARTMENT        (GA0250300)
    AGENCY CASE NBR-114441        NAME USED-
        CHARGE 01-POSS/MANUF/DIST, ETC. - MARIJUANA       OFFENSE DATE-

    JUDICIAL
        DISP-CONVICTED                    COURT DISP DATE-1994/03/22
        OFFENSE-POSS. MARIJUANA - LESS THAN 1 OZ - MISD.
        COURT-RECORDERS COURT             (GA025021J)    COURT NBR-
        SENTENCE: FINE-$350


ARREST-02    ARREST DATE-1990/09/23     TRACKING NBR-28140512
    AGENCY-HINESVILLE STATE PATROL            (GAGSP1100)
        CHARGE 01-DRIVING UNDER THE INFLUENCE (DUI)       OFFENSE DATE-

    JUDICIAL
        DISP-NOLO CONTENDERE              COURT DISP DATE-
        OFFENSE-DRIVING UNDER THE INFLUENCE (DUI)
        COURT-LIBERTY COUNTY STATE COURT  (GA089043J)    COURT NBR-
        SENTENCE: FINE-$131
```

1

/25
Inspection Service
Exhibit
23
Label 113, July 1987

USAO-00067

TRAFFIC SCHOOL
DKT#90SR2341

ARREST-03    ARREST DATE-1991/09/17    TRACKING NBR-22634124
  AGENCY-LIBERTY CO. SHERIFF'S OFFICE         (GA0890000)
    CHARGE 01-FORGERY - 1ST DEGREE                    OFFENSE DATE-
          3CTS

  JUDICIAL
    DISP-CONVICTED                    COURT DISP DATE-1993/07/13
    OFFENSE-FORGERY - 1ST DEGREE
          3CTS                                        CIT-
    COURT-LIBERTY COUNTY STATE COURT    (GA089043J)   COURT NBR-92E6464
    SENTENCE: PROB-3Y FINE-$300
              1ST OFF SENT MODIFIED W/O COURT ORDER BY CONVICTION
              RESTITUTION
              VARIOUS FEES
              CONCURRENT WITH PRIOR SENTENCE 3CTS CC


ARREST-04    ARREST DATE-1991/09/20    TRACKING NBR-36911394
  AGENCY-RICHMOND HILL POLICE DEPARTMENT      (GA0150200)
  AGENCY CASE NBR-91090168    NAME USED-
    CHARGE 01-FORGERY - 1ST DEGREE                    OFFENSE DATE-1991/08/02

ARREST-05    ARREST DATE-1991/11/29    TRACKING NBR-36910160
  AGENCY-RICHMOND HILL POLICE DEPARTMENT      (GA0150200)
  AGENCY CASE NBR-91110296    NAME USED-
    CHARGE 01-DRIVING WTH LICENSE SUSPENDED OR REVOKED  OFFENSE DATE-

    CHARGE 02-DRIVING UNDER THE INFLUENCE (DUI) .       OFFENSE DATE-


  JUDICIAL
    DISP-CONVICTED                    COURT DISP DATE-1992/01/14
    OFFENSE-DRIVING WTH LICENSE SUSPENDED OR REVOKED
    COURT-RICHMOND HILL MUNICIPAL COURT    (GA015021S)    COURT NBR-
    SENTENCE: FINE-$450 SUSP-6M
              COURT COSTS

    DISP-CONVICTED                    COURT DISP DATE-1992/01/14
    OFFENSE-DRIVING UNDER THE INFLUENCE (DUI)
    SENTENCE: FINE-$938
              TRAFFIC SCHOOL
              48HRS JAIL


ARREST-06    ARREST DATE-1995/11/18    TRACKING NBR-44782883
  AGENCY-LIBERTY CO. SHERIFF'S OFFICE         (GA0890000)
    CHARGE 01-DRIVING UNDER THE INFLUENCE (DUI)        OFFENSE DATE-

  JUDICIAL
    DISP-CONVICTED                    COURT DISP DATE-1995/12/05
    OFFENSE-DRIVING WTH LICENSE SUSPENDED OR REVOKED
          C/F DUI                                      CIT-40-5-121
    COURT-LIBERTY COUNTY STATE COURT    (GA089043J)    COURT NBR-95SR14259
    SENTENCE: CONF-10D FINE-$1316


ARREST-07    ARREST DATE-1996/03/29    TRACKING NBR-42140184
  AGENCY-LIBERTY CO. SHERIFF'S OFFICE         (GA0890000)
    CHARGE 01-ROBBERY                           OFFENSE DATE-1996/03/26

  JUDICIAL
    DISP-CONVICTED                    COURT DISP DATE-1997/09/19
    OFFENSE-ROBBERY

Inspection Service
Exhibit
22
Label 113, July 1987

```
COURT-LIBERTY COUNTY STATE COURT        (GA089043J)    CIT-16-8-40
SENTENCE: CONF-5Y                                      COURT NBR-96R7833


SUPERVISION-CUSTODY
   AGENCY-COASTAL CORRECTIONAL INSTITUTION  (GA025025C)   OCA-000384198
      1997/11/10   STATUS-RECEIVED INTO INSTITUTION

   AGENCY-MUSCOGEE CO. CORRECTIONAL INST.    (GA106013C)   OCA-000384198
      1997/12/11   STATUS-TRANSFERED


   AGENCY-MUSCOGEE CO. CORRECTIONAL INST.    (GA106013C)   OCA-000384198
      1999/06/14   STATUS-PAROLED

   AGENCY-COASTAL CORRECTIONAL INSTITUTION  (GA025025C)   OCA-000384198
      2001/02/27   STATUS-TRANSFERED FROM OTHER INST.

