# APPENDIX T

JUN   2 2003



FORENSIC LABORATORY EXAMINATION REPORT

UNITED STATES POSTAL INSPECTION SERVICE
NATIONAL FORENSIC LABORATORY
22433 RANDOLPH DRIVE
DULLES VA 20104-1000

May 27, 2003

Case No. 0241-1370514-ECR(1); 9-401-01672(1)
Evidence Processing, Trace Examinations and DNA Contract Services
Requested December 10, 2002

M. F. McLendon
Postal Inspector
P.O. Box 6
Savannah, GA 31402-0006

REQUEST: Determine whether trace evidence from the clothing of the decedent can be associated to M. J. Brown.

Determine whether trace evidence from the clothing items recovered from the environments of M.J. Brown can be associated to standards of the decedent.

Determine whether human blood is present on assorted items recovered from the environments of M.J. Brown.

Determine whether any human blood recovered from the environments of M.J. Brown can be associated to the decedent using DNA technology.

FINDINGS: Hairs exhibiting Caucasian racial characteristics were recovered from the clothing, body and adjacent surroundings of the decedent. A single hair fragment exhibiting Negroid racial characteristics was recovered from the decedent transport sheet (Item Q-53C). A head hair standard from M.J. Brown was not provided for microscopic comparison purposes.

Hairs and hair fragments exhibiting Negroid racial characteristics were recovered from the clothing items and vehicle utilized by M.J. Brown. A hair exhibiting Caucasian racial characteristics was recovered from a duffle bag containing clothing items (Item Q-29). The hair is microscopically dissimilar to the head hair standard of the decedent.

Human blood was detected on the right cuff of the olive-drab jacket in Item Q-35.

TELEPHONE: 703-406-7100
FAX: 703-406-7115

USA1110

Inspection Service
Exhibit
237 (2 pp)
Label 113, July 1987

- 2 -

Several knives (Q-23, Q-24, Q-25 and Q-32), the seat and pedals of a bicycle (Q-28A and Q-28B), the aforementioned olive-drab jacket, and assorted swabs taken of the interior of a Dodge Durango (Q-45, Q-46, Q-47, Q-48 and Q-49) were transported to the Bode Technology Group for contract DNA testing. The results of DNA analysis are the subject of a separate report issued by the Bode Technology Group.

EXHIBITS: The exhibits, as described in the requests for examination, were received via hand carry on December 12, 2002, RC 012 132 701 US on December 17, 2002, RB 497 246 858 US on December 16, 2002, RC 012 132 750 US on December 24, 2002, RR 359 070 795 US on December 26, 2002 and RC 012 132 879 on January 14, 2003. The exhibits are being retained at the laboratory pending personal pick-up.

Stephanie L. Smith, BS D-ABC
Senior Forensic Chemist
(703) 406-7141

USA1111

# APPENDIX U

## AFFIDAVIT FOR SEARCH WARRANT

I, Marla F. McLendon, first being duly sworn, depose and state that I am a United States Postal Inspector assigned to the Savannah, Georgia office of the Southeast Division of the United States Postal Inspection Service. I have been a Postal Inspector for the past nine years. As part of my official duties, I investigate crimes committed against the U.S. Postal Service and postal employees during the course of their duties, including armed robbery and homicide, all in violation of United States Code, Title 18, Section 1111, Murder; Section 1114, Protection of Officers and Employees of the United States; and Section 2114, Mail, Money or other Property of the United States. This affidavit is made in support of an application for a warrant to search the residence of MEIER JASON BROWN. 6724 Leroy Coffer Highway, Fleming, GA 31309. Your affiant deposes the following:

1. On November 30, 2002, at about 10:51am, the body of Sallie Louise Gaglia was found inside the US Post Office, in Fleming, GA, which is in Liberty County. Ms. Gaglia was identified as the Postmaster Relief, a federal employee, for the Fleming Post Office. Between 10:40 and 10:50am on November 30, 2002, a customer entered the post office and found Ms. Gaglia's body lying on the floor. The witness summoned medical personnel and law enforcement who arrived within minutes and secured the scene. Examination of the crime scene determined that Ms. Gaglia was stabbed with what appears to be a knife or other sharp cutting instrument multiple times over the front and back of her body. Based on a review of the materials at the scene, it appears she was in the process of preparing to close the post office for the day and was processing the day's receipts. Among the transactions found to have been made were the sale of four US Postal Money Orders in the amounts of $500.00, $500.00, $20.00 and $175.00. A check of interior of the facility failed to locate the monies received for the sale of the money orders. A financial review of the Post Office confirmed the sale of the four money orders and also confirmed the funds for the purchase of these money orders was missing from the Post Office. Further check of Ms. Gaglia's pocket book, which was on a chair by the desk, determined her wallet containing her license, credit cards, and personal papers were missing. Based on these factors, the motive of the incident was felt to be robbery.

