APPENDIX K-1

**Per Order of the Court this Evaluation is to be provided only to Judge G. R. Smith to be placed under Seal**

## FORENSIC EVALUATION
### Mental Health Department
### Federal Medical Center
### Butner, North Carolina

**NAME:** Meier Jason Brown
**REGISTER NUMBER:** 11364-021
**DOCKET NUMBER:** CR403-001
**DATE OF BIRTH:** 07/04/70
**DATE OF REPORT:** 09/16/03

**Identifying Information:** Mr. Meier Jason Brown is a 33 year old, single, African American male, who was admitted to the Mental Health Department of the Federal Medical Center (FMC) in Butner, North Carolina on 08/05/03, to undergo a forensic evaluation as ordered by the federal court. In an order issued by the Honorable Magistrate Judge G.R. Smith for the Southern District of Georgia, on 07/15/03, Mr. Brown was designated to the Federal Bureau of Prisons to determine his mental condition under the Federal Rules of Criminal Procedures 12.2. The examiners were asked to prepare a report which would include Mr. Brown's history and present symptoms; description of the psychiatric, psychological and medical tests that were employed and their results; the examiners' findings; and the examiners' opinions as to whether he has any mental condition that may bear on the issue of punishment in a capital case and, specifically, whether he has ever suffered from a mental disease or defect which would impair his abilities or render him unable to appreciate the nature and quality or wrongfulness of his acts such that it might mitigate the punishment imposed against him. It was further ordered that the results and reports of the examination shall be submitted exclusively to Magistrate Judge G.R. Smith, Post Office Box 9563, Savannah, Georgia 31412, and must not be disclosed to any attorney for the government or the defendant until further order of the Court. It was noted that pursuant to Fed.R.Crim.P. 12.2(c)(2), the results and report shall remain under seal and will not be disclosed to the parties unless the defendant confirms an intent to offer expert evidence on mental conditional during the sentencing phase of the case. The evaluation was viewed as beginning on the day of Mr. Brown's admission to the FMC.

A three count indictment filed on 01/06/03, charges Mr. Brown with Murder Within a Federal Jurisdiction in violation of 18, USC, Section 1111. The indictment alleges that on or about 11/30/02, in Liberty County within the Southern District of Georgia, in the United States Post Office, Fleming, Georgia, a place within the special territorial jurisdiction of the United States, the defendant with malice and forethought did unlawfully kill Sallie Louise Gaglia by stabbing, in the knowing and willful perpetration of a robbery at said Post Office in violation of Title 18, USC, Section 7(3) and 1111(a)(b). In count two, he is charged with Murder of a Federal Employee in violation of Title 18, USC, Section 1114 and 1111(a). It alleges that Mr. Brown unlawfully killed Ms. Gaglia, a United States Postal Service Postmaster Relief, an employee of the United States Post Office while she was

Meier Jason Brown                                                                2
#11364-021
CR403-001
September 16, 2003

engaged in the performance of her official duties. Count three charges Mr. Brown with Robbery of Federal Property in violation of Title 18, USC, Section 2114, on the same date. Specifically, he is charged with robbery of three United States Postal Money Orders in the amounts of $500, $500, and $175. This is in violation of Title 18, USC, Section 2114(a). The indictment further notes special findings that the charged offenses were intentional, that Mr. Brown was 18 years of age or older at the time of the offenses, and that the acts of violence in which he engaged were done so knowing that they created a grave risk of death to another person, and constituted a reckless disregard for human life resulting in the death of Ms. Gaglia. It was found that the offenses were committed in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to the victim. Mr. Brown was arrested and taken into custody on 12/06/02 and remains in custody at this time.

Mr. Brown is being represented by public appointed attorneys William Bell and Richard Darden. The Assistant U.S. Attorney assigned to this case is William Frentzen.

At the outset of this evaluation, pertinent collateral information was requested from both the defense and prosecuting attorneys. A packet of information was promptly received from the U.S. Attorney's Office for the Southern District of Georgia which included a cover letter from Mr. Frentzen, a list of the names and addresses of several relatives and Mr. Brown's most recent girlfriend, a copy of the Criminal Complaint date 12/06/02, an Affidavit in Support of Criminal Complaint dated 12/06/02, a copy of the Indictment filed on 01/06/03, a copy of the Penalty Certification in this case dated 01/06/03, a copy of the United States Postal Inspection Service Warning and Waiver of Rights form, which was signed by Mr. Brown on 12/06/02, a transcript identified as Exhibit 19 Cassette Tape of 12/06/02 Interview prepared by Detective Charles Woodall, a typed Summary of an Interview of Detective Charles Woodall with the Liberty County Sheriff's Department, a Memorandum of Interview concerning an interview that occurred on 12/05/02 with Mr. Brown conducted by J.T. Rushwin Postal Inspector and Detective Woodall, and a partial transcript of Mr. Brown's testimony which is not dated but appears to have taken place at a hearing in the preliminary stages of his case. Assistant U.S. Attorney Frentzen was also interviewed by phone.

Written and telephone requests for collateral information from Defense Attorney William Bell did not result in receipt of any collateral information. The evaluator was advised by a paralegal in that office, to contact Richard Darden for this information. Mr. Darden was interviewed by phone by the evaluator and provided an overview of information available on this case. The evaluator requested that various types of written information be forwarded for her review and a packet was received on 09/09/03. The packet was limited to copies of some of Mr. Brown's records from state incarcerations in Georgia.

