IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

NO. 04-10325-P

---

MEIER JASON BROWN

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA

Respondent-Appellee.

---

A DIRECT APPEAL OF A CONVICTION AND
DEATH SENTENCE IN A CRIMINAL CASE
IMPOSED IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA, SAVANNAH DIVISION

---

BRIEF OF APPELLANT

Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404)688-7530

Donald F. Samuel
State Bar No. 624475
Garland, Samuel & Loeb
3151 Maple Road
Atlanta, Georgia 30305
dfs@gsllaw.com
(404)262-2225



COUNSEL FOR APPELLANT, MR. BROWN

## CERTIFICATE OF INTERESTED PERSONS

Counsel hereby certifies that the following have an interest in the outcome of this case:

(a)   William Bell, Trial Counsel for Appellant;

(b)   Meier Jason Brown, Defendant-Appellant;

(c)   Amy Copeland, Counsel for Appellee;

(d)   Richard Darden, Trial Counsel for Appellant;

(e)   Jeffrey L. Ertel, Appellate Counsel for Defendant-Appellant;

(f)   B. Avant Edenfield, United States District Court Judge

       for the Southern District of Georgia;

(g)   Willaim Frentzen, Counsel for Appellee;

(h)   Joseph Newman, Counsel for Appellee;

(i)   Donald F. Samuel, Appellate Counsel for Defendant-Appellant.

C1 of 1

STATEMENT OF TYPE STYLE AND SIZE

Pursuant to 11th Cir. Rule 28-2(d), the type style and size of this brief is

TIMES NEW ROMAN, 14 POINT.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Brown requests oral argument in this capital case as it presents issues of first impression in this Circuit. For instance, does the Supreme Court's decision in *Crawford v. Washington*, apply in the penalty phase of a capital proceeding. In the instant case, the victim's husband and sons did not testify. However, the government, via hearsay testimony, presented victim impact evidence as it related to the husband and sons. Based in part on this victim impact evidence, the jury decided to sentence Mr. Brown to death.

In addition, this case presents the Court with the opportunity to decide a case of first impression that has thus far caused a split in the Circuit Courts. The fifth and the Tenth Circuits have held that the pecuniary gain statutory aggravating circumstance (18 U.S.C. §3592(c)(8)) is applicable only in cases where the murder itself was committed as consideration for, or in the expectation of, anything of pecuniary value, while the Fourth Circuit has expressly declined to do so. *See*, *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) and *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

iii

TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ....................... C1 of 1

STATEMENT REGARDING ORAL ARGUMENT ...................... iii

TABLE OF CONTENTS ....................................... iv

TABLE OF AUTHORITIES .................................... vii

STATEMENT OF JURISDICTION ............................. xiv

STATEMENT OF THE ISSUES ................................. 1

STATEMENT OF THE CASE ................................. 3

    (A) Course of Proceeding ................................. 3

    (B) Statement of Facts ................................. 10

    (C) Standard of Review ................................. 19

SUMMARY OF THE ARGUMENT ............................... 22

ARGUMENT AND AUTHORITY ................................ 24

    I. The District Court Erred in Denying Mr. Brown the Right to Be Present and to Cross Examine Witnesses When this Court Remanded the Case so as to Construct the Record ................................. 24

    II. The Trial Court Erred in Denying Appellant's Motion for Directed Verdict on the Aggravating Circumstance of Pecuniary Gain and Erred in Refusing to Instruct the Jury Regarding the Proper Scope of the Pecuniary Gain Aggravating Circumstance ................................. 30

    III. The Trial Court Repeatedly Erred During Voir Dire by Asking Jurors

Whether They Would Be Willing to Return a Life Sentence *If* Mitigating Circumstances Were Presented That Would Make a Life Sentence Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.   The District Court Erred in Allowing Hearsay Testimony in Both the Guilt/innocence and Penalty Phase Portions of Mr. Brown's Capital Trial in Violation of Th Fifth, Sixth, and Eight Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

V.   The District Court Erred in Denying Mr. Brown's Motion to Suppress Statements Which Were Obtained in Violation of *Miranda V. Arizona* . . . 52

VI.   The District Court Rendered Mr. Brown's Capital Sentencing Proceeding Fundamentally Unfair When it Denied Funds to Hire Expert Assistance in Violation of the Fifth, Sixth and Eighth Amendments to the Constitution . 72

VII.   The Trial Court Erred in Refusing to Conduct an Evidentiary Hearing on Appellant's Motion to Suppress Improper and Suggestive Identification Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

VIII.   The Government Withheld Favorable  Material Evidence in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution and *Brady V. Maryland*, 373 U.S. 83 (1963), and its Progeny . . . . . . . . . . . . . . 86

IX.   The Court Erred in Granting the Motion to Quash Mr. Brown's Subpoena for the Production of DFACS Records . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

X.   The Trial Court Erred in Excusing for Cause Juror Fahey, Whose Answers to the Court's Voir Dire Questions Indicated That She Was Able to Impose the Death Penalty in Appropriate Circumstances . . . . . . . . . . . . . . . . . . . . . . . 91

Xi.   The District Court Erred in Finding That the Federal Death Penalty Act Was Constitutional in Light of *Ring V. Arizona*, 536 U.S. 584 (2002) . . . . . . . . 93

XII.   The District Court Erred in Allowing the Introduction of Gruesome Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

XIII.   The District Court Erred in Denying Mr. Brown's Motion for Bifurcated Voir Dire in Violation of the Fifth, Sixth and Eighth Amendments . . . . . 103

XIV.  The District Court Erred in Denying Mr. Brown's Motion to Prohibit the Death Qualification of Potential Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

XV.  The Trial Court Erred in Telling a Prospective Juror Who Served on the Jury That the Defendant Had Entered a Guilty Plea . . . . . . . . . . . . . . . . 111

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

CERTIFICATE OF WORD COUNT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adams v. Texas*, 448 U.S. 38 (1980) ................................................................ 34, 72

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ...........................................................*passim*

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ............................................ 50, 98, 99

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................ 86

*Beckwith v. United States*, 425 U.S. 341 (1976) ............................................... 68, 69

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ............................................... 61, 70, 71

*Blount v. Rizzi*, 400 U.S. 410 (1971) ................................................................... 97

*Bousley v. United States*, 523 U.S. 614 (1998) ...................................................... 96

*California v. Beheler*, 463 U.S. 1121 (1983) ........................................................ 66

*Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000) .................................................... 78

*Conklin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004) .......................................... 77

*Crawford v. Washington*, 124 S.Ct. 1354 (2004) .......................................... *passim*

*Crosby v. Hardwick*, 320 F.3d 1127 (11th Cir. 2003) ..................................... 41, 89

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ..................................................... 42, 89

*Fay v. New York*, 332 U.S. 261 (1947) ............................................................... 108

*Florida v. Bostick*, 501 U.S. 429 (1991) .............................................................. 67

*Florida v. Royer*, 460 U.S. 491 (1983) ................................................................ 67

*Foster v. California*, 394 U.S. 440 (1969) ............................................................... 85

*Francis v. Franklin*, 471 U.S. 307 (1985) ........................................................ 40, 113

*Gray v. Mississippi*, 481 U.S. 648 (1987) ............................................................. 91

*Grayson v. Thompson*, 257 F.3d 1194 (11th Cir. 2001) ......................................... 77

*Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985) ................................................. 106

*Harris v. United States*, 536 U.S. 545 (2002) ....................................................... 95

*Jones v. United States*, 526 U.S. 277 (1999) ......................................................... 98

*Irwin v. Dowd*, 366 U.S. 717 (1961) .................................................................... 105

*Keeton v. Garrison*, 742 F.2d 129 (4th Cir. 1984) .............................................. 110

*Kelly v. South Carolina*, 534 U.S. 246 (2002) ...................................................... 79

*Kentucky v. Stincer*, 482 U.S. 730 (1987) .............................................. 26, 27, 29

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................ 86, 87

*In re Lindsey*, 875 F.2d 1502 (11th Cir. 1989) ..................................................... 73

*Lockett v. Ohio,* 438 U.S. 586 (1978) ......................................................... 42, 89, 90

*Lockhart v. McCree*, 476 U.S. 162 (1986) .................................. 106, 108, 109, 110

*Maine v. Moulton,* 474 U.S. 159 (1985) ................................................................ 26

*Manson v. Braithwaite*, 432 U.S. 98 (1977) .......................................................... 85

*Michigan v. Chesternut*, 486 U.S. 567 (1988) ....................................................... 67

*Miller v. French*, 530 U.S. 327 (2000) .................................................................. 97

viii

*Minnesota v. Murphy,* 465 U.S. 420 (1984) ........................................................ 66

*Miranda v. Arizona,* 384 U.S. 436 (1966) ................................................... *passim*

*Missouri v. Seibert,* 124 S.Ct. 2601 (2004) ..................................................... 60

*Moore v. Kemp,* 809 F.2d 702 (11th Cir. 1987) .......................................... 76, 77

*Morgan v. Illinois,* 504 U.S. 719 (1992) ........................................ 34, 40, 41, 105

*Murray v. Giarratano,* 492 U.S. 1 (1989) ....................................................... 48

*Neil v. Biggers,* 409 U.S. 188 (1972) .............................................................. 85

*Oregon v. Mathiason,* 429 U.S. 492 (1977) ..................................................... 65

*Orozco v. Texas,* 394 U.S. 324 (1969) ............................................................ 62

*Parker v. Dugger,* 498 U.S. 308 (1991) .......................................................... 28

*Potts v. Kemp,* 814 F.2d 1512 (11th Cir. 1987) ............................................. 113

*Reid v. Georgia,* 448 U.S. 438 (1980) ............................................................ 78

*Riley v. Dretke,* 362 F.3d 302 (5th Cir. 2004) ................................................ 73

*Ring v. Arizona,* 536 U.S. 584 (2002) ....................................................... *passim*

*Simmons v. South Carolina,* 512 U.S. 154 (1994) ....................................... 27, 79

*Simmons v. United States,* 390 U.S. 377 (1968) .............................................. 85

*Spears v. Mullin,* 343 F.3d 1215 (10th Cir. 2003) ......................................... 102

*Stansbury v. California,* 511 U.S. 318 (1994) ................................................. 67

*Stovall v. Denno,* 388 U.S. 293 (1967) ........................................................... 85

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................. 86

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998) ................................. 63

*Thompson v. Keohane*, 516 U.S. 99 (1995) ............................................... 60

*United States v. Bagley*, 473 U.S. 667 (1985) .......................................... 87

*United States v. Barnard*, 299 F.3d 467 (5th Cir. 2002) ..................... 31, 32

*United States v. Booker*, 125 S.Ct. 738 (2005) ......................................... 96

*United States v. Bouthot*, 878 F.2d 1506 (1st Cir. 1989) .......................... 85

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) ......... 31, 32

*United States v. De Parias*, 805 F.2d 1477 (11th Cir. 1986) ................. 100

*United States v. Eltayib*, 88 F.3d 157 (2d Cir. 1996) ............................... 85

*United States v. Greatwalker*, 356 F.3d 908 (8th Cir. 2004) ................. 100

*United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990) ........................... 61

*United State v. Honer*, 225 F.3d 549 (5th Cir. 2000) ............................... 85

*United States v. Howard-Arias*, 679 F.2d 363 (4th Cir. 1982) ................ 48

*United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812) .......................... 96

*United States v. Jackson*, 390 U.S. 570 (1968) ............................... 96, 97, 98

*United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000) ........................... 75

*United States v. Johnson*, 846 F.2d 279 (5th Cir. 1998) ........................... 61

*United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998) ........................... 62

x

*United States v. Mills*, 704 F.2d 1553 (11th Cir. 1983) ........................................... 82

*United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996) .............................................. 60

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) .............................................. 61

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) ........................................ 27

*United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002) ............................ 59

*United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) ................................................ 43

*United States v. Villabona-Garnica*, 63 F.3d 1051 (11th Cir. 1995) ..................... 59

*United States v. Wade*, 388 U.S. 218   (1967) ......................................................... 26

*United States v. Wiseman*, 172 F.3d 1196 (10th Cir. 1999) .................................... 85

*Walton v. Arizona*, 497 U.S. 639 (1990) .................................................................. 98

*Watkins v. Sowers*, 449 U.S. 341 (1981) .................................................................. 82

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................... 27, 81

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ................................ 34, 108, 109, 110

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .................................................. 48

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ....................................................... 71

## STATE CASES

*Hovey v. Superior Court*, 616 P.2d 1301 (Cal. 1980) ........................................... 110

*Parisie v. State*, 344 S.E.2d 727 (Ga. App. 1986) ................................................ 106

*State v. Burgess*, 264 Ga. 777 (Ga. 1994) .............................................................. 90

*State v. Kelley*, 540 S.E.2d 851 (S.C. 2001) ........................................................ 74

## FEDERAL STATUTES

18 U.S.C. §3592 .............................................................................. 5, 30, 32, 42

18 U.S.C. § 3593(a)(1) ................................................................................ 68

21 U.S.C. § 848 ...................................................................... 27, 72, 77, 78
Fed. R. Evid. 401 ..................................................................................... 100

Fed. R. Evid. 402 ..................................................................................... 100

Fed. R. Evid 403 ...................................................................................... 100

18 U.S.C. 3595 ............................................................................................. 1

18 U.S.C. §3742(a) ...................................................................................... 1

28 U.S.C. §1291 ........................................................................................... 1

## MISCELLANEOUS

*Belief in Capital Punishment and Jury Performance,*
   U. Tx 1964 ......................................................................................... 109

*Litigating with Victim Impact Testimony,* 88 CNLLR 517 ..................................... 49

*New Data on the Effect of a "Death Qualified Jury on*
*the Guilt Determination Process,* 84 Harv. L. Rev 567 (1971) ........................... 109

*Some Data on Juror Attitudes Toward Capital Punishment,*
   U. Chic. Monography (1968) ................................................................. 109

*The Effects of Death Qualification on Jurors' Predisposition*
*to Convict and on the Quality of Deliberations,*
   8 Law & Hum. Behav. 53 (1984) ............................................................. 109

*The Prejudicial Nature of Victime Impace Statements,*
     10 PSYPPL 492 ................................................................. 49

*Toward Expansion of Witerspoon,*
     5 Harv. Civ. Rights-Civ. Lib. L.Rev 53, (1970) ......................................... 109

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to Title 18 U.S.C. §3742(a), §3595, Title 28 U.S.C. §1291 and Rule 4 of the Federal Rules of Appellate Procedure. This is a direct appeal from a conviction and death sentence imposed in a criminal proceeding in United States District Court for the Southern District of Georgia, Savannah Division.

## STATEMENT OF THE ISSUES

1.  The district court erred in denying Mr. Brown the right to be present and to cross examine witnesses when this court remanded the case so as to construct the record.

2.  The trial court erred in denying appellant's motion for directed verdict on the aggravating circumstance of pecuniary gain and erred in refusing to instruct the jury regarding the proper scope of the pecuniary gain aggravating circumstance.

3.  The trial court repeatedly erred during voir dire by asking jurors whether they would be willing to return a life sentence *if* mitigating circumstances were presented that would make a life sentence appropriate.

4.  The district court erred in allowing hearsay testimony in both the guilt/innocence and penalty phase portions of Mr. Brown's capital trial.

5.  The district court erred in denying Mr. Brown's motion to suppress statements which were obtained in violation of *Miranda v. Arizona.*

6.  The district court rendered Mr. Brown's capital sentencing proceeding fundamentally unfair when it denied funds to hire expert assistance.

7.  The trial court erred in refusing to conduct an evidentiary hearing on appellant's motion to suppress improper and suggestive identification

1

evidence.

8. The government withheld favorable, material evidence in violation of the fifth, sixth, and eighth amendments to the united states constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

9. The court erred in granting the motion to quash Mr. Brown's subpoena for the production of DFACS records.

10. The trial court erred in excusing for cause Juror Fahey, whose answers to the court's voir dire questions indicated that she was able to impose the death penalty in appropriate circumstances.

11. The district court erred in finding that the Federal Death Penalty Act was constitutional in light of *Ring v. Arizona*, 536 U.S. 584 (2002).

12. The district court erred in allowing the introduction of gruesome photographs.

13. The district court erred in denying Mr. Brown's motion for bifurcated voir dire.

14. The district court erred in denying Mr. Brown's motion to prohibit the death qualification of potential jurors.

15. The trial court erred in telling a prospective juror who served on the jury that the defendant had entered a guilty plea.

## STATEMENT OF THE CASE

A.    Course of Proceedings

On December 5, 2002, Appellant, Meier Jason Brown, was arrested on a criminal complaint charging him with the killing of a federal employee, Sallie Louise Gaglia. (Doc. 1). Counsel, William G. Bell, III, was appointed to represent Mr. Brown and after a preliminary/detention hearing the magistrate court found probable cause and ordered that Appellant be detained without bond. Mr. Bell filed a Motion for the Appointment of Additional Counsel which was granted and Richard Darden was also appointed to represent Mr. Brown. (Doc. 4 & 9).

On January 6, 2003, a grand jury for the Southern District of Georgia, returned a three (3) count indictment alleging that Mr. Brown: "within the special territorial jurisdiction of the United States, with malice aforethought, ... unlawfully killed Sallie Louise Gaglia... in the knowing and willful perpetration of a robbery" in violation of 18 U.S.C. 7(3) and 1111 (a) and (b) (Count I); with malice aforethought ... kill[ed] Sallie Louise Gaglia, ... an employee of the United States ... while she was engaged in the performance of her official duties" in violation of 18 U.S.C. 1114 and 1111(a) (Count II); and assault on "Sallie Louise Gaglia, a person having lawful charge, custody and control of the United States Mail matter ..." in violation of 18 U.S.C. 2114(a) (Count III). (Doc. 15).

3

Also contained in the indictment was a Notice of Special Findings, specifically, as to Counts I and II: (1) that Appellant was over 18 at the time of the offense; (2) that appellant intentionally killed the victim; (3) that appellant intentionally inflicted serious bodily injury that resulted in death upon the victim; (4) that Appellant engaged in one or more acts that contemplated that a life would be taken, and that the victim, who was not a participant in the offense, died; (5) that Appellant engaged in one or more acts which created a grave risk of death to a person and that the victim died as a result of the acts in which Appellant engaged; and (6) that Appellant committed the offense in an especially heinous, cruel, or depraved manner in that it caused serious physical abuse to the victim. *Id.* In addition to the Indictment the government also filed a Penalty Certification outlining the maximum sentences which could be imposed (Counts I & II = death; Count III = 25 years). (Doc. 16).