   AGENCY-MONTGOMERY CORRECTIONAL INST.     (GA103015C)   OCA-000384198
      2001/04/05   STATUS-TRANSFERED

   AGENCY-MONTGOMERY CORRECTIONAL INST.     (GA103015C)   OCA-000384198
      2001/11/14   STATUS-SENTENCE EXPIRED


ARREST-08   ARREST DATE-1996/03/28-A   TRACKING NBR-46827056
   AGENCY-LIBERTY CO. SHERIFF'S OFFICE        (GA0890000)
   CHARGE 01-FORGERY - 1ST DEGREE                         OFFENSE DATE-


JUDICIAL
   DISP-CONVICTED                      COURT DISP DATE-1997/09/18
   OFFENSE-FORGERY - 1ST DEGREE
                                                     CIT-16-9-1
   COURT-LIBERTY COUNTY STATE COURT     (GA089043J)   COURT NBR-96R7855
   SENTENCE: CONF-5Y


ARREST-09   ARREST DATE-1996/05/16      TRACKING NBR-47268911
   AGENCY-HINESVILLE POLICE DEPARTMENT       (GA0890100)
   CHARGE 01-THEFT BY TAKING                             OFFENSE DATE-
           AUTO


JUDICIAL
   DISP-CONVICTED                      COURT DISP DATE-1997/09/27
   OFFENSE-THEFT BY TAKING
          AUTO                                       CIT-16-8-2
   COURT-LIBERTY COUNTY STATE COURT     (GA089043J)   COURT NBR-97R8052
   SENTENCE: CONF-4Y


   DISP-CONVICTED                      COURT DISP DATE-1997/09/27
   OFFENSE-DRIVING WTH LICENSE SUSPENDED OR REVOKED
                                                     CIT-40-5-121
   COURT-LIBERTY COUNTY STATE COURT     (GA089043J)   COURT NBR-97R8052
   SENTENCE: CONF-12M
           TIME TO BE SERVED CONCURRENT

   DISP-CONVICTED                      COURT DISP DATE-1997/09/27
   OFFENSE-DRIVING UNDER THE INFLUENCE (DUI)
                                                     CIT-40-6-391(A)1
   COURT-LIBERTY COUNTY STATE COURT     (GA089043J)   COURT NBR-97R8052
   SENTENCE: CONF-12M
           TIME TO BE SERVED CONCURRENT