2. An autopsy conducted by the Georgia Bureau of Investigations, Medical Investigations Division, Atlanta, Georgia, determined Ms. Gaglia died from multiple stab wounds. The victim was stabbed ten times -- twice in the chest area, twice on the wrist, and six times in the back. The medical examiner stated the killer probably retained some blood from the attack on his clothing and shoes. Examination of the interior of the facility resulted in the location of numerous areas of blood as well as hand prints and foot prints which were made after coming into contact with the blood of Ms. Gaglia. Due to the extremely violent nature of the attack, the large amounts of blood present, the obvious hand prints and foot prints in the blood, and the medical examiner's report, it is probable that blood from Ms. Gaglia was transferred to the offender during the attack.

3. While conducting interviews with personnel located in the area of the post office, contact was made with the rural route carrier working in Fleming, GA, was interviewed and stated that on the morning of November 30, 2002, between 8:00 and 9:30am, an unidentified male was overheard attempting to access a post office box. Based on the conversation overheard by the rural carrier, the male making inquiry to the post office box was apparently not a registered user of the box. The carrier overheard Ms. Gaglia ask the male what his name was and he replied "JASON". The carrier reported the voice seemed to be that of an African American male.

4. Interviews with various witnesses who live in the area of the post office identified two separate witnesses who described seeing an African American male at or near the post office prior to the time frame established as the time of the attack on Ms. Gaglia. One of the witnesses described the African American male as being in his late 20's or early 30's, weighing approximately 180 lbs and bearing facial hair. This witness reported she had seen the male riding a bicycle towards the post office at approximately 10:30am.

5. A second witness described an African American male who was seen on a bicycle near the railroad crossing immediately adjacent to the post office at approximately 10:30am. This witness described the male as approximately 25 to 26 years of age, 5'10" to 6'00" with a stocky build.

USAO000442

4 x 6
Inspection Service
Exhibit
1 G-2

6.    On December 3, 2002, a confidential source (CS) contacted the Liberty County Sheriff Department and reported he had information pertaining to this incident. The source was subsequently interviewed by Postal Inspectors and Detectives of the Liberty County Sheriff Department. A criminal history inquiry regarding the CS revealed a prior arrest but no conviction for a possession of narcotics charge in December 1990.

7.    The source reported he was a life long friend of MEIER JASON BROWN and had heard from an unidentified source on Monday night, 12-02-02, that Jason Brown was involved in the murder at the Fleming Post Office. The CS stated his source provided the following information:

Jason Brown was at the residence of the Morgan family, who reside on Leroy Coffer Highway, Fleming, GA, on Saturday morning, 11-30-02. Trying to obtain some money. He was refused and was overheard stating, "I will go and get some." Brown left the residence and returned on a bicycle, appearing to be very nervous. Brown used a telephone to call for a ride from his girlfriend who lives off of Quacco Road, Savannah, Georgia, in Chatham County. Brown stated he went over the counter in the Post Office and surprised the lady coming from the restroom and had to kill her because she knew him. Brown threw the knife into a wooded area while riding the bicycle from the Fleming Post Office south on Fleming Loop Road back to the Morgan residence

The CS also stated Brown presently does have some facial hair. The CS stated Brown may have changed clothes at the Morgan residence on Saturday, November 30, 2002, but could not be certain.

8.    A criminal history inquiry regarding Meier Jason Brown disclosed 13 arrests for various offenses, and seven convictions. Convictions for Jason Brown include one Robbery, two Forgery, one Theft by Taking – Auto, two Driving Under the Influence, and one Possession of Marijuana convictions.

9.    Further coordination with local law enforcement determined that through previous contacts with the various occupants of 6724 Leroy Coffer Highway, Fleming, GA, one of the persons who stays at this residence was identified as MEIER JASON BROWN. This residence and two other residences co-located at this location are collectively known to local Law Enforcement as "The Morgan Residences". Incident reports concerning prior arrests of Meier Jason Brown by the LCSD confirm Brown is a black male, 5'7", 140 lbs. and 32 years of age.