Meier Jason Brown                                                                    3
#11364-021
CR403-001
September 16, 2003

Phone contact was attempted with family members for whom Mr. Brown was able to provide current phone numbers and included Dexter Brown (brother), Pelham Brown (father), and Willie Bell Williams (maternal aunt). Information obtained from these contacts will be discussed below.

During this evaluation period Mr. Brown was evaluated by Sally Johnson, M.D., Consultant to the Medical Director of the Bureau of Prisons. Psychological testing was conducted by Carlton Pyant, Ph.D., Staff Psychologist at the FMC. Mr. Brown was interviewed individually by the primary evaluator, Dr. Johnson, on 11 occasions. Dr. Pyant also interviewed Mr. Brown and conducted psychological test procedures over a course of six sessions. The results of testing will be discussed later in the report. Other clinical and correctional staff also had the opportunity to observe and interact with Mr. Brown throughout the course of the evaluation and their comments and observations were considered prior to the preparation of this report.

**Background Information:** At the outset of the evaluation the limits of confidentiality of information provided were discussed with Mr. Brown. The court order was reviewed and he was specifically informed that the report generated from this evaluation would be sent to Magistrate Judge Smith and placed under seal for possible use during the sentencing phase of his trial should he be convicted and mitigating circumstances were raised. He expressed a clear understanding of this information and a willingness to cooperate with the evaluation process. He did express some concern as to how he should handle information regarding the alleged offenses in view of the fact that he had entered a plea of not guilty and was anticipating going to trial in an effort to support that plea. Few sources of collateral information were available in regard to Mr. Brown's early history. Where information was available for comparison, it appears the information he provided was essentially consistent with that from other sources. Overall, he was viewed as a reliable historian.

Mr. Brown was born on 07/04/70, in Liberty Memorial Hospital in Hinesville, Georgia, to Sadie Morgan Brown and Pelham Brown. He is the seventh of eight children born to his mother and the third born to his parents' relationship. Mr. Brown's mother is recently deceased, having died in June of 2003 as a result of multiple chronic illnesses, and we were unable to obtain details about his birth and early development from anyone else. A copy of his birth certificate indicates he weighted seven pounds, 12 ounces. Mr. Brown indicates that as far as he knows, he was the result of a full term pregnancy and delivered vaginally. He is not aware of anyone indicating he had any developmental problems but admits he's not sure. An aunt chose his name (Meier) but he uses either his first or middle name (Jason) interchangeably. His mother was 61 at the time of her death on 06/16/03. She was a long term insulin dependent diabetic with cardiac and renal problems, and was on dialysis prior to her death. He remembers her as sickly in the later years of her life. She worked as a waitress for years, but eventually became disabled due to her medical problems. She had one leg amputated prior to her death. It appears that when Mr. Brown was not incarcerated he was a major source of support for his mother during her later years.

Meier Jason Brown                                                                4
#11364-021
CR403-001
September 16, 2003


Mr. Brown's father, Pelham, is 62 years of age. Although Mr. Brown's parents never divorced, his father left their home after being "thrown out" by his mother due to infidelity, when Mr. Brown was in the eighth grade. His father is now retired, having worked for the City of Richmond Hill as Superintendent over Public Works.

Mr. Brown identifies seven brothers resulting from pregnancies by his mother. Roy Morgan is age 43, suffers from heart problems secondary to rheumatic fever, has had a valve replacement, and recently suffered from a stroke. Leo and Levi are twins and approximately 41 years of age. Dexter is approximately 39 years of age. Glen is 37 and the only other individual in this sibling group to have served time in prison. Nita died in 1998 from HIV/AIDS complications. Rolton is approximately 21 years of age. All of these siblings except Dexter who lives in Orlando, Florida, are living in the Savannah, Georgia area. Only Glen and Nita are products of the union of Mr. Brown's parents. He had two additional half siblings from his father's other relationships: Beverly (age unknown); and Tony who is deceased. Mr. Brown describes himself as being close to all of his siblings, but closet to Rolton.

Mr. Brown denies any known history of mental health problems in the family.

Mr. Brown indicates he had an 11th grade education, when he left school to work and help support his mother. He obtained his GED in approximately 1998. School history includes kindergarten in Midway, Georgia, elementary school at Liberty Elementary in Midway, middle school at Hinesville Middle School in Georgia, and high school at Bradwell Institute. He indicates that he was required to repeat the ninth grade because he "rebelled" at that time, which he defines as not completing his work as required. He states that in school math was his favorite subject but he always did just enough to get by. He remembers being involved in Future Farmers of America for a short time in the 10th grade, but was never involved in other activities or sports at the varsity or intramural level.

Mr. Brown describes being brought up in a large extended family. His mother and her siblings lived on his grandmother's property. Although everyone was poor, he doesn't remember ever not having enough to eat or clothes to wear. The relatives helped each other out and always made sure the children were taken care of. He remembers his upbringing in a very positive manner. He spent most of his time interacting with his relatives, particularly his cousins, and had few other close friends. He was very close to his mother. He was never harshly disciplined and can only recall his mother slapping him on one occasion when he was nagging her. He states that she spoiled him and the other children. Neither she nor his father ever physically abused them or even used particularly cross words in speaking with them. He states his older brother beat him up once when he intentionally skipped school, but otherwise, feels that his brothers were relatively protective in his upbringing. He does describe the family trailer being set on fire while he was and adolescent and was babysitting his cousin and brother. He got them out safely but their home was completely destroyed.