Counsel for Mr. Brown filed a series of motions including, but not limited to, a Motion for Declaration the Federal Death Penalty Act is Unconstitutional (Doc. 36); Motion to Suppress Statements (Doc. 37); Motion to Suppress Out of Court Identification (Doc. 45); Motion to Preclude Admission of Gruesome and Highly Prejudicial Color Photographs of Deceased (Doc. 47); Motion for an Order Requiring the Production of any Mitigating Evidence Known to the Government

4

(Doc. 55); Motion to Suppress Evidence (Doc. 67); Motion for Order Providing Bifurcated Voir Dire (Doc. 95); Motion for an Order Requiring Production of all Matters Involving Victim Impact Evidence (Doc. 101); and Motion to Prevent Death Qualification Voir Dire (Doc. 103).

Thereafter, on May 9, 2003, a Grand Jury returned a superseding indictment and superseding penalty certification.  (Doc. 137 & 138).  The only difference between the original and superseding indictment was the addition of a seventh special finding, that being that Mr. Brown "committed the offense in the expectation of the receipt of anything of pecuniary value (18 U.S.C. 3592(c)(8))." *see* Doc. 137, pg. 2 ¶G.  The death penalty certification was changed only in that it added the word **MURDER** to counts I and II and the word **ROBBERY** to count III. *See*, Doc. 138.

On July 9, 2003, a suppression hearing was held before the magistrate court after which, on August 11, 2003, the magistrate recommended that Mr. Brown's Motion to Suppress Evidence, and Motion to Suppress Statements be denied.  (Doc. 185).  In the interim, the magistrate recommended that Mr. Brown's Motions as listed above, be denied.  (*See*, Doc. 171).  Thereafter, in a written report, the magistrate also recommended that Mr. Brown's Motion to Declare the Federal Death Penalty Unconstitutional be denied.  (Doc. 183).  Mr. Brown timely filed his

5

objections and the district court ultimately adopted the magistrate's findings as to deny the Motion to Declare the Federal Death Penalty Unconstitutional, and to deny the Motions to Suppress.(Doc. 198 & 201).

On September 28, 2003, the district court entered an order denying Mr. Brown's Motions to Suppress; Motion to Preclude Admission of Gruesome and Highly Prejudicial Color Photographs of Deceased; Motion in Liminie re: Autopsy Photographs; Motion to Suppress Out of Court Identification, Motion to Suppress Photographic Identification. (Doc. 223).

On September 30, 2003, Mr. Brown filed his requests to charge which he amended on October 20, 2003. (Doc. 225 & 248). Thereafter, on October 24, the district court submitted its proposed jury instructions and ordered the parties to submit any objections thereto by November 3, 2003. (Doc. 254). Mr. Brown timely filed his objections on October 28, 2003. (Doc. 258).

On October 30, 2003, the district court summoned a number of jurors and instructed the panel on the completion of juror questionnaires which were presented to both parties upon their completion. (Doc. 295). Jury selection began on November 3, 2003 with the district court propounding all death penalty related questions to the potential jurors. However, one juror, Dorothy Rentz, was never questioned. (Doc. 290 & 291). The trial on guilt began on the afternoon of

6

November 4, and concluded on November 6, 2003, when the jury returned a verdict of guilty on all counts (Doc. 272; Doc. 293 at 1050-51).

The district court immediately began the penalty phase of the trial which concluded the same day. After closing arguments by counsel and instructions by the court, the jury began its deliberations but retired for the evening without having reached a verdict. The following day, November 7, 2003, the jury returned is verdict finding that the government had proven beyond a reasonable doubt that: (1) Mr. Brown was over the age of eighteen; (2) the defendant intentionally killed the victim; (3) the defendant intentionally inflicted serious bodily injuries which resulted in death; (4) the defendant intentionally participated in one or more acts contemplating that a life would be taken or intending that lethal force would be used and the victim died as a direct result of the act; (5) the defendant intentionally and specifically engaged in an act of violence, knowing that act created a grave risk of death such that the participation in the act constituted a reckless disregard for human life, and the victim died as a direct result of that act; (6) the defendant committed the offenses in an especially heinous, cruel, and depraved manner in that they involved serious physical abuse; (7) the defendant committed the offense in the expectation of the receipt of anything of pecuniary value; (8) the defendant caused injury, harm, and loss to the victim and to her family and that this factor tends to

7

support the imposition of the death penalty; (9) the manner of the defendant's commission of the offense was intended to reduce the likelihood of detection of the defendant's involvement in the underlying federal robbery offense, and in the assault on the victim and this factor tends to support the imposition of a death penalty; (10) the victim was an employee of the United States Postal Service, and was killed while she was engaged in the performance of her official duty, and that this factor tends to support imposition of the death penalty; (11) the defendant has committed an array of other criminal acts, some but not all of which have resulted in convictions and that this factor tends to support the imposition of the death penalty; and (12) repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed and that this factor tends to support the imposition of the death penalty. (Doc. 294 at 1236 - 40).

The jury then found[1] that the "aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death therefore is the appropriate sentence in this case, we, the jury, recommend by unanimous vote, that the sentence of death be

---

[1]    It is questionable whether the jury even considered any mitigating evidence as its verdict was merely a wholesale adoption of the verdict form prepared by the district court.  There were no express findings as to any mitigating factor even though a number were charged.  (*See e.g.,* Doc. 293 at 1212 - 13).

8

imposed." (Doc. 294 at 1240).  On November 11, 2003, in accordance with the jury's binding recommendation, the district court sentenced Mr. Brown to death on Counts I and II and a term of 300 months in custody on Count III.  (Doc. 276)

On November 12, 2003, Mr. Brown timely filed a Motion for New Trial which was denied on January 13, 2004.  (Doc. 277 & 289).  On January 20, 2004, Mr. Brown timely filed his notice of appeal.  (Doc. 297).  Thereafter, on April 15, the district court granted trial counsel's Motion to Withdraw and appointed undersigned counsel to represent Mr. Brown on appeal. (Doc. 305).  On August 16, 2004, Mr. Brown filed a Motion to Unseal Files which was granted on August 25, 2005.  (Doc. 306 & 307).

Thereafter, undersigned counsel, in speaking with trial counsel, learned that there may have been *ex parte* communications between trial counsel and either the magistrate or district court.  Mr. Brown filed with this Court  a Motion to Transfer Jurisdiction to the District Court for Construction of the Record.  This Court granted the Motion and directed the district court to determine if any unrecorded communications occurred related to Mr. Brown's pretrial Motions for funding to employ a forensic social worker and future dangerousness expert.  On February 10, 2005, without conducting an evidentiary hearing, without contacting current counsel for Mr. Brown, and without interviewing trial counsel or the magistrate

9

judge, the district court entered an order finding that no unrecorded communications occurred. (Doc. 313). Mr. Brown filed a Motion for Reconsideration objecting to the district court's order as being insufficient because, the court inquired only of the court reporter and the district court staff and not of trial counsel or the magistrate court. In addition, Mr. Brown objected to the district court making a finding without first conducting a hearing where witnesses would be sworn and subject to cross examination by counsel for Mr. Brown. (Doc. 314). The Motion for Reconsideration was ultimately denied. (Doc. 315)

B.    Statement of Facts

On November 30, 2002, Ms. Sallie Gaglia, a part-time postmaster for the United States Postal Service, was working in the Fleming, Georgia, Post Office. (Doc. 291 at 566). At approximately 8:00 a.m., postal carrier, Darlene Washington came into the Post Office and began sorting the mail for her route. As she was sorting the mail, an unidentified person came into the Post Office and went to P.O. box 327. (*Id.* at 570). That box belonged to the Morgans and Browns, an extended family that lived on Leroy Coffer Highway in Fleming. (*Id.* at 571). As the person was leaving, Ms. Gaglia conversed with the customer asking him his name on three occasions. The customer apparently replied but in a manner that neither Ms. Washington or Ms. Gaglia could understand. Finally, on the third inquiry, Ms.

10

Washington heard the customer say his name was "Jason." *Id.* Ms. Washington ultimately left the Post Office between 9:30 and 9:45 a.m. (*Id.* at 579.)

At approximately 10:30 a.m., Mr. Frank Kania went to the Fleming Post Office to pick up his mail. Inside the Post Office, Mr. Kania spoke with Ms. Gaglia as she handed him his mail. (*Id.* at 628-29). Mr. Kania left and sat in his truck for approximately 1 minute as he sifted through his mail. (*Id.* at 630). During that brief period, Mr. Kania saw a black male in a dark hooded sweatshirt and dark jogging pants riding a bicycle toward the Post Office. (*Id.* 630-31; 640 - 41). As he drove off, Mr. Kania looked in his rearview mirror, he saw the black male get off of the bike and go into the building. (*Id.* at 632).

Somewhere between 10:30 and 10:35 a.m., Mr. Chris Bowen, as he drove past the Post Office, saw a black male dressed in dark clothing sitting on a bike in front of building. (*Id.* at 647). In addition to noting the man wearing a dark jogging suit (*Id.* at 655), Mr. Bowen saw the man had something white on his hands that he thought were gloves. (*Id.* at 647).

At 10:45 a.m., Ms. Stephen Nichols and his girlfriend, Jennifer Zech, arrived at the Fleming Post Office. (*Id.* at 607). Ms. Zech went insid to pick up her mail while Mr. Nichols remained in the car. (*Id.* 585). Once inside, Ms. Zech[2] did not

---

[2]    Because of problems with her pregnancy, Ms. Zech's testimony was presented via videotaped deposition.

11

initially see anyone behind the counter. Eventually, she put her hands on the counter and booster herself up to see what she first believed to be a balled up jacket. (*Id*. at 587). Eventually Ms. Zech determined that it was not a jacket but the post master laying in a fetal position in front of a desk. Ms. Zech believed that Ms. Gaglia had been shot because she saw what she believed to be blood on the clothing. (*Id*. at 587-88; 591). Ms. Zech ran out of the Post Office screaming and as Mr. Nichols went inside, Ms. Zech ran to the trailer next door where she asked the residents to call 911. (*Id*. at 590 - 91).

When Mr. Nichols got into the Post Office he saw Ms. Gaglia laying on the floor with 2 half-dollar sized blood stains on her back. (*Id*. at 603). After calling to her and getting no response, Mr. Nichols climbed through the window. (*Id*. at 605). Because the window area of the Post Office was approximately 2 feet wide by 2 feet high, Mr. Nichols had to slide himself through the opening in order to get to Ms. Gaglia. *Id*. Mr. Nichols got no response from Ms. Gaglia and then opened the door so that when help arrived they would have access to the victim. *Id*. When the EMS arrived they found no vital signs but the body was still warm.

Members of the Georgia Bureau of Investigation (GBI) crime scene team were summoned to the scene where they took photos and gathered evidence. Among the items of significance found were a shoe print on the counter, underneath

12

the window area, a hand print also on the counter and a bloody shoe print[3] on the floor of the Post Office. (*Id*. at 768; 783; Doc. 292 at 852;Govt. Ex. 9E, 9F, 9G)

Postal Inspector, Henry Reeves, was contacted and he arrived at the Fleming Post Office at approximately 6:00 p.m. Once there, Mr. Reeves did an accountability study to determine what, if anything of value had been taken. (Doc. 292 at 687). The results of his study revealed that $1,266.59 was missing from the Post Office, $1,195.00 of which were in postal money orders. (*Id*. at 689-90). Further investigation revealed that the missing money orders were in the amount of $20.00; $500.00; $500.00; and $175.00. (*Id*. at 692). Even though these money orders were missing, there was still $103.00 in the cash drawer that was apparently undisturbed. ( *Id*. 693-94).

An autopsy was performed wherein it was revealed that Ms. Gaglia had been stabbed approximately ten times, two of which could have caused her death. (*Id*. at 797-811). The medical examiner could not determine in which order the wounds were inflicted and therefore could not rule out the possibility that the first and/or second wounds inflicted were actually fatal. (*Id*. at 816). The only thing he could say for certain was that death came fairly quickly when blood fills the sac around

---

[3]    Neither the hand print nor the bloody foot print could be connected to Mr. Brown's or anyone else law enforcement knew was in the Post Office on November 30, 2003.

13

the heart as would have been the case here.  (*Id*. at 812).

Eventually, law enforcement focused its attention on Mr. Brown and on December 3, 2003, Mr. Brown spoke with someone from the Liberty County Sheriff's Department who asked him to come in for questioning.  Mr. Brown refused.  (Doc. 292 at 733-34).  On another occasion, upon being contacted by law enforcement, Mr. Brown again refused to speak this time by hanging up the phone. Because Appellant and Ms. Brown were on their way to Tybee Island, Mr. Brown would not agree to surrender for questioning.  *Id*.  Although law enforcement obtained search warrants for the homes of Diane and Ms. Sadie Brown, searches at both locations were conducted pursuant to consent.  (Motion Hearing at pg 29).

At Diane Brown's home, a large number of agents/officers, at least one of whom was armed with a shot-gun, and others who were accompanied by dogs approached the residence. (Doc. 292 at 752).  When the door to the residence was opened, approximately 10 or 12 agents, with guns drawn, rushed past her into the home.  (*Id*. at 753).  One of the officers grabbed a chair from the dining room and placed it in the middle of the room telling Mr. Brown to "sit there and don't move." (*Id*. at 754).  At the same time, another officer pushed Ms. Brown into another room while other officers roamed through her house.  *Id*.  At some point, Postal Inspector

14

Rushwin obtained consent to search from Ms. Brown. (*Id.* at 904).[4]

During the search of Diane Brown's home, law enforcement discovered the receipts from two postal money orders which had been taken from the Post Office and from the floor of her bedroom, a pair of blue Lugz brand sneakers. (*Id.* at 741; 905). After discovering these items, Mr. Brown was questioned. Although he was directed to sit down and not move, and although he was escorted by law enforcement whenever he moved within the house, and although at least two sheriff's deputies stood outside the home with shotguns drawn, law enforcement claimed Mr. Brown was not under arrest. Consequently, Mr. Brown was not advised of his rights prior to being questioned.

Initially, Inspector Rushwin asked Mr. Brown to accompany him to the Chatham County Jail where they would meet with Detective Chuck Woodall of the Chatham County Sheriff's Department. Mr. Brown purportedly agreed and went to put on a pair of shoes. (Doc 302 at 42). The shoes Mr. Brown attempted to retreive were the blue Lugz shoes Inspector Rushwin had noticed earlier. Inspector Rushwin informed Mr. Brown that he could not take those shoes and Mr. Brown decided he would not go to Chatham County. Instead, it was decided that Detective Woodall would come to Diane Brown's home. (*Id.* at 43).

---

[4]     Although Ms. Brown allowed law enforcement to search her residence, she did so because she did not believe she had a choice in the matter. *Id.* at 753

15

Immediately upon his arrival, approximately one hour and fifteen minutes after police had taken control of Ms. Brown's home, without first *Mirandizing* Mr. Brown, Detective Woddall began the interrogation[5] which lasted between 4 to 6 hours. (*Id.* at 32; 60). During the 4 hour interrogation, Mr. Brown made an inculpatory statement. After incriminating himself, Mr. Brown was arrested and finally *Mirandized. Id.* He was then transported to the Liberty County jail where he remained over night only to be re-interrogated the following morning. During this recorded statement, Mr. Brown confessed to robbing the post office and stabbing Ms. Gaglia. However, he maintained that the stabbing was an accident. (*Id.* at 87).

In summary, Mr. Brown admitted to going to the post office with a knife he had taken from his mother's house. He had ridden his uncle Junior's bicycle, and had put white socks on his hands. He asked for money orders in the amounts of $175.00, $500.00 and $500.00, which he intended to use to pay Diane Brown's bills. When the post master turned to total the money orders and concurrent charges, Mr. Brown claimed to have jumped over the counter, lost his balance and accidently stabbed the victim. Mr. Brown admitted to taking the money orders and the wallet from the victim's purse. He claimed to have thrown the knife and socks

---

[5]    For a more detailed account of the events surrounding the search and seizure and subsequent statements obtained, *see* Issue V, *infra.*

16

along the side of the road on the way back to his mother's home. Although he gave

law enforcement a detailed description of where he claimed to have hidden the

wallet in his mother's back yard, neither the knife, socks or wallet were where Mr.

Brown claimed to have put them. (Doc. 292 at 921)

Mr. Brown was eventually indicted and charged with murder in the special

territorial jurisdiction of the United States, murder of a federal employee and a

single count of assault on a federal employee. Counsel was appointed and filed a

series of motions including but not limited to: motion to suppress identification;

motion for funds to hire a forensic social worker and future dangerousness expert;

motion to exclude gruesome photographs; motion to suppress evidence; and motion

to suppress statements. These motions were denied.

After having potential jurors complete questionnaires, the district court began

the voir dire process on November 3, 2003. In its discretion, the court asked all of

the voir dire questions with counsel having a limited opportunity to ask follow up

questions in rare situations. To each juror[6] individually, the court propounded a

series of questions pertaining to the potential juror's beliefs on the death penalty

---

[6]    It appears that a juror who actually sat and rendered a verdict on both guilty
and punishment, Dorothy Rentz, was never questioned as to here beliefs on the
death penalty. If this is true, Mr. Brown's sentence must be reversed. However, if
this Court believes further factual development on this issue is in order, Mr. Brown
herein requests this Court stay the instant proceedings and remand to the trial court
for a determination on whether Ms. Rentz was, in fact, never death qualified.

17

which improperly shifted the burden of proof to the defendant.  For example, the court asked potential juror Tamara Brewer[7] "if you were convinced that there were mitigating circumstances that made life imprisonment without benefit of parole the more appropriate sentence, could you vote for that?" (Doc. 291 at 501).  Eventually a jury was sworn and testimony began on the afternoon of November 4, 2003.  The guilt/innocence portion of the trial finished the morning of November 6, 2003, with the defense calling no witnesses.  After an undisclosed period of time, the jury returned a verdict of guilty on all counts.  The court began the penalty phase immediately thereafter and the evidence, argument and charge of the court concluded the afternoon of November 6, 2003.  The jury deliberated for an undisclosed amount of time that day and then court recessed for the evening.  The following morning, and after sending out two notes, one requesting a photograph, the other requesting the court define "violence" the jury found the existence of all the predicate facts, non-statutory aggravating circumstances and statutory aggravating circumstances offered by the government and recommended that a sentence of death be imposed on Counts I & II.  Thereafter, the district court imposed the death sentence and also imposed a sentence of 300 months on Count III.

---

[7]    Ms. Brewer was eventually seated on the jury which convicted and sentenced Mr. Brown to death.

18

C.    Standards of Review

1.    This is a legal issue, subject to *de novo* review.

2.    Whether the pecuniary gain aggravator is applicable in cases in which a murder is the culmination of a robbery is a question of law, subject to *de novo* review. This is an issue of first impression, whether "the offense" identified in § 3592(c)(8), applies to the murder, as opposed to the underlying felony.