ARREST-10   ARREST DATE-2000/09/21      TRACKING NBR-78185634
   AGENCY-LIBERTY CO. SHERIFF'S OFFICE        (GA0890000)
```

3

USAO-00069

39 5
Inspection Service
Exhibit
22

Label 113, July 1987

AGENCY CASE NBR-9747          NAME USED-BROWN, MEIER JASON
      CHARGE 01-FINANCIAL TRANSACTION CARD FRAUD          OFFENSE DATE-2000/09/04
              3 CTS

      CHARGE 02-PAROLE VIOLATION                          OFFENSE DATE-

ARREST-11    ARREST DATE-2002/05/03    TRACKING NBR-32014846
      AGENCY-LIBERTY CO. SHERIFF'S OFFICE          (GA0890000)
      AGENCY CASE NBR-              NAME USED-BROWN, MEIER JASON
          CHARGE 01-FINANCIAL TRANSACTION CARD FRAUD          OFFENSE DATE-2001/08/03
          ARREST DISPOSITION-                               CIT-16-9-33


ARREST-12    ARREST DATE-2002/07/25    TRACKING NBR-106202202
      AGENCY-POOLER POLICE DEPARTMENT          (GA0250400)
      AGENCY CASE NBR-              NAME USED-BROWN, ROLTON
          CHARGE 01-DRIVING UNDER THE INFLUENCE (DUI)          OFFENSE DATE-
          ARREST DISPOSITION-                               CIT-40-6-391(A)1


END OF PART  1 - PART  2 TO FOLLOW

**USAO-00070**

4 8 5
Inspection Service
Exhibit
22
Label 113, July 1987

**Senter, Linda H**

From:         fox@open_fox.uspis.gov
Sent:         Tuesday, December 10, 2002 1:27 PM
To:           LHSENTER@USPIS.GOV
Subject:      CR

CR.GAIII0000.LHSENTER.
TXT
HDR/2L0169R00USPIS0NBMC
ATN/MCLENDON  ARN/
PART  2
THE FOLLOWING RECORD PERTAINS TO EID/GA1634080H

GEORGIA CRIMINAL HISTORY


JUDICIAL
  DISP-DISMISSED                          COURT DISP DATE-2002/09/24
  OFFENSE-DRIVING UNDER THE INFLUENCE (DUI)
  COURT-POOLER POLICE DEPARTMENT        (GA0250400)    COURT NBR-207070839


ARREST-13   ARREST DATE-2002/09/11       TRACKING NBR-106451505
  AGENCY-POOLER POLICE DEPARTMENT        (GA0250400)
  AGENCY CASE NBR-              NAME USED-BROWN, MEIER JASON
    CHARGE 01-CONTEMPT OF COURT  STATE)          OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-15-7-4


    CHARGE 02-OBSTRUCTION OF OFFICERS - MISD     OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-16-10-24(A)

    CHARGE 03-GIVING FALSE NAME/INFORMATION TO POLICE   OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-16-10-25

    CHARGE 04-TAMPERING WITH EVIDENCE           OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-16-10-94


    CHARGE 05-DRIVING WTH LICENSE SUSPENDED OR REVOKED  OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-40-5-121

    CHARGE 06-DRIVING UNDER THE INFLUENCE (DUI)   OFFENSE DATE-2002/09/10
            LESS SAFE
    ARREST DISPOSITION-                          CIT-40-6-391(A)1

    CHARGE 07-DRIVING UNDER THE INFLUENCE (DUI)   OFFENSE DATE-2002/09/10
    ARREST DISPOSITION-                          CIT-40-6-391(A)1

****************************************************************************
* THIS RECORD IS SOLELY FOR OFFICIAL CRIMINAL JUSTICE USE.  USE OF THIS    *
* RECORD OR INFORMATION HEREIN FOR ANY OTHER PURPOSE VIOLATES GEORGIA LAW. *
****************************************************************************


END OF RECORD

    MCLENDON
    USPIS
    POB 6
    532 INDIAN ST
    SAVANNAH,GA
    31402



**USAO-00071**



Inspection Service
Exhibit

Label 113, July 1987

1

# APPENDIX K-1

Meier Jason Brown                                                                3
#11364-021
CR403-001
September 16, 2003

Phone contact was attempted with family members for whom Mr. Brown was able to provide current phone numbers and included Dexter Brown (brother), Pelham Brown (father), and Willie Bell Williams (maternal aunt). Information obtained from these contacts will be discussed below.

During this evaluation period Mr. Brown was evaluated by Sally Johnson, M.D., Consultant to the Medical Director of the Bureau of Prisons. Psychological testing was conducted by Carlton Pyant, Ph.D., Staff Psychologist at the FMC. Mr. Brown was interviewed individually by the primary evaluator, Dr. Johnson, on 11 occasions. Dr. Pyant also interviewed Mr. Brown and conducted psychological test procedures over a course of six sessions. The results of testing will be discussed later in the report. Other clinical and correctional staff also had the opportunity to observe and interact with Mr. Brown throughout the course of the evaluation and their comments and observations were considered prior to the preparation of this report.

Background Information: At the outset of the evaluation the limits of confidentiality of information provided were discussed with Mr. Brown. The court order was reviewed and he was specifically informed that the report generated from this evaluation would be sent to Magistrate Judge Smith and placed under seal for possible use during the sentencing phase of his trial should he be convicted and mitigating circumstances were raised. He expressed a clear understanding of this information and a willingness to cooperate with the evaluation process. He did express some concern as to how he should handle information regarding the alleged offenses in view of the fact that he had entered a plea of not guilty and was anticipating going to trial in an effort to support that plea. Few sources of collateral information were available in regard to Mr. Brown's early history. Where information was available for comparison, it appears the information he provided was essentially consistent with that from other sources. Overall, he was viewed as a reliable historian.

Mr. Brown was born on 07/04/70, in Liberty Memorial Hospital in Hinesville, Georgia, to Sadie Morgan Brown and Pelham Brown. He is the seventh of eight children born to his mother and the third born to his parents' relationship. Mr. Brown's mother is recently deceased, having died in June of 2003 as a result of multiple chronic illnesses, and we were unable to obtain details about his birth and early development from anyone else. A copy of his birth certificate indicates he weighted seven pounds, 12 ounces. Mr. Brown indicates that as far as he knows, he was the result of a full term pregnancy and delivered vaginally. He is not aware of anyone indicating he had any developmental problems but admits he's not sure. An aunt chose his name (Meier) but he uses either his first or middle name (Jason) interchangeably. His mother was 61 at the time of her death on 06/16/03. She was a long term insulin dependent diabetic with cardiac and renal problems, and was on dialysis prior to her death. He remembers her as sickly in the later years of her life. She worked as a waitress for years, but eventually became disabled due to her medical problems. She had one leg amputated prior to her death. It appears that when Mr. Brown was not incarcerated he was a major source of support for his mother during her later years.

Meier Jason Brown                                                                              **4**
#11364-021
CR403-001
September 16, 2003

Mr. Brown's father, Pelham, is 62 years of age. Although Mr. Brown's parents never divorced, his father left their home after being "thrown out" by his mother due to infidelity, when Mr. Brown was in the eighth grade. His father is now retired, having worked for the City of Richmond Hill as Superintendent over Public Works.

Mr. Brown identifies seven brothers resulting from pregnancies by his mother. Roy Morgan is age 43, suffers from heart problems secondary to rheumatic fever, has had a valve replacement, and recently suffered from a stroke. Leo and Levi are twins and approximately 41 years of age. Dexter is approximately 39 years of age. Glen is 37 and the only other individual in this sibling group to have served time in prison. Nita died in 1998 from HIV/AIDS complications. Rolton is approximately 21 years of age. All of these siblings except Dexter who lives in Orlando, Florida, are living in the Savannah, Georgia area. Only Glen and Nita are products of the union of Mr. Brown's parents. He had two additional half siblings from his father's other relationships: Beverly (age unknown); and Tony who is deceased. Mr. Brown describes himself as being close to all of his siblings, but closet to Rolton.

Mr. Brown denies any known history of mental health problems in the family.