10.    On December 3, 2002, an anonymous call to the CrimeStoppers tip line indicated Jason Brown was responsible for the murder at the Fleming Post Office. The caller stated Brown is also known as "Mara".

11.    On December 3, 2002, another witness stated he saw an African American male wearing white gloves holding the handlebars of a bicycle while standing in front of the doorway of the Fleming Post Office on November 30, 2002 at approximately 10:30 to 10:45am. This witness was shown a photo spread consisting of twelve individual's photos and positively identified Meier Jason Brown as the individual he witnessed in front of the Post Office on November 30, 2002. An additional witness who stated he saw an African American male approaching the Fleming Post Office on bicycle at approximately 10:40 was unable to identify the individual from the same photo spread.

12.    On December 3, 2002, at 7:15pm. Detective Marty Adams, LCSD, received a telephone call from an individual who identified himself as Jason Brown. Brown stated his mother, Sadie Brown, advised him that detectives were looking for him in connection with the murder at the Fleming Post Office. Brown declined to be interviewed by Detective Adams and stated he was enroute to South Carolina at the time of the call. The Sheriff's Department telephone display showed Brown's telephone number as 912-308-8463.

13.    On December 3, 2002, Chief Deputy Keith Moran, LCSD, telephoned the above number and spoke with Jason Brown. Brown stated he was in the Fleming Post Office on November 30, 2002 sometime after 8:00am. The telephone line then went dead.

14.    On December 3, 2002, Chief Deputy Moran again telephoned the above number, which was answered by a female who identified herself as Ms. Brown. Ms. Brown confirmed Jason Brown used her cell phone to telephone detectives earlier. She also stated she had just dropped him off at a friend's residence near Richmond Hill, GA.

USAO00443

5 9 6
Inspection Service
Exhibit

15.    On December 4, 2002, subpoenaed telephone records for 912-308-8463 indicate this number received an incoming, four-minute call at 10:57am on November 30, 2002. An outgoing telephone call from this number was placed at 11:25am on November 30, 2002 to telephone number 912-884-4346. Subpoenaed telephone records for this number confirm it is the residential listing for Sadie Brown, Jason Brown's mother. Sadie Brown resides at 6724 Leroy Coffer Highway, Fleming, GA.

16.    A search conducted by law enforcement personnel, along with trained cadaver canines, of the wooded area between the Post Office and the Morgan residences failed to disclose a knife. The area consists of dense undergrowth covering approximately one to two miles. The Morgan residences are situated on a large parcel of wooded land which has not been searched.

16.    Based on investigation to date, it is believed that the person who stabbed and killed Ms. Gaglia had blood, fibers, and trace evidence transferred to their person, clothing and shoes. This suspicion is strengthened by the presence of a large amount of blood located at the crime scene and the presence of blood transfers to the surrounding furniture. Since a postal employee witnessed some type verbal exchange between the victim and an unidentified black male named "JASON", and because Meier Jason Brown was identified by a witness as being in the area of the post office at the time of the attack, it is suspected that this person is involved in the subsequent stabbing of Ms. Gaglia.

17.    Since no clothing, shoes, or knife was found at the scene, it is believed that these items would have been removed by the suspect when he left the post office. Therefore, it is felt that the clothing and other items as well as the money orders or other documents, papers, and belongings of Ms. Gaglia may be located in the residence or hidden somewhere on the property of the residence. For these reasons, affiant feels there is probable cause to believe that evidence which will link MEIER JASON BROWN to the stabbing of Ms. Gaglia will be found inside the property described in this affidavit.

18.    Based on the above, affiant feels there is probable cause to believe that evidence supporting the offense of Murder and Robbery may be found inside the residence described in this affidavit or inside any vehicle located on the premises.

USAO00444



Inspection Service
Exhibit
16 2
Label 113, July 1987

# APPENDIX V

## MEMORANDUM OF INTERVIEW

PERSON INTERVIEWED                      :

DATE OF INTERVIEW                       :    December 3, 2002

PLACE OF INTERVIEW                      :    Hinesville Courthouse
                                             Main Street
                                             Hinesville, GA  31313

TIME OF INTERVIEW                       :    11:20 a.m.