Meier Jason Brown                                                      5
#11364-021
CR403-001
September 16, 2003

Mr. Brown indicates that he was raised in the Baptist religion at a church located on his grandmother's property. The pastor has not been to visit him since his arrest which has somewhat changed his view of that church. He states he attended services regularly and his extended family was actively involved in singing at the church. He does express a continued belief in God and views his religion and beliefs as a source of support at present.

Mr. Brown has no military history.

Before leaving school at age 16, Mr. Brown began working at Shoney's. He then started working construction and other labor jobs. His longest period of employment (about three years) was with the City of Richmond Hill Public Works Department beginning around 1989. In 2000 top 2001 he worked in landscaping until the jobs were located at a distance too far for him to get to without a car and driver's license. He then did odd jobs with a brick mason, busing tables, washing dishes, maintenance work, and car repair. His lost his last job in late October or early November of 2002, as a result of his refusing to work on a Saturday. At the time of his arrest he was unemployed.

Mr. Brown states he has no particular hobbies, but indicates in more recent years he reads a lot and has learned to play chess.

Prior to his arrest Mr. Brown was living at his mother's house at 6724 Leroy Coffer Highway in Fleming, Georgia 31309. He indicates he had been in and out of the house, intermittently living with his girlfriend but his home address was his most constant address.

Mr. Brown views himself as heterosexual and has been involved in short term relationships, mostly as an adult. He has no children. Most recently he was in a relationship with Diane Brown, who had previously been employed as a correctional officer. The duration of that relationship was less than a year at the time of his arrest. She lived in the Savannah area and as noted, he spent some time staying with her in Savannah. She has one child, a daughter, in her early teens from a previous relationship. Mr. Brown indicates that he met her after waving to her at a stoplight while they were both driving. After she waved back, he followed her and got her phone number when she pulled over. From that point they struck up a relationship. He indicates that prior to this he had been involved in an abusive relationship, where he was the victim of physical abuse and had terminated that relationship as a result of that behavior. He denies ever being involved in abusing females himself.

When Mr. Brown met Diane Brown she had filed for bankruptcy. She subsequently lost her job, at least in part, as a result of her involvement with him, thus neither of them were employed at the time of his arrest.

Meier Jason Brown                                                             6
#11364-021
CR403-001
September 16, 2003

Mr. Brown denies any previous mental health history. Prior to his current arrest he had never been formally evaluated, hospitalized or given any type of psychotropic medication. He has generally been in good health. He reports having one visit by a psychiatrist or psychologist while he was in jail in Georgia on his current charges which had been arranged by his attorney. No testing was done and he has no specific recollection of anything noteworthy from that visit. He does not remember the name of that evaluator and no written information regarding that evaluation has been made available to the current evaluator. His attorney did state there were no significant findings.

Mr. Brown relates that as a juvenile he broke into a store, although clarifies that he was really only a lookout for an older cousin. He told on his cousin and gave the $20 the cousin had given him to the police. He was placed on probation. He believes he was in the seventh grade at the time. He denies any period in juvenile detention or special schools as the result of criminal behavior.

Mr. Brown states his first adult charge for which he was put in Liberty County Jail, was a forgery charge. He indicates that a cousin had taken a checkbook and asked Mr. Brown to write checks and cash them, which he did. He received probation as a first time offender on that charge.

Mr. Brown indicates that his adult criminal history consists of a robbery charge in 1994 or 1995. He was with two of his cousins and stopped at a store to buy beer. When he was paying, one of the cousins ran around the counter and grabbed money out of the cash register. One cousin subsequently confessed. The younger of his two cousins got off as a juvenile and the older cousin did not confess. Mr. Brown was given a five year sentence. He had also been involved in other criminal behavior around that time, including forgery and theft by taking an automobile, as well as driving related offenses, and those were all combined into a five year sentence as the result of a plea bargain. The car theft occurred while he was out on bond for the robbery charge. He apparently stole a car because "the opportunity presented itself," realizing now that was a bad decision. At that time he saw stealing cars and selling them for parts as a way to make money when he was unemployed. He served 18 months at Muskogee County Prison in Columbus, Georgia. He was paroled but subsequently violated and was sent to Montgomery State Prison in Georgia, where he served an additional eight months. His parole violation resulted from an incident with a cousin, whereby the cousin had stolen a car and credit card. They subsequently obtained money fraudulently from an ATM. Mr. Brown has had numerous Driving Under the Influence (DUI) and other alcohol related minor crimes. The last offense prior to his current arrest involved him pretending to be his brother when stopped on an alcohol related driving offense. His driver's license remains suspended.

Mr. Brown indicates that although he has a history of criminal behavior, he has no trial experience except for bench trials on minor offenses. On his more serious charges in the past, he negotiated a plea bargain.

Meier Jason Brown                                                                    7
#11364-021
CR403-001
September 16, 2003

Throughout his periods of incarceration Mr. Brown denies any periods of disruptive or negative behavior. He has lived in single cells, with roommates, and in dormitory situations. He indicates that he tends to recognize possible negative events brewing and avoids trouble.