3.    The manner of voir dire and the decision whether to excuse jurors for cause is reviewed under an abuse of discretion standard. *United States v. McLeod*, 53 F.3d 322 (11th Cir. 1995); *United States v. Isom*, 88 F.3d 920 (11th Cir. 1996). However, with respect to this issue, because counsel contends that the erroneous questioning amounted to an improper instruction on the law, the issue must also be reviewed as a question of law, subject to *de novo* review.

4.    Evidentiary rulings are generally reviewed under an abuse of discretion standard. *United States v. Range*, 94 F.3d 614 (11th Cir. 1996). Whether the Confrontation Clause applies to the Sentencing Phase of a Death Penalty Trial, however, is a legal

19

issue that is subject to *de novo* review.

5. Review of the lower court's denial of the Motion to Suppress is a mixed question of law and fact. The lower court's factual findings are reviewed under a clearly erroneous standard, while the legal holdings based on the factual findings are reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690 (1996); *United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996).

6. This Court's review of a denial of a request for funds to hire an expert follows the three-part test set forth in *Conklin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004): (1) a timely request for funds had been made; (2) a showing that it was unreasonable for the trial court to deny funds; (3) a showing that the denial rendered the defendant's trial fundamentally unfair.

7. Whether the lower court erred in denying Appellant's request for a hearing on the admissibility of identification testimony should be reviewed under an abuse of discretion standard. *Watkins v. Sowers*, 449 U.S. 341 (1981).

8. Whether the government withheld favorable evidence is a question of fact subject to review under a clearly erroneous

standard. Whether the evidence was material under the standard of *Kyles v. Whitley* is reviewed under *de novo*.

9.  The court's decision to quash the subpoena is treated as an evidentiary ruling and is subject to an abuse of discretion standard of review. However, whether the evidence that was sought would be admissible is a question of law which should be reviewed *de novo*.

10/15.  The manner of voir dire and the decision whether to excuse jurors for cause is reviewed under an abuse of discretion standard. *United States v. McLeod*, 53 F.3d 322 (11th Cir. 1995); *United States v. Isom*, 88 F.3d 920 (11th Cir. 1996).

11.  This presents an issue of law subject to *de novo* review.

12.  This issue presents a question subject to review under an abuse of discretion standard, because it relates to the admissibility of evidence.

13.  As presented, this is an issue of law, subject to *de novo* review.

14.  As presented, this is an issue of law, subject to *de novo* review.

SUMMARY OF ARGUMENT

1.  The district court erred in denying Mr. Brown the right to be present and to cross examine witnesses when this court remanded the case so as to construct the record.

2.  The trial court erred in denying appellant's motion for directed verdict on the aggravating circumstance of pecuniary gain and erred in refusing to instruct the jury regarding the proper scope of the pecuniary gain aggravating circumstance.

3.  The trial court repeatedly erred during voir dire by asking jurors whether they would be willing to return a life sentence *if* mitigating circumstances were presented that would make a life sentence appropriate.

4.  The district court erred in allowing hearsay testimony in both the guilt/innocence and penalty phase portions of Mr. Brown's capital trial.

5.  The district court erred in denying Mr. Brown's motion to suppress statements which were obtained in violation of *Miranda v. Arizona*.

6.  The district court rendered Mr. Brown's capital sentencing proceeding fundamentally unfair when it denied funds to hire expert assistance.

7.  The trial court erred in refusing to conduct an evidentiary hearing on appellant's motion to suppress improper and suggestive identification

22

evidence.

8. The government withheld favorable, material evidence in violation of the fifth, sixth, and eighth amendments to the united states constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

9. The court erred in granting the motion to quash Mr. Brown's subpoena for the production of DFACS records.

10. The trial court erred in excusing for cause Juror Fahey, whose answers to the court's voir dire questions indicated that she was able to impose the death penalty in appropriate circumstances.

11. The district court erred in finding that the Federal Death Penalty Act was constitutional in light of *Ring v. Arizona*, 536 U.S. 584 (2002).

12. The district court erred in allowing the introduction of gruesome photographs.

13. The district court erred in denying Mr. Brown's motion for bifurcated voir dire.

14. The district court erred in denying Mr. Brown's motion to prohibit the death qualification of potential jurors.

15. The trial court erred in telling a prospective juror who served on the jury that the defendant had entered a guilty plea.

## ARGUMENT AND AUTHORITY[8]

### ISSUE I

### THE DISTRICT COURT ERRED IN DENYING MR. BROWN THE RIGHT TO BE PRESENT AND TO CROSS EXAMINE WITNESSES WHEN THIS COURT REMANDED THE CASE SO AS TO CONSTRUCT THE RECORD

In reviewing the record, undersigned counsel determined that trial counsel, William Bell and Richard Darden, filed a number of *ex parte* motions for funds to hire various investigative and expert help.

The magistrate court recommended that Mr. Brown's *ex parte* motions for funds to hire a forensic social worker and an expert on future dangerousness be denied and that recommendation was adopted by the district court. Current counsel, in their preparation of Mr. Brown's appeal, spoke with trial attorneys Willaim Bell and Richard Darden who related that certain *ex parte* conversations occurred between counsel and the bench[9] relating to the funding motions named above.

---

[8]    Each of the following claims challenging the validity of the conviction and death sentence is premised on the Fifth, Sixth and Eighth Amendments to the United States Constitution. In addition, Issue V, specifically incorporates the Fourth Amendment.

[9]    Initially, trial counsel indicated that the communications occurred with the district court. However, since that time, Mr. Bell has indicated that the communications might not have been with the district court, but does specifically reference a communication with the magistrate court that was not recorded. Obviously, communications with the magistrate court concerning funding are

24

After scouring the district court record and moving to unseal all filings previously filed under seal, Mr. Brown could not locate the transcripts of any *ex parte* communications between trial counsel and the magistrate or district court. Consequently, Mr. Brown filed a Motion for to Transfer Jurisdiction to the District Court for Construction of the Record which was eventually granted by this Court.

The district court, without contacting trial counsel or inquiring of the magistrate court, issued an order on February 10, 2005, wherein it stated that the Court "searched its records, ... consulted with the Court Reporter," and that no one "on the Court's staff recall any unrecorded hearings in this case." (Doc. 313). Thus, the district court concluded the record did not need to be constructed. *Id.* Mr. Brown filed a motion for reconsideration asserting:

> The Court's inquiry was insufficient in a number of respects. First, inquiring only of the court reporter and the district court staff excludes at least three critical players in the process: Richard Darden; William Bell, and Magistrate Judge G.R. Smith. Second, concluding that no unrecorded communications took place without first conducting a hearing where witnesses would be sworn and subject to cross examination by counsel for Mr. Brown does not comport with fundamental notions of due process and ignores the heightened reliability required in

---

perhaps more critical than those with the district court. The magistrate court, hearing the *ex parte* communications (that were not recorded) initially made the determination to deny the motions. The district court, who may not have been privy to all of the evidence (i.e., the unrecorded communications between trial counsel and the magistrate court), then adopted the magistrate's recommendation.

25

capital cases.

(Doc. 314).  Reconsideration was likewise denied.  (Doc. 315).

The Due Process Clause of the Fifth Amendment provides that the criminally accused has the right to be present at all critical stages of the proceedings against him.  *Maine v. Moulton*, 474 U.S. 159, 170 (1985).  A critical stage of the proceedings is one "where the results might well settle the accused's fate and reduce the trial itself to a mere formality."  *United States v. Wade*, 388 U.S. 218, 224 (1967).  As the Court has noted, the Due Process Clause provides broader protection than the Confrontatiion Clause of the Sixth Amendment (which provides that a criminal defendant has the right to be present to confront witnesses against him).  Specifically, the Court has held that the Due Process Clause mandates the accused be present "even in situations where [he] is not actually confronting witnesses or evidence against him."  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  The Fifth Amendment right to be present attaches:

> whenever [the defendant's] presence has a relation,
> reasonably substantial, to the fulness of the opportunity to
> defend against the charge . . . [this right] is not guaranteed
> when presence would be useless, or the benefit but a mere
> shadow, . . . [but] due process clearly requires that a
> defendant be allowed to be present to the extent that a fair
> and just hearing would be thwarted by his absence . . .
> Thus, a defendant is guaranteed the right to be present at
> any stage of the criminal proceeding that is critical to the
> outcome if his presence would contribute to the fairness of

26

the procedure.

*Id.; see also, United States v. Novaton*, 271 F.3d 968, 997-998 (11th Cir. 2001).

Clearly, this Court's remand to the district court was a critical stage of the proceedings in that the inclusion of crucial portions of the procedure below could indeed determine the outcome of this criminal prosecution.  Mr. Brown has raised substantial allegations that he was denied due process by the district court denying him funds necessary to develop two essential lines of defense to a death sentence - - a future dangerousness expert and a forensic social worker.

The Supreme Court has spoken on the critical aspect of both of these experts finding that future dangerousness is an aspect of *every* capital prosecution *see Simmons v. South Carolina*, 512 U.S. 154 (1994) , and *Wiggins v. Smith*, 539 U.S. 510 (2003) (trial counsel ineffective for failing to employ assistance in developing a meaningful social history).  Thus, the denial of either expert, upon sufficient showing under *Ake v. Oklahoma, supra,* and/or 21 U.S.C. 848(q), would have deprived Mr. Brown of a fair capital sentencing proceeding.

As indicated in both *Ake* and 848(q), part of the analysis this Court must undertake to determine if trial counsel made an adequate showing as to the need of the requested services.  *See*, Issue III, *supra.*  As both *Ake* and 848 (q) make clear, the requisite showing must be conducted outside the presence of the government.

27

Thus, any *ex parte* communications on the subject between trial counsel and the bench[10] is a necessary component to meaningful appellate review. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991)(We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.").

As current counsel was not trial counsel, the only person other than the magistrate or district courts (and their staff) who could shed light on what occurred in any unrecorded *ex parte* communications would be Mr. Brown and/or his trial counsel (none of whom were queried by the district court).   Mr. Brown is not impugning the veracity of the collective recollection of the lower courts - - *i.e.*, that the district court and magistrate court and their staff do not recall any *ex parte* unrecorded communications.  However, just because the courts and their staffs do not recall any such communications does not necessarily mean they did not take place.  It could be that trial counsel's recollection is more accurate than the district and magistrate court's.  In fact, there is objective evidence supporting trial counsel's recollection.  At the conclusion of the Motions Hearing conducted by the

---

[10]     Both the magistrate court and district were presented with motions for funding for these experts.  The district court adopted and relied upon the findings of the magistrate court in denying funding.  Thus, the information presented to both the district and magistrate court is critical to this Court determining the funding issues.

28

magistrate, the following exchange occurred:

> THE COURT: All right. I want to see defense counsel.
> There's something you filed that puzzled me a little bit.
> And I want to -- it is something that can be heard ex parte.
> It doesn't pertain to the government. And I'll just see you
> very briefly.
>
> MR. DARDEN: All right, sir.

(Doc. 302 pg 175). Thus, it is clear that an *ex parte* communication took place between trial counsel and the magistrate court. However, there is nothing in any of the transcripts to indicate what occurred during this *ex parte* communication.

Given the obvious discrepancy between the objective facts and the district court's summary conclusion that no unrecorded *ex parte* communication occured, it was error to not conduct an evidentiary hearing on the matter where Mr. Brown would be present and be afforded the right to counsel and to confront and cross-examine relevant witnesses. *See Kentucky v. Stincer*, 482 U.S. at 735 ("The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process."). This Court should stay the instant appellate proceedings and remand the case to the district court with instructions to conduct a hearing on the matter.[11]

---

[11]    The district court's summary denial of Appellant's request to correct the record in the lower court – a denial that was not preceded with any notice to the attorneys, or any fact-finding – also resulted in the inability of counsel to correct and supplement the record on two other matters. First, despite the fact that the

ISSUE II

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION FOR DIRECTED VERDICT
ON THE AGGRAVATING CIRCUMSTANCE OF
PECUNIARY GAIN AND ERRED IN REFUSING TO
INSTRUCT THE JURY REGARDING THE PROPER
SCOPE OF THE PECUNIARY GAIN AGGRAVATING
CIRCUMSTANCE

Prior to trial, and throughout the course of the litigation, the defendant

objected to the government's effort to obtain a death sentence on the grounds that

the offense was committed in the expectation of pecuniary gain (18 U.S.C. §

---

lower court was required to unseal all records; and despite the fact that both of
Appellant's counsel traveled to Savannah, Georgia to review the entire clerk's file
to determine if there were any other documents under seal, Appellant's counsel
were not provided with the juror questionnaires that were filled out by each of the
jurors prior to voir dire and submitted to the court. Because some of the issues
raised in this appeal relate to voir dire and juror qualifications, counsel believes
that a review of these questionnaires is necessary. This was an additional matter
that counsel had intended to request of the lower court during the remand hearing
that was envisioned by this Court's order. Second, a review of the voir dire seems
to indicate to Appellant's counsel that one of the jurors who was selected to serve
on the jury, Dorothy Rentz, was possibly never questioned. Though her name was
called out during the initial role, and though the attorneys for both sides apparently
agreed that she would sit on the jury, Appellant's counsel have not been able to
locate her actual questioning by the court and counsel. Every other juror was
individually questioned. Appellate counsel recognize that they may have
overlooked some transcript, or that the juror's voir dire may be otherwise not
apparent, but, nevertheless, this was another issue that counsel had intended to
raise in the lower court during the remand hearing. The trial judge's summary
disposition, however, deprived counsel of the ability to raise either of these issues.

30

3592(c)(8)).[1]  (See, *e.g.*, Doc. 269 [directed verdict]; Doc. 225 [Requests to Charge #39 & Sentencing Instruction Request #9]; Doc. 243 [Objections to Court's Proposed Jury Instruction]; Doc. 29 at 1224 [renewal of objections accepted by the trial court]; Doc. 277 Motion for New Trial).

The defendant cited the decisions in two Circuits that have expressly held that the "pecuniary gain" aggravating circumstance is not applicable in a typical robbery case in which the victim of the robbery is murdered.  That is, the pecuniary gain that is envisioned in the statute must be pecuniary gain that is expected as a result of the murder, not as a result of a robbery that resulted in a murder.  Both the Fifth and the Tenth Circuits concluded that the broad interpretation advocated by the government – and accepted by the trial court in this case – would not sufficiently narrow the class of cases in which the death penalty was appropriate and is inconsistent with the language of the statute.  *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) and *United States v. Barnard*, 299 F.3d 467 (5th Cir. 2002).

The district court rejected the defendant's challenge, explaining the basis for this decision in the denial of the Motion for New Trial (Doc. 289).  While recognizing that the Tenth and Fifth Circuits do, in fact, limit the "pecuniary gain"

---

[1]  The "pecuniary gain" aggravating circumstance was not in the initial indictment, but was added in the superseding indictment returned on May 9, 2003 (Doc. 137).

31

aggravating circumstance to cases in which the murder was committed with the expectation of pecuniary gain *from the killing* as opposed to pecuniary gain from an underlying felony, such as robbery, the lower court rejected the decisions of these two Circuits in favor of the broader interpretation, which would essentially permit the death penalty in *every* case of a robbery that resulted in the death of the victim. For the reasons set forth in *Barnard* and *Chanthadara*, the trial court erred.

This court should follow the lead of the Tenth and Fifth Circuit, and hold that the pecuniary gain aggravating circumstance that is codified at 18 U.S.C. § 3592(c)(8), does not apply in cases where the murder is the culmination of a robbery. That is, the (c)(8) aggravator must be limited to cases in which the defendant seeks money from the commission of the murder, as opposed to a robbery that culminates in a muder.

If, as Appellant claimed in the lower court, the pecuniary gain aggravating factor was not appropriately offered to the jury, then the trial court erred in denying his Motion for Directed Verdict (Doc. 269), erred in denying his Requests to Charge (Doc. 225 #9 and #39), and erred in the instruction that was given to the jury (Doc. 293 at 1207).

In the instant case the error cannot be considered harmless because there was little in aggravation presented and significant evidence in mitigation. By

32

eliminating pecuniary gain the lone statutory aggravating circumstance was that the crime was "heinous, cruel or depraved." Evidenced on this aggravator was scant and could not have outweighed the evidence in mitigation that was presented. In addition, and in light of *Ring v. Arizona*, 536 U.S. 584 (2002), the weighing of aggravators and mitigators is solely the province of the jury. Because the jury was instructed to "weigh" the aggravating circumstances and the mitigating circumstances, and because the jury was improperly instructed on the "pecuniary gain" aggravator (and, in fact, as a matter of law, this aggravator was inapplicable), the death sentence in this case must be set aside.

## ISSUE III

### THE TRIAL COURT REPEATEDLY ERRED DURING VOIR DIRE BY ASKING JURORS WHETHER THEY WOULD BE WILLING TO RETURN A LIFE SENTENCE *IF* MITIGATING CIRCUMSTANCES WERE PRESENTED THAT WOULD MAKE A LIFE SENTENCE APPROPRIATE

During the course of voir dire, the court repeatedly asked the jurors whether they would be willing to impose a sentence of life without parole if there were mitigating circumstances that were presented that would render a life sentence appropriate. This question erroneously suggested, in it premise, that a life sentence would only be appropriate if mitigating circumstances were presented. By improperly phrasing the question in this manner, the court implicitly instructed the

33

jurors erroneously about the proper role of aggravating an mitigating circumstances. Moreover, by improperly phrasing the question as such, the court deprived the defendant of the ability to determine whether the jurors were even qualified in this case: there is no way to determine from the voir dire whether the jurors who were selected to try the case would be willing to return a life sentence in the absence of *any* mitigating circumstances. Yet, only a juror who was willing to return a verdict of life in the absence of mitigating circumstances would be qualified to be a juror in this death penalty case.