Mr. Brown indicates he had an 11th grade education, when he left school to work and help support his mother. He obtained his GED in approximately 1998. School history includes kindergarten in Midway, Georgia, elementary school at Liberty Elementary in Midway, middle school at Hinesville Middle School in Georgia, and high school at Bradwell Institute. He indicates that he was required to repeat the ninth grade because he "rebelled" at that time, which he defines as not completing his work as required. He states that in school math was his favorite subject but he always did just enough to get by. He remembers being involved in Future Farmers of America for a short time in the 10th grade, but was never involved in other activities or sports at the varsity or intramural level.

Mr. Brown describes being brought up in a large extended family. His mother and her siblings lived on his grandmother's property. Although everyone was poor, he doesn't remember ever not having enough to eat or clothes to wear. The relatives helped each other out and always made sure the children were taken care of. He remembers his upbringing in a very positive manner. He spent most of his time interacting with his relatives, particularly his cousins, and had few other close friends. He was very close to his mother. He was never harshly disciplined and can only recall his mother slapping him on one occasion when he was nagging her. He states that she spoiled him and the other children. Neither she nor his father ever physically abused them or even used particularly cross words in speaking with them. He states his older brother beat him up once when he intentionally skipped school, but otherwise, feels that his brothers were relatively protective in his upbringing. He does describe the family trailer being set on fire while he was and adolescent and was babysitting his cousin and brother. He got them out safely but their home was completely destroyed.

Meier Jason Brown                                                        5
#11364-021
CR403-001
September 16, 2003

Mr. Brown indicates that he was raised in the Baptist religion at a church located on his grandmother's property. The pastor has not been to visit him since his arrest which has somewhat changed his view of that church. He states he attended services regularly and his extended family was actively involved in singing at the church. He does express a continued belief in God and views his religion and beliefs as a source of support at present.

Mr. Brown has no military history.

Before leaving school at age 16, Mr. Brown began working at Shoney's. He then started working construction and other labor jobs. His longest period of employment (about three years) was with the City of Richmond Hill Public Works Department beginning around 1989. In 2000 top 2001 he worked in landscaping until the jobs were located at a distance too far for him to get to without a car and driver's license. He then did odd jobs with a brick mason, busing tables, washing dishes, maintenance work, and car repair. His lost his last job in late October or early November of 2002, as a result of his refusing to work on a Saturday. At the time of his arrest he was unemployed.

Mr. Brown states he has no particular hobbies, but indicates in more recent years he reads a lot and has learned to play chess.

Prior to his arrest Mr. Brown was living at his mother's house at 6724 Leroy Coffer Highway in Fleming, Georgia 31309. He indicates he had been in and out of the house, intermittently living with his girlfriend but his home address was his most constant address.

Mr. Brown views himself as heterosexual and has been involved in short term relationships, mostly as an adult. He has no children. Most recently he was in a relationship with Diane Brown, who had previously been employed as a correctional officer. The duration of that relationship was less than a year at the time of his arrest. She lived in the Savannah area and as noted, he spent some time staying with her in Savannah. She has one child, a daughter, in her early teens from a previous relationship. Mr. Brown indicates that he met her after waving to her at a stoplight while they were both driving. After she waved back, he followed her and got her phone number when she pulled over. From that point they struck up a relationship. He indicates that prior to this he had been involved in an abusive relationship, where he was the victim of physical abuse and had terminated that relationship as a result of that behavior. He denies ever being involved in abusing females himself.

When Mr. Brown met Diane Brown she had filed for bankruptcy. She subsequently lost her job, at least in part, as a result of her involvement with him, thus neither of them were employed at the time of his arrest.

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

6

Mr. Brown denies any previous mental health history. Prior to his current arrest he had never been formally evaluated, hospitalized or given any type of psychotropic medication. He has generally been in good health. He reports having one visit by a psychiatrist or psychologist while he was in jail in Georgia on his current charges which had been arranged by his attorney. No testing was done and he has no specific recollection of anything noteworthy from that visit. He does not remember the name of that evaluator and no written information regarding that evaluation has been made available to the current evaluator. His attorney did state there were no significant findings.

Mr. Brown relates that as a juvenile he broke into a store, although clarifies that he was really only a lookout for an older cousin. He told on his cousin and gave the $20 the cousin had given him to the police. He was placed on probation. He believes he was in the seventh grade at the time. He denies any period in juvenile detention or special schools as the result of criminal behavior.

Mr. Brown states his first adult charge for which he was put in Liberty County Jail, was a forgery charge. He indicates that a cousin had taken a checkbook and asked Mr. Brown to write checks and cash them, which he did. He received probation as a first time offender on that charge.

Mr. Brown indicates that his adult criminal history consists of a robbery charge in 1994 or 1995. He was with two of his cousins and stopped at a store to buy beer. When he was paying, one of the cousins ran around the counter and grabbed money out of the cash register. One cousin subsequently confessed. The younger of his two cousins got off as a juvenile and the older cousin did not confess. Mr. Brown was given a five year sentence. He had also been involved in other criminal behavior around that time, including forgery and theft by taking an automobile, as well as driving related offenses, and those were all combined into a five year sentence as the result of a plea bargain. The car theft occurred while he was out on bond for the robbery charge. He apparently stole a car because "the opportunity presented itself," realizing now that was a bad decision. At that time he saw stealing cars and selling them for parts as a way to make money when he was unemployed. He served 18 months at Muskogee County Prison in Columbus, Georgia. He was paroled but subsequently violated and was sent to Montgomery State Prison in Georgia, where he served an additional eight months. His parole violation resulted from an incident with a cousin, whereby the cousin had stolen a car and credit card. They subsequently obtained money fraudulently from an ATM. Mr. Brown has had numerous Driving Under the Influence (DUI) and other alcohol related minor crimes. The last offense prior to his current arrest involved him pretending to be his brother when stopped on an alcohol related driving offense. His driver's license remains suspended.

Mr. Brown indicates that although he has a history of criminal behavior, he has no trial experience except for bench trials on minor offenses. On his more serious charges in the past, he negotiated a plea bargain.

Meier Jason Brown                                                                    7
#11364-021
CR403-001
September 16, 2003


Throughout his periods of incarceration Mr. Brown denies any periods of disruptive or negative behavior. He has lived in single cells, with roommates, and in dormitory situations. He indicates that he tends to recognize possible negative events brewing and avoids trouble.