INTERVIEWED BY                          :    J. T. Rushwin, Postal Inspector
                                             J. Don Martin, Sheriff
                                             Liberty County Sheriffs Office
                                             Keith Moran, Chief Deputy
                                             Liberty County Sheriffs Office
                                             Dennis Davis, Captain
                                             Liberty County Sheriffs Office


called the Liberty County Sheriff's office with information on the murder of Sallie Gaglia, Postmaster Relief, Fleming, GA Post Office.

said Jason Brown (half brother to the Morgan's in Fleming,GA) did it. He said Jason was at the Morgan's Saturday, November 30, 2002, looking for money. No one would give him any. Jason said "don't worry about it, I'll get me some." He left on a bike and returned around 10:30-11:00 a.m. He was very nervous and said he had to get a ride. He called his girlfriend from Sadie Brown's house.

said Brown went through the box at the counter line. He said the woman may have been in the bathroom, then surprised him when she came out of the bathroom, she knew him.

USAO00403

Inspection Service
Exhibit
144
Label 113, July 1987

## MEMORANDUM OF INTERVIEW - Scriven

said the weapon may be in the woods. They said Jason threw it in the woods near the log cabin house with the green roof. They said he came back that way.

said Jason is laying low now. He lives in Savannah with his girlfriend, in the last mobile home park on the right on Quacco Road. said he heard all this information from the other people last night, not directly from Brown.

said the guys in the white box type car, the Lincoln, had nothing to do with it. He said the Lincoln was in the area Saturday morning "doing things you guys don't approve of."

*J. T. Rushwin*

J. T. Rushwin
Postal Inspector

USAO00404

Inspection Service
Exhibit
149
Label 113, July 1987

# APPENDIX  W

—  ⌐ stated the conversation centered around Jason Brown, whom he calls "Brown", and the murder of the Fleming postal employee on November 30, 2002. — ⸱  described the conversation as follows:

Black Boy and Latoya said they knew Jason killed that lady because he was asking everybody to get him from around there on the morning of November 30, 2002 and finally got his girlfriend to come pick him up. Earlier that day, Jason had asked for money but no one gave him any. He said he'd get it and left on a bicycle to get the mail. He was "acting crazy" and nervous when he returned but was not bloody. Jason called his girlfriend from Latoya's cell phone, number 570-7073. Latoya said Jason told his girlfriend to come get him and he had money to pay the bills. Latoya said the girlfriend must have asked where he got the money because Jason told her not to worry about it, just come get him and added he had about $200 for the phone bill.

stated he returned to the Bizzard residence on the evening of December 2, 2002, but when Black Boy and Latoya asked why he had so many questions, he did not pursue the conversation further. He stated Deke and Nick were not present on this date.

stated he has since learned that Jason returned to the Morgan residence with his girlfriend on December 4 or 5, 2002, and appeared to be acting normal. ⸱ stated h was told Jason claimed to have found a new job and was trying to find transportation.

stated he heard the next contact the family had with Jason was the night he was arrested. He stated Black Boy and Latoya told him Jason called his mother and told her i was an accident, he didn't mean to kill anyone, and he had taken his clothes out back and burned them. ⸱ stated Black Boy and Latoya told him Jason claimed the weapon was out back in the woods, also.

⸱ stated Black Boy and Latoya did not say much about Jason's girlfriend other than he killed that lady to pay the girlfriend's bills. ⸱ stated Jason stayed in Savannah with his girlfriend until she put him out 2-3 weeks earlier because he lost his job in Pooler. ⸱ stated Jason said afterward he may need a ride to get his clothes from his girlfriend and indicated he was tired of her.

⸱ stated he never saw Jason with a weapon or heard him talk about doing anythin like the murder before. He described Jason as a fast-talker and slick. He stated Jason uses marijuana and crack but not on a daily basis. He stated Jason is Latoya and Rober Bizzard's cousin and is close to Robert and Black Boy. stated Robert was not present at the Bizzard residence on the day of the murder. ⸱ stated Jason's father's last name is Pellam and he lives on Highway 17 past Richmond Hill.

⸱ stated the word on the street was that Deke gave Jason up. He stated he had no further information concerning the robbery and homicide at the Fleming Post Office.