Review of information provided by the defense in regard to previous periods of incarceration with the state verified Mr. Brown's account of his criminal history and provided information on his periods of incarceration. It was determined that he had undergone a colonoscopy in September of 2001 response to concerns about rectal bleeding. Although the results were not clear, Mr. Brown reports they were negative and the diagnosis was thought to be hemorrhoids. He was told to increase the fiber in his diet and has not experienced any recurrence of the problem. It is noted that he received several relatively minor incident reports for failure to clean areas as assigned, and on one occasion refused to allow a tooth to be pulled.

Initially Mr. Brown denies any substance abuse other than regular use of alcohol and having tried marijuana. He began drinking in approximately the eighth grade when he was round 13 years of age. He describes at that time he was hanging around an uncle who was always drinking beer. When the beer got warm his uncle wouldn't drink it and instead of throwing it away, Mr. Brown drank it. He states that early on he did not drink every day but continued drinking regularly and eventually began drinking after school and work, and on the weekends. He usually drinks only beer. He denies ever drinking in the morning. On an average he drank three beers in an evening and on the weekends he drank a 12 pack. If he went to a party, he drank continuously. He denies ever passing out or experiencing blackouts as a result of drinking. He denies problems with hangovers or shakiness. He denies ever drinking any homemade alcohol products. He states that when he drinks, he's "laid back, laughs, and has fun." He describes this as "getting your little light bulb going." He never viewed himself as having an alcohol problem but has joked with people he knows and called himself an alcoholic. He clarified that if anything, he views himself as a "social alcoholic" which he defines as one who can do without alcohol.

As noted, he has had several DUI charges, and his license is suspended. He has acquired additional charges for Driving with a Suspended License.

Mr. Brown initially admitted to some use of marijuana but states he has not used any for more than one year. He indicates that it was never a regular drug habit. He denies sniffing glue or using intravenous drugs (because he's afraid of needles). Initially he denied any cocaine use or prescription drug abuse. During the phone interview with Attorney Darden, he mentioned Mr. Brown's use of cocaine. Mr. Brown was questioned again about his cocaine use. He then did admitted that he had used cocaine. Again he denied that this was a persistent drug of abuse and stated he had not used any for an extended period of time.

Meier Jason Brown                                                          8
#11364-021
CR403-001
September 16, 2003

When asked about any specific stressors in his life, Mr. Brown volunteered that he was saddened by the deaths of his brother Nita and his grandmother. He relates that the death of his mother, however, has been the most difficult for him.

In an effort to gather further social history on Mr. Brown, attempts were made to contact several family member. Telephone interview was conducted by this evaluator with Pelham Brown, Mr. Brown's father. He indicated that he left the family home at some point but couldn't remember when. Although he maintained contact with Jason intermittently, he was unable to provide many specific details. He described his son, whom he called Jason, as a nice boy when he was going to school. He noted that Jason's mother had died "about six weeks ago" and that Jason was very close to his mother. Pelham Brown expressed his own opinion that Jason "did not do that...ain't nobody would go to rob a post office in the middle of the day, he had to be set up." He added that he thought Jason was possibly there when the true perpetrators of the crime came in or that the crime had already happened when he got there. He indicated that Jason had worked with him for some period of time but couldn't remember the specific time frame. His primary concern appeared to be in finding out the address of the FMC and trying to send him some money to demonstrate his support.

Telephone interview with his aunt, Willie Bell Williams, also provided limited information. She remembers him as a quiet boy who was raised with his cousins. She notes his maternal grandmother often took care of the kids while her daughters worked. Physical discipline was not used to any extent. She notes he was close to his mother, who was a hard working woman. He went to church regularly as a child. She has had less contact with him as an adult. She commented that she realizes kids change as they grow up and get into things they should not get into.

Mr. Brown's brother Dexter did not return the evaluator's call.

In regard to the time around the alleged offenses which occurred on 11/30/02, Mr. Brown denies experiencing any specific stressors affecting his life. He did indicate that as a result of both he and his girlfriend being unemployed and her ex-husband offered to assist with her expenses, he moved back into his mother's home. He commented that "being a man I couldn't be supported by another man." He maintained an ongoing relationship with Ms. Brown despite not living together. He found some odd jobs to make some money, and his mother assisted him with basic expenses. He anticipated that he would eventually regain employment with the landscaping company (referenced above) when they returned to his area, but had no clear time frame for when this would occur.

Mr. Brown continued his usual pattern of drinking but denies that he was drinking on the day of the alleged offenses. As noted, he states he never drinks in the morning, nor did he indicate he was experiencing symptoms of alcohol withdrawal. He denies any symptoms of mental illness including anxiety or depression around that period of time. He reiterated his position that on his attorney's

Meier Jason Brown                                                                9
#11364-021
CR403-001
September 16, 2003

advice, he has entered a plea of not guilty and thus he maintains he was not involved in the alleged offenses. At the same time, he is clearly aware that he previously confessed to the alleged offenses in interviews with the Postal Inspector and Detective Woodall on December 5th and 6th, 2002.

In summary, review of collateral information currently available, indicates that on 11/30/02, around 10:51am, the body of Sallie Louise Gaglia was found inside the Post Office in Fleming, Georgia. A customer had entered the Post Office and found the body lying on the floor. It appeared Ms. Gaglia had been stabbed numerous times and it was determined that several U.S. Postal Money Orders were missing. It was also determined that the victim's wallet had been removed from her pocketbook. Autopsy showed the victim had been stabbed 10 times in the areas of the chest, wrist, and back.