The voir dire (which was almost entirely conducted by the judge), was designed, in part, to determine if the jurors were "death qualified." In order to determine whether the potential jurors satisfied the standards of *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Adams v. Texas*, 448 U.S. 38 (1980) and *Morgan v. Illinois*, 504 U.S. 719 (1992), the trial court posed hypothetical questions to the jurors. With few exceptions, however, the hypothetical questions that were posed unmistakably suggested to the jurors that the sentence of death would be appropriate *unless* mitigating factors outweighed any aggravating factors. The questions posed to eleven[2] of the twelve jurors who actually delivered the death

---

[2]    Ms. Dorothy Rentz, a juror who was selected by the parties and was polled at the conclusion of both the guilt-innocence and penalty phases of the trial was not (to the best of the defendant's ability to find) ever questioned in court.

sentence were as follows:

> **Charles Capers**: " Now, you understand you wouldn't have to [impose the death penalty]. You could say well, he was a good son, and he hasn't done bad things or not much, therefore, we should spare his life. Could you do that? . . . And if the defendant needed not to be put to death, that he needed to be granted – you found him guilty, and there was evidence you thought that justified not taking his life, could you vote for life without parole?" (Doc. 290 at 66; 68). [This improperly suggests that death penalty is appropriate absent some countervailing evidence].
>
> **Ms. Cota**: "The jury may consider mitigating factors, that there was something that made the death sentence not the appropriate sentence, but life without parole. If you felt there [sic] was the appropriate punishment, could you vote for that?" (Doc. 290 at 135). [Suggests that there must be something to contradict propriety of death sentence once aggravating factors are established. In addition, using the term "may" suggests that the jury does not have to consider mitigating factors.].
>
> **Ms. Colson**: "[I]n making that decision, the jury consider aggravating

circumstances surrounding the death, and all of the surrounding circumstances.  In other words, if there was something that even though the defendant were guilty that maybe the most appropriate sentence would be life imprisonment without possibility of parole.  Now, could you weigh those factors, aggravating and mitigating circumstances?" (*Id*. at 172)

**Helen McClinton**: "If there were mitigating circumstances, in other words, something about the defendant or the circumstances that you thought that should be considered, could you vote for a sentence other than death?" (*Id*. at 178) [suggests the necessity of mitigating circumstances].

**Rose Mary Taylor**:  "If you are on the jury and you find him guilty, but you consider that there are certain mitigating circumstances that you think speak against the death penalty, could you find him guilty, but impose the lesser sentence of life without benefit of parole?" (*Id*. at 251). [This conveys the impression that absent mitigating circumstances, death is appropriate, as opposed to available].

**Paul Cooper**: "If you are convinced that he is guilty and that the most appropriate punishment would be life imprisonment without benefit of

36

parole, could you vote that for that?" (*Id.* at 256).

**Patricia Taylor**: "Now, in making that decision, that jury may consider aggravating circumstances, things that were bad, out of the ordinary bad; or, they may consider mitigating circumstances. In other words, even though he is guilty, nevertheless, there was something they found good or not so bad, and that a death sentence should not be imposed. Now, under your oath, would you listen to the evidence, and could you, if you felt that the appropriate sentence was death, could you vote for a death sentence? . . . If you were not convinced, could you vote for life imprisonment without benefit of parole? (*Id.* at 261). [Using terms "may consider" implies jury does not have to consider mitigation. Also implies that a life without parole sentence can only be imposed if there is something "good or not so bad."]

**Mr. Polese**: "If you are convinced that he is guilty, but there's something in the background, there is some circumstances that would be a mitigating circumstance, could you vote to spare him death, and give him a life sentence without benefit of parole?" (*Id.* at 335-36). [This is improper suggestion that "sparing" him is only appropriate if mitigating circumstance is found].

37

**Ms. Knight**: "If you felt like even though he was guilty that was there were mitigating evidence, that is something good or not so bad that made life imprisonment without the possibility of parole the better sentence, could you vote for that, too?" (Doc.291 at 414-415) [improper suggestion of necessity of some evidence to support life sentence].

**Mr. Little**: "If you decide that there is sufficient mitigating evidence, mitigating meaning less, or something that lessens the impact, could you vote for life imprisonment without benefit of parole?" (*Id.* at 428) [Explicitly states that there must be mitigating evidence to overcome propriety of death sentence].

**Tamara Brewer**: "And if you were convinced that there were mitigating circumstances that made life imprisonment without benefit of parole the more appropriate sentence, could you vote for that? (*Id.* at 501) [Explicitly states that there must be mitigating circumstances to render life the more appropriate sentence].

The questioning of these jurors, with few exceptions noted above, invariably conveyed at least three improper messages: (1) that a death sentence was the presumptively correct sentence upon a finding of guilt; (2) that in the absence of

38

evidence to support a finding that there were mitigating circumstances, a death sentence would be the appropriate sentence; and (3) that the jury was not required to consider mitigating evidence.

Over and over, the jurors were asked whether they could return a death sentence if there were aggravating circumstances, and then asked whether they could sentence the defendant to life without the possibility of parole *if* there were mitigating circumstances.  Those questions posed a false and misleading premise. A life sentence is not reserved for cases in which mitigating circumstances outweigh aggravating circumstances.  Rather, a life sentence may be imposed even if there are *no* mitigating circumstances, or even if mitigating circumstances do not outweigh the aggravating circumstances.[3]

The error in posing the questions to the jury in this manner is actually two-fold:  First, the premise of the question falsely explains that a life sentence is only appropriate when mitigating circumstances exist *and* overcome the aggravating

---

[3]     The proper interplay between aggravating and mitigating circumstances was explained in the jury instructions:  "From this, you are to determine whether the aggravating factors found to exist sufficiently outweigh the mitigating facts; *or, in the absence of mitigating factors whether the aggravating factors alone are sufficient to support a finding that a sentence of death be imposed regardless of your findings with respect to aggravating and mitigating factors, however, you individually or collectively are never required to recommend a sentence of death.*" (Doc. 293 at 1213).  Of course, by this point in the trial it was too late to learn if one, or more of these jurors was willing to consider a life sentence, in the absence of mitigating circumstances.

circumstance. Whether the jurors decided on the sentence on the basis of this erroneous explanation of the law – a misunderstanding engendered by an inappropriate explanation of the law by the court – cannot be determined. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict").

Second, and more menacing to the defendant's right to a fair trial, is the possibility that many of these jurors may not even have qualified had the question been posed correctly. That is, if a juror had been asked, "Can you impose a life sentence, even in the absence of any mitigating circumstance?" many of the jurors might have responded, "No" thus disqualifying them from service. *Morgan v. Illinois, supra.*

The improperly phrased question was not the fault of defense counsel. In fact, these questions were posed by the court. Defense counsel's participation in voir dire was essentially relegated to that of a spectator. The fact that the judge posed the question imparted the clear message that the premise as stated was correct – that is, that the existence of mitigating circumstances was a prerequisite for imposition of a life sentence. In addition, this issue does not involve a mere slip of

40

the tongue, or a random inartfully drawn question. The improper question was posed to nearly every one of the jurors who ultimately sat in judgment of the defendant.

Because the defense never learned – and this court cannot determine – whether one or more (if not most) of the jurors were in fact willing to impose a life sentence in the absence of any mitigating circumstances, the judgment of the trial court should be reversed. The right to fully voir dire the jurors to determine whether they were, in fact, qualified to serve on the jury, therefore, was unconstitutionally abridged. *See, Morgan v. Illinois, supra.*

The other patent error is that the trial court conveyed, to at least two of the jurors, that consideration of mitigating evidence was an *option.* This premise is clearly contradicted by clearly established Supreme Court case law. As this Court has noted, "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Crosby v. Hardwick*, 320 F.3d at 1166 (*quoting, Eddings v. Oklahoma,*

41

455 U.S. 104, 110, 113-14 (1982) and *Lockett v. Ohio,* 438 U.S. 586, 604 (1978)).[4]

Because the district court improperly shifted the burden to the defendant to submit evidence sufficient to prove that a life sentence was appropriate and because the district court implied that the jury had the *option* to consider mitigating evidence, this Court must reverse the death sentences in this case.

## ISSUE IV

### THE DISTRICT COURT ERRED IN ALLOWING HEARSAY TESTIMONY IN BOTH THE GUILT/INNOCENCE AND PENALTY PHASE PORTIONS OF MR. BROWN'S CAPITAL TRIAL IN VIOLATION OF TH FIFTH, SIXTH, AND EIGHT AMENDMENTS TO THE UNITED STATES CONSTITUTION

"The Sixth Amendment's Confrontation Clause provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." *Crawford v. Washington*, 125 S.Ct. 1354, 1359 (2004). The Confrontation Clause applies to "'witnesses' against the accused--in other words, those who 'bear testimony.'" 124 S.Ct. at 1364 (*quoting* 1 N. Webster, An American Dictionary of the English Language (1828)). As recognized by the *Crawford* Court:

---

[4]     Indeed, the clear language of the statute leaves no room for interpretation,
            (a) Mitigating factors. - - In determining whether a
            sentence of death is to be imposed on a defendant, the
            finder of fact *shall consider* any mitigating factor . . .

18 U.S.C. §3592.

"'Testimony,' is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " 124 S.Ct. at 1364 (*quoting* 1 N. Webster, An American Dictionary of the English Language (1828)). Because "[t]he the text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirements" (*Id.* at 1365), "testimonial statements of witnesses absent from trial [will be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 1369. The *Crawford* Court specifically noted "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" 124 S.Ct. at 1370.

Thus, hearsay statements may not be introduced against a defendant unless the declarant is unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. 124 S.Ct. at 1374. Importantly, this outcome obtains regardless of whether the statement at issue falls within a firmly rooted hearsay exception or has a particularized guarantee of trustworthiness. *Id.* In sum, *Crawford* replaced the malleable judicial inquiry mandated by *Roberts* with a virtually *per se* rule of exclusion. *See United States v. Saget,* 377 F.3d 223, 226-27 (2d Cir.2004) ( "It is clear that a court faced with an out-of-court testimonial

43

statement need not perform the *Roberts* reliability analysis, as *Crawford* replaces that analysis with a bright-line rule drawn from the historical origins of the Confrontation Clause.").

In a pretrial motion, Mr. Brown objected to the introduction of hearsay testimony. (*See*, Doc. 36 at pg 10). The magistrate court recommended denying this motion, a recommendation the district court adopted. (Doc. 183; 204). At trial, at both the guilt/innocence and penalty phases, the Government introduced hearsay testimony of witnesses Mr. Brown did not have the prior opportunity to cross-examine. Thus, the district court erred in allowing witnesses to testify to hearsay which Mr. Brown did not have a prior opportunity to cross-examine.

**Penalty Phase Testimony**

During the penalty phase of his capital trial, the Government presented the testimony of Catherine Webb. Ms. Webb was the sister of Sallie Gaglia. Ms. Webb, a victim impact witness, testified not only about how the loss effected her, she also testified about how the loss effected the victim's husband and sons.

Q. All right. Was your late sister married?

A. Yes, she was.

Q. Who was she married?

A. She was married to Joe Gagila.

44

Q. And what career path did Joe Gagila take?

A. Joe was -- he retired from the military. He was in the Army. And then he retired, and they moved to Fleming, and settled in Fleming after his retirement.

Q. Did they have any children?

A. She had two children, Scott and Craig.

Q. How old are they?

A. Scott is 23, and Craig turned 18 in July.

Q. Where did the boys go to school, middle school and high school?

A. Savannah Christian in Savannah.

Q. Where is the older boy, Scott, right now?

A. Scott is at Georgia Tech. He should be graduating this year. He has been in the Co-Op Program.

Q. Where is Craig right now?

A. Craig is at Fort Sam Houston in Texas. He is finishing up his medic training there in the United States Army.

Q. When did he join Army?

A. He joined the Army in June of this year.

Q. Where would that be in relation to his graduation from high school?

A. He graduated in May, and he left June 10th.

45

Q.   Prior to certain events, had Craig planned to go to college?

A.   Yes.  He had planned to go to college.  He scored 1150 on the SAT, which would have gotten him into any college basically.  And his -- but he felt under his emotional state of mind that he could not do it at this time.  He could not concentrate to go onto college.  And he decided to enlist in the Army for a two-year program, and hopes that at that time he would be in such a state of mind that he could concentrate on his education.

Q.   Where is your former brother-in-law, Joe Gagila, today?

A.   Today, as a matter of fact, I just spoke with him just a few minutes ago.  He could not appear.  His emotional state, he is going through therapy.  This has been extremely difficult for him.  And we remain very close.  And he -- I have kept him in touch all along the way.  And he knew that under the advise of his therapist, and a counseling group that he had gone to with other family members that have lost closed loved ones, that he could not, he could not manage to go through this court hearing.

Tr. 1086-87.

The excerpted section of Ms. Webb's testimony is nothing but hearsay.  She testifies to things about her nephew (who did not testify) and his inability to continue his education because of the tragic death of the victim and his subsequent decision to join the military.  Likewise, she testified to that the victim's husband (who also did not testify) was going through counseling because of the murder and that he was so distraught that he could not even attend the trial.

46

To exacerbate matters, the government exploited Ms. Webb's impermissible hearsay testimony when in closing it argued:

> And she has raised these two fine boys, one of whom is in the early days of his service in the United States Army. When he gets sent to Iraq or Afghanistan, and the buddy in the next cot, bunk, is writing home to his mom, he'll think for a second and say "I can't do that. I don't have a mom. Meier Jason Brown took my mom from me in a deliberate, calculated, horrible, heinous way."

Tr. 1199.

> Why is this justice? The loss to Sallie Gagilaof her life and the loss to her family. And you heard from her family. And you heard about Joe and the kids, Scott and Craig, and why they could not be here. I don't think I can say anything more about this than what they said themselves.

Tr. 1176.

### *Crawford* applies with equal force to the penalty phase of a capital trial

The requirement that such statements be excluded under the Confrontation Clause is unaffected by other facts indicating the reliability of the statements, see *id.* at 1370-71, or the fact that the statements were given under circumstances which arguably support their reliability. See *id.* at 1372-74. The only safeguard which matters "is the one the Confrontation Clause demands" -- whether the defendant had the opportunity to cross-examine the witness. See *id.* at 1372; *id.* at 1373 ("The

47

Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we ... lack the authority to replace it with one of our own devising").

The same is true of the penalty phase of a capital trial. As *Crawford* makes clear, the requirements of the Confrontation Clause are entirely independent of the Federal Rules of Evidence. *See Crawford v. Washington*, 124 S.Ct. at 1364, 1374. Thus, the inapplicability of the Rules at the penalty phase, *see* 21 U.S.C. § 848(j), says nothing about the defendant's Confrontation Clause rights. Moreover several principles support -- indeed, require -- application of the Confrontation Clause in that context.

First, nothing in the text of the Confrontation Clause suggests any other result. By its own terms, the Sixth Amendment applies "[i]n all criminal prosecutions." Plainly, the sentencing phase of a capital trial is a "criminal prosecution."

Second, "a[ny] defendant has a right to be sentenced only on information that is accurate." *United States v. Howard-Arias*, 679 F.2d 363, 367 (4th Cir. 1982). A capital prosecution, however, demands "heightened reliability" *at both phases of the trial. See, e.g., Murray v. Giarratano*, 492 U.S. 1, 8 (1989) (plurality opinion)*; Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). Since

48

the strict application of the Sixth Amendment's Confrontation Clause provides the only constitutionally valid means for assuring reliability, it can not be seriously argued that the Confrontation Clause is not applicable to the penalty phase of a capital case.

Moreover, even if such an argument could be made in reference to the penalty phase generally, it certainly can not be made in reference to evidence concerning victim impact which scholars have noted is some of the most compelling evidence in support of a death sentence. *See*, Burr, 88 CNLLR 517, *Litigating with Victim Impact Testimony: the Serendipity That Has Come from Payne V. Tennessee,* (January, 2003)("In the wake of *Payne v. Tennessee*, it is virtually impossible for defense counsel to exclude or limit victim impact testimony. If it is admitted, its emotional power will frequently produce a death sentence."); 10 PSYPPL 492, 501, *The Prejudicial Nature of Victim Impact Statements*, Implications for Capital Sentencing Policy ("[victim impact testimony] is perhaps the most compelling evidence available to the state-- highly emotional, frequently tearful testimony coming directly from the hearts and mouths of the survivors left behind by killings. And it arrives at the precise time when the balance is at its most delicate and the stakes are highest--when jurors are poised to make the visceral decision of whether the offender lives or dies--after the defendant has been

49

convicted of the most horrendous crime possible.").

Given the compelling nature of victim impact testimony, its widespread use in capital cases, and the likelihood that a death sentence will be imposed when it is used, such evidence is on a par with proving statutory aggravating circumstances - - *i.e.*, when one is proved, the punishment moves from life to death. In *Ring v. Arizona*, 536 U.S. 584 (2002) the Supreme Court noted that proof of any factor that advanced a potential life sentence to a death sentence was an essential element that must be proven to a jury beyond a reasonable doubt. Similarly, in *Ring*, the Court rejected as "'without precedent in our constitutional jurisprudence'" the notion that the strictures of the Eighth Amendment should provide the States with more "leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence") *Ring v. Arizona*, 536 U.S. at 606 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 539 (2000) (O'Connor, J., dissenting)). The results in both *Crawford* and *Ring* are grounded in the plain intent of the Founding Fathers in adopting the Sixth Amendment. See *Crawford*, 124 S.Ct. at 1362-66; *Ring*, 536 U.S. at 607-609). It is implausible that at the intersection of *two* aspects of the Sixth Amendment, each reflecting "bedrock" constitutional principles, see *id.* at 1359, one of them would suddenly be rendered null and void merely because one has moved from the guilt phase of a trial into the penalty phase.

50

### Guilt phase hearsay testimony

During the guilt/innocence phase of Mr. Brown's trial, Ms. Darlene Washington testified that she was in the Fleming Post Office the morning Ms. Gaglia was killed. Ms. Washington testified that while she was in the Post Office, she heard conversation between Ms. Gaglia and a customer who had entered the premises. Ms. Washington testified that she overheard Mr. Gaglia ask the cutomer his name and that eventually he answered his name was "Jason." (Doc. 291 - pg. 571).

In addition, Mr. Brown's cousin Dietrechusn Davis testified that he overheard a statement made by Mr. Brown's mother. Mr. Davis testified that he returned to Ms. Sadie Brown's house around 6:30 p.m., on the night Mr. Brown was arrested. (Doc. at pg 668). While he was there he testified that the phone rang and:

> My cousin Rodney answered the phone , and he gave the
> phone to his mother, which is Aunt Sadie. And she was
> like, "Meier, where you at? Meier, you didn't kill that
> lady, no." She started crying, and I left.

(Doc. at pg. 669). Mr. Brown objected prior to the admission of this testimony arguing, "I can't cross examine her. So, I'm completely helpless here if the Court let's in that type of hearsay" but the objection was overruled. *Id.*

Each of the aforementioned hearsay statements was impermissibly admitted under *Crawford* and each of them individually as well as cumulatively were

51

prejudicial to Mr. Brown. Having Ms. Washington state that the person who was in the Post Office on the morning of the murder was "Jason" established his presence at the scene. The testimony of Dietrechusn Davis was extremely prejudicial as it established corroborative evidence that Mr. Brown had admitted to his mother that he had killed the victim.