Review of information provided by the defense in regard to previous periods of incarceration with the state verified Mr. Brown's account of his criminal history and provided information on his periods of incarceration. It was determined that he had undergone a colonoscopy in September of 2001 response to concerns about rectal bleeding. Although the results were not clear, Mr. Brown reports they were negative and the diagnosis was thought to be hemorrhoids. He was told to increase the fiber in his diet and has not experienced any recurrence of the problem. It is noted that he received several relatively minor incident reports for failure to clean areas as assigned, and on one occasion refused to allow a tooth to be pulled.

Initially Mr. Brown denies any substance abuse other than regular use of alcohol and having tried marijuana. He began drinking in approximately the eighth grade when he was round 13 years of age. He describes at that time he was hanging around an uncle who was always drinking beer. When the beer got warm his uncle wouldn't drink it and instead of throwing it away, Mr. Brown drank it. He states that early on he did not drink every day but continued drinking regularly and eventually began drinking after school and work, and on the weekends. He usually drinks only beer. He denies ever drinking in the morning. On an average he drank three beers in an evening and on the weekends he drank a 12 pack. If he went to a party, he drank continuously. He denies ever passing out or experiencing blackouts as a result of drinking. He denies problems with hangovers or shakiness. He denies ever drinking any homemade alcohol products. He states that when he drinks, he's "laid back, laughs, and has fun." He describes this as "getting your little light bulb going." He never viewed himself as having an alcohol problem but has joked with people he knows and called himself an alcoholic. He clarified that if anything, he views himself as a "social alcoholic" which he defines as one who can do without alcohol.

As noted, he has had several DUI charges, and his license is suspended. He has acquired additional charges for Driving with a Suspended License.

Mr. Brown initially admitted to some use of marijuana but states he has not used any for more than one year. He indicates that it was never a regular drug habit. He denies sniffing glue or using intravenous drugs (because he's afraid of needles). Initially he denied any cocaine use or prescription drug abuse. During the phone interview with Attorney Darden, he mentioned Mr. Brown's use of cocaine. Mr. Brown was questioned again about his cocaine use. He then did admitted that he had used cocaine. Again he denied that this was a persistent drug of abuse and stated he had not used any for an extended period of time.

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

8

When asked about any specific stressors in his life, Mr. Brown volunteered that he was saddened by the deaths of his brother Nita and his grandmother. He relates that the death of his mother, however, has been the most difficult for him.

In an effort to gather further social history on Mr. Brown, attempts were made to contact several family member. Telephone interview was conducted by this evaluator with Pelham Brown, Mr. Brown's father. He indicated that he left the family home at some point but couldn't remember when. Although he maintained contact with Jason intermittently, he was unable to provide many specific details. He described his son, whom he called Jason, as a nice boy when he was going to school. He noted that Jason's mother had died "about six weeks ago" and that Jason was very close to his mother. Pelham Brown expressed his own opinion that Jason "did not do that...ain't nobody would go to rob a post office in the middle of the day, he had to be set up." He added that he thought Jason was possibly there when the true perpetrators of the crime came in or that the crime had already happened when he got there. He indicated that Jason had worked with him for some period of time but couldn't remember the specific time frame. His primary concern appeared to be in finding out the address of the FMC and trying to send him some money to demonstrate his support.

Telephone interview with his aunt, Willie Bell Williams, also provided limited information. She remembers him as a quiet boy who was raised with his cousins. She notes his maternal grandmother often took care of the kids while her daughters worked. Physical discipline was not used to any extent. She notes he was close to his mother, who was a hard working woman. He went to church regularly as a child. She has had less contact with him as an adult. She commented that she realizes kids change as they grow up and get into things they should not get into.

Mr. Brown's brother Dexter did not return the evaluator's call.

In regard to the time around the alleged offenses which occurred on 11/30/02, Mr. Brown denies experiencing any specific stressors affecting his life. He did indicate that as a result of both he and his girlfriend being unemployed and her ex-husband offered to assist with her expenses, he moved back into his mother's home. He commented that "being a man I couldn't be supported by another man." He maintained an ongoing relationship with Ms. Brown despite not living together. He found some odd jobs to make some money, and his mother assisted him with basic expenses. He anticipated that he would eventually regain employment with the landscaping company (referenced above) when they returned to his area, but had no clear time frame for when this would occur.

Mr. Brown continued his usual pattern of drinking but denies that he was drinking on the day of the alleged offenses. As noted, he states he never drinks in the morning, nor did he indicate he was experiencing symptoms of alcohol withdrawal. He denies any symptoms of mental illness including anxiety or depression around that period of time. He reiterated his position that on his attorney's

Meier Jason Brown                                                                                  9
#11364-021
CR403-001
September 16, 2003

advice, he has entered a plea of not guilty and thus he maintains he was not involved in the alleged offenses. At the same time, he is clearly aware that he previously confessed to the alleged offenses in interviews with the Postal Inspector and Detective Woodall on December 5th and 6th, 2002.

In summary, review of collateral information currently available, indicates that on 11/30/02, around 10:51am, the body of Sallie Louise Gaglia was found inside the Post Office in Fleming, Georgia. A customer had entered the Post Office and found the body lying on the floor. It appeared Ms. Gaglia had been stabbed numerous times and it was determined that several U.S. Postal Money Orders were missing. It was also determined that the victim's wallet had been removed from her pocketbook. Autopsy showed the victim had been stabbed 10 times in the areas of the chest, wrist, and back.

Interview with a mail carrier who had been in the office before the crime revealed that earlier that morning an unidentified male had come to the Post Office to get mail out of a box and stated his name was Jason. Witnesses in the area reported seeing an African American male in proximity to the Post Office around the time of the alleged offenses. He was apparently riding a bicycle toward the Post Office just prior to the time of the offenses. A confidential source apparently provided additional information implicating Mr. Brown in the murder of Ms. Gaglia. The source alleged that Mr. Brown was trying to obtain money and had left his residence and returned appearing nervous. Mr. Brown subsequently called his girlfriend for a ride to Savannah and she picked him up. The source alleged that Mr. Brown stated that he had gone to the Post Office, surprised Ms. Gaglia and had to kill her because she knew him.

Additional witnesses came forward indicating they had seen an African American male on a bicycle wearing gloves, in front of the Post Office. Mr. Brown was identified from a photo spread. On 12/03/02, Mr. Brown apparently called Detective Marty Adams but declined to be interviewed. On 12/04/02, telephone records for his girlfriend's phone were subpoenaed, and it was noted that he had placed a call at 11:25 on 11/30/02 to her number. On 12/05/02, searches were conducted of his mother's and girlfriend's residences. At his mother's, a red bicycle with an apparent spot of blood on the seat, a knife which matched the description of the knife used in the stabbing and a jacket similar to that described by witnesses were located. At Diane Brown's receipts for U.S. Postal Money Orders which were determined to have been stolen from the Post Office were discovered, as well as tennis shoes which overtly appeared to match shoe prints found on the counter and a substance consistent with blood was found on the seat of Diane Brown's car.