Marla F. McLendon
Postal Inspector

Prepared December 30, 2002

USAO00406

Inspection S
Exhibit
15 C
Label 113, July

# APPENDIX X

12/04/2002 16:14    FAX 19128760797          Liberty Co Jail          ☑04

# AFFIDAVIT FOR SEARCH WARRANT

I, Marla F. McLendon, first being duly sworn, depose and state that I am a United States Postal Inspector assigned to the Savannah, Georgia office of the Southeast Division of the United States Postal Inspection Service. I have been a Postal Inspector for the past nine years. As part of my official duties, I investigate crimes committed against the U.S. Post Service and postal employees during the course of their duties, including armed robbery and homicide, in violation of United States Code, Title 18, Section 1111, Murder; Section 1114, Protection of Officers and Employees of the United States; and Section 2114, Mail, Money or other Property of the United States. This affidavit is made in support of an application for a warrant to search the residence of MR JASON BROWN, 6724 Leroy Coffer Highway, Fleming, GA 31309. Your affiant deposes the following:

1. On November 30, 2002, at about 10:51am, the body of Sallie Louise Gaglia was found inside the US Post Office, Fleming, Ga. Ms. Gaglia was identified as the Postmaster Relief for the Fleming Post Office. Between 10:40 and 10:50am on November 30, 2002, a customer entered the post office and found Ms. Gaglia's body lying on the floor. The witness summoned medical personnel and law enforcement who arrived within minutes and secured the scene. Examination of the crime scene determined that Ms. Gaglia was stabbed with what appears to be a knife or other sharp cutting instrument multiple times over the front and back of her body. Based on a review of the materials at the scene, it appears she was in the process of preparing to close the post office for the day and was processing the day's receipts. Among the transactions found to have been made were the sale of four US Postal Money Orders in the amounts of $500.00, $500.00, $20.00 and $175.00. A check of interior of the facility failed to locate the monies received for the sale of the money orders. A financial review of the Post Office confirmed the sale of the four money orders and also confirmed the funds for the purchase of these money orders was missing from the Post Office. Further check of Ms. Gaglia's pocket book, which was on a chair by the desk determined her wallet containing her license, credit cards, and personal papers were missing. Based on these factors, the motive of the incident was felt to be robbery. One on counter showed a transaction.

3. Examination of the interior of the facility resulted in the location of numerous areas of blood as well as hand prints and foot prints which were made after coming into contact with the blood of Ms. Gaglia. Due to the extremely violent nature of the attack, the large amounts of blood present and the obvious hand prints and foot prints the blood, it is believed that blood from Ms. Gaglia was transferred to the offender during the attack.

4. While conducting interviews with personnel located in the area of the post office, contact was made with a rural route carrier who reported that on the morning of November 30, 2002, an unidentified male was overheard attempting to access a post office box. Based on the conversation overheard by the rural carrier, the male making inquiry to the post office box was apparently not a registered user of the box. The carrier overheard Ms. Gaglia ask the male what his name was and he replied "JASON". The carrier reported the voice seemed to be that of an African American male.

6. Interviews with various witnesses who live in the area of the post office identified two separate witnesses who described seeing an African American male at or near the post office prior to the time frame established as the time of the attack on Ms. Gaglia. One of the witnesses described the African American male as being in his late 20's or early 30's, weighing approximately 180 lbs and bearing facial hair. This witness reported she had seen the male riding a bicycle towards the post office about five minutes before the suspected time of the incident.

8. A second witness described an African American male who was seen on a bicycle near the railroad crossing immediately adjacent to the post office approximately 10 minutes prior to the time frame established as the time of the attack on Ms. Gaglia. This witness described the male almost exactly as

12/04/2002 16:14   FAX 19128760797              Liberty Co Jail                              ⌀05

the first witness had. *How T cont.*

*CS crim. history// cocaine*

9.    On December 3, 2002, a confi [...] ntial source contacted the Liberty County Sheriff Department and reported he had information pertain [...] g to this incident. The source was subsequently interviewed by Detectives of the Liberty County Sheriff [...] Department as well as Inspectors for the US Postal Service.

*Remote*

10.    The source reported he was a l [...] long friend of MEIER JASON BROWN and had heard from an unidentified source on Monday night, 1[...] 02-02, that Jason Brown was involved in the murder at the Fleming Post Office. The CS stated Br[...] n, who is related to the Morgan family, was at their residence in Liberty County, Georgia, on Saturday m [...] ming, 11-30-02, trying to obtain some money. He was refused [...] and overheard stating, "I will go and ge [...] some." The CS further related Brown returned to the Morgan residence on a bicycle, appeared very n [...] vous and used a telephone to call for a ride from his girlfriend who lives off of Quacco Road, Savanna [...] Georgia. The CS related he believed Brown went over the counter in the Post Office and possibly [...] rprised the lady coming from the restroom and had to kill her because she knew him. The CS stated [...] e believes Brown threw the knife into the wooded area while riding the bicycle from the Fleming Post [...] Office south on Fleming Loop Road back to the Morgan residence. The CS also related Brown [...] sently does have some facial hair. The CS also believes Brown may have changed clothes at the Morg[...] residence on, Saturday, 11-30-02.