Interview with a mail carrier who had been in the office before the crime revealed that earlier that morning an unidentified male had come to the Post Office to get mail out of a box and stated his name was Jason. Witnesses in the area reported seeing an African American male in proximity to the Post Office around the time of the alleged offenses. He was apparently riding a bicycle toward the Post Office just prior to the time of the offenses. A confidential source apparently provided additional information implicating Mr. Brown in the murder of Ms. Gaglia. The source alleged that Mr. Brown was trying to obtain money and had left his residence and returned appearing nervous. Mr. Brown subsequently called his girlfriend for a ride to Savannah and she picked him up. The source alleged that Mr. Brown stated that he had gone to the Post Office, surprised Ms. Gaglia and had to kill her because she knew him.

Additional witnesses came forward indicating they had seen an African American male on a bicycle wearing gloves, in front of the Post Office. Mr. Brown was identified from a photo spread. On 12/03/02, Mr. Brown apparently called Detective Marty Adams but declined to be interviewed. On 12/04/02, telephone records for his girlfriend's phone were subpoenaed, and it was noted that he had placed a call at 11:25 on 11/30/02 to her number. On 12/05/02, searches were conducted of his mother's and girlfriend's residences. At his mother's, a red bicycle with an apparent spot of blood on the seat, a knife which matched the description of the knife used in the stabbing and a jacket similar to that described by witnesses were located. At Diane Brown's receipts for U.S. Postal Money Orders which were determined to have been stolen from the Post Office were discovered, as well as tennis shoes which overtly appeared to match shoe prints found on the counter and a substance consistent with blood was found on the seat of Diane Brown's car.

Apparently prior to his arrest, Mr. Brown agreed to be interviewed at Diane Brown's residence. He indicated that he had gone to the Post Office with the intent to steal money orders from Ms. Gaglia and was going to threaten her with a knife. He stated that during the robbery he accidently tripped and stabbed her, and in essence "finished it." He took the money orders and fled on his bicycle. Ms.

Meier Jason Brown
#11364-021
CR403-001
September 16, 2003

10

Brown stated that she had received the money orders from Jason Brown but didn't know where the funds to purchase them had come from.

The transcript of the interview with Mr. Brown on 12/06/03 indicated that after he had been advised of his rights, he agreed to talk to Detective Woodall. He admitted going to the Post Office early in the morning and getting mail out of the family mailbox. He indicated he rode his bicycle there. He subsequently delivered mail to his relatives and then went back to rob the lady at the Post Office. He stated his intent was to steal some money orders. He went inside the Post Office and asked the lady (Ms. Gaglia) for the money orders. As she made them, he jumped across the counter, tripped and accidently cut her. He indicated he had taken the knife to intimidate her not to injure her, and obtained the knife from his mother's house. Apparently he put socks over his hand at the time of the incident. He asked for three money orders, two of them to pay one bill and one for another bill. He indicated that he doesn't remember anything after the accidental cut of Ms. Gaglia until he threw the knife away, yet he remembered taking the money orders and the wallet, and leaving the Post Office. He then returned to his mother's and took off his clothes and threw them in the washing machine. He got dressed and called his girlfriend to pick him up. He indicated that she did not know anything about the incident and had nothing to do with it. He insisted that he had utilized a kitchen knife in the commission of the crime and then threw it away. He also stated he had never told anyone what happened in the Post Office until he told Diane on 12/05/02, in front of the detectives. He insisted that he had gone there only with the intent of robbing the woman and without any intent to kill anybody. He indicated that the killing of the woman was a stupid decision. Near the end of the interview, he did indicate that he was very sorry for what had happened, and was extremely scared.

During this evaluation period Mr. Brown stated that the only reason he gave a confession was because the detectives were threatening to arrest his girlfriend Diane and take her child away from her. He stated that frightened him more than anything and so he agreed to state that he had committed the alleged offenses. He stated that he was pushed to do so by the detectives' description of the event as an accident. He did state to this evaluator that he stole the money from a "drug dealing cousin" to get the money orders for Diane to pay her bills.

Following his confession, Mr. Brown was arrested and has been housed at the Liberty County Jail in Fleming, Georgia. While there, he received some visits from his mother, youngest brother, and Diane. During his incarceration, his mother was hospitalized and subsequently died on 06/16/03. He describes being very sad about her death and his inability to attend funeral services. He reports that following his arrest, he told his mother he was innocent and didn't commit the crime and asked her whether indeed there was a god and was reassured by her that there was.

Meier Jason Brown                                                                                                 11
#11364-021
CR403-001
September 16, 2003


**Course in Institution:** Following admission to the FMC, Mr. Brown underwent a routine physical examination and laboratory studies. At the time of intake screening, he denied any known drug allergies and indicated he was not in any acute distress or suffering from any pain. Screening for tuberculosis exposure was negative. He was on no medication at the time of admission. Medical history report from Mr. Brown was entirely negative. He indicated he has good vision in both eyes and is right handed. He denied any previous medical or psychiatric hospitalizations. Review of medical history was essentially negative. He did report that at approximately age 11 he had some type of a cyst or mass removed from under the right side of his chin, done in the doctor's office with no followup required. He denied any history of fractures, head injury, cardiac, respiratory, gastrointestinal, renal or genital urinary problems. As noted, family history is positive for insulin dependent diabetes mellitus, hypertension, and heart problems in his mother, one brother who was status post a valve replacement secondary to rheumatic heart disease and status post a cerebral vascular accident in the last three years, and one brother deceased from complications of AIDS. Alcohol use history is positive as described above. He also indicated that he started smoking as an adolescent and smoked one half to one pack of cigarettes per day until the last year, when secondary to incarceration he has in essence discontinued this. In summary, medical history is viewed as noncontributory and the physical exam was unremarkable.