Because the district court allowed, over defense objection, hearsay testimony of declarants Mr. Brown was unable to cross examine his convictions and sentence must be reversed.

ISSUE V

THE DISTRICT COURT ERRED IN DENYING MR.
BROWN'S MOTION TO SUPPRESS STATEMENTS
WHICH WERE OBTAINED IN VIOLATION OF
*MIRANDA V. ARIZONA*

Appellant challenged the admissibility of statements he made to law enforcement agents on December 5 and 6, 2002. He contended that these statements were obtained in violation of *Miranda v. Arizona*, and were involuntary. A Motion to Suppress was filed and an evidentiary hearing was conducted on July 9, 2003.

The evidence offered by the government during the July 9, 2003 hearing on the Motion To Suppress consisted of the testimony of four agents who participated in the search of the premises and the interrogation of Mr. Brown on December 5

52

and December 6, 2002. There were three separate (though closely related) statements made by Mr. Brown: First, the defendant was questioned over the course of several hours in the dining room of the residence of his girlfriend prior to being advised of his *Miranda* rights. Immediately after he made a statement implicating himself in the robbery and homicide, he was formally arrested, then *Mirandized*, and he then gave a second statement that mimicked the first statement. He was then brought to the Liberty County jail and housed overnight. He was interrogated a third time the next morning, December 6, 2002 while still at the Liberty County jail, prior to being brought to the Magistrate for his first appearance.

Prior to the encounter with Mr. Brown at the residence of his girlfriend, Diane Brown, there had been two prior contacts between Mr. Brown and the police. On both occasions – both of which were just days prior to the day the statements were made – Mr. Brown signaled his unequivocal desire not to talk to the police. On one occasion, he expressly told the police that he did not want to talk to them, and when the police called him on the phone to ask some questions, he hung up the phone. (Search Warrant Affidavit ¶¶ 12 & 13, attached to Doc. 37).

Agent James Thomas Rushwin was a member of the task force that was investigating the murder of Sally Louise Gaglia. (Doc. 302 at 30-31). On December 5, 2002, he participated in the search of the residence of Diane Brown at 131 Laurel

53

Wood Drive. (*Id.* at 31). Seven law enforcement agents arrived to conduct the search. *Id.* There were two Chatham County officers in uniform; two postal inspectors wearing vests labeled "POLICE" and badges, one Liberty County officer, among others. (*Id.* at 32). When the officers approached the front door, the defendant opened the door. (*Id.* at 33, 115). Some of the officers were at the front door, while others were guarding the sides of the house. (*Id.* at 66). One officer remained in the front yard, visibly holding a shotgun (*Id.* at 64) and others also had their guns drawn (*Id.* at 120). The officers promptly identified themselves as police and asked Diane Brown, who was sitting in the living room whether they could talk to her about searching the residence. (*Id.* at 33). Brown, according to the police, consented to a search, remarking that she was a corrections officer. (*Id.* at 34). Diane Brown signed a written consent to search form that was presented to her by the agents.

While Agent Rushwin was talking to Ms. Brown about signing the form, Mr. Brown remained in the living room with other agents for approximately 15-20 minutes (*Id.* at 37; 117).[5] As the search commenced, Agent Rushwin located a pair

---

[5]    The lower court found that the defendant "[got] up and moved around" during the fifteen minutes that he was asked to sit in the chair prior to the beginning of the interrogation (Doc. 185 at 12). The testimony of the agent is not as generous as the court suggested on this point: "Q.: During the time that he was in that chair, did he – did he get up out of the chair? A.: Yes, he did. Q.: Did you do anything else while he was sitting in the care (sic; should read "chair")? A.:

54

of sneakers in Ms. Brown's bedroom which the agent believed matched the print that was lifted from the crime scene. (*Id.* at 39). He placed the sneakers back and then returned to the living room where Mr. Brown was still sitting, smoking a cigarette. (*Id.* at 40). Rushwin identified himself and explained that he was investigating the murder of Ms. Gaglia at the Fleming Post Office. He further stated that he was talking to everybody who might have been at the post office that day. (*Id.* at 41). Mr. Brown said that he would talk to them. *Id.* Rushwin also testified, "I advised him that he was not in custody. He wasn't under arrest, and that he was free to go at any time." *Id.*

Rushwin, however, did not want to conduct the interview at the home. Instead, he stated that the interview would occur at the Chatham County Police Department. *Id.* Rushwin testified that Mr. Brown responded, "Yes, I'll go. . . I have to get a pair of shoes on." Mr. Brown then headed into the bedroom where the sneakers had been found earlier. Rushwin would not let him go alone, however, advising him, "I was coming with him. And I said for my safety and yours, for safety reasons." (*Id.* at 42). As they got into the bedroom, Agent Rushwin further

Yes, sir. I mean, he scratched his head. And I think he smoked one cigarette. I'm not sure." (Doc. 302 at 117).

The suggestion in the lower court's finding that this evidences the fact that Mr. Brown was not "in custody" is, at best, a stretch. In fact, the testimony of every agent was that whenever Mr. Brown moved during the course of the six hour session in the house, he was accompanied by an officer.

advised Mr. Brown that he could not put on those sneakers, because he had already looked at them and they looked similar to the pattern of the shoe prints lifted from the Fleming Post Office and that they were being taken as evidence. (*Id.* at 42; 72). Rushwin then asked if he would go in his stocking feet, to which Brown responded, "No." (*Id.* at 43).

Rushwin then decided to question him at the house. *Id.* However, because the agents had decided that Officer Woodall with Chatham County police should participate in the interview, the interview did not begin for another forty minutes, while they remained in the house. (*Id.* at 44; 78-79). Rushwin stated that he again advised Mr. Brown that he was not under arrest, that he was free to go and was not in custody and repeated this again after Officer Woodall arrived. (*Id.* at 44 - 46). Nevertheless, whenever Mr. Brown moved from one room in the house to another during the nearly six hours prior to his formal arrest, he was accompanied by an agent at all times. (*Id.* at 69; 75).

Mr. Brown then made a statement that acknowledged that he had gone to the post office the morning of the murder. (*Id.* at 46-48). His story was inconsistent, however, and included, at first, a denial that he had gone to the post office twice, but he later, acknowledged a second trip to the post office. (*Id.* at 48).

At some point during the interview, the group moved to another room in the

56

house, because there were several officers conducting the search and Diane Brown and Mr. Brown were making eye contact that disrupted the interview process. (*Id.* at 49-50).[6]

During the course of the interview, at one point Office Woodall left and another postal inspector joined the interrogation and advised Mr. Brown that the officers did not believe that he was telling the truth. (*Id.* at 51; 118-119). This "good cop – bad cop" routine was strategically planned by the interrogating officers. (*Id.* at 118).

Mr. Brown did not reply, the other officer left and Woodall returned. (*Id.* at 52). Also during the interview, the officers told Mr. Brown, "You know, we found things in the house that indicates someone here is involved. And you know, you say you are not involved. You say Ms. Brown is involved (sic) You know, but things we have found indicate differently." (*Id.* at 54).

Thereafter, Mr. Brown confessed. He stated he went there to rob the postal clerk, not to kill her; that while jumping over the counter with the knife, he slipped and fell into her with the knife, killing her. (*Id.* at 53). Even after making this statement, the officers stated to him again that he, "could do what he wanted to do,

---

[6]    The lower court (Doc. 185 at 11) characterized this as "defendant voluntarily moved to the sitting room at one end of the house." The testimony was that he was "asked" by the interrogating officers to re-locate to avoid the chaos of the searching agents and the interruptions of his girlfriend.

as he had been told throughout the interview." (Doc. 185 at 9).

During the course of the confession, Mr. Brown stated that he couldn't talk about the actual killing anymore and would discuss that the next day with the officers. (Doc. 302 at 56). The interrogation continued, however, after which Mr. Brown acknowledged that he took money from the victim's purse. (*Id.* at 56-57).

Needless to say, shortly after defendant's statement concluded, he was formally arrested. (*Id.* at 58).

Then, for the first time, at 9:17 p.m. – more than five and one-half hours after the seven agents arrived at the residence – Mr. Brown was advised of his *Miranda* rights. The agents then re-interrogated Mr. Brown, reviewing the entire confession that he had just given, including additional questions about the shoes that he was wearing that day. (*Id.* at 59).

The next morning, December 6, 2002, Officer Woodall and the postal inspectors met with Mr. Brown in the Liberty County jail and expressly told him that they "needed to go back over what he had discussed previously." (*Id.* at 87). He was then advised of his *Miranda* rights, which he waived and his statement to the police was then tape recorded.

At the conclusion of the government's evidence at the hearing on the Motion to Suppress, Mr. Brown testified. (*Id.* at 123). He testified that when he answered

58

the knocking at the door, the officer had his gun drawn and announced: "police, search warrant." (*Id*. at 124). He was ordered by an officer to sit down in a chair. *Id*. He testified that he was not free to move about the house at will (*Id*. at 125). While sitting on a chair in the middle of the living room (where the officer placed the chair), he could see the officer outside the window in the front yard with a shotgun.

Mr. Brown's testimony was corroborated at trial by the testimony of Diane Brown, who testified for the government.[7] She testified that the officer kept banging on the door prior to coming in, and that when Mr. Brown opened the door, several officers came in with "guns drawn." (Doc. 292 at 752). "And when I [opened the door], that's when they rushed in. And they – one of them snatched the chair from my dining room table snatched it around and told Jason to sit there and don't move. . . Oh, it was very frightening." (*Id*. at 753).

The Magistrate issued a Report and Recommendation on August 11, 2003 rejecting Mr. Brown's Motions to Suppress.[8] Appellant does not question the

---

[7]    This court should consider evidence at trial in reviewing the decision on a Motion to Suppress. *United States v. Villabona-Garnica*, 63 F.3d 1051 (11th Cir. 1995); *United States v. Ramirez-Chilel*, 289 F.3d 744 n.5 (11th Cir. 2002).
[8]    After the Defendant filed objections to the Report and Recommendation on August 21, 2003 (Doc. 198) the District Court adopted the Magistrate's Report and Recommendation without any changes in an Order entered on September 2, 2003 (Doc. 204).

Findings of Fact relating to the core facts – the historical facts – that are set forth in the Court's Order.   However, the conclusion that Mr. Brown was not "in custody" for *Miranda* purposes during the several-hour interrogation in Dianne Brown's house is clearly wrong.  Therefore, the statements he gave pre-*Miranda* should have been suppressed.[9]  Moreover, because the subsequent statements came hot on the heals of the tainted confession, those statements, too, must be suppressed pursuant to *Missouri v. Seibert*, 124 S.Ct. 2601 (2004).

The Magistrate concluded that the evidence established that Mr. Brown was not in custody, based on the fact that the agents repeatedly assured him that he was not in custody *and* based on the defendant's "clear understanding of those assurances."  Neither predicate for the conclusion, however, supports the lower court's holding.

First, the notion that a law enforcement officer can immunize the prosecution from any further *Miranda* inquiry by simply mouthing the words, "You are not under arrest and you are free to go" would undermine the protection of *Miranda* if,

---

[9]    The reviewing court's evaluation of whether a defendant was in custody represents a review of a mixed question of law and fact.  The historical facts – who said what, when, and in what tone of voice; how long did the interrogation last; who sat where – are reviewed under a clearly erroneous standard.  Given those historical facts, however, the next step in the analysis: would a reasonable person have felt free to leave, is a legal question that the appellate court should review *de novo*.  *Thompson v. Keohane*, 516 U.S. 99, 112-113 (1995); *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996).

60

in fact, the words are hollow and not, in fact, a reflection of the true state of affairs. In short, simply saying it doesn't make it so. The fact that the agent's assurances were not serious is reflected in the fact that even *after* Mr. Brown confessed to having robbed the post office and killed the postal clerk, the officers again uttered the rather preposterous assurance that he was free to leave. (R&R p.9). No reasonable person in Mr. Brown's position could possibly believe that with half a dozen armed officers in the house; with physical evidence that he was guilty of a murder having been found in the house; and having just confessed to being the perpetrator of a murder, that he would be free to go on his merry way. Thus, the agent's repeated incantation of the phrase "you are not under arrest, you are not in custody, you are free to go" may constitute some evidence of the state of affairs, but in this case, the assurance was no more indicative of the truth than the storybook wolf's assurances to the three little pigs that he was only there to help them. *See United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) (fact that police told the suspect that he was free to leave was a factor to be considered, but was insufficient to establish that the defendant was, in fact, free to leave); *United States v. Johnson*, 846 F.2d 279 (5th Cir. 1988); *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990).

Second, the Magistrate's conclusion that the defendant "clearly understood those assurances" is problematic both factually and legally. Actually, the defendant

61

testified that he did not feel free to leave; that he saw the officer with a shotgun in the front yard and that the officers had confronted him at the front door in an aggressive manner that left him frightened and compliant. What the Magistrate seemed to be concluding, in actuality, and what the record certainly supports, is that Mr. Brown "heard" what he was being told (i.e., you are free to leave, you are not in custody, you are not under arrest), not that he "clearly understood those assurances."

The fact that the interrogation occurred in the defendant's house (or the house of his girlfriend) is surely a factor to be considered, but does not prove that the interrogation was non-custodial. *See Orozco v. Texas*, 394 U.S. 324 (1969) (custodial interrogation in the house of the suspect requires *Miranda* warnings to the same extent that custodial stationhouse interrogation requires prophylactic warning). In fact, the longer the interrogation lasted, the less important is the actual site of the interrogation. After all, the presence of six armed police officers in your dining room for six hours during which time you are being accused of lying and being a participant in a murder is hardly indicative of a social call. And added to this, of course, is the fact that the defendant could not even move around his own premises without being accompanied by an armed guard wherever he went. *See United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998) (inability to move without

62

law enforcement permission and accompaniment is indicative of custodial status).

Also, being accused of being a participant in the murder is not proof of custodial status, but it is surely an important ingredient of the inquiry. One who is told that he is a witness to an important event that the police would like to learn about, would consider his own status different than one who is told that he is the prime suspect in a homicide. *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998).

Thus, this court must review the underlying factual situation and determine whether, in fact, the defendant was in custody during the six hour session that occurred prior to, and during his interrogation in Diane Brown's house.

These undisputed historical facts should inform the court's decision:

A.   Seven agents came to the house.

B.   Mr. Brown had twice previously expressed a desire not to talk to the police, just days before he was encountered at Dianne Brown's house.

C.   The agents were armed.

D.   One agent had the appearance of standing guard in the front yard with a shotgun.

E.   Other agents flanked the house.

F.   The interrogation lasted nearly six hours.

63

G.    The defendant was immediately told that the sneakers that he wanted to put on were evidence of a murder and he would not be allowed to put the sneakers on.

H.    The defendant was told by one agent that he was lying when he denied being involved in the murder.

I.    The defendant was not allowed to move anywhere in the house for nearly six hours without being accompanied by an agent.

J.    The defendant was repeatedly asked[10] to do certain things: Sit in the chair for twenty minutes while waiting to be questioned; Come to the Chatham County Police station to be questioned; Move into the dining room to be interrogated; Move into another room to be interrogated.

The decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), is founded on the proposition that interrogation that occurs in certain settings is inherently "coercive" and subject to abuse. These "certain settings" – custodial interrogation – "contain

---

[10]    While the term "asked" might suggest that one is not in custody, the notion that seven armed police in one's house asking the occupant to do certain things is evidence of "freedom" is not convincing. Most guests in a person's house do not "ask" the host to sit down, wait there, go nowhere without being accompanied, be questioned for hours in one room and then another. Thus, these "asks" would more accurately be characterized as "tells."

64

inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*, at 467. But there is no empirical test that defines when a person is "in custody." Rather, the courts are required to assess the totality of the circumstances in deciding whether the circumstances are such that the defendant's freedom of movement has been sufficiently restricted that the *Miranda* rights are triggered.

There are a surprising number of Supreme Court cases focusing directly on the question of when a defendant is "in custody" and therefore entitled to *Miranda* warnings, prior to being questioned.

In *Oregon v. Mathiason*, 429 U.S. 492 (1977), the Court considered a case in which the police left a note on the suspect's door asking him to come to the police station. The suspect called the police and agreed to come to the police station the next day. The officer and the suspect met in a room in the station and the officer told him that he was a suspect and that there was evidence of his involvement in the crime. Within five minutes, the defendant confessed to the burglary. He was then allowed to leave the station and return to his job. The Court held that the environment of this interrogation did not satisfy the "in custody" requirement. The Court's analysis began with the premise that *Miranda* is required when the suspect has been taken into custody, "or otherwise deprived of his freedom of action in any

significant way." *Id.* at 494. Because the defendant drove himself to the police station (and, in fact, drove himself away) and there was no effort at any time to restrain him, the Court concluded that he was not "in custody" for *Miranda* purposes.

Six years later, the Court considered the case of *California v. Beheler*, 463 U.S. 1121 (1983). In many respects, this case is indistinguishable from *Mathiason*. The defendant voluntarily went to the police station, confessed to a crime, and then went home. The interrogation lasted less than thirty minutes. Reiterating the holding in *Mathiason*, the Court held that this session was not custodial and therefore there was no necessity for *Miranda* warnings.

During the next term of Court, the "in custody" requirement was again evaluated in the case of *Minnesota v. Murphy*, 465 U.S. 420 (1984). The facts were considerably different than the *Mathiason / Beheler* facts. The questioning of the suspect in *Murphy* occurred at a court-ordered probation interview. There were virtually no indicia of personal restraint or lack of freedom of movement. Rather, the suspect claimed that because he was under court order to participate in probation interviews and because the probation officer anticipated eliciting incriminating statements from the suspect, *Miranda* should be extended to this situation. The Court rejected this expansion of *Miranda*. A routine probation

66

interview, even if designed to elicit incriminating answers, is not "custodial" and does not have the coercive atmosphere that *Miranda* envisioned. There is simply nothing about the circumstances of a probation interview – even if court-ordered – that overbear a probationer's free will to resist answering questions.

Later that same term, barely months later, the Court decided *Berkemer v. McCarty*, 468 U.S. 420 (1984). The Court began by holding that custodial interrogation for *any* crime invokes *Miranda*'s protection, even a simple traffic offense – assuming the suspect is arrested. Second, however, the Court held that roadside questioning that lasts for a brief period of time, even if custodial in the strictest sense, invariably involves a minor restraint on the driver's freedom which the driver knows will be short-lived. Thus, the coercive atmosphere upon which *Miranda* relied does not exist and therefore, *Miranda* warnings are not required.