Apparently prior to his arrest, Mr. Brown agreed to be interviewed at Diane Brown's residence. He indicated that he had gone to the Post Office with the intent to steal money orders from Ms. Gaglia and was going to threaten her with a knife. He stated that during the robbery he accidently tripped and stabbed her, and in essence "finished it." He took the money orders and fled on his bicycle. Ms.

Meier Jason Brown                                                                                    10
#11364-021
CR403-001
September 16, 2003

Brown stated that she had received the money orders from Jason Brown but didn't know where the funds to purchase them had come from.

The transcript of the interview with Mr. Brown on 12/06/03 indicated that after he had been advised of his rights, he agreed to talk to Detective Woodall. He admitted going to the Post Office early in the morning and getting mail out of the family mailbox. He indicated he rode his bicycle there. He subsequently delivered mail to his relatives and then went back to rob the lady at the Post Office. He stated his intent was to steal some money orders. He went inside the Post Office and asked the lady (Ms. Gaglia) for the money orders. As she made them, he jumped across the counter, tripped and accidently cut her. He indicated he had taken the knife to intimidate her not to injure her, and obtained the knife from his mother's house. Apparently he put socks over his hand at the time of the incident. He asked for three money orders, two of them to pay one bill and one for another bill. He indicated that he doesn't remember anything after the accidental cut of Ms. Gaglia until he threw the knife away, yet he remembered taking the money orders and the wallet, and leaving the Post Office. He then returned to his mother's and took off his clothes and threw them in the washing machine. He got dressed and called his girlfriend to pick him up. He indicated that she did not know anything about the incident and had nothing to do with it. He insisted that he had utilized a kitchen knife in the commission of the crime and then threw it away. He also stated he had never told anyone what happened in the Post Office until he told Diane on 12/05/02, in front of the detectives. He insisted that he had gone there only with the intent of robbing the woman and without any intent to kill anybody. He indicated that the killing of the woman was a stupid decision. Near the end of the interview, he did indicate that he was very sorry for what had happened, and was extremely scared.

During this evaluation period Mr. Brown stated that the only reason he gave a confession was because the detectives were threatening to arrest his girlfriend Diane and take her child away from her. He stated that frightened him more than anything and so he agreed to state that he had committed the alleged offenses. He stated that he was pushed to do so by the detectives' description of the event as an accident. He did state to this evaluator that he stole the money from a "drug dealing cousin" to get the money orders for Diane to pay her bills.

Following his confession, Mr. Brown was arrested and has been housed at the Liberty County Jail in Fleming, Georgia. While there, he received some visits from his mother, youngest brother, and Diane. During his incarceration, his mother was hospitalized and subsequently died on 06/16/03. He describes being very sad about her death and his inability to attend funeral services. He reports that following his arrest, he told his mother he was innocent and didn't commit the crime and asked her whether indeed there was a god and was reassured by her that there was.

Meier Jason Brown                                                                                    11
#11364-021
CR403-001
September 16, 2003

**Course in Institution:** Following admission to the FMC, Mr. Brown underwent a routine physical examination and laboratory studies. At the time of intake screening, he denied any known drug allergies and indicated he was not in any acute distress or suffering from any pain. Screening for tuberculosis exposure was negative. He was on no medication at the time of admission. Medical history report from Mr. Brown was entirely negative. He indicated he has good vision in both eyes and is right handed. He denied any previous medical or psychiatric hospitalizations. Review of medical history was essentially negative. He did report that at approximately age 11 he had some type of a cyst or mass removed from under the right side of his chin, done in the doctor's office with no followup required. He denied any history of fractures, head injury, cardiac, respiratory, gastrointestinal, renal or genital urinary problems. As noted, family history is positive for insulin dependent diabetes mellitus, hypertension, and heart problems in his mother, one brother who was status post a valve replacement secondary to rheumatic heart disease and status post a cerebral vascular accident in the last three years, and one brother deceased from complications of AIDS. Alcohol use history is positive as described above. He also indicated that he started smoking as an adolescent and smoked one half to one pack of cigarettes per day until the last year, when secondary to incarceration he has in essence discontinued this. In summary, medical history is viewed as noncontributory and the physical exam was unremarkable.

Mr. Brown was noted to be 5'7" tall and weighed 146 pounds at the time of admission, which is his average weight. Laboratory studies completed at the time of admission included routine blood chemistries, hematology, urinalysis, and serology. All the results were either negative or within normal limits with the exception of mild but not clinically significant elevation in calcium of 10, with normal range being 8.5 to 9.9mg/dL, and abnormalities in total T4 and thyroid uptake. Consultation with the general medical physician assigned to mental health inmates was done regarding the abnormal thyroid function studies. Additional thyroid tests were conducted which were normal and the final assessment was that there was no clinical significance of the original abnormal readings. HIV testing was negative. Vital signs were within normal limits except for intermittent reading of bradycardia (a slowed pulse). On further assessments, his pulse ranged from 45 to the mid 80s. He was not experiencing any clinically identifiable symptoms. A review of prior records showed that pulse readings were in the same range. A routine EKG has been ordered and he was again referred to the general medical physician for further evaluation which is pending at the time of this report.

Mr. Brown remained in good health throughout this evaluation period. He did experience one episode of ear pain from an infection which resolved with antibiotic treatment.

Initially Mr. Brown was placed in the 1E seclusion unit within the Mental Health Department as the result of the need for further observation given his current charges. During the early part of this evaluation it was the administration's decision that the study should take place in that environment.

Meier Jason Brown                                                                                 12
#11364-021
CR403-001
September 16, 2003

Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit. He completed the evaluation in that status. His living situation included rooming with another individual and going to the dining area for meals. He also had access to the recreation and educational facilities, as well as the law library. Mr. Brown indicated that he had no familiarity with using the law library and didn't know how to go about finding legal information. He was informed of the orientation class available to instruct inmates on use of that library. Throughout the evaluation period he spent his time reading, watching television, and walking. He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.