*won't dark* *sout* *?* *kil* *location*

*ID as Mom's residence? Yes, later.*

Further coordination with local law enf[...] cement determined that through various previous contacts with the various occupants of 6724 Lercy C[...] fer Highway, Fleming, GA, one of the persons who stays at this residence was identified as ~~MEIER JAS[...] BROWN. This residence~~ and two other residences co-located at this location are collectively known t[...] local Law Enforcement as "The Morgan Residences". Incident reports concerning prior arrests of Meie[...] Jason Brown by the LCSD confirm Brown is a black male, 5'7", 140 lbs. and 32 years of age.

On December 3, 2002, an anonymous [...] ll to the CrimeStoppers tip line indicated Jason Brown was responsible for the murder at the Flemin [...] Post Office. The caller stated Brown is also known as "Mara".

*on the bike.*

On December 3, 2002, an additiona [...] witness stated he saw an African American male on a bicycle wearing white gloves in front of the Fle [...] ing Post Office on November 30, 2002 at approximately 10:30 – 10:45am. This witness was shown a [...] photo spread consisting of eight individual's photos and positively identified Meier Jason Brown [...] s the individual he witnessed in front of the Post Office on November 30, 2002. *Other individuals a B/M in P.O. . . . .*

On December 3, 2002, at 7:15pm, Det [...] tive Marty Adams, LCSD, received a telephone call from an individual who identified himself as Jas[...] Brown. Brown stated his mother, Sadie Brown, advised him that detectives were looking for him in [...] nnection with the murder at the Fleming Post Office. Brown declined to be interviewed by Detective [...] dams and stated he was enroute to South Carolina at the time of the call. The Sheriff's Department d [...] play showed Brown's telephone number as 912-308-8463.

On December 3, 2002, Chief Deputy K[...] h Moran, LCSD, telephoned the above number and spoke with Brown. Brown stated he was in the Fle [...] ing Post Office on November 30, 2002 sometime after 8:00am. The telephone line then went dead.

On December 3, 2002, Chief Deputy M [...] an again telephoned the above number, which was answered by a female who identified herself as Ms. [...] own. Ms. Brown confirmed Jason Brown used her cell phone to telephone detectives earlier. She also s [...] ted she had just dropped him off at a friend's residence near Richmond Hill, GA.

On December 4, 2002, subpoenaed tel[...] hone records for 912-308-8463 indicate this number received an incoming, four-minute call at 10:57a [...] on November 30, 2002. An outgoing telephone call from this number was placed at 11:25am on Nov [...] mber 30, 2002 to telephone number 912-884-4346.

12/04/2002 16:14   FAX 19128760797              Liberty Co Jail                                    ☑06

Subpoenaed telephone records for this number confirm it belongs to Sadie Brown, Jason Brown's mother. Sadie Brown resides at 6724 Leroy Coffer Highway, Fleming, GA.

10.    Based on investigation to date it is believed that the persons who stabbed and killed Ms. Gaglia had blood, fibers, and trace evidence transferred to their person, clothing and shoes. This suspicion is strengthened by the presence of a large amount of blood located in the crime scene and the presence of blood transfers to the surrounding furniture. Since a post office employee witnessed some type verbal exchange between the victim and an unidentified black male named "JASON", and because Meier Jason Brown was identified by a witness as being in the area of the post office at the time of the attack, it is suspected that this person is involved in the subsequent stabbing of Ms. Gaglia.

11.    Since no clothing, shoes, or knife was found at the scene, it is believed that these items would have been removed by the suspect when he left the post office. Therefore, it is felt that the clothing and other items as well as the money orders or other documents, papers, and belongings of Ms. Gaglia may be located in the residence or hidden somewhere on the property of the residence. For these reasons, affiant feels there is sufficient reason to believe that evidence which will link MEIER JASON BROWN to the stabbing of Ms. Gaglia will be found inside the property described in this affidavit.