Mr. Brown was noted to be 5'7" tall and weighed 146 pounds at the time of admission, which is his average weight. Laboratory studies completed at the time of admission included routine blood chemistries, hematology, urinalysis, and serology. All the results were either negative or within normal limits with the exception of mild but not clinically significant elevation in calcium of 10, with normal range being 8.5 to 9.9mg/dL, and abnormalities in total T4 and thyroid uptake. Consultation with the general medical physician assigned to mental health inmates was done regarding the abnormal thyroid function studies. Additional thyroid tests were conducted which were normal and the final assessment was that there was no clinical significance of the original abnormal readings. HIV testing was negative. Vital signs were within normal limits except for intermittent reading of bradycardia (a slowed pulse). On further assessments, his pulse ranged from 45 to the mid 80s. He was not experiencing any clinically identifiable symptoms. A review of prior records showed that pulse readings were in the same range. A routine EKG has been ordered and he was again referred to the general medical physician for further evaluation which is pending at the time of this report.

Mr. Brown remained in good health throughout this evaluation period. He did experience one episode of ear pain from an infection which resolved with antibiotic treatment.

Initially Mr. Brown was placed in the 1E seclusion unit within the Mental Health Department as the result of the need for further observation given his current charges. During the early part of this evaluation it was the administration's decision that the study should take place in that environment.

Meier Jason Brown                                                        12
#11364-021
CR403-001
September 16, 2003

Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit. He completed the evaluation in that status. His living situation included rooming with another individual and going to the dining area for meals. He also had access to the recreation and educational facilities, as well as the law library. Mr. Brown indicated that he had no familiarity with using the law library and didn't know how to go about finding legal information. He was informed of the orientation class available to instruct inmates on use of that library. Throughout the evaluation period he spent his time reading, watching television, and walking. He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.

Mental status examination throughout the evaluation showed little change and remained consistent with that seen at the time of admission. Mr. Brown appeared to be a medium build, African American male, who was oriented to person, time, place and situation. His hygiene and grooming were good. He chose to wear his hair very short. Eye contact was good and he was generally cooperative with the evaluation process. He did not appear guarded or evasive in providing answers but defined areas where he was uncomfortable discussing details, such as any information regarding the current alleged offenses. There was no evidence of psychomotor agitation or retardation, and no unusual mannerisms or tics were noted. Gait was normal. There was no overt evidence of anxiety, although during one interview when thinking about his current situation, he became upset. Speech was of normal rate and tone, and vocabulary appeared to be within the average range. He described his mood as okay, clarifying that he was quite aware of the severity of his situation, but did not feel depressed. He denied that he had ever experienced any decrease in his mood consistent with a clinical diagnosis of depression. Sleep and appetite were good. He did not appear angry or irritable. Affect showed a normal range in response to content of conversations.

No abnormalities in the form or content of his thinking were noted. He spoke spontaneously and answered questions appropriately. His answers were goal directed and relevant to the conversations. No loosening of associations, illogical or tangential thinking, rambling, or perseveration were noted.

Review of the content of Mr. Brown's thinking showed no unusual preoccupations. There was no evidence of obsessive thinking, compulsions, or phobias. He denied suicidal and homicidal ideation in his current state. There was no evidence of hypochondriasis.

Detailed review of his mental status showed no evidence of delusional thinking. He did not appear overtly paranoid. There were no ideas of reference noted. There was no evidence of hallucinations. There was no evidence of depersonalization or derealization. He did not describe any unusual dreams or nightmares.

Meier Jason Brown                                                              13
#11364-021
CR403-001
September 16, 2003

Throughout the evaluation period Mr. Brown appeared alert and aware of his environment. His concentration was good and he demonstrated a good attention span. He remained oriented to person, time, place and situation.

There was no evidence of impairment in his memory: immediate recall was good and intermediate and long term memory appeared intact. His fund of knowledge was within the average to low average range and consistent with his education history. Mathematical skills were intact. He showed the capacity for abstract thinking.

Mr. Brown demonstrated insight into his current situation. He did not view himself as mentally ill and that appeared to be a consistent view of those around him. His judgement on the unit appeared adequate. He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain his own safety and not impose on others.

Mr. Brown cooperated with psychological testing, which was conducted by Dr. Pyant and outlined below.

**Psychological Test Results:** During the evaluation process Mr. Brown was administered several psychological tests. He fully cooperated with requests for testing, but at times appeared annoyed and irritated. He occasionally commented about being asked "dumb questions." Although recognizing that psychological testing was a part of the evaluation process, he communicated mild anger at being treated as if he had a "mental problem." He did, however, display good motivation and appeared engaged in the testing process. During other periods of testing he displayed frustration when unable to answer questions. In these situations he engaged in brief laughter which conveyed anxiety or responded with "I don't know," seemingly as a measure to avoid embarrassment. When answers were not readily available to him or he simply was unable to answers certain questions, more encouragement was required to increase his self confidence. Mr. Brown displayed no problems with hearing, vision or motor skills.