Ten years passed before the Court considered the in-custody requirement after *Berkemer*.[11] The next case was *Stansbury v. California*, 511 U.S. 318 (1994). The questioning of the suspect occurred in the police station. Based on *Mathiason* and *Beheler*, it was evident that the interrogation qualified as consensual and non-

---

[11]    This is not to suggest, however, that the question of when a suspect is in custody was not addressed in other contexts. For example, for purposes of determining the legality of an arrest (and, therefore, the validity of a consent to search), the Court has also considered the "in custody" question on numerous occasions. *See, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *Michigan v. Chesternut*, 486 U.S. 567 (1988).

67

custodial.  Yet, the trial court held that the law enforcement agent's mental state –

his unexpressed opinion that the defendant was the perpetrator – which evolved

during the course of the interrogation, was relevant to the question of when

*Miranda* warnings should have been issued.  The Supreme Court did not further

refine the definition of "in custody" but did emphasize that the officer's state of

mind, in particular, his belief that the suspect might have been, or in fact definitely

was, the perpetrator of a crime, is completely irrelevant in deciding whether the

suspect was in custody.  In part, the Court relied on an earlier opinion that involved

an admittedly non-custodial interview of a tax evader in which the suspect

acknowledged that he was not in custody, but sought refuge in *Miranda* because he

was the target of the IRS.  *Beckwith v. United States*, 425 U.S. 341 (1976).

In *Beckwith*, the Court held that a non-custodial interrogation does not invoke

*Miranda* regardless of how much evidence is known to the interrogators at the

outset of the interrogation.  *Stansbury* re-enforced this holding, noting that the

circumstances of the interrogation, the objective facts, dictate whether, in the words

of *Miranda*, the suspect has been "taken into custody or otherwise deprived of his

freedom of action in any significant way."  The intentions of the police that are not

revealed to the suspect have no bearing on the extent to which his freedom of

choice has been overborne.  Of course, the converse is also true:  When the police

68

do tell the defendant that he is a suspect in a murder; that his clothes are associated with the murder; and that his denials of participation amount to lies; these expressions (even if untrue) can have a considerable impact on the suspect's (or a reasonable person's) sense of freedom. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned . . . Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" 511 U.S. at 325.

From these decisions, it is evident that there are countless factors that the court should consider in determining whether *Miranda* warnings should have preceded interrogation. Ultimately, the question is whether the circumstances surrounding the interrogation evince an atmosphere that was geared to overbearing a reasonable person's ability to terminate the questioning or avoid contact with the police altogether.

Factors that have been considered by courts include: (1) the location of the interrogation; (2) the length of time that the interrogation lasted; (3) the presence of numerous law enforcement officers; (4) whether the defendant initiated contact, or drove himself to the location of the interrogation; (5) whether the defendant's family (parents, etc) were present; (6) whether the defendant was physically

69

restrained; (7) whether the defendant was aware of his status, that is, as a suspect, witness, or a soon-to-be arrested person; (8) whether any effort by the defendant to terminate the interrogation was discouraged, or prevented; (9) the words used by the police to induce the suspect to answer questions; (10) the words used by the police to explain to the suspect that he was free to leave, or, being detained; (11) other conduct of the police observed by the defendant that would lead a reasonable person to believe that his interrogation / detention would be temporary; (12) whether the suspect was, in fact, released at the conclusion of the interrogation.

This list, however, is hardly exhaustive. Any other factor that would assist the court in deciding whether a reasonable person would feel free to terminate the contact with the police should be considered. Nor are any of these factors outcome determinative, or necessarily deserving of more weight than any other factor. Thus, as noted above, "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." 468 U.S. at 437. Distinguishing the facts in this case from *Berkemer*, of course are simple. *Berkemer* involved a mere traffic stop. But what is crucial are the two salient factors that led the *Berkemer* Court to decide that *Miranda* does not apply in situations of roadside questioning. First, the questioning is brief. Second, the suspect knows that his custodial status will not last

70

long.  In this case, in contrast, the interrogation went on for hour after hour, and included express allegations that the suspect's shoes were evidence of his participation in a homicide, that the suspect was lying when he denied involvement in the homicide, and included the continuous presence of half a dozen armed law enforcement officers, including officers standing guard outside the door.  Thus, the type of facts that prompted the *Berkemer* Court to hold that the questioning did not trigger *Miranda* warnings are precisely the facts that necessitated *Miranda* warnings in this case.

"An objective, reasonable-man test is appropriate because, unlike a subjective test, it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." *Berkemer*, at 442 n. 35. *See generally Yarborough v. Alvarado*, 541 U.S. 652 (2004) (holding that state court decision that eschewed consideration of suspect's age in making objective determination of custodial status was not unreasonable application of Supreme Court precedent).  What this means, of course, is that the statement of the officers that Mr. Brown was free to leave may be considered in deciding whether the defendant, having heard those words, would have felt free to leave, but are not relevant for "the truth of the matter asserted" or as indications of the officers' state

71

of mind, which is also irrelevant. And when considering whether the defendant (or any reasonable person) would feel free to leave after being told that his shoes were evidence in a murder case; that he was lying in his denials of involvement; and that seven officers were needed to search the premises, including an armed guard posted outside; the incantation of the phrase, "you are free to leave" must certainly ring hollow. Given the objective facts in this case, the district court erred in denying Mr. Brown's Motion to Suppress and this Court must vacate Mr. Brown's conviction.

## ISSUE VI

### THE DISTRICT COURT RENDERED MR. BROWN'S CAPITAL SENTENCING PROCEEDING FUNDAMENTALLY UNFAIR WHEN IT DENIED FUNDS TO HIRE EXPERT ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION

Mr. Brown filed pretrial motions to obtain funds for expert and investigative assistance. The magistrate court and then the district court denied his requests for a forensic social worker and for a future dangerousness expert. There are two means by which this Court must review this claim - - *Ake v. Oklahoma*, 470 U.S. 68, (1985) and 470 U.S. 68, 71 (1985) and 21 U.S.C §848(q)(9). Under the first analysis, this Court reviews *de novo* whether the denial of funds deprived Mr. Brown of his right to a fair trial under the Fifth, Sixth and Eighth Amendments to

72

the United States Constitution. Under the second analysis, this Court must determine if the district court abused its discretion in denying the funds requested. *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004); *In re Lindsey*, 875 F.2d 1502, 1507 (11th Cir. 1989).

### Forensic Social Worker

In a sealed motion filed July 18, 2003, Mr. Brown requested that he be permitted to retain the services of a forensic social worker. (Doc. 174). In that motion, Mr. Brown outlined why this expert service was necessary. The district court had already approved funds for a mitigation specialist and Mr. Brown noted that the forensic social worker would utilize the "material gathered by the mitigation specialist to provide a comprehensive social history ... of the defendant's environment and social functioning" with an eye toward testifying before the jury as a mitigation witness.[12] *Id.* In addition, Mr. Brown provided an affidavit from David I. Bruck, one of three attorneys funded by the Administrative Office of the United States Courts to provide assistance to federally appointed counsel in capital cases. Mr. Bruck outlined the need and responsibilities of a forensic social worker. Mr. Brown also provided the court with the *curriculum vitae* of a forensic social

---

[12]    Mr. Brown also noted that the forensic social worker would "conduct comprehensive interviews in a clinical fashion"; "conduct diagnostic interviews to tell the Defendant's story"; "provide counseling to the Defendant and his family." (Doc. 174).

73

worker and an estimate of the total cost of her employment ($8,000.00).

The magistrate court, in an order entered August 14, 2003, noted that the court had previously approved the defense's request for funds to hire a number of experts and that "in the Court's judgment the services of a social worker would simply duplicate the work of these other experts and is not reasonably necessary..." (Doc. 195). The district court adopted the finding of the magistrate court. (Doc. 213.

### Future Dangerousness Expert

Mr. Brown also requested funds for James Aiken, an expert who would testify "to show that defendant does not pose a risk of future dangerousness if not sentenced to death." (Doc. 179 at ¶3). Mr. Aiken was proffered as an expert on future dangerousness who would have, in addition to the fact that Mr. Brown did not pose a risk of future dangerousness, that "defendant ... is little or no risk of escape and risk of harm to other inmates, prison personnel and the community and thus counsel for defendant may better argue Defendant's life should be spared if convicted." *Id*. at ¶4. Mr. Brown also proffered that the anticipated cost of employing Mr. Aiken would be between $5,000.00 and $10,000.00. *Id*.[13]

---

[13] Mr. Brown attached the *curriculum vitae* of Mr. Aiken in the motion before the magistrate court. When Mr. Brown objected to the magistrate court's denial of funds for Mr. Aiken, he attached an opinion of the South Carolina Supreme Court, *State v. Kelley*, 540 S.E.2d 851 (2001) (wherein the court noted Mr. Aiken had

74

The district court adopted the magistrate court's recomendation and, in ruling on a motion for reconsideration, expressly prevented Mr. Brown "from offering any testimony on the BOP's ability to prevent future dangerousness." (Doc. 242). The denial of funds and the subsequent prohibition from offering evidence on the nature of incarceration and concurrent impact on future dangerousness was error that warrants a new sentencing trial. In making this ruling, the district court relied upon *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000). However, the *Johnson* opinion was flawed in that it erroneously considered the proffered testimony as a frontal attack on the death penalty rather than evidence that Mr. Brown in particular would not pose a future danger.[14]

**The Constitutional Analysis**

In *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985), the Supreme Court recognized

---

testified in the penalty phase of that trial) and the transcript of proceedings in *United States v. Kevin L. Gray and Rodney Moore*, CR 00-157, United States District Court for the District of Columbia (wherein Mr. Aiken was called and testified as an expert witness on future dangerousness).

[14] Evidence of this misinterpretation is found in the language of the court when it found that testimony that the conditions of confinement in this case would effectively prevent Mr. Brown from ever committing future criminal conduct. *United States v. Johnson*, 223 F.3d at 675 (" A mitigating factor is a factor arguing against sentencing *this* defendant todeath; it is not an argument against the death penalty in general."). Clearly, evidence that Mr. Brown would have little opportunity to harm other inmates or correctional staff, and that he was unlikely to escape and pose a risk to the community is relevant to the jury's consideration of future danger.

that indigent defendants are entitled to independent experts when their assistance

"may well be crucial to the defendant's ability to marshal a defense." Id., 470 U.S.

at 80. The Court conducted a Fourteenth Amendment due process analysis and held

that without independent experts defendants could be denied "meaningful access to

justice." Id. at 76-77. In *Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987), this Court

discussed *Ake*:

> An expert can assist a criminal defendant in marshaling
> his defense in two essential ways. First, he can gather
> facts, inspect tangible evidence, or conduct tests or
> examinations that may aid defense counsel in confronting
> the prosecution's case, including its expert witnesses, or
> in fashioning a theory of defense. Second, the expert can
> provide opinion testimony to rebut prosecution evidence
> or to establish an affirmative defense, such as insanity. *In
> a given case, the assistance of an expert could be so
> important to the defense that without it an innocent
> defendant could be convicted or, at the very least, the
> public's confidence in the fairness of his trial and its
> outcome could be undermined.*

*Id.*, 809 F.2d at 709-710. Mr. Brown's very life depended upon his marshaling

evidence to present in mitigation of punishment.[15] A forensic social worker and an

expert on future dangerousness[16] go to the heart of presenting evidence that

---

[15]    The "State may not legitimately assert an interest in maintenance of a
strategic advantage over the defense, if the result of the advantage is to cast a pall
on the accuracy of the verdict obtained." *Ake, supra*, 470 U.S. at 79.
[16]    While this Court has noted that "Neither the Supreme Court nor this court
has held that the Constitution requires" funding for "nonpsychiatric experts" court
has routinely assumed that such funding would be mandated under *Ake. See,*

76

mitigates against a death sentence and the denial of funding denied Mr. Brown due process.

This Court noted in *Moore* that to claim error under *Ake*, a defendant must inform the trial court about the nature of the crime and the evidence linking him to the crime," "must demonstrate a substantial basis for the defense," must "provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case," and must "show the relevancy and necessity of the requested witnesses' testimony." *Id.*, 809 F.2d at 712. Mr. Brown made the necessary showing, and he is entitled to a new trial.

**The Statutory Analysis**

Title 21 U.S.C. §848(q)(9) provides that:

> Upon a finding that investigative, expert, or other services
> are reasonably necessary for the representation of the
> defendant ... the court may authorize the defendant's
> attorneys to obtain such services on behalf of the
> defendant and, if so authorized, shall order the payment of
> fees and expenses...."

In order to obtain such funding, the defendant must show that "he is indigent and that the requested services are reasonably necessary[17] for his representation. *Riley*

---

*Grayson v. Thompson*, 257 F.3d 1194, 1232 (11th Cir. 2001); *Conklin v. Schofield*, 366 F.3d 11911206 (11th Cir. 2004). In any event, 21 U.S.C. §848(q)(9), provides statutory authority for capital defendants to obtain expert services.

[17]    From counsel's research, it does not appear that this Court has ever endeavored to define what is reasonably necessary. The Fifth Circuit has held that

77

*v. Dretke*, 362 F.3d at 307 (*citations* omitted). Because the appellate review under

*Ake v. Oklahoma* necessitates this Court applying a *de novo* (which is a much more

beneficial standard for Mr. Brown), rather than an abuse of discretion standard, if

Mr. Brown establishes an *Ake* violation, he has, by necessity, established an error

under 21 U.S.C. § 848(q). Thus, for purposes of this Claim, Mr. Brown will rely

upon the following analysis to support both a Constitutional and statutory challenge

to his conviction and death sentence.

### It was error to deny funds for a future dangerousness expert

As the Supreme Court has noted, future dangerousness is an issue in every

capital case: "[t]his Court has approved the jury's consideration of future

---

"reasonably necessary" means that a defendant must demonstrate "a substantial need" for the requested assistance. *Clark v. Johnson,* 202 F.3d 760, 768 (5th Cir.2000). Mr. Brown takes issue with this standard and notes that it was announced in a capital habeas corpus proceeding wherein a petitioner was challenging his state-imposed death sentence in federal court. It is Mr. Brown's position that in cases such as his, an appellant challenging his conviction and sentence of death *on direct appeal*, a much lower standard should apply. Borrowing from Supreme Court cases defining "reasonable suspicion" - - where the police officer has an articulable reasonable suspicion that criminal activity is afoot, he may make a *Terry* stop. *See e.g., Reid v. Georgia*, 448 U.S. 438 (1980). Thus, the standard should be: did the defendant articulate a reasonable defense strategy whereby the evidence/testimony would be relevant and admissible? If so, has he demonstrated that this expert, or one like him, would be necessary - - in other words, is this the most effective and efficient manner in which to put forth the evidence/testimony? If both prongs are met, then the defendant would be entitled to funds and it would be an abuse of discretion for the district court to deny the funding.

78

dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994). As the Court noted, "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." *Id.* at 163. Thus, in every case a defendant is entitled to present evidence that he does not pose a future danger to society. However, where the prosecution argues, as it did here, that the defendant poses a future danger, all evidence to counter that argument is relevant and admissible. *See, Kelly v. South Carolina*, 534 U.S 246, 252 (2002).

Prior to trial, the government submitted a list of non-statutory aggravating circumstances it intended on presenting to the jury. Included in this list were the following:

> that the defendant has committed an array of other criminal acts, some but not all of which have resulted in convictions and that this factor tends to support the imposition of the death penalty;

> that repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed and that this factor tends to support the imposition of the death penalty.

(Doc. 230 at 37). Based on this, the government, in its closing argument, further brought Mr. Brown's future dangerousness into issue. The prosecutor noted that Mr. Brown had been found guilty of crimes before and served time. Implicit in this

79

argument is the fact that he has not been rehabilitated and that if given a life sentence he will continue his lawless ways:

> Why is this justice? Repeated prior efforts to rehabilitate and to deter the defendant from criminal conduct have failed. There was not a whole lot of evidence offered with respect to this. But you heard that he was a trustee at the Liberty County jail. You heard that he had been in prison before. You heard that he had been on parole and probation before.

(Doc. 293 at 1177).

Here, by the government's own submission of non-statutory aggravating circumstances and subsequent argument to the jury, the district court was made aware that Mr. Brown's future dangerousness was being made an issue. By claiming that previous attempts at rehabilitation had failed, the government expressly was asking the jury to sentence Mr. Brown to death because merely putting him prison for the remainder of his life was also not likely to rehabilitate him. The failure to rehabilitate, where a defendant has been found guilty of murder, means that he was likely to do the same thing over again, *i.e.*, kill someone. Thus, his future dangerousness was clearly a critical issue in this capital trial.

Mr. Brown, through the attachments to his motions and his offer of proof (Doc. 268), also demonstrated how the testimony of Dr. Aiken would be relevant and necessary to show that he would not likely be able to kill anyone while in

80

prison. Further, without an expert such as Dr. Aiken, Mr. Brown was virtually unable to show that he would never be in a position, while incarcerated in the federal "super-max" prison, to harm another person, whether it be staff or inmate.

Mr. Aiken's testimony was reasonably necessary and the denial of funds to employ him deprived Mr. Brown of a fundamentally fair trial and reliable capital sentencing proceeding. The denial of funds to hire Dr. Aiken was error that cannot be considered harmless, because without testimony from such as his, Mr. Brown was unable to refute the "failure to rehabilitate" aspect of the government's case. A new sentencing should be granted.

### It was error to deny funds for a forensic social worker[18]

The defense was unable to present coherent testimony relating to the background, upbringing and social context of Mr. Brown's life. Because a forensic social worker was not employed, the testimony of various witnesses presented by the defense was a disjointed, incomprehensible collection of stories that ultimately failed to relate personally to Mr. Brown. Instead of being able to distill the information in a relevant and contextual manner, the witnesses merely testified to

---

[18]    The fact that Mr. Brown was afforded $7,500.00 for a mitigation specialist, Laura Blankman, is of no consequence to this analysis. Mr. Blankman did no background investigation and complied no social history. In essence, Ms. Blankman did nothing a mitigation specialist is supposed to do. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

the disheveled, chaotic, and often violent circumstances found at the "Morgan compound." Not one of the witnesses was able to personalize the events to Mr. Brown. Thus, the jury was not able to connect any of the events that were potentially mitigating to Mr. Brown. The district court's denial of funds to employ a forensic social worker warrants a new sentencing proceeding.

## ISSUE VII

### THE TRIAL COURT ERRED IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING ON APPELLANT'S MOTION TO SUPPRESS IMPROPER AND SUGGESTIVE IDENTIFICATION EVIDENCE

The trial court affirmed the Magistrate's Recommendation that no hearing be held on Appellant's Motion to Suppress Identification Testimony. (Doc. 223). Without the benefit of an evidentiary hearing, therefore, the identification testimony was admitted at trial, over objection.