Mental status examination throughout the evaluation showed little change and remained consistent with that seen at the time of admission. Mr. Brown appeared to be a medium build, African American male, who was oriented to person, time, place and situation. His hygiene and grooming were good. He chose to wear his hair very short. Eye contact was good and he was generally cooperative with the evaluation process. He did not appear guarded or evasive in providing answers but defined areas where he was uncomfortable discussing details, such as any information regarding the current alleged offenses. There was no evidence of psychomotor agitation or retardation, and no unusual mannerisms or tics were noted. Gait was normal. There was no overt evidence of anxiety, although during one interview when thinking about his current situation, he became upset. Speech was of normal rate and tone, and vocabulary appeared to be within the average range. He described his mood as okay, clarifying that he was quite aware of the severity of his situation, but did not feel depressed. He denied that he had ever experienced any decrease in his mood consistent with a clinical diagnosis of depression. Sleep and appetite were good. He did not appear angry or irritable. Affect showed a normal range in response to content of conversations.

No abnormalities in the form or content of his thinking were noted. He spoke spontaneously and answered questions appropriately. His answers were goal directed and relevant to the conversations. No loosening of associations, illogical or tangential thinking, rambling, or perseveration were noted.

Review of the content of Mr. Brown's thinking showed no unusual preoccupations. There was no evidence of obsessive thinking, compulsions, or phobias. He denied suicidal and homicidal ideation in his current state. There was no evidence of hypochondriasis.

Detailed review of his mental status showed no evidence of delusional thinking. He did not appear overtly paranoid. There were no ideas of reference noted. There was no evidence of hallucinations. There was no evidence of depersonalization or derealization. He did not describe any unusual dreams or nightmares.

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

13

Throughout the evaluation period Mr. Brown appeared alert and aware of his environment. His concentration was good and he demonstrated a good attention span. He remained oriented to person, time, place and situation.

There was no evidence of impairment in his memory: immediate recall was good and intermediate and long term memory appeared intact. His fund of knowledge was within the average to low average range and consistent with his education history. Mathematical skills were intact. He showed the capacity for abstract thinking.

Mr. Brown demonstrated insight into his current situation. He did not view himself as mentally ill and that appeared to be a consistent view of those around him. His judgement on the unit appeared adequate. He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain his own safety and not impose on others.

Mr. Brown cooperated with psychological testing, which was conducted by Dr. Pyant and outlined below.

**Psychological Test Results:** During the evaluation process Mr. Brown was administered several psychological tests. He fully cooperated with requests for testing, but at times appeared annoyed and irritated. He occasionally commented about being asked "dumb questions." Although recognizing that psychological testing was a part of the evaluation process, he communicated mild anger at being treated as if he had a "mental problem." He did, however, display good motivation and appeared engaged in the testing process. During other periods of testing he displayed frustration when unable to answer questions. In these situations he engaged in brief laughter which conveyed anxiety or responded with "I don't know," seemingly as a measure to avoid embarrassment. When answers were not readily available to him or he simply was unable to answers certain questions, more encouragement was required to increase his self confidence. Mr. Brown displayed no problems with hearing, vision or motor skills.

**Personality Assessment:** Mr. Brown was administered the Minnesota Multiphasic Personality Inventory-2 on 08/14/03, which is a well validated, 567 true/false item test used to assess personality characteristics and symptoms of mental illness. Although elevations in three of the validity scales approached cutoff scores, the protocol was deemed interpretable. Validity scale scores elevations, however, described Mr. Brown as a person who was portraying himself as being free of mental illness. Individuals obtaining similar validity profiles are often described as viewing themselves as virtuous and without moral flaws. These individuals deny the existence of anger or emotional distress and perceive themselves as being psychologically stable persons who have positive relationships with others.

Meier Jason Brown                                                                    14
#11364-021
CR403-001
September 16, 2003

Mr. Brown's clinical scales reflected no evidence of psychosis or symptoms of depression, anxiety or an inability to manage stress. Admittedly, elevations in his clinical scales may have been depressed due to his defensive approach. However, in this forensic setting even when test takers approach the testing situation in a defensive manner, clinical scales typically reflect acute distress related to personal circumstances, such as pending criminal charges, family separation, financial problems etc.

Interestingly, Mr. Brown obtained significant elevations on the Over-controlled Hostility Scale (O-H) and MacAndrew Alcoholism Scale-Revised (MAC-R), two Supplementary Scales. High scorers on the O-H scale are described as individuals who often fail to appropriately respond to acts of provocation. These individuals are likely to avoid expressing feelings of frustrations directly, perceive they are above the law and free from punishment, tend not to discuss angry feelings and have strong needs to excel. However, they are also described as socialized, trustful and dependent upon others. Individuals with high scores on the MAC-R are likely to drink excessively. They are also described as extroverted, exhibitionistic, self confident, high risk takers and aggressive.

**Neurobehavioral Cognitive Status Examination:** On 08/15/03, Mr. Brown was administered the Neurobehavioral Cognitive Status Examination (Cognistat), which is designed to assess intellectual functioning in five major ability areas: Language, Constructions, Memory, Calculations and Reasoning. The instrument is also specifically designed to assess the degree of disability across these domains. Test development further indicates that the Cognistat assesses cognitive functions at a specific point in time and is sensitive to cognitive dysfunctions. Mr. Brown's test scores were not indicative of cognitive dysfunction. His scores fell in the Average range across the five domains, thus reflecting no evidence of cognitive impairment.

**Revised-Competency Assessment Instrument:** On 08/14/03, Mr. Brown was administered the Revised-Competency Assessment Instrument, a 14 item structured interview questionnaire addressing the following domains: 1. Understanding Charges; 2. Appreciation of Penalties; 3. Appraisal of Available Defenses; 4. Appraisal of Functions of Courtroom Participants; 5. Understanding the Court Procedures; 6. Motivation to Help Self in the Legal Process; 7. Appraisal of Likely Outcomes; 8. Planning of Legal Strategies; 9. Ability to Cooperate Rationally with Counsel; 10. Capacity to Disclose Pertinent Information to Counsel; 11. Capacity to Testify; 12. Capacity to Challenge Prosecution Witnesses; 13. Ability to Manifest Appropriate Courtroom Behavior; and 14. Capacity to Cope with the Stress of Incarceration Awaiting Trial.

Overall, results indicated Mr. Brown was familiar with the legal proceeding and capable of working with his attorney to address charges against him. He verbally acknowledged being charged with murder and robbery, and stated if found guilty, a possible outcome is death or life without parole. Mr. Brown expressed that he had entered a plea of not guilty, but understands he may also enter a

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

15

plea of guilty. He adamantly communicated an unwillingness to enter a plea of not guilty by reason of insanity since he does not believe he is mentally ill nor guilty of a crime. He appropriately described a plea bargain as "an acceptance of being found guilty with your sentence being prearranged, most likely shorter." He expressed confidence in his lawyers and communicated a willingness to "give full cooperation." He verbalized a willingness to consult with his lawyer if not understanding what is going on in the courtroom or in situations in which he perceives a witness is telling lies about him. Mr. Brown defined appropriate courtroom behavior as sitting and listening and recognized that speaking without permission would result in him being "locked up."