12.    During my investigation into this matter, I have coordinated closely with members of the Liberty County Sheriff Department, Hinesville, GA. They have reported to me during the past several years they have had many occasions to meet with and interview various occupants of the residence described in this affidavit. It is the collective opinions of these local law enforcement officers that on nearly every instance there was excessive amounts of alcohol or illegal substances in use by persons residing or visiting the residence. On many of these occasions, the purpose of the visits by law enforcement were for crimes of violence in which weapons were often used to inflict serious harm to other persons at or in the residences. On almost every occasion, persons in the residences routinely flee at the site of arriving law enforcement officers.

13.    As an officer having been in law enforcement for over nine (9) years, I have had occasion to work many credit card and identity theft type crimes. I am aware that in many instances the persons involved in these types of crimes will hold onto the various forms of identification and credit cards for future use or to sell to others involved in criminal activity. Since the credit cards and other personal identification of Ms. Gaglia has not been recovered, it is logical to assume the suspects still have possession of the cards.

14.    Based on the information from local law enforcement that persons in the residence herein described routinely pass along proceeds from criminal activity to other occupants or even share the wealth from criminal enterprises, any of the persons present in the residence may have possession of some of the items of evidence sought in this affidavit. Therefore it is requested that judicial authorization be given to detain and search any and all persons present in the residence at the time of execution of any search warrant.

15.    Based on the above, affiant feels there is sufficient cause to believe that evidence supporting the offense of Murder and Robbery may be found inside the residence described in this affidavit or inside any vehicle located on the premises.

16.    Based on all available information from local law enforcement concerning the persons likely to be at this residence when any search warrant is executed, it is extremely likely that weapons are of various types will be possessed by the persons present. Further, it is my knowledge and belief that when confronted by law enforcement personnel the various persons in the residence will attempt to flee, destroy evidence or cause injury to the officers if their presence is made known at the time of execution of this warrant.

17.    Further, affiant believes there sufficient cause to believe that any announcement of the presence of law enforcement during the execution of a warrant would cause undue danger to the officers and allow the opportunity for the suspe s to flee, to arm themselves, or dispose of evidence. Therefore a NO KNOCK authorization is requested for the execution of this warrant.

# APPENDIX  Y

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| In the United States District Court for the Northern District of Georgia | |
|---|---|
| Name (under which you were convicted):<br>**Meier Jason Brown** | Docket or Case No.:<br>**04-07-CV-85** |
| Place of Confinement:<br>**USP Terre Haute** | Prisoner No.:<br>**11364-021** |

UNITED STATES OF AMERICA    v.    **Meier Jason Brown**
_____
MOVANT (include name under which convicted)

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging: _____
   **United States District Court for the Southern District of Georgia**

   (b) Criminal docket or case number (if you know): **03-CR-1**

2. (a) Date of the judgment of conviction (if you know): **11/6/03**

   (b) Date of sentencing: **11/6/03 and 11/11/03**

3. Length of sentence: **Death**

4. Nature of crime (all counts): **Murder (2 Counts) and Robbery**

5. (a) What was your plea? (Check one)  (1) Not guilty ☒  (2) Guilty ☐  (3) Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to? _____

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☒    Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☒    No ☐

8. Did you appeal from the judgment of conviction?    Yes ☒    No ☐

Rev. 12/5/07

Page 2

9. If you did appeal, answer the following:

   (a) Name of court: __United States Court of Appeals for the Eleventh Circuit__

   (b) Docket or case number (if you know): __04-10325-P__

   (c) Result: __Convictions and sentence affirmed.__

   (d) Date of result (if you know): __3/13/06__

   (e) Citation to the case (if you know): __441 F3d 1330 (11th Cir. 2006)__

   (f) Grounds raised: __See attached.__

   (g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☒    No ☐

      If "Yes," answer the following:

      (1) Docket or case number (if you know): __06-7289__

      (2) Result: __Certiorari denied.__

      (3) Date of result (if you know): __1/22/07__

      (4) Citation to the case (if you know): __127 S.Ct. 1149__

      (5) Grounds raised: __Challenge to pecuniary gain statutory aggravating circumstance and related jury instruction.__

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

     Yes ☐     No ☒

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court: _____

      (2) Docket or case number (if you know): _____

      (3) Date of filing (if you know): _____

      (4) Nature of the proceeding: _____

Rev. 12/5/07

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

      Yes ☐         No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

      Yes ☐         No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

    (1) First petition:      Yes ☐        No ☐

    (2) Second petition:    Yes ☐        No ☐

Page 4

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

GROUND ONE: __See attached._____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Rev. 12/5/07

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3)  Did you receive a hearing on your motion, petition, or application?