**Personality Assessment:** Mr. Brown was administered the Minnesota Multiphasic Personality Inventory-2 on 08/14/03, which is a well validated, 567 true/false item test used to assess personality characteristics and symptoms of mental illness. Although elevations in three of the validity scales approached cutoff scores, the protocol was deemed interpretable. Validity scale scores elevations, however, described Mr. Brown as a person who was portraying himself as being free of mental illness. Individuals obtaining similar validity profiles are often described as viewing themselves as virtuous and without moral flaws. These individuals deny the existence of anger or emotional distress and perceive themselves as being psychologically stable persons who have positive relationships with others.

Meier Jason Brown    14
#11364-021
CR403-001
September 16, 2003

Mr. Brown's clinical scales reflected no evidence of psychosis or symptoms of depression, anxiety or an inability to manage stress. Admittedly, elevations in his clinical scales may have been depressed due to his defensive approach. However, in this forensic setting even when test takers approach the testing situation in a defensive manner, clinical scales typically reflect acute distress related to personal circumstances, such as pending criminal charges, family separation, financial problems etc.

Interestingly, Mr. Brown obtained significant elevations on the Over-controlled Hostility Scale (O-H) and MacAndrew Alcoholism Scale-Revised (MAC-R), two Supplementary Scales. High scorers on the O-H scale are described as individuals who often fail to appropriately respond to acts of provocation. These individuals are likely to avoid expressing feelings of frustrations directly, · perceive they are above the law and free from punishment, tend not to discuss angry feelings and have strong needs to excel. However, they are also described as socialized, trustful and dependent upon others. Individuals with high scores on the MAC-R are likely to drink excessively. They are also described as extroverted, exhibitionistic, self confident, high risk takers and aggressive.

**Neurobehavioral Cognitive Status Examination**: On 08/15/03, Mr. Brown was administered the Neurobehavioral Cognitive Status Examination (Cognistat), which is designed to assess intellectual functioning in five major ability areas: Language, Constructions, Memory, Calculations and Reasoning. The instrument is also specifically designed to assess the degree of disability across these domains. Test development further indicates that the Cognistat assesses cognitive functions at a specific point in time and is sensitive to cognitive dysfunctions. Mr. Brown's test scores were not indicative of cognitive dysfunction. His scores fell in the Average range across the five domains, thus reflecting no evidence of cognitive impairment.

**Revised-Competency Assessment Instrument**: On 08/14/03, Mr. Brown was administered the Revised-Competency Assessment Instrument, a 14 item structured interview questionnaire addressing the following domains: 1. Understanding Charges; 2. Appreciation of Penalties; 3. Appraisal of Available Defenses; 4. Appraisal of Functions of Courtroom Participants; 5. Understanding the Court Procedures; 6. Motivation to Help Self in the Legal Process; 7. Appraisal of Likely Outcomes; 8. Planning of Legal Strategies; 9. Ability to Cooperate Rationally with Counsel; 10. Capacity to Disclose Pertinent Information to Counsel; 11. Capacity to Testify; 12. Capacity to Challenge Prosecution Witnesses; 13. Ability to Manifest Appropriate Courtroom Behavior; and 14. Capacity to Cope with the Stress of Incarceration Awaiting Trial.

Overall, results indicated Mr. Brown was familiar with the legal proceeding and capable of working with his attorney to address charges against him. He verbally acknowledged being charged with murder and robbery, and stated if found guilty, a possible outcome is death or life without parole. Mr. Brown expressed that he had entered a plea of not guilty, but understands he may also enter a

Meier Jason Brown                                                                           15
#11364-021
CR403-001
September 16, 2003

plea of guilty. He adamantly communicated an unwillingness to enter a plea of not guilty by reason of insanity since he does not believe he is mentally ill nor guilty of a crime. He appropriately described a plea bargain as "an acceptance of being found guilty with your sentence being prearranged, most likely shorter." He expressed confidence in his lawyers and communicated a willingness to "give full cooperation." He verbalized a willingness to consult with his lawyer if not understanding what is going on in the courtroom or in situations in which he perceives a witness is telling lies about him. Mr. Brown defined appropriate courtroom behavior as sitting and listening and recognized that speaking without permission would result in him being "locked up."

**Intellectual Functioning:** On 08/21/03, Mr. Brown was administered the Wechsler Intelligence Scale-Third Edition, a general measure of cognitive and intellectual functioning. He obtained a Full Scale IQ score of 90 which falls in the Average range of intellectual functioning. This score equates to a percentile rank of 25, indicating his score fell at or above 25% of the adult peer group used to validate the test. He obtained a Verbal IQ score of 91 which equated to a percentile rank of 27 and a Performance IQ score of 91, also resulting in a percentile rank of 27. There is a 95% chance his true IQ score falls in the range of 86-94. Of note was a strength in Matrix Reasoning, assessing his ability to utilize complex mental processes to identify various patterns. However, a weakness was observed on Digit Symbol, a task assessing speed of visual information processing and the use of motor skills. This suggests he is exceptionally slow at a skill involving the analysis visual information and utilization of motor skills. Overall results, however, suggests he has Average intelligence.