Though the Supreme Court has held that a pre-trial evidentiary hearing is not *required* in every case, the Court has never held – and certainly not in a death penalty case – that a hearing is not available to a defendant who asserts a specific basis for challenging the reliability (and constitutionality) of an identification procedure. *See Watkins v. Sowers*, 449 U.S. 341 (1981); *United States v. Mills*, 704 F.2d 1533, 1563 (11th Cir. 1983). *Watkins* specifically envisioned that the Constitution might require a hearing outside the presence of the jury in certain

82

cases. *Id.* at 348. In this case, Mr. Brown filed a detailed Motion to Suppress and expressly requested an evidentiary hearing on the reliability and constitutionality of the identification evidence. The Magistrate denied the request for a hearing. (Doc. 302 at 27; 149).

In the initial Motion (Doc. 45), seeking an evidentiary hearing, counsel for Appellant specifically contested the reliability of the identification procedures that were used, including the photo array (a copy of which was attached to the Motion). Despite this pretrial showing, the request for an evidentiary hearing outside the presence of the jury was summarily denied. (Doc. 302 at 149; Doc. 223).

At trial, defense counsel renewed his objection (referring to his previously filed motions) (Doc. 291 at 632-633). The evidence presented at trial established just why a pre-trial hearing should have been conducted. Two witnesses, Mr. Fank Kania and Mr. Chris Bown, were called by the government to identify Appellant as the person they saw outside the post office the morning of the homicide. Both witnesses conceded that their observation of the person they saw was limited to a brief view from their car window. One witness was driving by; the other witness only saw the person's face as he drove off while looking in his rear view mirror.

Mr. Kania testified that he was initially parked in front of the post office and he observed a man on a bicycle wearing a hooded sweatshirt. (*Id.* at 629). When

83

asked if he could see the "front of the person" his only response was, "Vaguely. I seen very little of it." (*Id.* at 630). He then saw the man again in his rearview mirror as he (the witness) was driving off. (*Id.* at 631; 642). His first attempt to identify the man he saw occurred a couple days later when he was given a photo array of several individuals.

Despite the fact that defense counsel challenged the reliability of this identification procedure, not only was no evidentiary hearing ever conducted, there was no pretrial ruling (or even a mid-trial ruling) that found the evidence admissible.

Mr. Brown, the second witness who was shown the photo array, also testified over objection. (*Id.* at 649). The unreliability of his identification was revealed in his trial testimony: when the agents came to his house several days after the homicide, they did not ask "whether" the person he saw at the post office was in the array; rather, "They just laid them in front of me, and asked me to look them over, and point out the one that I seen." (*Id.* at 650). Proper identification procedure requires that the witness *not* be told that the suspect's photograph is, in fact, one of the photos in the array. Moreover, that witness testified that his observation of the person standing outside the post office was limited to a brief view as he (the witness) was driving by the post office at ten miles per hour. (*Id.* at 645 – 647). He

acknowledged that it was dark.  (*Id.* at 655). On cross-examination the witness acknowledged that he was not "100%" sure of his identification, but he "thought it might be him."  (*Id.* at 652).  In addition, he actually knew the defendant, and did not know any of the other people in the photo array (*Id.* at 652; 654), yet when he first talked to the law enforcement officers the day of the homicide, he told them that he did not know the person he saw at the post office that morning. (*Id.* at 653).

Despite the obvious flaws and apparent lack of reliability of these identifications, the trial court never ruled – and has not issued any findings to this day – that the evidence met the threshold of reliability required by the Supreme Court decisions in *Stovall v. Denno*, 388 U.S. 293 (1967); *Simmons v. United States*, 390 U.S. 377 (1968); *Neil v. Biggers*, 409 U.S. 188 (1972) *Manson v. Braithwaite*, 432 U.S. 98 (1977); and *Foster v. California*, 394 U.S. 440 (1969). *See also United States v. Bouthot*, 878 F.2d 1506 (1st Cir. 1989); *United States v. Wiseman*, 172 F.3d 1196 (10th Cir. 1999); *United States v. Eltayib*, 88 F.3d 157 (2d Cir. 1996); *United State v. Honer*, 225 F.3d 549 (5th Cir. 2000).  Despite the debatability of virtually all of the *Biggers* factors in this case (opportunity of witness to observe the suspect; the witness's degree of attention at the time of the observation; the accuracy of the witness's description prior to the identification; the witness's level of certainty when identifying the defendant; and the length of time

85

between the observation and the identification), there still is no decision of the trial court that this court can review.

In sum, Mr. Brown properly filed a Motion to Suppress; the evidence established that there were numerous issues relating to the reliability of the identification procedures, yet the trial court never conducted an evidentiary hearing and never ruled on the reliability of the evidence. For these reasons, the judgment of the trial court must be reversed.

## ISSUE VIII

### THE GOVERNMENT WITHHELD FAVORABLE, MATERIAL EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND *BRADY V. MARYLAND*, 373 U.S. 83 (1963), AND ITS PROGENY

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution has a constitutional obligation to disclose exculpatory evidence to a criminal defendant if it is material to either guilt *or to punishment.* Moreover, the government has an affirmative duty to seek out information that is relevant and favorable to the defense. *Kyles v. Whitley*, 514 U.S. 419 (1995); and *Strickler v. Greene*, 527 U.S. 263 (1998). If the government withholds favorable evidence from the defendant, reversal is mandated upon a showing of materiality. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the

86

result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. at 436-37.

Here, upon information and belief, the government withheld materially favorable evidence as it related to punishment.[19] As noted above (*see* Issue II, *supra*), the victim impact evidence can be some of the most compelling evidence in support of a death sentence. Conversely, should the victim's family not want the jury to impose a death sentence, that evidence can be some of the most compelling for a sentence of life in prison. Upon information and belief, at the very least,[20] Ms. Gaglia's husband did not want Mr. Brown to be sentenced to death. Further, it is believed that Ms. Gaglia's family, in pretrial communications with the Department

---

[19]    At the time of the filing of this Brief, undersigned counsel is pleading this claim "on information and belief" based on conversations they have had with trial counsel wherein it was revealed that, sometime after verdict, it was revealed that the victim's husband had communicated with the Department of Justice that he supported the resolution of this case by a guilty plea and sentence of life in prison without the possibility of parole. Undersigned counsel is currently attempting to verify the accuracy of this information and should it turn out the information they are relying upon is inaccurate, this claim may be withdrawn.

[20]    It is entirely possible that her sons also did not want to see the jury impose a death sentence. As noted in Issue II, none of Ms. Gaglia's immediate family (her husband and/or children) submitted victim impact testimony. Undersigned counsel believes that this was because they did not support a death sentence.

87

of Justice, voiced their wishes that the death penalty not be pursued.  This evidence

should have been disclosed to Mr. Brown prior to trial and the failure to do so was a

violation of *Brady* and its progeny.

ISSUE IX

THE COURT ERRED IN GRANTING THE MOTION
TO QUASH MR. BROWN'S SUBPOENA FOR THE
PRODUCTION OF DFACS RECORDS

Prior to trial, Mr. Brown served a subpoena on the Liberty County

Department of Child and Family Services (DFACS) for the production of "[a]ny

and all material relating to Sadie Brown and/or Roy Morgan, their living and health

circumstances, and any information regarding their residence at 6724 Leroy Coffer

Highway, Fleming, Georgia, 30308."[21]  (Doc. 232, Appendix A).  In response to

this subpoena, the Georgia Attorney General's office filed a Motion to Quash

Subpoena and For Protective Order claiming that the "subpoena requires the

production of material that is confidential and protected" under state law.  *Id*. at ¶2.

The Attorney General did note, however, that the information could be released

upon the issuance of a court order.  *Id*. at ¶3.

Mr. Brown filed a response citing the critical nature of the information

---

[21]     Ms. Sadie Brown was Mr. Brown's mother, Mr. Roy Morgan was Mr.
Brown's father, and  6724 Leroy Coffer Highway, was the home Mr. Brown was
raised in.

88

requested as being relevant to developing mitigation evidence for Mr. Brown's capital sentencing proceeding. (Doc. 244). Mr. Brown specifically requested that the magistrate court conduct an *in camera* inspection of the requested materials. *Id.* at ¶5. Thereafter, the magistrate court ordered the production of these files *in camera*. (Doc. 239). However, upon reviewing the records, the magistrate court concluded that they "contain[ed] no information relevant to the defendant's case and no information that would warrant disclosure of these typically confidential records." (Doc. 249). This ruling was error.

A criminal defendant on trial for his life is entitled to present a wide range of mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586 (1978). As this Court has noted, "the Supreme Court has been clear that both statutory and nonstatutory mitigating factors must be considered in a capital sentencing proceeding" *Crosby v. Hardwick*, 320 F.3d 1127, 1166 (11th cir. 2003). This is so because:

> the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence.

*Id. (quoting, Eddings v. Oklahoma,* 455 U.S. 104, 110, 113-14 (1982) and *Lockett v.*

89

*Ohio,* 438 U.S. 586, 604 (1978)).

The material contained in the DFACS records was clearly relevant to Mr. Brown developing and presenting mitigation evidence to the jury. As one member of the Georgia Supreme Court has noted when dealing with this exact issue:

> [A]n individualized sentencing decision is essential in capital cases. . . The United States Supreme Court has determined that 'the Eight and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character . . . [the law] permits the defendant to present evidence as to any mitigating circumstances, and Lockett and *Eddings* require the sentencer to listen. *Eddings v. Oklahoma,* 455 U.S. at 115, n. 10,

*State v. Burgess,* 264 Ga. 777, 796 (1994)(Benham, PJ, concurring in part, dissenting in part). Justice Benham aptly noted that "the expert who needs access to evidence in mitigation is the death penalty defendant's lawyer . . .[thus] the trial court's failure to give trial counsel 'potentially mitigating' material from the confidentail DFACS records amounted to the trial court's improper exclusion of the mitigating evidence." *Id.*

The same conclusion should be reached here. The magistrate judge was in no position to determine what the relevance of the DFACS records were to the defense's case in mitigation. That determination is uniquely left to trial counsel. Granting the State's Motion to Quash deprived Mr. Brown of a fair and reliable

90

sentencing proceeding in violation of *Eddings, supra, Lockett, supra*, and the Sixth and Eighth Amendments to the United States Constitution.

ISSUE X

THE TRIAL COURT ERRED IN EXCUSING FOR
CAUSE JUROR FAHEY, WHOSE ANSWERS TO THE
COURT'S VOIR DIRE QUESTIONS INDICATED
THAT SHE WAS ABLE TO IMPOSE THE DEATH
PENALTY IN APPROPRIATE CIRCUMSTANCES

The trial court's removal of a juror who was, in fact, eligible to serve is reversible error *per se* and no showing of prejudice is required. *Gray v. Mississippi*, 481 U.S. 648 (1987).

Juror Fahey was questioned by the court about her willingness to obey the law and the instructions of the court and consider returning a death sentence. She responded that she would have trouble returning a death sentence, but that "it depends on the case." (Doc. 290 at 200). She was then asked, "Is your opposition so firm to the death penalty that under no circumstances you could impose the death penalty?" She responded, "No, sir." (*Id.* at 201). The court then inquired "It is not that firm?" to which she replied, "No, sir." *Id.* She then explained that she would have great difficulty imposing the death sentence, but when asked, "Would you rule out imposing the death sentence?" She again responded, "No." *Id.* When questioned by the prosecutor, she again expressed reluctance, but when questioned

91

by the defense, her answers demonstrated her ability to be open-minded (albeit appropriately hesitant) about the imposition of the death penalty:

Q: "With respect to this case, you don't want to prejudge it. You want to hear all of the evidence. You want to hear both sides. You want to hear the aggravating evidence, and you want the hear [sic] the mitigation. Is that correct?

A: That's correct.

Q: And then you will make a decision as to what you think would be an appropriate sentence in this case. Is that correct?

A: That's correct.

Q: And you have not ruled out the possibility of a death penalty in this case, and you have not decided on life imprisonment in this case; have you?

A. No, sir.

Q: You want to hear everything?

A: Yes, sir.

(*Id*. at 203 -204). Despite this lack of equivocation about her ability to impose the

92

death sentence, the trial court excused the juror, over objection, on the basis that she was not *Witherspoon*-qualified. (*Id.* at 215).

The trial court's excusal of Juror Fahey was erroneous and deprived the defendant of the opportunity to select a juror in this case who was *appropriately* hesitant to impose the death sentence, but who was not substantially impaired in her ability to follow the instructions of the court and render a verdict and sentence in accordance with the law.

## ISSUE XI

### THE DISTRICT COURT ERRED IN FINDING THAT THE FEDERAL DEATH PENALTY ACT WAS CONSTITUTIONAL IN LIGHT OF *RING V. ARIZONA*, 536 U.S. 584 (2002)

A Grand Jury for the Southern District of Georgia named Mr. Brown in a three count indictment charging him with two counts of murder and one count of assault. Also contained in the indictment were special findings that alleged, as to Counts I and II: (1) that Appellant was over 18 at the time of the offense; (2) that appellant intentionally killed the victim; (3) that appellant intentionally inflicted serious bodily injury that resulted in death upon the victim; (4) that Appellant engaged in one or more acts that contemplated that a life would be taken, and that the victim, who was not a participant in the offense, died; (5) that Appellant engaged in one or more acts which created a grave risk of death to a person and that

93

the victim died as a result of the acts in which Appellant engaged; and (6) that Appellant committed the offense in an especially heinous, cruel, or depraved manner in that it caused serious physical abuse to the victim. (*See* Doc. 15). In a superseding indictment, the government alleged an additional special finding, that Mr. Brown "committed the offense in the expectation of the receipt of anything of pecuniary value (18 U.S.C. 3592(c)(8)." (*See* Doc. 137, pg. 2 ¶G). Mr. Brown filed a motion pretrial to strike the Special Findings section arguing it was an unconstitutional "rewriting" of the FDPA, and that the FDPA was uncostituional. (*See*, Doc. 39 & 36). The magistrate court recommended these motions be denied, a recommendation adopted by the district court. (Doc. 183 & 204). The district court erred in finding the FDPA constitutional and Mr. Brown's death sentence must be vacated.

The inclusion of the Special Findings in both the original and superseding indictments was the Government's apparent attempt to comply with *Ring v. Arizona, supra,* which required that aggravating factors be pled by indictment and proven beyond a reasonable doubt to a jury. By including these Special Findings, the Government has attempted to constitutionalize the facially unconstitutional Federal Death Penalty Act ("FDPA"). The Supreme Court made it clear in *Ring* that the aggravating factors in a death penalty statute operate as the "functional

94

equivalent of an element of a greater offense." *Ring*, 536 U.S. at 609.   In a federal capital prosecution, the Grand Jury Clause of the Fifth Amendment applies, so the aggravating factors, or elements of the greater offense, must be found by the grand jury and alleged by indictment.  However, the federal statutory scheme does not involve the grand jury in the process of indicting the "greater" offense,

The unambiguous language of the FDPA establishes that Congress intended the decision to set into the motion the machinery of death should be exclusively reserved to the Government's attorneys.  *Ring* altered that crucial section of the federal capital landscape, so it is the role of Congress to determine what, if anything, should replace that which is no longer consistent with the Constitution. In this case, the Government attempted to fill the void in the FDPA by conceding that *Ring* requires that the elements of capital murder be submitted to a grand jury and alleged by indictment by identifying the elements they thought present in the charges again Mr. Brown and submitting that to a grand jury for findings.  The Government apparently does not wish to recognize that it is up to Congress, not the Executive and not the Judiciary, to establish what the elements of the greater offense are.  The Supreme Court explained in both *Ring* and *Harris v. United States*, 536 U.S. 545 (2002), the aggravating factors and other essential elements which expose a defendant to a greater punishment are new, different and greater

95

offenses that must be found and alleged by the grand jury in the indictment. What are the elements of this new criminal offense are decisions of substantive constitutional law. The elements of the new offense of federal capital murder and the procedures appropriate for the trial of such an offense must be determined by Congress, not by the Executive or Judicial Branches.

The Supreme Court may have decided in *United States v. Booker*, __ U.S. __, 125 S.Ct. 738 (2005) that it had the authority to render a sentencing scheme constitutional by dissecting and excising from it the offending portions. However, the Judiciary cannot render constitutional a statutory scheme by rewriting the procedures and elements originally enacted by the Legislative Branch. *See United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (Marshal, C.J.) (federal courts have no common law authority to create offenses). It has been clear that only Congress is vested with this power. *See Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("For under our federal system it is only Congress, and not the courts, which can make conduct criminal") (*citing United States v. Lanier*, 520 U.S. 529, 267-68 fn. 6, (1997)).

The Supreme Court has previously refused to rescue through ersatz construction a constitutionally flawed federal death penalty statute. *See United States v. Jackson*, 390 U.S. 570 (1968). The *Jackson* court repeatedly made the

96

point that "the government would have us give the statute ... this meaning without the slightest indication that Congress contemplated any such scheme". 390 U.S. at 578, and that:

> It is one thing to fill a minor gap in the statute - to extrapolate from its general design details that were inadvertently omitted. It is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality.

390 U.S. at 580, *see also Blount v. Rizzi*, 400 U.S. 410 (1971) (statute that permitted the Post Master General to make a determination that material was obscene was struck down by the court which, in the process, rejected the Government's suggestion that Congress' plain language could be "construed" to allow a judge to make the determination instead of the Post Master General, the court explaining that "it is for Congress, not this court, to rewrite the statute.")

Nor can the FDPA be saved through the doctrine of constitutional avoidance. The Act is not susceptible to two constructions. There is no ambiguity about what Congress' intent was in enacting the AEDPA. *Miller v. French*, 530 U.S. 327, 341 (2000) ("where Congress has made its intent clear, we must give effect to that intent."). It was clear at the time the AEDPA passed that the Supreme Court approved treating facts required for imposition of the death penalty as sentencing

97

factors, *Walton v. Arizona*, 497 U.S. 639, 649 (1990). And at that time, Congress made it clear that the allegation of aggravating factors was in the province of the Government. In light of *Jones v. United States*, 526 U.S. 277 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona, supra*, this is no longer constitutional. The district court did not have the authority to save the statutory scheme from constitutional challenge by allowing the engrafting of a procedure not passed upon by the legislature.