**Intellectual Functioning:** On 08/21/03, Mr. Brown was administered the Wechsler Intelligence Scale-Third Edition, a general measure of cognitive and intellectual functioning. He obtained a Full Scale IQ score of 90 which falls in the Average range of intellectual functioning. This score equates to a percentile rank of 25, indicating his score fell at or above 25% of the adult peer group used to validate the test. He obtained a Verbal IQ score of 91 which equated to a percentile rank of 27 and a Performance IQ score of 91, also resulting in a percentile rank of 27. There is a 95% chance his true IQ score falls in the range of 86-94. Of note was a strength in Matrix Reasoning, assessing his ability to utilize complex mental processes to identify various patterns. However, a weakness was observed on Digit Symbol, a task assessing speed of visual information processing and the use of motor skills. This suggests he is exceptionally slow at a skill involving the analysis visual information and utilization of motor skills. Overall results, however, suggests he has Average intelligence.

**Impressions:** According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision, of the American Psychiatric Association, we currently view Mr. Brown as follows:

Axis I:        No Diagnosis, V71.09

Axis II:       No Diagnosis, V71.09

Axis III:      History of intermittent bradycardia, asymptomatic; History of ear infection resolved with antibiotic treatment

Axis IV:       Significant legal problems

Axis V:        GAF=85

Meier Jason Brown                                                    **16**
#11364-021
CR403-001
September 16, 2003

Review of Mr. Brown's mental status and history support that at present he does not meet the criteria for any psychiatric diagnosis. He has no history of mental health symptoms or treatment prior to his current period of incarceration. As noted, he was evaluated at his attorneys' request briefly by a psychiatrist or psychologist at the county jail. Although a specific report of that evaluation was not available to this evaluator, Defense Attorney Darden did identify that no mental health findings were uncovered during that evaluation.

Given the nature of his current legal situation, Mr. Brown was reluctant to talk about specific details of his thinking and behavior in close proximity to the alleged offenses or during the time of the offenses. In general, however, he was unable to identify any unusual stressors he felt would have impacted his behavior at that time. Although he was unemployed at that time, he had experienced this intermittently and denied that he was feeling desperate in his financial state.

As noted, Mr. Brown has a significant history of ongoing alcohol use. His self report and other available information failed to support that he meets the formal criteria for Alcohol Abuse or Dependence. A diagnosis of substance abuse requires recurrent substance use resulting in a failure to fulfill major role obligations at work or at home, use in situations in which it is physically hazardous, recurrent substance abuse related legal problems or continued abuse despite having persistent social or interpersonal problems caused or exaggerated by the effects of the substance abuse. There is some evidence historically that he has utilized alcohol while driving. The details, however, are not sufficiently clear to assure he meets the criteria of this diagnosis. A diagnosis of Substance Dependence requires evidence of at least three of the following: tolerance; withdrawal; increased intake of the substance taken in larger amounts and over a longer period of time than was intended; persistent desire and unsuccessful efforts to reduce or control substance use; a great deal of time spent activities necessary to obtain the substance; reduction of important social, occupational, and recreational activities; or substance use being continued despite knowledge of having persistent physical or psychological problems caused or exacerbated by the substance. Specifically, Mr. Brown denies any evidence that he has developed tolerance to alcohol or withdrawal symptoms. His pattern of drinking seems fairly consistent over time and he expresses an ability to stop drinking when he chooses to do so. His social, occupational, and recreational activities seem to be consistent regardless of his alcohol use. He has not yet experienced any physical or psychological problems related to his substance use.

As noted above, Mr. Brown's drug of choice is alcohol. Although he admits to marijuana and cocaine use is in the past, he does not make any claim that he was using any legal or illegal substance in proximity to the time of the charged offenses.

Meier Jason Brown                                                    17
#11364-021
CR403-001
September 16, 2003

Review of Mr. Brown's social history reveals that he was raised in an extended family who undoubtedly experienced socioeconomic problems at least intermittently. Nonetheless, he is able to described in a fair amount of detail how the family pulled together to assure all the children were adequately taken care of, fed and clothed. He remembers his childhood in a positive light and recounts a variety of activities in which he was involved. He developed close relationships with cousins and other family members more so than with individuals outside the family setting. There appears to have been an internal support system including his grandmother and a number of maternal aunts, to assist with childcare and monitoring as needed when his mother was working. Mr. Brown denies that he was ever physically or sexually abused by anyone.

Mr. Brown does describe some disruption in the family as the result of his father being "thrown out" by his mother when he was in the eighth grade. However, he did maintain a relationship with his father and felt he understood the basis for the problems between his parents.

Available history on Mr. Brown did not support evidence of a conduct disorder with onset before the age of 15. There is not sufficient evidence that he had a pervasive pattern of disregard for or violations of the rights of others since the age of 15, as indicated by the identified criteria for a diagnosis of Antisocial Personality Disorder. He does have a persistent history of criminal behavior and the focus of his current clinical situation is his adult antisocial behavior, not specifically a mental disorder. Nonetheless, he does not demonstrate chronic history of organized criminal behavior; instead, he has a history interspersed with a variety of relatively minor charges until the time of the current alleged offenses.

Psychological testing supports the clinical impression that Mr. Brown is not suffering from any type of diagnosable mental illness. It also supports that his intellectual functioning falls within the Average range.

Review of his behavior while incarcerated does not identify that he ever presented as a problematic inmate. Except for minor disciplinary infractions related to housekeeping issues, he has no history of problems with staff or other inmates.

Specifically in response to the question of the Court, it is this evaluator's opinion that there is no specific mental condition that bears on the issue of punishment in a capital case. Mr. Brown does not appear to have ever suffered from a mental disease or defect which would render him unable to appreciate the nature and quality or wrongfulness of his acts such as might mitigate the punishment imposed against him.

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

18

Although Mr. Brown has no history of mental illness and is not evidencing any symptoms, given the reality of his current situation and the potential stress of the upcoming trial, he should be monitored for the onset of depression. Currently he denies any symptoms consistent with depression and requires no active mental health intervention. He is not on any psychotropic medications or general medical treatments.

Sally Johnson, M.D.
Consultant to the Medical Director of the
  Federal Bureau of Prisons

Carlton Pyant, Ph.D.
FMC Butner Staff Psychologist

SCJ/dd