     Yes ☐       No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

     Yes ☐       No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

     Yes ☐       No ☐

(6)  If your answer to Question (c)(5) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

_____

**GROUND TWO:** __**See attached.**__ _____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐          No ☐

(6) If your answer to Question (c)(5) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)      If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise

this issue: _____

_____

_____

**GROUND THREE:** __See attached.__

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐          No ☐

(6)  If your answer to Question (c)(5) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)    If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise

this issue: _____

_____

_____

_____

_____

**GROUND FOUR:** __**See attached.**_____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐          No ☐

(6)  If your answer to Question (c)(5) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)      If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise

this issue: _____

_____

_____

_____

13.  Is there any ground in this motion that you have not previously presented in some federal court?  If so, which ground

or grounds have not been presented, and state your reasons for not presenting them:  **Ineffective assistance**

Rev. 12/5/07

of counsel — could not have been raised earlier; Brady violation — could not have been raised earlier; Unreliable DNA Evidence — Factual basis could not have been discovered earlier; Denial of Right to be Present — Trial counsel ineffective method of execution — not ripe until sentenced; Denial of Right to Meaningful Appellate Review — Factual basis unavailable.

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging?    Yes ☐        No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing: William Bell, 420 Broughton Street, Savannah, GA 31401

(b) At the arraignment and plea: William Bell; Richard Darden, 106 Montgomery Street, Savannah, GA 31401

(c) At the trial: William Bell and Richard Darden

(d) At sentencing: Same

(e) On appeal: Jeffrey Ertel, 100 Peachtree St., #1700, Atlanta, GA 30303
Donald Samuel, 3151 Maple Drive, Atlanta, GA 30305

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

Rev. 12/5/07

Page 11

16.  Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☒    No ☐

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?

Yes ☐    No ☒

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future: _____

_____

_____

(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the other sentence: _____

(d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?

Yes ☐    No ☐

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —
(1)  the date on which the judgment of conviction became final;
(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**Therefore,** Movant asks that the Court grant the following relief: **See attached.** _____

Rev. 12/5/07

_____

_____

_____

_____

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

Jeffrey L. Ertel

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____

(month, date, year)

Executed (signed) on __January 22, 2008_____ (date).

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

___Attorney for Movant_____

_____

_____

_____

_____

Rev. 12/5/07

Question 9 (f): Grounds raised:

1. The district court erred in denying Mr. Brown the right to be present and to cross examine witnesses when this court remanded the case so as to construct the record.

2. The trial court erred in denying appellant's motion for directed verdict on the aggravating circumstance of pecuniary gain and erred in refusing to instruct the jury regarding the proper scope of the pecuniary gain aggravating circumstance.

3. The trial court repeatedly erred during voir dire by asking jurors whether they would be willing to return a life sentence *if* mitigating circumstances were presented that would make a life sentence appropriate.

4. The district court erred in allowing hearsay testimony in both the guilt/innocence and penalty phase portions of Mr. Brown's capital trial.

5. The district court erred in denying Mr. Brown's motion to suppress statements which were obtained in violation of *Miranda v. Arizona*.

6. The district court rendered Mr. Brown's capital sentencing proceeding fundamentally unfair when it denied funds to hire expert assistance.

7. The trial court erred in refusing to conduct an evidentiary hearing on appellant's motion to suppress improper and suggestive identification evidence.

8. The government withheld favorable, material evidence in violation of the fifth, sixth, and eighth amendments to the united states constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

9. The court erred in granting the motion to quash Mr. Brown's subpoena for the production of DFACS records.

10. The trial court erred in excusing for cause Juror Fahey, whose answers to the court's voir dire questions indicated that she was able to impose the death penalty in appropriate circumstances.

11. The district court erred in finding that the Federal Death Penalty Act was constitutional in light of *Ring v. Arizona*, 536 U.S. 584 (2002).

12. The district court erred in allowing the introduction of gruesome photographs.

13. The district court erred in denying Mr. Brown's motion for bifurcated voir dire.

14. The district court erred in denying Mr. Brown's motion to prohibit the death qualification of potential jurors.

15. The trial court erred in telling a prospective juror who served on the jury that the defendant had entered a guilty plea.