**Impressions:** According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision, of the American Psychiatric Association, we currently view Mr. Brown as follows:

Axis I:       No Diagnosis, V71.09

Axis II:      No Diagnosis, V71.09

Axis III:     History of intermittent bradycardia, asymptomatic; History of ear infection resolved
              with antibiotic treatment

Axis IV:      Significant legal problems

Axis V:       GAF=85

Meier Jason Brown                                                                16
#11364-021
CR403-001
September 16, 2003

Review of Mr. Brown's mental status and history support that at present he does not meet the criteria for any psychiatric diagnosis. He has no history of mental health symptoms or treatment prior to his current period of incarceration. As noted, he was evaluated at his attorneys' request briefly by a psychiatrist or psychologist at the county jail. Although a specific report of that evaluation was not available to this evaluator, Defense Attorney Darden did identify that no mental health findings were uncovered during that evaluation.

Given the nature of his current legal situation, Mr. Brown was reluctant to talk about specific details of his thinking and behavior in close proximity to the alleged offenses or during the time of the offenses. In general, however, he was unable to identify any unusual stressors he felt would have impacted his behavior at that time. Although he was unemployed at that time, he had experienced this intermittently and denied that he was feeling desperate in his financial state.

As noted, Mr. Brown has a significant history of ongoing alcohol use. His self report and other available information failed to support that he meets the formal criteria for Alcohol Abuse or Dependence. A diagnosis of substance abuse requires recurrent substance use resulting in a failure to fulfill major role obligations at work or at home, use in situations in which it is physically hazardous, recurrent substance abuse related legal problems or continued abuse despite having persistent social or interpersonal problems caused or exaggerated by the effects of the substance abuse. There is some evidence historically that he has utilized alcohol while driving. The details, however, are not sufficiently clear to assure he meets the criteria of this diagnosis. A diagnosis of Substance Dependence requires evidence of at least three of the following: tolerance; withdrawal; increased intake of the substance taken in larger amounts and over a longer period of time than was intended; persistent desire and unsuccessful efforts to reduce or control substance use; a great deal of time spent activities necessary to obtain the substance; reduction of important social, occupational, and recreational activities; or substance use being continued despite knowledge of having persistent physical or psychological problems caused or exacerbated by the substance. Specifically, Mr. Brown denies any evidence that he has developed tolerance to alcohol or withdrawal symptoms. His pattern of drinking seems fairly consistent over time and he expresses an ability to stop drinking when he chooses to do so. His social, occupational, and recreational activities seem to be consistent regardless of his alcohol use. He has not yet experienced any physical or psychological problems related to his substance use.

As noted above, Mr. Brown's drug of choice is alcohol. Although he admits to marijuana and cocaine use is in the past, he does not make any claim that he was using any legal or illegal substance in proximity to the time of the charged offenses.

Meier Jason Brown                                                                                         17
#11364-021
CR403-001
September 16, 2003

Review of Mr. Brown's social history reveals that he was raised in an extended family who undoubtedly experienced socioeconomic problems at least intermittently. Nonetheless, he is able to described in a fair amount of detail how the family pulled together to assure all the children were adequately taken care of, fed and clothed. He remembers his childhood in a positive light and recounts a variety of activities in which he was involved. He developed close relationships with cousins and other family members more so than with individuals outside the family setting. There appears to have been an internal support system including his grandmother and a number of maternal aunts, to assist with childcare and monitoring as needed when his mother was working. Mr. Brown denies that he was ever physically or sexually abused by anyone.

Mr. Brown does describe some disruption in the family as the result of his father being "thrown out" by his mother when he was in the eighth grade. However, he did maintain a relationship with his father and felt he understood the basis for the problems between his parents.

Available history on Mr. Brown did not support evidence of a conduct disorder with onset before the age of 15. There is not sufficient evidence that he had a pervasive pattern of disregard for or violations of the rights of others since the age of 15, as indicated by the identified criteria for a diagnosis of Antisocial Personality Disorder. He does have a persistent history of criminal behavior and the focus of his current clinical situation is his adult antisocial behavior, not specifically a mental disorder. Nonetheless, he does not demonstrate chronic history of organized criminal behavior; instead, he has a history interspersed with a variety of relatively minor charges until the time of the current alleged offenses.

Psychological testing supports the clinical impression that Mr. Brown is not suffering from any type of diagnosable mental illness. It also supports that his intellectual functioning falls within the Average range.

Review of his behavior while incarcerated does not identify that he ever presented as a problematic inmate. Except for minor disciplinary infractions related to housekeeping issues, he has no history of problems with staff or other inmates.

Specifically in response to the question of the Court, it is this evaluator's opinion that there is no specific mental condition that bears on the issue of punishment in a capital case. Mr. Brown does not appear to have ever suffered from a mental disease or defect which would render him unable to appreciate the nature and quality or wrongfulness of his acts such as might mitigate the punishment imposed against him.

Meier Jason Brown                                                                    18
#11364-021
CR403-001
September 16, 2003

Although Mr. Brown has no history of mental illness and is not evidencing any symptoms, given the reality of his current situation and the potential stress of the upcoming trial, he should be monitored for the onset of depression. Currently he denies any symptoms consistent with depression and requires no active mental health intervention. He is not on any psychotropic medications or general medical treatments.

Sally Johnson, M.D.
Consultant to the Medical Director of the
    Federal Bureau of Prisons

Carlton Pyant, Ph.D.
FMC Butner Staff Psychologist

SCJ/dd