The Doctrine of Separation of Powers reserves exclusively to the Legislative Branch the task of legislating, and the nondelegation doctrine and the long established principle that the Constitution does not allow for judge made "common law" criminal offenses means that the FDPA cannot, in the aftermath of *Ring*, be substantially rewritten by the Government. A statute whose terms and structure are unambiguous and indicative of conscious congressional choice is not properly subject to judicial construction. Moreover, the Supreme Court in the past has rejected the Department of Justice's invitation to rewrite a statute to render it constitutional. *United States v. Jackson, supra.*

The unambiguous language of the FDPA authorizes the Government, not a grand jury, to determine whether a sentence of death is justified and will be sought. 18 U.S.C. § 3593(a)(1). The FDPA requires the Government to notice asking the

98

jury to return "special findings" is not consistent with Fed.R.Crim.Proc. 7(c)(1) or the Indictment Clause of the Fifth Amendment.

Also missing from the superseding indictment are all the alleged nonstatutory aggravating factors. During the penalty trial the FDPA calls for the weighing of all aggravators found by the jury, statutory and nonstatutory, against all mitigating circumstances. Although the statutory aggravators may have been used to determine whether a capital defendant is eligible for the death penalty, the jury is very likely weighing the nonstatutory aggravators such as victim impact evidence to determine whether the defendant should be sentenced to death. Under *Apprendi*, *supra*, the nonstatutory aggravators would then serve as the "functional equivalent of elements" and, under the Indictment Clause, should be presented to the grand jury.

Because the inclusion of Special Findings was not a procedure drafted and then passed upon by the Legislature and subsequently approved by the President, the procedure utilized here does not pass Constitutional muster and the district court erred in finding the FDPA constitutional. Mr. Brown's death sentences must be reversed.

ISSUE XII

THE DISTRICT COURT ERRED IN ALLOWING THE
INTRODUCTION OF GRUESOME PHOTOGRAPHS

Mr. Brown filed a pretrial motion seeking to preclude the government from introducing gruesome photographs of the victim as found *after* EMT's attempted resuscitation. (Doc. 47). Mr. Brown's Motion was denied by the district court. Doc. 223). In addition, Mr. Brown objected at trial to the admission of these photographs. (*See e.g.*, Doc. 292 at 773).

Only relevant evidence is permitted to be introduced at a criminal trial. *See* Fed. R. Evid. 402. Further, "relevant evidence" means

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.

Fed. R. Evid. 401. However, even relevant evidence may be excluded if the probative value is substantial outweighed by the prejudicial effect. *See* Fe. R. Evid. 403. Such is the analysis when determining whether the introduction of gruesome photographs (such as the one's in the instant case) into evidence. *See United States v. De Parias*, 805 F.2d 1477 (11th Cir. 1986), *United States v. Greatwalker*, 356 F.3d 908, 912 (8th Cir. 2004). In the instant case, the complained of photographs had absolutely no probative value and their prejudicial effect was great. It was error

100

for the district court to overrule Mr. Brown's objections.

In the complained of photographs, the victim is depicted as laying on her back with her arms strewn above her head. This clearly was not the position she was found in as Ms. Zech and Mr. Nichols testified that when she was discovered, the victim was laying in a fetal position with her back to the post office window. In addition, the amounts of blood in and around the body were not present when she was discovered as Mr. Nichols testified that all he could notice were two half-dollar sized blood stains on the victim's back.[22] The victim is also shown on her back with her sweater pulled up above her breasts revealing a blood soaked bra. This is clearly not the position Mr. Nichols and Ms. Zech found the body. The photos show the victim with blood smeared across her face which could only be the result of resuscitation efforts. None of the wounds occurred to her face and there was no testimony from the medical examiner that there were any injuries to the face as a result of her falling.

Moreover, the photographs did not have to be admitted for the purposes of depicting the wounds inflicted. Had the government wanted to depict the wounds to the victim, it could have done so with the autopsy photographs which accurately showed their location and nature without the gratuitous blood smears. Another

---

[22]    Similarly, Ms. Zech testified only that she saw what she believed to be blood on the victim's sweater.

101

alternative would have been to introduce a diagram depicting where the wounds were located.[23]

As the photographs of the victim at the crime scene in no way depicted the actual state at the time of the crime, they had absolutely no probative value. Moreover, because of the gruesome nature of the artificial condition of the body and surrounding area, the prejudicial effect was astronomical. It was error for the district court to admit these photos and Mr. Brown is entitled to a new trial.

Assuming *arguendo*, the introduction of the gruesome photos of the victim at the post office were harmless as to guilt, their introduction was not harmless as to penalty. Recently, the Tenth Circuit was faced with a similar situation as that presented here. In *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003), the Court found that although the introduction of gory photographs was harmless error as to guilt, the prejudicial nature as to the proving of the state's equivalent of the federal "heinous, cruel, and depraved" statutory aggravating circumstance, the prejudicial nature of the photographs warranted a new sentencing.

Such is the case here. At a minimum, the photographs depicted a crime scene that was artificially gruesome so as to portray the killing as heinous, cruel or

---

[23]    It is Mr. Brown's position that photographs were not probative when the medical examiner provided ample testimony about the location and nature of the wounds.

102

depraved, when in fact, it was not. This Court should reverse Mr. Brown's death sentence.

## ISSUE XIII

### THE DISTRICT COURT ERRED IN DENYING MR. BROWN'S MOTION FOR BIFURCATED VOIR DIRE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

Mr. Brown moved pretrial for an order providing for bifurcated voir dire of prospective jurors. (Doc. 95). In this Motion, Mr. Brown pointed out how some of the questions that are statutorily mandated subject potential jurors to "questions about the efficacy of the different choices of punishment [resulting in] the defendant's presumption that he is not guilty go[ing] out the judicial window." *Id.* at ¶4. As a result, Mr. Brown urged the court to bifurcate the voir dire process empaneling, if necessary, two different juries. One which is qualified as to guilt/innocence issues, and if a conviction was had, one who is qualified based on their opinions on the death penalty. The district court denied this Motion. The denial of this Motion effectively guaranteed that a death sentence would be unconstitutionally obtained. As a result, Mr. Brown's death sentence must be reversed.

The district court should have bifurcated the guilt/innocence proceedings and the sentencing proceedings by empaneling two different panels of jurors, one panel

to hear evidence on the issues of guilt or innocence and the other panel to make a determination of sentence in the event that the defendant were to be convicted. The bifurcated panel was especially important given the manner in which the court conducted its own voir dire and then limited defense counsel's questioning jurors on their predisposition to impose the penalty of death.

In death penalty cases, all jurors are "death-qualified," a process by which those unable to impose a death sentence and those who will automatically impose death are excluded. This process is often referred to as *Witherspoon* voir dire, named for the opinion of the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In the instant case, jurors were asked whether they are opposed to capital punishment. During this process, the jurors who must first decide the issue of the defendant's guilt or innocence are also being asked to consider whether or not they would be able to inflict a particular punishment. Those jurors who are "death qualified" are undoubtedly predisposed to convict a defendant because, before the court makes a final determination as to the jurors' qualifications by asking the statutory questions, the jurors are subjected to questions concerning their opinions about whether they believe the death penalty is appropriate in cases such as the one they are being considered to decide. The presumption that the defendant is not guilty is entirely subordinated to the issue of

104

punishment. The jurors are essentially told that the system considers the defendant guilty and the jurors must therefore be questioned as to their opinions on punishment before they have had a trial to determine guilt or innocence. In fact, they are being probed about the death penalty before they are asked a single question about the case they may be selected to try.

It is clear that if a prospective juror is asked if he is prepared to vote for the execution of an individual, he will no longer presume that the jury will be deciding only guilt/innocence. Inherent in the questioning on punishment is the assertion that this case will proceed to the penalty phase of trial. The reasonable, "death-qualified" juror will be prepared not only to reach that phase, but also be more likely to convict that individual. Logic and common sense dictate that the juror's attention is focused, before hearing any evidence about the guilt or innocence of the defendant, on what the punishment should be. The focusing of the juror's attention on punishment before he or she has been asked to determine whether or not the defendant is even guilty of the offenses for which he has been charged means that he has been denied the right to a "fair trial by a panel of impartial, 'indifferent' jurors." A failure to afford a criminal defendant this right "violates even the minimal standards of due process." *Morgan v. Illinois*, 504 U.S.719 (1992) (*quoting Irvin v. Dowd*, 366 U.S. 717, 711 (1961). As has been noted by some courts "Jurors

105

should come to a case free from even a suspicion of prejudgment of the issues to be tried as to the parties, the subject matter, or the credibility of witnesses." *Parisie v. State*, 344 S.E.2d 727, 729 (1986).

The inherent prejudice to a defendant in a death penalty trial was recognized in the Eighth Circuit case of *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985). Although the United State Supreme Court reversed *Grigsby* on a Sixth Amendment issue, the case is still instructional for this court because Mr. Brown's claim is grounded in the fact that the denial of a bifurcated trial in a death penalty case violates the Eighth Amendment's prohibitions against cruel and unusual punishment. *See Lockhart v. McCree*, 476 U. S. 162 (1986) (Removal for cause at guilt phase of persons whose attitudes toward capital punishment would prevent or substantially impair the performance of their duties at the punishment phase does not violate the Sixth Amendment right to an impartial jury or to a jury drawn from a fair cross-section of the community). Further, although a process whereby *Witherspoon* jurors are excluded from service with impunity is not violative of the Sixth Amendment's right to have a cross-section of the community, a process whereby an individual is sentenced to death by a juror who is conviction-prone is, in fact, violative of the Eighth Amendment's protection against cruel and unusual punishments.

106

Finally, Mr. Brown's right to due process was violated when the jury that had rejected his guilt phase defenses, had convicted him, and had necessarily developed a bias against his credibility, his counsel and his witnesses was then expected to sit as fair and impartial decision-makers on the sensitive issue of penalty. Because a separate penalty phase jury should have been empaneled, Mr. Brown was denied due process of law and this right to be free from cruel and unusual punishment. His death sentence must be reversed.

ISSUE XIV

THE DISTRICT COURT ERRED IN DENYING MR.<br>BROWN'S MOTION TO PROHIBIT THE DEATH<br>QUALIFICATION OF POTENTIAL JURORS

Mr. Brown, via a pretrial motion, moved to prevent death qualification voir dire. (Doc. 103). Mr. Brown asserted that:

> the exclusion of jurors from the guilt/innocence phase of the trial, who could be fair and impartial at that phase but who would not consider voting for a death sentence if a penalty phase is reached, would produce a biased and prosecution-prone jury and would deprive [him] of his right to a fair and impartial jury drawn from a fair cross-section of the community.

*Id*. at ¶2. The magistrate court recommended this motion be denied, a recommendation adopted by the district court. The district court erred in denying this motion and as a result, Mr. Brown was tried by a jury predisposed to convict

107

him in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution. Mr. Brown's conviction must be reversed.

"There is considerable evidence that the very process of determining whether any potential jurors are excludable for cause under *Witherspoon* predisposes jurors to convict," thus increasing the likelihood that the innocent will be executed. *Lockhart v. McCree,* 476 U.S. 162, 172 (1986) (Marshall, Brennan and Stevens, J.J. dissenting).

Many years ago, *Fay v. New York,* 332 U.S. 261 (1947) presented the "blue ribbon jury" for review. This panel was screened for "all who possess . . . such conscientious opinions with regard to the death penalty as would preclude finding a defendant *guilty* ..." 332 U.S. at 267-68. So-called "nullifiers," which is a much narrower class than at issue in *Lockhart,* didn't serve on the special panel. Complaint about sex discrimination – only 11% were women – was said to be "almost frivolous." *Fay,* 332 U.S. at 266 n. 4. "*A more serious allegation* against the special jury panel is that it is more inclined than the general panel to convict." 332 U.S. at 278. "Extensive studies" were made by "the New York State Judicial Council" which "indicated[d] that special juries are prone to convict. In a study of certain types of homicide cases, it found that in 1933 and 1934, special juries convicted in eighty-three and eighty-two percent of the cases while ordinary juries

108

... convicted in forty-three and thirty-seven percent respectively." 332 U.S. at 278, 279.

Afterward, *Witherspoon v. Illinois*, 391 U.S. 510, 521 n. 18 (1968), discussed the possibility that so-called "death-qualified" jury's are "less than neutral with respect to guilt." Social science research has proven this proposition. In *McCree*, the Supreme Court assumed that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. *See* "H. Zeisel, *Some Data on Juror Attitudes Toward Capital Punishment* (University of Chicago Monograph 1968); W. Wilson, *Belief in Capital Punishment and Jury Performance* (unpublished manuscript, University of Texas, 1964); Goldberg, *Toward Expansion of Witherspoon*: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law, 5 Harv.Civ.Rights-Civ.Lib.L.Rev. 53 (1970);  Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971);  and Cowan, Thompson, & Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law & Hum.Behav. 53 (1984).

In *McCree*, the Supreme Court criticized but did not reject out-of-hand the unquestionably impressive array of social science studies indicating that the very

109

process of selecting a jury in a capital case creates a more conviction-prone jury. *See., e.g., Hovey v. Superior Court,* 616 P.2d 1301, 1341 (Cal. 1980). Nor does *McCree,* 476 U.S. at 172 n. 11, seriously dispute the "'essential unanimity' of support among social science researchers and other academics for *McCree*'s assertion that 'death-qualification' has a significant effect on the outcome of jury deliberations at the guilt phase of capital trials," (quoting the dissent, 476 U.S. at 188). "[T]here are no studies which contradict" the empirical records developed in *Hovey, supra, McCree, supra,* and *Keeton v. Garrison,* 578 F.Supp. 1164, 1171-79, *rev'd,* 742 F.2d 129 (4th Cir. 1984), *cert. denied,* 106 S.Ct. 2258 (1986). *See Grigsby v. Mabry,* 758 F.2d 226, 238 (8th Cir. 1985) (*en banc*), *rev'd sub nom McCree.* This remains true.

Death qualification infringes a capital defendant's "interest in a completely fair determination of guilt or innocence." *Witherspoon,* 391 U.S. at 520 n. 18. Because Mr. Brown's guilt was determined by a "death qualified' jury which was pre-disposed to convict, he was denied his right to a fair and impartial jury drawn from a cross-section of the community in violation of the Fifth, Sixth, and Eighth Amendments. Consequently, his conviction must be reversed.

ISSUE XV

THE TRIAL COURT ERRED IN TELLING A
PROSPECTIVE JUROR WHO SERVED ON THE JURY
THAT THE DEFENDANT HAD ENTERED A GUILTY
PLEA

During the "voir dire" of juror Ms. Brewer (juror number 227), the trial court

told the juror, "Now, you understand that the defendant has entered a plea of

guilty." (Doc. 291 at 499). Juror Brewer responded that she did understand this. *Id.*

Neither the defense, nor the government objected to the trial court's statement and

this apparent slip of the tongue was never corrected.

Though Juror Brewer was initially in the panel that included alternates, she

ended up being in the main panel of jurors (*Id.* at 530). She sat on the jury that

tried the case and returned the death penalty.

There is no way to know now, of course, to what extent Juror Brewer

considered the statement made by the judge. She may have considered it as an

important fact that she was expected to understand (as she was told by the judge), or

it may have gone "in one ear and out the other." Moreover, the fact that the case

was being tried (after she was told the defendant entered a guilty plea) may have

confused her, or she may have assumed that even after having entered a guilty plea,

he was thereafter entitled to a jury trial, or, for that matter, that the defendant may

have been entitled to withdraw the plea after entering a guilty plea.

111

As attorneys and judges we recognized that what the judge said was a slip of the tongue. We recognize, moreover, that in our experience, it must have been a slip of the tongue, because why else would the jury be going through the voir dire process, followed by a trial at which the defendant claimed (through counsel) that he was innocent.

But Juror Brewer, as far as this record is concerned, is not an experienced litigator. She arranges for transportation for Kerr McGee products for a living (*Id.* at 498). She may have had no ability to sort through the seemingly contradictory information being offered to her by the court. And what she was expressly and unequivocally told, in her first one-on-one encounter with the judge, was that the defendant had entered a guilty plea. Neither attorney objected, or sought to correct the judge, so she may very well have assumed that the she was being instructed accurately.

The law recognizes that inconsistent statements from a trial judge – usually during jury instructions – may confuse a jury. The law is clear that when inconsistent statements are given to the jury during instructions, some of which are accurate and some of which are not, the appellate court will not forgive the erroneous instruction and assume that the trial jury somehow figured it out correctly. On the contrary, where inconsistent instructions are given to the jury, one

112

of which is right and one of which is wrong, the appellate court generally concludes that there has been error. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict"); *Potts v. Kemp*, 814 F.2d 1512 (11th Cir. 1987) (same).

The existence of a prior guilty plea is a particularly egregious fact to be "known" by a jury. In fact, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure expressly forbid any discussion in front of the jury of an aborted guilty plea, or even discussions about a guilty plea. Fed.R.Evid. 410; Fed.R.Crim.P. 11(f). There is hardly any evidence that would be more prejudicial to a defendant on trial, than inadmissible evidence that he had entered a guilty plea.

Because the parties cannot now discern to what extent this erroneous statement by the trial court influenced the juror who sat in judgment in this case; and because the cost of assuming incorrectly is so high, this court must reverse the conviction and remand for a new trial.

113

## CONCLUSION

For the forgoing reasons this Court should reverse Mr. Brown's convictions and sentences.

Dated, this the 28th day of March, 2005.

Respectfully submitted,

JEFFREY L. ERTEL
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

DONALD SAMUEL
State Bar No. 624475
GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225
dfs@gsllaw.com

ATTORNEYS FOR MR. BROWN

114

# US Court of Appeals, 11th Circuit - Brief Upload Result Page

Successfully Received Appellant - Initial Brief for Docket #04-10325 at March 28, 2005 04:10:10 PM from Jeffrey Lyn Ertel (015893661)

# PLEASE NOTE: All submissions are subject to review.

View Uploaded Brief

Upload Another Brief

**Please Logout When You Are Done**
**E-Mail EDF Support**

**03/28/2005 04:10:10 PM US Court of Appeals for the 11th Judicial Circuit.**

## CERTIFICATE OF WORD COUNT

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), undersigned counsel hereby certifies that the word processing system, used to prepare this Brief of Appellant, has counted 26,985 words which is in excess of the maximum. However, Mr. Brown has filed simultaneously with this brief, a *Motion for Leave to File Brief in Excess of Page Limit.*

JEFFREY L. ERTEL
State Bar No. 249966

COUNSEL FOR MR. BROWN

Federal Defender Program, Inc.
100 Peachtree Street, Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the forgoing pleading upon

counsel for the Government by placing a copy with proper postage affixed in the

U.S. mail, addressed as following:

   Amy Lee Copeland, Esq.
   William Frentzen, Esq.
   Assistant United States Attorney
   P.O. Box 8970
   Savannah, Georgia 31412

Dated, this the 28th day of March, 2005.