IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| MEIER JASON BROWN | : | CIVIL ACTION NO. |
| Petitioner, | : | No. 4-07-CV-85(BAE)(GRS) |
| | : | |
| vs. | : | CRIMINAL ACTION NO. |
| | : | 4:03-CR-00001-BAE-1 |
| UNITED STATES OF AMERICA | : | |
| Respondent. | : | CAPITAL HABEAS CORPUS |
| | : | |

PETITIONER'S COMPREHENSIVE BRIEF PURSUANT
TO ORDER OF FEBRUARY 12, 2008

COMES Petitioner and files the following brief in support of his claims for

relief, as directed by this Court's Order of February 12, 2008:

1. This is a federal habeas corpus action brought by a death-sentenced

inmate. Mr. Brown's convictions and sentences were affirmed by the United

States Court of Appeals for the Eleventh Circuit on March 13, 2006. *United*

*States v. Brown*, 441 F.3d 1330 (11th Cir. 2006). A timely filed Petition for Writ

of Certiorari was denied on January 22, 2007. *Brown v. United States*, 127 S.Ct.

1149 (2007), and a Petition for Rehearing was denied on March 19, 2007. *Brown*

*v. United States*, 127 S.Ct. 1870 (2007).

2. Petitioner filed a motion pursuant to 28 U.S.C. § 2255 on January 22,

1

2008.   In its Response filed March 12, 2008, the Government concedes that the 2255 motion was timely filed.  Response at 2.

**I.  Petitioner Has Satisfied the Standards for Holding an Evidentiary Hearing**

When a prisoner files a Motion to Vacate or Set Aside Judgment, an evidentiary hearing must be granted "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. §2255.  *See  Aron v. United States*, 291 F.3d 708, 714-25 (11th Cir. 2002).  Thus, where a "petitioner alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim."  *Id*.; *see also Riley v. United* States, 244 Fed. Appx. 1000, 1001 (11th Cir. 2007);  *Ramirez v. United States,* 2007 WL 4455383 (11th Cir. 2007) ("Ramirez is entitled to an evidentiary hearing on her ineffective assistance claim if she alleges facts which, if proven, would entitle her to relief."); *Holmes v. United States,* 876 F.2d 1545, 1552 (11th Cir.1989);  *Slicker v. Wainwright,* 809 F.2d 768, 770 (11th Cir. 1987).  Although "the burden is on the petitioner in a habeas case" to establish his right to a hearing, that burden is "relatively light . . . and is significantly lower than his burden to show he is entitled to §2255 relief."  *Valentine v. United States*, 488 F.3d 325, 333-34 (6th Cir. 2007).  Petitioner has satisfied this standard.

However, for most if not all of the claims raised in the §2255 motion, the Government has not denied any of the facts alleged by Petitioner.[1]  Filed herewith is a motion for evidentiary hearing, and/or to expand the record, containing affidavits, copies of affidavits, and one draft affidavit.  As with the Appendices to the §2255 motion, the Government may not dispute the facts contained in the Appendix to the evidentiary hearing motion.  If that is the case, then this Court may grant summary judgment with respect to many of the claims for relief.[2]

## II.  Law Governing Claims for Relief

Many of the claims in the §2255 motion involve allegations of ineffective assistance of counsel in violation of the Sixth Amendment and Government misconduct in violation of the Fifth Amendment.  Petitioner sets out the controlling principles here once rather than repeating them in the body of each argument.

---

[1]An answer "must address the allegations in the motion."  Rule 5(b), Rules Governing Section 2255 Proceedings.

[2]Petitioner also is filing herewith a motion for discovery.  If that discovery is granted in whole or in part the need for an evidentiary hearing and/or to expand the record would thereafter arise again.

3

**A.  Ineffective Assistance of Counsel**

1.  Under *Strickland*

Lawyers have "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Ineffective assistance of counsel under the Sixth Amendment occurs when counsel acts contrary to professional norms, with prejudice resulting.  Prejudice is established when attorney conduct undermines confidence in the result or creates a reasonable probability that the result in the case would have been different absent the conduct.  *Id.*

In *Williams v. Taylor*, 120 S.Ct. 1495 (2000), the Court cited the ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980), as one source for the "norm" of lawyer behavior.  And in *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), the Court cited the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as providing **the** norm for attorney conduct under the Sixth Amendment.  Thus, "the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases" (*Hamblin v. Mitchell*, 354 F.3d 482, 386 (6th Cir. 2003)) under *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

4

With regard to capital sentencing, to comply with professional norms defense counsel must conduct a thorough and complete investigation into the client's background and social history.  *See Williams, supra*, 545 U.S. at 396 ("Trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." [citing 1 ABA Standards for Criminal Defense 4-4.1, Commentary, p. 4-55 (2d ed. 1980)]; *id.* at 415 (counsel's duty is to conduct the  "requisite, diligent" investigation into client's background)(O'Connor, J., concurring).  "The ABA Guidelines provide that investigations into mitigating evidence 'should  comprise efforts to discover ***all*** *reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  *Wiggins, supra,* 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty 11.4.1 c), p. 93.

The Guidelines require a *multi-disciplinary* defense team, consisting of no fewer than two qualified attorneys, an investigator, and *a mitigation specialist,*[3] with at least one team member qualified by training and experience to screen for the presence of mental or psychological disorders or impairments.[4]

---

[3]ABA Guideline 4.1.A.1 (The Defense Team and Supporting Services).  *See also* Guideline 10.4.C(2)(a) ("at least one mitigation specialist and one fact investigator").

[4]ABA Guidelines 4.1.A.2 and 10.4.C(2)(b).

The mitigation specialist is an indispensable member of the defense team at every stage of a capital case:[5]

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including impact on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to allow them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive case in mitigation.[6]

As will be shown, defense counsel in this case performed unreasonably and prejudicially.  Counsel's individual actions, and their cumulative effect, *Williams, supra,* 120 S.Ct at 398, require reversal.

2.  Under *Cronic*

In *United States v. Cronic*, 466 U.S. 648 (1984), the Court recognized that there are times when  "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiring into the actual conduct of the trial."  *Cronic*, 466 U.S. at 659.

---

[5]ABA Guidelines 4.1 (The Defense Team and Supporting Services), 10.4 (The Defense Team), and 1.1 (Objective and Scope of Guidelines).

[6]Commentary to Guideline 4.1, 31 Hofstra L.Rev at 959.

## B. Prosecutorial Misconduct

It violates due process for the state not to disclose material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963). Evidence is exculpatory if it is favorable in any manner to the defendant, including evidence that would show the bias or motive of a witness. *Banks v. Dretke*, 540 U.S. 668, 701 (2004)(had the jury known of the suppressed evidence it "might well have distrusted" or even "disregarded" state's evidence); *Youngblood v. West Virginia*, 126 S.Ct 2188 (2006). Exculpatory evidence is material if it undermines confidence in the guilt/innocence or sentencing verdict, *Kyles v. Whitley*, 514 U.S. 419 (1995), without regard to whether "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 435. When two or more pieces of favorable evidence are suppressed, their materiality "must be considered collectively, not item by item." *Id.*, at 435-36; *see also United States v. Sipe*, 388 F.3d 471,478 (5th Cir. 2004) ("[w]hen there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the Government raises a reasonable probability that its disclosure would have produced a different result").

When false evidence or argument is presented, or the facts are cast in a false light by the prosecutor, reversal is required if there is "any reasonable likelihood

that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 394 U.S. 103 (1935).

### III. Law Governing When an Ineffectiveness Claim Must be Raised

With respect to most if not all of the claims of ineffective assistance raised in the §2255 motion, the Government responds that because they were not raised on direct appeal they are defaulted. *See, e.g*., Doc. # 50 at 3, 6 - 10. The Government's position finds no support in the law. The precedent in this Circuit for at least a decade prior to Mr. Brown's direct appeal was that "claims of ineffective assistance of counsel raised on direct appeal where a district court did not entertain the claim nor develop a factual record" will generally not be considered. *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002), *citing United States v. Khoury*, 910 F.2d 948, 969 (11th Cir. 1990).

Recently, the United States Supreme Court has held the same way. In *Massaro v. United States*, 538 U.S. 500, 509 (2003), the Court held that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255." And after the Government filed its response, the Eleventh Circuit again held that ineffectiveness claims are not usually heard on direct appeal. *United States v.*

8

*Brown*, ___ F.3d ___ (11ᵗʰ Cir. 2008)(2008 WL 1869727 at *11)(ineffective

assistance of counsel claims "we generally will not hear on appeal").

### IV. Argument

### CLAIM I

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE LOCAL PROSECUTORS' AGREEMENT THAT THIS OUGHT NOT TO BE A DEATH PENALTY CASE**

Petitioner agreed to plead guilty and the Government agreed to a life

sentence long before this case went to trial, Doc. # 12, but the Attorney General of

the United States refused to allow the plea agreement. Petitioner alleges that trial

counsel ineffectively and prejudicially (1) failed to inform the sentencers that the

prosecutors had agreed to a life sentence, and (2) harmfully informed the jurors

that the Petitioner had agreed to plead guilty. At sentencing, counsel introduced a

stipulation that said only that Petitioner offered to plead guilty. T. 1167.

Inasmuch as the jurors knew he had not pled guilty, the only conclusion for the

jurors to draw was that the Government said "no." In fact, the local prosecutors

said "yes." Additionally, defense counsel unreasonably did not enter a stipulation

that said when the offer to plead guilty had occurred.

The Government responds that because appellate counsel did not raise this

issue on direct appeal "it has been procedurally defaulted." Doc. # 50, at 3.

However, Claim I is an ineffective assistance of trial counsel claim and "failure to

raise an ineffective-assistance-of counsel claim on direct appeal does not bar the

claim from being brought in a later, appropriate proceeding under § 2255."

*Massaro v. United States*, 538 U.S. 500, 509 (2003). *See also United States v.*

*Brown*, ___ F.3d ___ (11th Cir. 2008)(2008 WL 1869727 at *11)(ineffective

assistance of counsel claims "we generally will not hear on appeal"). However,

if this Court determines that this claim should have been raised on direct appeal,

then Petitioner alleges that his appellate counsel were prejudicially ineffective for

failing to raise the claim, which excuses any default. *Murray v. Carrier*, 477 U.S.

478 (1986). Current appointed counsel was also appointed counsel on appeal

and this may pose a conflict if counsel must raise and litigate his own

ineffectiveness.

On the merits of the claim, the Government writes that "Brown cannot

overcome the presumption that his counsel's trial strategy was sound."[7] Doc. # 4.

Petitioner specifically avers that it was unreasonable attorney conduct for counsel

not to argue that the local prosecutors' position that life in prison was an

---

[7]In its answer, the Government did not deny that these actions by counsel were prejudicial.

appropriate punishment provided a basis for a sentencer decision of a punishment less than death and, thus, was mitigating.   Worse still, counsel told the jurors that Mr. Brown offered to plead guilty in such a way that the jurors had to conclude that the prosecutors had said "no" and in a way that left jurors to speculate on when that offer by Mr. Brown had been made.  One "cannot imagine what they hoped to gain" by introducing this evidence.   *Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007).

The Government also writes that "Brown's attempt to impeach the verdict with an affidavit from a juror is improper."  Doc. # 50, at 4.[8]  Petitioner has not attempted to impeach the verdict.   Petitioner proves prejudice under *Strickland* by demonstrating that had counsel acted reasonably "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003).  The affidavit of the jury foreperson  (Doc. # 13) is evidence offered by Petitioner to prove  prejudice.  It is not an attack on the verdict and it does not invade the province of the jury.  It is evidence about Sixth Amendment ineffective assistance of counsel.[9]

---

[8]The Government makes this complaint regarding this claim, and regarding claims 2 & 3.  Doc. # 50, at 5-6.

[9]In addition, trial counsel attests to the mistake that was made by introducing the stipulation.  *See* Motion for Evidentiary Hearing And/Or to

11

## CLAIM II

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE VICTIM'S HUSBAND'S (AND OTHER FAMILY MEMBERS') AGREEMENT WITH A SENTENCE OF LIFE IN THIS CASE**

The victim's survivors in this case knew all about the Petitioner's home life and upbringing, had told sympathetic stories about it to T.E. Barnell of the Postal Inspection Service, and several family members, including the victim's widow, did not want the death penalty for Petitioner. Defense counsel was given the Postal Inspector's Report containing summaries of interviews with the survivors of the victim before trial, but did not use the mitigating evidence contained therein. Petitioner alleges that this was unreasonable and prejudicial attorney conduct.

The Government contends that because Petitioner raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and it was rejected on direct appeal, then Petitioner cannot now raise this claim as an ineffective assistance of counsel claim. Petitioner avers that what was raised on direct appeal was a claim that the Government did not tell defense counsel about the victim's family members' opposition to the death penalty. The claim being raised now is that the defense *did* know about this and ineffectively and prejudicially did not use the information.

---

Expand the Record, Appendix 1, filed herewith.

12

For example, the Government argued that the death penalty was the correct decision because it brought justice to the victim's family.  *See* Claim VI, *infra*. Counsel were prejudicially ineffective for not objecting, moving for a mistrial, and asking to introduce evidence to rebut this portion of the prosecutor's argument for death.  This ineffectiveness is properly brought in this petition.

The Government does not aver that counsel acted reasonably by failing to introduce compelling mitigation evidence about Mr. Brown's upbringing, mitigating evidence that could have come from the victim's survivors who testified.   Rather the Government avers only that this omission by counsel was not prejudicial because "similar testimony came in through other defense witnesses." Doc. # 50, 5.  Nothing introduced by the defense was similar to mitigation coming from the testimony of the victim's survivor's, *the Government's witnesses*.  These victim's family members knew that Meier Brown had "no home base," Petition, Doc. # 8, Claim II, ¶ 6, knew that the Brown family had "a lot of problems," *id*., and knew that the Brown family and their minister had told the victim's family – during a welcomed visit to their home  – that they wished that they could have prevented the offense from happening.  Id., ¶ 7.  These are compelling mitigating circumstances, and had they been introduced through these witnesses "there is a reasonable probability that at least one juror would have struck a different

13

balance."  *Wiggins, supra*, 539 U.S. at 536.

## CLAIM III

**COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED DETECTIVE WOODALL'S CONCLUSION AS A SEASONED DETECTIVE THAT, FROM THE EVIDENCE AND MEIER BROWN'S HISTORY, THE VICTIM'S DEATH WAS NOT PLANNED, AND THAT WOODALL AGREED WITH THE LOCAL PROSECUTORS THAT LIFE IN PRISON WAS THE APPROPRIATE PUNISHMENT**

Petitioner contends that Detective Woodall could have testified about significant evidence in mitigation but that defense counsel unreasonably and prejudicially failed to elicit or proffer this testimony.  The Government responds that this claim should have been raised on direct appeal and it is now defaulted. Doc. # 50 at 6.  As discussed *supra*, ineffective assistance of counsel claims are raised in § 2255 proceedings, not on direct appeal.  *See Massaro, (James) Brown*, *supra.*   And if this issue should have been raised on direct appeal, then present appointed counsel was prejudicially ineffective on direct appeal.  Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

The Government also responds that trial counsel "made strategic decisions." Doc. # 50 at  6.  Petitioner avers that counsel's failings on this claim were not based upon any strategy and, if they were, it was unreasonable strategy.  The

Government also avers that "the 'new' information provided by Detective Woodall was covered largely in his sentencing testimony. *Id.* This is incorrect.

Detective Woodall's testimony at trial[10] was cursory and totally lacking in detail. He testified that he had known Mr. Brown for approximately 8 years as a result of calls to the Morgan residence and some dealings he had with Mr. Brown on specific cases. T. 1160-61. He had been to the Morgan residence on numerous occasions in response to reports of "fights, domestic problems, shootings, stabbings, alcohol, drug sales, and robberies" and Mr. Brown grew up in this environment. Mr. Brown's mother[11] was in bad health and the inside of her home was not quite "squaller" but the Morgans "lived a very poor life." *Id*. He said he was aware of one incident where one of the Morgans died on the property,

---

[10]The Government did not call Detective Woodall in its case-in-chief even though Detective Woodall was specifically brought into the investigation to interrogate Mr. Brown and it was Detective Woodall who obtained the confession that played such a prominent part in the Government's case against Mr. Brown.

[11] Trial counsel's ineffectiveness in eliciting compelling evidence in mitigation from Detective Woodall is demonstrated by the fact that they tried to elicit information about Mr. Brown's relationship with his mother. Detective Woodall had to admit that he knew nothing of the relationship. Had trial counsel adequately interviewed Detective Woodall and adequately prepared for his direct examination, they would have known he did not have knowledge of the nature of the relationship and they would have known that the detective had a wealth of information that would have been admissible and relevant to the jury's penalty phase determination.

whom he recalled to be one of Mr. Brown's sisters[12] who drowned in a septic tank. T. 1163.  Lastly, he opined that Mr. Brown was remorseful when giving his statement (T. 1164)[13] and that he can be heard on the taped statement saying he (Detective Woodall) believed Mr. Brown's version of events. (T. 1165).[14]  His direct testimony was five (5) pages long.

In contrast to what Detective Woodall *did* testify to, *he could have* testified in detail about a variety of mitigating subjects.  For example, he could have testified in great detail about the horrific upbringing Mr. Brown suffered.  He would have testified[15] that in his years with the Liberty County Sheriff's Department he became familiar with Mr. Brown from the "countless" responses he

---

[12] In reality, it was a cousin of Mr. Brown's who, as an infant, fell into and drowned in a septic tank.

[13] However, on cross examination the prosecutor pointed out that Mr. Brown's remorse was when he was talking not just of the victim but also of Diane Brown and that when Mr. Brown was sobbing he said his life was over.

[14] Trial counsel did not elicit that Detective Woodall still believed that Mr. Brown was being honest in his statement.  The distinction is significant as telling Mr. Brown, during the course of an interrogation, that the detective believed him, could have been (and could have been interpreted by the jury to be) nothing more than a ploy to get Mr. Brown to confess.  Merely asking Detective Woodall whether he still believed Mr. Brown was telling the truth was a no-risk proposition as the detective had spoken with trial counsel prior to trial and they knew he did in fact still believe Mr. Brown was being truthful.

[15] An affidavit from Detective Woodall is submitted as Appendix 2 to the Motion for Evidentiary Hearing And/Or to Expand the Record.

made to the Morgan Residence, and that he estimates law enforcement were making 2 to 3 calls to the Morgan residence per week and this practice lasted 8 years.[16]  Mr. Brown's brothers Glenn and Roy and his cousin Roger Underwood (who also lived on the residence) were major drug dealers as was Sam Walthour, who also sold drugs on the Morgan property.  He would have testified that the drug dealing was open and notorious, occurring out in the open in front of everyone living on the property.  Consequently, a large number of the responses to the Morgan residence were drug related.  When he responded to the calls, Mr. Brown, although not involved in the sale of drugs, was most often in the house or in the car where people were arrested for selling drugs.

Detective Woodall would have further graphically described how the structures on the "compound" were over run with violence, drugs, poverty, chaos and social blight, so much that violence was unavoidable for anyone living there. He would have testified how shootings or stabbings were routine and would have been able to give specific instances of violence witnessed by Mr. Brown.  He would have recounted an incident where Sam Morgan and Deborah Jenkins had been fighting and one shot or stabbed the other.  When Detective Woodall arrived

---

[16]At that rate over that period of time, police would have responded to Mr. Brown's residence between 800 and 1,200 times (100 - 150 calls per year = 800 - 1,200 calls in the eight year period).

on the scene, he found that Mr. Brown was in the area and saw what happened. Another instance of violence Detective Woodall was privy to related to Sam Walthour, who was severely beaten, hog tied, shot and killed in Midway, Georgia. This occurred the same night that Edward Morgan (Mr. Brown's cousin) was murdered at Mr. Walthour's house. Finally, he could have told how Quincey Waye, a toddler, was found drowned in the septic tank apparently after trying to retrieve a toy that had fallen in, and that Meier was there when it happened.

Detective Woodall would have recounted how Sadie Brown, although in ill health later in life, had told him how she had lost control of her children well before Mr. Brown ever got into trouble. She recalled how all the boys except Meier drank and fought all of the time, and how it got so bad she had to throw then out of the house on a regular basis.

Detective Woodall would have testified how he was always concerned when a woman living at the Morgan residence became pregnant because it was no place to raise a child. The environment was not safe, poverty was extreme, and the homes were filthy with holes in the floors and walls. All of the rooms were crammed with junk so dense that you could often not walk through them, and the outside of the trailers were strewn with junk and old cars. He observed that nutrition and medical care were very poor, and there was no intellectual

18

stimulation for children.  Further, there was no clean living going on;  none of the able bodied men worked regular jobs - - they sold drugs instead.  It was his opinion that the Morgan residence provided a "nasty, sordid, disgusting" environment and that neither Mr. Brown nor anyone who was being raised there at the time had no real chance in life.

As to the offense, Detective Woodall could have testified that, from all he knew of Mr. Brown and his past, and from the Detective's experience as an officer, Mr. Brown was not a violent offender , and there was nothing in his past that indicated Mr. Brown would or could be a danger to anyone.  Based on his thirty  plus years of experience as a law enforcement officer, he did not believe that Mr. Brown took the knife to the post office with the intention of stabbing anyone.  He knew that this crime was completely out of character for Mr. Brown.

Having a police officer testify to all of this, and especially to this conduct being out of character for Mr. Brown, could have caused at least one juror to vote for life.  *Wiggins, supra*, 539 U.S. at 536; *see also Collier v. Turpin*, 177 F.3d 1184 (11th Cir 1999)(ineffective not to introduce evidence that crime is totally out of character).

Trial counsel also performed unreasonably and prejudicially by not objecting to the prosecutor's argument that Detective Woodall did not speak for

these jurors who had to "speak a verdict for the Southern District of Georgia" and who "do not take your marching orders from Detective Woodall of the Liberty County Sheriff's Office." T. 1197. This prosecutor himself had agreed to a sentence of life imprisonment, as had the state prosecutor in Liberty County. By arguing that Detective Woodall was an irresponsible or irrational interloper the prosecutor cast the facts in a false light and defense counsel acted unreasonably by not objecting, seeking a mistrial, and seeking to reopen the proof to rebut the suggestion that Detective Woodall was somehow out of the mainstream.

CLAIM IV

**DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO CONDUCT THE DILIGENT INVESTIGATION INTO MEIER BROWN'S BACKGROUND AND SOCIAL HISTORY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS REQUIRE**

Petitioner contends that trial counsel unreasonably and prejudicially failed to conduct a thorough investigation into Petitioner's background and social history. The Government responds that this was resolved on direct appeal and that if it was not then it should have been raised on direct appeal and it is thus defaulted. Doc. # 50, p. 6. Again, as discussed *supra*, ineffective assistance of counsel claims are raised in § 2255 proceedings, not on direct appeal. *See Massaro, (James) Brown*, *supra.* And if this issue should have been raised on

20

direct appeal, then present appointed counsel was prejudicially ineffective on direct appeal.  Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

The Government also contends that "[d]efense counsel introduced most, if not all, of the evidence now cited by Brown in the mitigation case."  Doc. # 50 at 7.  This implicitly acknowledges that the evidence outlined in the 2255 motion is in fact mitigating evidence that would be admissible.  However, the Government is incorrect to state that "most" or "all" this evidence was presented, and ignores the allegation that defense counsel presented wrong and affirmatively harmful evidence about Petitioner.

A.  Affirmatively harmful and incorrect evidence

The affirmatively wrong evidence that was admitted by defense sentencing counsel allowed current counsel for the Government to write in her appellate brief that Petitioner's "poverty, a childhood punctuated by violence and death, and chaos," was not mitigating because Mr. Brown "managed" it "by hiding anger under a thin veneer of civility."  Brief of the Government on direct appeal, p. 79, Doc. # 50, Exhibit 2.  The Government was only able to say this, and the jurors think it, because defense counsel, unprepared at sentencing,  had Vanessa

Montgomery Parker testify.  T. 1131.  She had been interviewed by the Postal Inspector.  Appendix D.   In her testimony she said that she was employed at the Liberty County Board of Education, that she knew Meier, and that she had  served as a school social worker.  She said that in that capacity she went and spoke with Meier's mother to assist the family in getting medication for Meier that he needed to take every day in school in order to do better.  She also testified that she did not know what school grade Meier was in at that time "because in the alternative school, they work sort of like on paces.  So he could have been scheduled for one grade, and may be working on a couple of grades in order to catch up."  She also said that Meier was an angry child:  "there was a little anger, but it wasn't directed at me or the school officials.....a tenseness sort of anger."  T. 1133.  The Government quoted this in its brief on appeal at p. 78.  Appendix 1, hereto.

But Ms. Parker was confused and mistaken.  Meier never took medications in school.  His brother Ralton did, for ADHD.  And Ralton  had anger issues and he was a discipline problem, which was the reason for his medication.  And Meier did not go to the alternative school.  And Meier was not reported by anyone else as having any underlying anger as a child; just the opposite.  Ms. Parker was talking about Meier's brother, Ralton.  Not Meier.  Meier was sad, not angry.  Doc. # 8,

Claim IV, at p. 56.[17]

Counsel did not know that they were putting on evidence about the wrong child, did not know that their client was not in an alternative school, and apparently did not know that he was not angry as a child.  Had the requisite investigation been conducted, they would have known.  As the Government hoped to convey in its brief on appeal, a person who "hid[es] anger under a thin veneer of civility" is likely to be a danger in the future.

B.  Incomplete depiction of the circumstances of Petitioner's Life

Petitioner concedes that counsel touched on some aspects of Petitioner's tragic upbringing at sentencing.  But the jurors were provided only a thin sketch of Petitioner's life; the full picture could have made a difference.

That full picture is presented in the  § 2255 motion.  It is also presented in the affidavit of Sara Flynn submitted with the motion (Doc. # 17; *see also* Doc. 8, note 12) and in Appendix 3, Motion for Evidentiary Hearing And/Or to Expand the Record, filed today.   Petitioner will not here repeat all of the documented mitigation, but will note some of the things that the jurors did not hear.

---

[17]Defense counsel also unreasonably introduced the testimony of a school teacher who said that she thought to herself after hearing about the offense that "he must have had a lot of anger" but she had not seen anger when he was her student.  T. 1129.

First, defense counsel did not convey to the jurors just how dangerous it was to live on the compound and in the family, and how early Petitioner came to realize this fact.[18]  For example, Pelham Brown, Petitioner's father, testified about the knife and gun battle he had with Roy: "he [Roy] had drawed – I was scared I would hurt him.  He cut me one time.  And I just – I had my pistol and I shot him."  But trial counsel presented no testimony tying this violence to  Petitioner.  Petitioner was seven years old at the time and *was in the next room and could hear the fighting and the gunshot*.   Similarly, Linda Jones, a teacher, testified that Petitioner's trailer burned down, causing him to miss too many days of school.  No further details were offered.   In fact the burning down of the house was a very dangerous scary event – Petitioner's younger brother and cousin were inside the house when it caught fire.

Petitioner  and his siblings and cousins were provided no medical care, poor nutrition, and little supervision or positive adult interaction. These conditions were documented by DFACS workers in detail.  In testimony at trial, there was no description of detrimental conditions, poor parenting, and no mention of DFACS.  For example, DFACS attempted to remove Petitioner's thirteen year old younger

---

[18]At least two murders occurred on the compound, which was not mentioned at sentencing.  Nine of Petitioner's relatives died violent or alcohol-related deaths during his life, but the sentencers did not hear this.

brother after one of his adult brothers hit and kicked him, resulting in a trip to the emergency room.

Petitioner's cousin died while in the care of her aunt when the toddler, unnoticed, chased a ball into an open septic tank on the property and drowned. Alexis Andrews and Detective Woodall both testified at sentencing that they were aware a child drowned in the septic tank on the property, but they gave no details to show how little supervision of the children there was.

No testimony was offered about how Petitioner came to use drugs and alcohol, even though the state introduced his convictions for driving while intoxicated as aggravation. For example, defense counsel did not introduce evidence that all of the children on the Morgan compound used drugs and alcohol at an early age without adult intervention or correction. They bought beer with their lunch money and used the adults' drugs. Counsel did not introduce evidence that Petitioner began using alcohol and marijuana in the 6th grade at age twelve. Both were readily available to him through his uncles and cousins. Defense counsel did not introduce evidence that as a teenager Petitioner got drunk or high several times a week and that by the age of 18 he was drunk and high on marijuana every day. He also used other drugs regularly, including crack. By the year 2000, he was addicted to crack cocaine. No  mitigating evidence about Petitioner's drug

and alcohol dependance was presented, although mention of his having used cocaine was made.

Finally, there were examples of Petitioner's loving character that went unmentioned.  For example, Petitioner cared for his epileptic Aunt Earnestine.  The other children were put off by Earnestine's sour personality and violent tendencies and were frightened by her seizures, but Petitioner learned how best to help her before, during, and after a seizure.  This was not presented at sentencing.

In short, the defense presented a thumbnail sketch of the mitigation that was available.

C.  Detective Woodall

As discussed in Claim III, *supra*, Detective Woodall could have testified to much more in mitigation of punishment than was offered at sentencing.

D.  Counsel unreasonably failed to obtain the meaningful services of a mitigation investigator or mental health professional

While counsel in this case obtained funding for a mitigation investigator and a mental health professional, neither one of them did anything to prepare for sentencing.  According to trial counsel Richard Darden:

> 4.  We hired Laura Blankman to be our mitigation investigator.  We told her before she agreed to participate that the Court would approve $7,500.00, that the Court was not going to approve any more than that, and that the trial would happen relatively quickly.  Ms.

Blankman agreed to these conditions.  She promised to conduct a complete social history and background investigation of Mr. Brown, and to arrange for Mr. Brown's psychological/psychiatric evaluation for purposes of mitigation and sentencing.

5. Ms. Blankman did nothing she promised.  She failed to perform any of here assigned tasks.  She literally left us in the lurch.

Affidavit of Richard Darden, Appendix 4, Motion for Evidentiary Hearing And/Or to Expand the Record, filed herewith.  Trial counsel Bell states that "I am not 'death penalty qualified or certified' in order to be qualified to be appointed to a death penalty case in Superior Court,"  Appendix 1, Motion for Evidentiary Hearing And/Or to Expand the Record, and so he needed help:

4. I had not been involved with a death penalty case in approximately 15 years prior to my appointment to represent Mr. Brown.  I prosecuted a death penalty case as an assistant district attorney in approximately 1986.  I acted as lead counsel in the guilt/innocence phase and was not actively involved in the punishment phase. Sometime around 1989 I was appointed as second chair in a  Superior Court of Chatham County case to represent a client facing the death penalty, however, that case concluded almost immediately with a guilty plea due to proof of the client's mental retardation and the wishes of the victim's family.

5. I had almost no experience in conducting an investigation into the type of evidence that is used by the defense at capital sentencing.  My only prior experience with this type of investigation had been in a case I worked on approximately 15 years earlier which concluded very quickly before the mitigation investigation really started.  I had never before witnessed someone else conducting such an investigation.  I had no training in how to conduct such an investigation.

6.  I had an assistant, Bobbye Ray now remarried with a last name of Gerard, who was my secretary/paralegal and my office manager.  The only other employee at my office during this time was a part time secretary.

7.  It was important that we get funding for someone to conduct an investigation into mitigating circumstances and into Mr. Brown's background and social history.  On the recommendation of David Bruck we hired Laura Blankman as our mitigation investigator. Before we even put in the motion for funds for her, we told her that the judge was likely to only approve $7500.00 and would not approve any more money.  We told her that if she did not want to handle the case for that amount then we would look for someone else.  We also told her that the case would come to trial very quickly.  She agreed to handle the case under these constraints.

8.  Ms. Blankman's responsibility was to gather a background and social history for the sentencing phase of the case and to help with any mental health issues that were pertinent to capital sentencing.  She did not do her job.  She completely dropped the ball. She did not give us one piece of paper pertaining to any investigation she did (other than perhaps a bill).  She found no witnesses, he gave us no reports.

9.  Because Blankman had done no mitigation work, we asked the Court for additional funds for a separate forensic social worker. That request was denied. It was left largely to me to attempt to conduct the type of mitigation investigation that is necessary for a capital case when I had never done such an investigation.  Later, Laura Blankman told us she would come to the trial and work for free but she did not come.

*Id.*[19]

---

[19]Bobbye Gerard, mentioned in Mr. Bell's affidavit, was provided an affidavit based upon what she reported to undersigned counsel, but she has not signed and returned that affidavit yet.  What she told counsel was:

This Court had advised counsel at trial that they could use their "previously

2.  I live in Claremont, Oklahoma.  In 2003 I was the office manager for William Bell.  I was his paralegal.  When he was appointed to represent Jason Meier Brown in 2003, the employees in his law office were Mr. Bell, me, and a part time secretary.

3.  I had worked for Mr. Bell for four years when he was appointed to represent Mr. Brown.  We did not do capital cases.  We had no experience in death penalty work.  Needless to say we were not death penalty certified.  We were surprised that Mr. Bell was appointed for this case.  We did not know where to begin.

4.  We obtained some funding for a person to do a mitigation investigation which we had no experience with.  Laura Blankman agreed to perform that part of the case.   It was very difficult to communicate with Laura Blankman.   It was very difficult to get in touch with her.  She would say what she was going to do things and never did them.  She would say that she was going to interview this person or that person but it never seemed to happen.  We never really saw anything  from her.  I do not recall her interviewing anyone.  We never received anything from her in terms of information about Mr. Brown's background and social history.

5.  After having done nothing and having disappeared, Laura Blankman called and said she would come and help at trial.  She did not show up.  She did not do anything.

6.  This greatly affected our preparation.  Because she did not do anything we were not prepared for the sentencing proceeding.  We were scrambling at the end to try and put together something, anything, during the sentencing proceeding.   As I said, we had never done a capital sentencing investigation and we were not qualified to do one.   It was the blind leading the blind.

Appendix 5, Motion for Evidentiary Hearing And/Or to Expand the Record, filed herewith.

approved mitigation specialist and psychologist" to present evidence of future non-dangerousness. Order, September 18, 2003. This Court was unaware that the mitigation specialist had done no work. In addition, as Mr. Darden reports, the defense psychologist was not even asked about mitigation.[20]

Undersigned counsel has employed a mitigation specialist. She reports that:

> 47. I have been advised that the Judge in this case would have admitted testimony from the appointed defense mitigation investigator regarding whether Mr. Brown would pose a danger to others if sentenced to a prison term. Based upon everything I have learned, it is my opinion that Mr. Brown would not have been dangerous to others in a prison setting. The experts at Butner found that Mr. Brown was not dangerous, and if his past behavior is a predictor of his future behavior then Mr. Brown would not have been a danger to others if sentenced to life imprisonment in 2003.

Appendix 3, Motion for Evidentiary Hearing and/or To Expand the Record.

Undersigned counsel also has obtained the services of mental health experts. They also report, as could counsel's court appointed expert (had he been asked about mitigation) on the question of future dangerousness:

---

[20]Mr. Darden states that

> We received funds for Dr. Maish to evaluate Mr. Brown for competency and sanity, but not for purposes of mitigation. Dr. Maish saw Mr. Brown one time early in the case for thirty or forty minutes and did not administer tests or attempt to diagnose Mr. Brown.

Appendix 4, Motion for Evidentiary Hearing And/Or to Expand the Record.

**Not likely a danger in the future**

16.   Based upon our interviews with Mr. Brown, his reported character (generosity, etc.), his good behavior during earlier imprisonment, his relative lack of prior violent offenses, the absence of a diagnosis of an antisocial personality, and all of the circumstances of his back ground and social history about which we have been made aware, there is every indication that Mr. Brown's risk of future violence was extremely low when he was tried in 2003 is low today.

Appendix 6, Motion for Evidentiary Hearing and/or To Expand the Record.

These experts express other opinions, set out in Claim V, *infra*, about mitigating evidence in this case, which is incorporated into this claim by specific reference.

E.  Conclusion

Petitioner did not receive the benefit of a mitigation investigator, and did not receive the assistance of a mental health expert, to prepare for capital sentencing.  This is unreasonable, as set forth in Section II, A., *supra*. Defense counsel unreasonably and prejudicially failed to investigate, to retain experts, and to introduce available evidence to rebut the state's case, in violation of the Sixth and Eighth Amendments.   The failings by counsel "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687 (1984).   Defendant had a trial "significantly different than the trial he might have had if represented by" effective counsel. *Williams v.*

31

*Washington*, 59 F.3d 673, 682 (7th Cir. 1995), and a new trial is required.   *Collier*

*v. Turpin*, 177 F.3d 1184 (11th Cir. 1999)

The Government makes much of the fact that the defense put witnesses on

to testify at sentencing.  But that is not the test.  In *Collier v. Turpin*, 177 F.3d

1184 (11th Cir. 1999),

> Counsel presented ten separate witnesses, including Collier's wife,
> whose testimony consisted almost entirely of one or two word
> answers to inquiries as to Collier's general reputation in the
> community, his reputation for truth and veracity, his reputation for
> hard work, and his reputation as a man who supports his family.

77 F.3d at 1202-03.  Counsel was still found to be ineffective in *Collier* because

the ten witnesses presented at sentencing sketched out just the "hollow shell" of

the mitigation that was available, and because counsel unreasonably failed to

utilize experts at sentencing.  As in *Collier*, the available mitigation here, from the

victim's family's testimony (Claim II, *supra*), to a police officer's testimony about

"out of character" conduct (Claim III, *supra*), to expert testimony about future

non-dangerousness (Claim V, *infra*) and other mitigation, proves that but for

counsel's unreasonable actions "there is a reasonable probability that at least one

juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 536

(2003).

**CLAIM V**

**DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO PRESENT EXPERT MENTAL HEALTH TESTIMONY AND RECORDS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

Petitioner contends that sentencing counsel performed prejudicially and unreasonably with respect to the investigation and presentation of mental health evidence. Counsel did not use any mental health expert at all at sentencing, did not seek the assistance of an expert in a reasonable manner, and did not speak with the Government's expert in any meaningful manner.

The Government responds that the claim that defense counsel did not ask their mental health expert about mitigation could have been raised on direct appeal. Doc. # 50, p. 7. Again, as discussed *supra*, ineffective assistance of counsel claims are raised in § 2255 proceedings, not on direct appeal. *See Massaro, (James) Brown*, *supra.* And if this issue should have been raised on direct appeal, then present appointed counsel was prejudicially ineffective on direct appeal. Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

The Government writes that the Eleventh Circuit resolved the claim about

counsel's ineffectiveness vis-a-vis a future dangerousness expert when it found

this Court did not abuse its discretion in denying funding for one. Doc. # 50 at 7-8

But had trial counsel made the proper proffer to this, this Court might have

provided the expert, or been reversed for not having done so.

As noted above, Mr. Darden reports that the expert this Court appointed as a

defense psychologist, Dr. Maish, was not in fact asked to address mitigation and

sentencing issues. Appendix 4, Motion for Evidentiary Hearing And/Or to

Expand the Record. This was unreasonable attorney conduct. *See* Section II, A.,

*supra*. It was also prejudicial.

A. Four experts, including the Government's expert, provide
pertinent and compelling mitigation evidence

In the §2255 motion, counsel set forth a report to undersigned counsel from

mental health experts who had been asked to look at mitigation. Doc. # 8, p. 60-

63. That report has now been made into an affidavit, and has been expounded

upon. As these experts report, Mr. Brown suffers from mental diseases and/or

defects and these and other circumstances are mitigating:

Come the following affiants, Marlyne K. Israelian, Ph.D.,
clinical psychologist, and Bhushan S. Agharkar, M.D., and, after
being duly sworn, deposeth and state the following, to-wit:

1. We are both mental health professionals. Our Curriculum
Vitaes are attached hereto as Attachment 1 and 2.

2.   Dr. Israelian is a Clinical Neuro-Psychologist in Atlanta, Georgia. She is an adjunct professor of psychology for Emory University along with owning her own clinical practice, Comprehensive Psychological Services of Atlanta, LLC.  Her curriculum vitae is attached.

3.   Dr. Agharkar is a physician board-certified in both adult and forensic psychiatry.  He is on the clinical faculty at Emory University School of Medicine and Assistant Professor and Associate Residency Training Director at Morehouse School of Medicine.  He has an active private practice in Atlanta, Georgia.   His curriculum vitae is attached.

4.   Counsel for Mr. Meier Jason Brown contacted us and asked that we evaluate Mr. Brown.  Counsel wished to know whether Mr. Brown had any diagnosable mental disease or defect and whether there were circumstances about Mr. Brown's mental make-up and social history which were relevant to his culpability and/or which provided mitigating circumstances in a capital sentencing setting. We were provided extensive background materials by counsel for Mr. Meier Jason Brown, see Attachment 3, the types of materials that are normally and regularly relied upon by experts in our fields to form and testify to expert opinions.   We also each met with Mr. Brown and evaluated him, separately, on January 14, 2008 (Israelian) and November 29, 2007 (Agharkar).

5.   We have concluded that Meier Brown does suffer from diagnosable mental diseases or defects, and that there is considerable evidence in his background and social history that could be considered mitigating within the context of capital sentencing.

**Social History**

6.  Despite an upbringing that was characterized by willful neglect, unpredictable and often-times life threatening violence, abject poverty, and a pervasive disregard for the physical and emotional care of others, Mr. Brown developed a strong sense of

personal responsibility for the care of several family members.  From a young age and well into adulthood, Mr. Brown slept with his mother, Sadie, every night.  When she was disabled by diabetes and kidney failure, he fed and bathed her, took her to her dialysis appointments, and assumed responsibility for her medical care.  In addition to tending to her medical care, Mr. Brown was also financially responsible and generous, giving his mother half his pay on a regular basis.

7.  Perhaps most telling of his nurturing character is his care for his aunt, Earnestine Morgan, who suffered from grand mal seizures.  Mr. Brown was often left under her care and he, unlike the other children who were present, was the one to tend to her.  At most he was only ten years old at the time.

8. Mr. Brown's history is full of similar examples of his inclination to care for and tend to others.  This natural inclination to care for and tend to others is remarkable given the lack of appropriate models for such behavior in his life.  Such a natural altruistic disposition speaks to Mr. Brown's innately good character, which would have, had he been born in different circumstances to a different family, led to a much different outcome.

9.  Recently conducted neuropsychological testing confirmed that Mr. Brown is cognitively intact.  In addition, it revealed that he possesses areas of significant strength.  For instance, Mr. Brown, an individual who dropped out of high school in the 11th grade, performed within the superior range of functioning (99th Percentile) on a measure of mental arithmetic.  In addition, Mr. Brown demonstrated particular strength in his non-verbal reasoning abilities.

### Mental Disease and Defect

10.  Mr. Brown was raised in an environment where drugs and alcohol were prevalent within the community in general and his family in specific.  His brothers and cousins sold drugs as their primary means of financial gain.  Not only was drug use condoned, it

was almost expected.  For all intents and purposes, the use and abuse of both alcohol and drugs was Mr. Brown's birthright and he began using both before adolescence.  Ultimately, Mr. Brown became dependent on alcohol and crack cocaine.

11.  Mr. Brown reported using alcohol and cocaine almost daily since his early teenage years.  As an adult, his use only escalated along with his concomitant use of marijuana.  In addition to powder cocaine, Mr. Brown would also smoke crack cocaine with increasing frequency as he grew older.  His continued use without regard for the untoward effects on his health and personal life along with his escalating use over time indicate he met criteria for Alcohol and Cocaine Dependence. These are serious substance-related disorders which often cause marked impairment and complications. Furthermore, substance abuse and dependance appear to aggregate in families, which is plainly the case here.   Mr. Brown's addictions were most likely not considered "problems" because everyone in his household and immediate surroundings were using illicit drugs and consuming alcohol regularly.

12.  These substances are known to have disinhibiting effects on cognitive functioning and could cause a person to act in uncharacteristically dangerous and impulsive ways.  In a rapidly escalating situation, a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might.

13.  Not only was Mr. Brown born into a drug culture, but he also  had no access to treatment.  It is unfortunate that he was never treated for his addiction problems as there are several treatment modalities available to address these issues.  Dr. Agharkar, as a former medical director of a residential treatment facility and in his active private practice, has seen first hand that patients with substance abuse problems can improve with treatment and go on to lead successful lives.  It is unfortunate that Mr. Brown was never given a chance to address his substance abuse issues as this may have been pivotal in changing his life's trajectory.

### Not an anti-social personality disorder

14.  By the accounts of those who knew him growing up, Meir Brown was described as an engaging and personable young man with a good sense of humor.  It was unlike him to assault or fight with others.  He is well-liked in his current incarceration setting and by previous psychiatric evaluations there is no evidence to suggest he is dangerous in a prison environment.  Remarkably, given the culture in which he was raised, it is noteworthy that Mr. Brown does not suffer from an antisocial personality disorder.  In fact, it is very telling that his evaluation through the Mental Health Department at the Federal Medical Center in Butner, North Carolina, confirmed that he did not meet criteria for a diagnosis of antisocial personality disorder, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision, of the American Psychiatric Association.  Dr. Sally Johnson and Dr. Carlton Pyant concurred that Mr. Brown did not meet criteria for either an Axis I or Axis II disorder.

15.  At the root of his personality, Mr. Brown is an individual who is very much a "giver" in the sense that whatever he gained or earned was for the benefit of others (his frail mother, his single parent girlfriend.)  He is not a self-serving, narcissistic, irreverent, individual void of empathy for others and an inability to form and sustain meaningful relationships.   Indeed, it is probably the strength of his relationship and the relentless desire to care for those he loves that, coupled with the effects of drugs and alcohol, lead to the crime for which he is now sentenced to death.  It could be argued that Mr. Brown is no less a causality of the depraved, dysfunctional, and damaging family as his cousin Quincy Waye was when he, as a result of negligent care and supervision, drowned in a septic tank at the age of 2.

### Not likely a danger in the future

16.   Based upon our interviews with Mr. Brown, his reported character (generosity, etc.), his good behavior during earlier

imprisonment, his relative lack of prior violent offenses, the absence of a diagnosis of an antisocial personality, and all of the circumstances of his back ground and social history about which we have been made aware, there is every indication that Mr. Brown's risk of future violence was extremely low when he was tried in 2003 and is low today.

**Conclusion**

17. In short, it is our opinion that Mr. Brown possesses a host of intellectual, intrapersonal and interpersonal strengths which, in a healthier environment than the one he was born into, would have served him and society well. He suffers from substance dependence and abuse through no fault of his own. Given his strengths, had Mr. Brown been born and/or raised in a less teratogenic environment, not only would he have been less likely to engage in substance use and abuse, he would, had he been given the opportunity, have benefitted from detoxification and rehabilitation, and could have lead a productive and rewarding life. The likelihood that he would be dangerous if sentenced to prison was very low in 2003, and is low today.

Appendix 6, Motion for Evidentiary Hearing And/Or to Expand the Record.

Inasmuch as the Government's only response to the claim that "[d]efense counsel failed to utilize appropriately a mental health expert" is that "this claim was not raised on direct appeal," Response at 7, and given that it could not (and need not) have been raised on direct appeal, Petitioner should be afforded relief based solely on his defense counsel's failure to consult with a mental health expert regarding capital sentencing.

With respect to counsel's failure properly to request the assistance of a

future non-dangerousness expert, James Aiken, this Court rejected defense counsel's requests at trial for several reasons. First, the Court held that counsel could use fact witnesses and the mitigation investigator and the court appointed psychologist for this purpose. Order, September 18, 2003. Upon reconsideration of that decision, and in response to the Government's motion to preclude the defendant from offering any testimony on the BOP's ability to prevent future dangerousness, the Court again denied the motion. Order, October 14, 2003. This Court reasoned that

> Aiken's testimony is about the BOP's ability to prevent future dangerousness generally. It is not about how Brown's character or record indicates that he will not be a threat in the future.

Order, October 14, 2003, p. 2. Counsel were ineffective in presenting Mr. Aiken's expertise and in failing to advise the Court that Aiken could in fact opine on future dangerousness based upon Brown's character or record.

In the original §2255 motion, Petitioner set forth what Mr. Aiken had reported to counsel. Doc. # 8, at 65. Mr. Aiken has now provided an affidavit, which states:

> 1. My name is James Evans Aiken and I am over the age of eighteen. The information contained in this affidavit is based on my personal knowledge and I am competent to testify.

2.  I received my Bachelor of Arts Degree in 1972 from Benedict College in Columbia, South Carolina.  At the time I obtained my degree, I was already employed by the South Carolina Department of Corrections.  In 1985, I obtained my Masters Degree in Criminal Justice from the University of South Carolina in Columbia, South Carolina.

3.  I am currently the president of James E. Aiken and Associates, Inc., a prison management consulting firm.  I began my involvement in various aspects of the correctional systems over 30 years ago.  I started my correctional career as a counselor in the South Carolina prison system in 1971.  In that capacity as with other positions, I became intimately aware of the behavioral aspects of the prison population and prison policies.  Utilizing this background, I was called upon to make assessments of individual inmates to determine their needs and to develop programs and security during incarceration. Also, these interventions provided the basis for successful transition into society when that time arrived.  While with the South Carolina prison system, I was promoted to various posts through out the penal system. Additionally, I was named as Commissioner of Correction for Indiana and served at the pleasure of the Governor in that capacity.  I also held the position of Director of the Bureau of Corrections for the United States Virgin Islands.  (A copy of my Resume is attached).  A common thread through all of these positions was that I was keenly involved in inmate security prison management and classification processes.  During my more than thirty-six years in the profession, I would estimate that I have personally conducted thousands of inmate security evaluations and inmate classifications.

4.  Classification is the assessment of prisoners for placement within the prison system.  Proper classification looks at the characteristics of the offender to include the nature of the offense, prison adjustment, and conviction to determine the proper security level (minimum, medium, maximum) and hence the appropriate institution for that individual.  This process had been studied and refined over the past thirty years and is a critical step in managing a

41

safe and secure prison system.  While not an exact science, the goal is to properly place each prisoner in an appropriate facility so as to attain the lowest level of probability of endangerment to the prison staff, prison population and the public.  In doing this type of analysis, a proper classification must adequately anticipate the likelihood of the offender committing acts of violence in the future, and based on this assessment, place that offender in an institution that can adequately secure, supervise and manage him.  Except for the sentence and type of conviction, an offender who is not likely to be violent in prison or the community, generally is housed in a minimum security institution.  One who has instances or higher potential of violent or erratic behavior in his past or the future will be best maintained in a higher security facility.  An offender who has a significant, demonstrated history of violence, or who is currently violently acting out, will be confined to a maximum security setting and the behavior is controlled.  Finally, an offender who is the worst of the worst, one who exhibits continual violent behavior even in a maximum security prison can be assigned to a "super-max" facility where his contact with other prisoners is minimal, and his contact with staff is strictly regulated (i.e. appropriate security restraints and behavior controls are applied as required).

5.  I have been qualified to testify as an expert on future dangerousness, classification, as well as other prison related issues in various courts around the country including South Carolina, Georgia, Florida, Arizona, Maryland, Mississippi, Delaware, Alabama, Louisiana, Indiana, North Carolina, Virginia, Missouri, and New York.  I have also been qualified to testify as an expert relative to prison matters in the United States District Courts for the District of Connecticut, Western Virginia, Northern Virginia, Eastern New York, Northern New York/Vermont, Pennsylvania, Texas, Alabama, Middle Tennessee, South Carolina, Georgia, Ohio, Missouri and the District of Columbia.

6.  I have been contacted by counsel for Meier Jason Brown and asked to render an opinion in his case based on my experience in making security classification assessments and anticipating future

violent behavior potential and offender security needs.  More specifically, I was requested to make an assessment as to the level of endangerment Mr. Brown would pose to staff, other offenders as well as the general public while placed in a confinement setting.  I have been provided a number of institutional records that experts and prison officials in the field of classification and prison security management normally rely upon, including: (1) Mr. Brown's jail records from the Chatham County Jail, the Liberty County Jail and Bryan County Jail; (2) Mr. Brown's Georgia Department of Corrections Central File as well as his records from Augusta State Medical Prison and Montgomery State Prison; (3) records from the United States Bureau of Prisons, Federal Medical Center at Butner in North Carolina.  In addition, I have been given a social history of Mr. Brown that has been prepared by an investigator working on his behalf.  Lastly, I have been provided a copy of the indictment, and a brief summary of the events that led to the charges.  I am aware that Mr. Brown has been convicted by a jury of all of the counts in the indictment and that he has been sentenced to death.  I take as true all allegations in the indictment and take as true all the facts which provided the basis for the jury's decision to convict Mr. Brown.

7.  Based on my review of the documents listed above, my assumptions about the facts of the crime, and my thirty-six years of prison experience, it is my opinion that Mr. Brown did not pose a risk of future danger in the prison system when he was sentenced in 2003.  This opinion is not based alone upon the level of security that could be provided in incarcerating Mr. Brown but also on Mr. Brown's personal characteristics and background, i.e., my professional assessment on Mr. Brown's personal risk for exhibiting violent behavior while in prison for the remainder of his natural life.  It is further my opinion now, and would have been in 2003, that Mr. Brown would appropriately adjust to prison without presenting management problems in any security level while incarcerated.

8.  My experience has taught me that the best indicator of future behavior is past behavior and, specifically in the case of prisoners, past prison behavior. This is a window into future behavior while incarcerated.  In this case, I was presented with a wealth of

information that can be relied upon to accurately better predict and anticipate that Mr. Brown will not exhibit a future danger to staff, other inmates or the community when placed in a prison setting. First, I looked to his personal history in the community. While it is true that Mr. Brown has had a number of convictions, none have been violent prior to this current criminal violation. There is one incident in Mr. Brown's past where he was involved in a robbery of a local store. However, there was apparently no weapon used or present during the crime and no one received injury as a result of this criminal violation.

9. Another aspect that I gave considerable weight to was that Mr. Brown, although exposed to violence throughout his life, did not engage in it himself. Mr. Brown's early socialization was in an environment that was fraught with violence. In and around his home, Mr. Brown experienced death of loved ones, domestic assaults, detrimental and tragic accidents. It was relatively routine for law enforcement to respond to complaints of criminal matters at the residence. It was reported that siblings would engage in violent domestic fights. Mr. Brown, although raised in the midst of dysfunctional and violence prone environment, did not involve himself in chronic criminal violent behavior.

10. Also important is how Mr. Brown has adapted to prison life. Here again, I have considerable information upon which to base my opinion. Mr. Brown had prior incarcerations before being arrested on the current murder charge. In each prior incarceration, whether at the local jail in pretrial status or after sentencing in county or state prisons, Mr. Brown demonstrated a favorable adjustment to confinement. For instance, when he was incarcerated at the state facility in Columbus, Georgia, he was such a trusted inmate that he was put into a work program that allowed him to work outside of the facility. Mr. Brown, by all reports, did his job well and complied with all the mandates as set forth by the prison regiment.

11. This adjustment is also remarkable in that he did not involve himself in random or systemic violence against other inmates

or staff. Prisons are organized and have command structures containing internal reporting systems whereby staff can report, adjudicate and apply sanctions for transgressions on the part of the prisoner with an in-house tribunal called a disciplinary committee. These reports can entail informal resolution such as a verbal warning as well as extended periods of segregation for punishment and control. Prison institutional violations can range from simply failing to make one's bed to violent activities. It is common, almost routine, for inmates to commit such violations during a period of incarceration that requires referral to the disciplinary committee. However, based upon the records reviewed, Mr. Brown is remarkable in that he has few, if any, referrals, and none for violent behavior.

12. From my review of all of the records, as provided by Counsel, related to his prior incarcerations, I find that Mr. Brown would be classified as well adjusted. The term "well adjusted" reveals that the prisoner has not been involved in random and/or systemic disruptive violent and/or predator behaviors while in confinement status. Examples of prison predator behaviors may involve sexual predator aggression and/or violence, being a "shot caller" (gang or security threat group leader), demonstrating illicit or criminal power and control over other inmates, controlling contraband activities, lethal attacks upon staff and other inmates, escape using force and amassing weapons for violent predator acts.

13. Records from the Federal Medical Center at Butner, North Carolina, where Mr. Brown was held during the pendency of a mental health examination ordered by the Federal District Court, provide important considerations. When he arrived at that particular institution, the prison officials wanted to place him in general population because he had no documented history of institutional physical violence or community violence other than the charges pending at the time. Although Dr. Johnson's request to place Mr. Brown in general population was originally denied, within a short period of time Mr. Brown was transferred and remained in general prison population without incident for the time he remained at the Butner federal facility. Mr. Brown, consistent with his prior

45

incarcerations, presented no management issues while in general population.

14.  Based upon my professional experience of classifying thousands of inmates, as well as securing and managing various criminal populations, it has been shown that people cannot mask behavior for prolonged periods of time.  Mr. Brown's prison confinement adjustment demonstrates that he is not a person who would pose an endangerment to staff, the community and inmates while confined.

15. I had been contacted by the attorneys who represented Mr. Brown at trial and I had agreed to consult with them. I conducted a review of the materials and may have provided some preliminary information.  However, counsel informed me they could not secure funds for me to provide an expert opinion before the Court. I was not able to provide expert testimony in his criminal proceeding.

16.  It is my job and my expertise to make educated assessments of the likelihood that an inmate will harm others and to classify that inmate accordingly.  I would classify Mr. Brown as an inmate who would function very well in general population without being a danger to himself or others.  As a prisoner serving life without the possibility of parole, his classification level is more restrictive than general population, and he is even less likely to be a danger in that setting

17. The Undersigned will amend this affidavit as necessary.

Appendix 7, Motion for Evidentiary Hearing And/Or to Expand the Record.

Finally, defense counsel should have determined how Mr. Brown

functioned while at a federal prison, FCI Butner, where he was sent for 50 + days

46

and was monitored, tested, and evaluated.  Dr. Sally Johnson who evaluated Mr.

Brown at FCI Butner reports the following:

2.  I am a forensic psychiatrist and am presently a Clinical Professor of Psychiatry at the University of North Carolina at Chapel Hill Forensic Psychiatry Program and Clinic.  From 1979 until 1983 I served as a staff psychiatrist at Federal Bureau of Prisons Federal Medical Center, Federal Complex in Butner, North Carolina (FCI Butner).  From 1983 until 1989 I served as the Director of Forensic Services and Clinical Research at FCI Butner. I became the Associate Warden of Health Services/Chief Psychiatrist at FCI Butner in 1989, and the Associate Warden Medical/Chief Psychiatrist in 1999.  From 1990 to 2004, I was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/ Duke University of Psychiatry.  From 2001 to June 30, 2004, I served as a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner. In this position I conducted forensic evaluations for the federal court system on high profile and complex cases, and served as an expert witness.  My curriculum vitae is attached to this affidavit.

3.  On August 5, 2003, Jason Meir Brown was admitted to the Mental Health Department of the FMC at FCI Butner.  In my capacity as a psychiatric consultant to the FMC, I, and others in a multi-disciplinary team, began a court ordered evaluation of Mr. Brown. This evaluation consisted of me interviewing Mr. Brown individually on 11 occasions; considering psychological testing conducted by Carlton Pyant, Ph.D, Staff Psychologist at the FMC ; and considering the comments of many other clinical and correctional staff who observed and interacted with Mr. Brown during the 50 + days he was at FCI Butner.  The evaluation of Mr. Brown resulted in a report dated September 16, 2003, which we sent under seal to the Honorable Magistrate Judge G.R. Smith for the Southern District of Georgia.

4.  Present counsel for Mr. Brown asked that I review the report of September 16, 2003, and the records maintained by FCI Butner regarding Mr. Brown's stay there.  I understand that these documents

are contained in Appendix K 1-5 of a federal habeas corpus petition that has been filed on Mr. Brown's behalf. I have reviewed our 2003 report and these FCI Butner records. Counsel also asked me to report on upon my contact with Mr. Brown's trial counsel in 2003, and to comment on some of our 2003 findings. This affidavit was prepared for these purposes.

5. My review of the 2003 report and records has refreshed my recollection of some of the specifics of Mr. Brown's case, but I had an independent memory of this case for several reasons.

6. First, this was a capital case. The result of our evaluation had the potential to have important consequences for Mr. Brown's case. In all cases of this nature it is important to obtain a complete and accurate history about the patient's background. To that end, we routinely attempt to get all available information from appointed defense counsel and prosecutors. As the report and the records from 2003 attest, it was very difficult to obtain any information from defense counsel. They did not respond to our routine requests. Mr. Bell did not make himself available for interview and did not provide us with any information. Only limited information was obtained from Mr. Darden. In my experience, it is unusual for defense counsel in a capital case to be so non-responsive to inquiries.

7. Second, during Mr. Brown's stay at FCI Butner, Mr. Brown did not present as a danger to staff or other inmates. He was not viewed as a risk for harming himself or others, and thus was housed in the open population of the Mental Health Unit. He did not present any management problems. He was not difficult to interact with and he was cooperative with the evaluation process.

8. Third, Mr. Brown was not diagnosed with having Antisocial Personality Disorder. Individuals who are diagnosed with Antisocial Personality Disorder (commonly referred to as psychopaths or sociopaths) typically demonstrate a  a pervasive pattern of disregard for, and violation of, the rights of others that begins in early childhood and continues into adulthood. They frequently lack

empathy and tend to be callous, cynical, and contemptuous of the feelings, rights, and suffering of others. This is not Mr. Brown's presentation, and it is not the picture produced by his psychological testing.

9. Rather, this case suggests a tragic and unfortunate set of circumstances. Despite his difficult living situation growing up, Mr. Brown appeared to have been viewed in his community as a decent person who was not enmeshed in a life of serious crime. He was a likeable and non-manipulative individual who had the ability to express genuine concern and caring for others (as described in his relationship to his ill mother).

10. Mr. Brown did not attempt to feign or malinger any signs or symptoms of mental disease during the evaluation period.

11. Mr. Brown did express sadness and remorse for his behavior at the time he was interviewed by Detective Woodall

12. Had our report been unsealed at trial and had I been asked to testify, I would of course have done so.

Appendix 8, Motion for Evidentiary Hearing And/Or to Expand the Record.

B. Counsel were ineffective

The failure of counsel to have performed at all on the critical issue of mental health and capital sentencing ought not to require a showing of *Strickland* prejudice. It is equivalent to the absence of counsel on a critical issue in a capital case and ought to require per se reversal. *United States v. Cronic*, 466 U.S. 648 (1984). To have neither a mitigation investigator nor a mental health expert per force requires relief without a showing of actual prejudice.

But if prejudice is necessary, case law indicates that the absence of a mental health expert at sentencing, or the poor performance of one, frequently results in a finding of prejudice. *See Rompilla v. Beard*, 125 S.Ct 2456 (2004); *Stevens v. McBride*, 489 F.3d 883 (7th Cir 2007); *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002); *Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991), *affirming Blanco v. Dugger*, 691 F.Supp 308 (S.D. Fla. 1988)(counsel asked for continuance for psychiatric evaluation and never had one done); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988); *Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987). The evidence set forth above creates a reasonable probability that at least one juror would have voted for life, and relief should be granted.

**CLAIM VI**

**THE PROSECUTORS COMMITTED MISCONDUCT IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS**

The Government does not dispute that: a report prepared by the Postal Inspector contained exculpatory information that was not disclosed until thirteen days before trial;  the defense was unable effectively to use the information in the report on the heels of trial;  and defense counsel unreasonably failed to seek a continuance based upon the late disclosure of the report.  The Government also

50

does not dispute that its closing argument injected "victim worth" into the sentencing decision and compared the crime in this case to the World Trade Center terrorist attack.[21]  The Government says only that these issues should have been raised on direct appeal and that there was no misconduct.  Doc. # 50, 8.

Claims of prosecutorial misconduct can be raised in §2255 proceedings.  *Cf. United States v. Brown*, ___ F.3d ___, 2008 WL 1869727 at 11 (11th Cir. 2008). However, if this Court determines that this claim should have been raised on direct appeal, then Petitioner alleges that his appellate counsel were prejudicially ineffective for failing to raise the claim, which excuses any default.  *Murray v. Carrier*, 477 U.S. 478 (1986).   Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

The exculpatory nature of the Postal report is set forth in the §2255 motion. Doc. # 8 at note p. 12, note 4, p. 13, n. 16, pp. 40, 44-46, 56, and Doc. # 15.  The Government had this report for nine months before it was turned over to defense counsel, This violates *Brady, supra*.  Counsel were unable meaningfully to use this

---

[21]It was prejudicially ineffective for trial counsel not to have objected to these words and actions by the prosecutors.

report,[22] and unreasonably and prejudicially failed to seek a continuance upon being provided the report.

Petitioner also contends that the prosecutor's argument;  that Mr. Brown was a "sorry excuse for a human being," while the victim "had more value that words can express;" that justice would be brought to the victim's survivors if the death penalty was imposed (knowing that the widow did not want the death penalty);  to ignore the "marching orders" of Detective Woodall;  and to treat this crime as if it was as bad as the terrorist attack on the World Trade.  This was misconduct which "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*,  477 U.S. 168 (1986);  *Romano v. Oklahoma*, 512 U.S. 1 (1994).  Counsel for Petitioner acted unreasonably and prejudicially.

---

[22]*See* Appendices 1 & 4, Motion for Evidentiary Hearing And/Or to Expand the Record.

## CLAIM VII

**THIS COURT AND THE GOVERNMENT VIOLATED PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS BY NOT DISCLOSING THE GOVERNMENT'S MENTAL HEALTH EXPERT'S REPORT**

The Government does not deny that the Court ordered evaluation of Petitioner at FCI Butner produced material exculpatory evidence. The Government writes only that this Claim should have been raised on direct appeal and that the procedure followed with respect to the Government's evaluation of Petitioner was consistent with a federal rule of criminal procedure. Doc. # 50, p. 9.

Claims of prosecutorial misconduct can be raised in §2255 proceedings. *See United States v. Brown*, ___ F.3d ___, 2008 WL 1869727 at 11 (11th Cir. 2008). However, if this Court determines that this claim should have been raised on direct appeal, then Petitioner alleges that his appellate counsel were prejudicially ineffective for failing to raise the claim which excuses any default. *Murray v. Carrier*, 477 U.S. 478 (1986). Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness. Finally, if Fed.R.Crim.P. 12.2(c)(2) requires non-

disclosure of material exculpatory evidence to the defense, then it violates the Fifth and Eight Amendments.

If the Government possesses material exculpatory evidence, it must be disclosed to the defense. *Brady, supra*. Here Dr. Johnson knew (and the Butner FCI records document) that Mr. Brown was not a future danger, that he did not have an anti-social personality disorder, and that he was a likeable and non-manipulative individual who had the ability to express genuine concern and caring for others. *See* Appendix 8, Motion for Evidentiary Hearing And/Or to Expand the Record; and Doc ## 25-29. The Court placed her report (Doc # 25) under seal[23]. Some mechanism must be in place to deliver exculpatory evidence to a defendant facing a capital charge, and it was not delivered in this case. It was material and exculpatory.

---

[23]Defense counsel would have called Dr. Johnson as a witness or obtained an evaluation of Petitioner for sentencing had they been made aware of this exculpatory evidence. Appendix 4, Motion for Evidentiary Hearing And/Or Motion to expand the record.

54

## CLAIM VIII

**THE DEATH PENALTY IS IMPOSED IN AN ARBITRARY AND DISCRIMINATORY MANNER UNDER THE FEDERAL DEATH PENALTY ACT (FDPA)**

Petitioner claims that his death sentence was imposed in a discriminatory and arbitrary manner in that his race, the victim's race and gender, and the amount of funds provided for his defense played a part in the decision. The Government contends that these claims were resolved against Petitioner on appeal, and, if they were not, then they have been defaulted. Doc. # 50, at 9. Petitioner responds that there is new data to support these claims that was not available before, and that if they are defaulted it is because of the ineffective assistance of direct appeal and/or trial counsel, providing "cause" for any default. Petitioner also contends that even if th claims are defaulted, it would be a fundamental miscarriage of justice to not entertain them now given the fundamental constitutional issues they involve.

With respect to race, new statistics compiled by the Director of the Federal Death Penalty Resource Counsel Project support Petitioner's claims.

> Based on the Project's figures, as well as the reports published by the Department of Justice in September 2000 and June 2001, it appears that the "pool" of potential capital defendants in the federal system since 1988 totals 2,596. This figure is current as of December 19, 2007. This consists of, among others, 52 cases reviewed prior to the 1995 Death Penalty Protocols put into place by Attorney General Reno, 682 reviewed by Ms. Reno after the Protocols went into effect

(2000 DOJ Study), 637 reviewed by Attorney General Ashcroft (RCP total) and 409 reviewed by Attorney General Gonzales (RCP total). There are also an additional 304 cases identified by United States Attorneys as potential capital cases that were never submitted for review (2001 DOJ Report). The Project has also identified additional cases reviewed by the various Attorney Generals as well as others that were never submitted for review and/or charged as capital offenses even though there was justification for doing so. The total also includes cases reviewed prior to the Clinton administration. The pool of defendants reviewed or to be reviewed is thus 2,543 defendants. Of these, 136 are currently pending review by the Department of Justice, bringing the total defendants reviewed so far to 2,407.

6. From this group of 2,407 potential capital defendants, a total of 435 defendants have actually been authorized for capital prosecution. Thus, the Department of Justice has authorized capital prosecutions in approximately 18% (435/2,407) of the cases in which the penalty could have been sought. To date, juries have sentenced 61 defendants to death. Two death sentences have been set aside on appeal. Three defendants have been executed. One defendant was granted clemency. Two defendants are pending retrial. There are 53 defendants presently on the federal death row under an active sentence of death. These cases are in various stages of review via direct appeal or post-conviction proceedings brought pursuant to 28 U.S.C. § 2255. There are 50 defendants presently pending or in trial who have been "authorized" by the Attorney General.

## II.

## RACE OF DEFENDANTS AUTHORIZED
## FOR FEDERAL CAPITAL PROSECUTIONS

7. The racial composition of the pool of 435 defendants whose cases were authorized for a federal capital prosecution is as follows: (1) African-American, 223 (51%); (2) Caucasian, 115 (27%); (3) Latino, 78 (18%); and (4), "other," 19 (4%). These figures are current as of December 19, 2007.

56

## III.

## REGIONAL VARIATIONS

8.  Based on figures compiled by the Death Penalty Information Center (current as of December 19, 2007) the states which currently lead the nation in post-*Gregg* executions are Texas (405), Virginia (98), Oklahoma (86) and Missouri (66).  The states whose federal districts have the most authorized federal death penalty prosecutions (including pending cases) are Virginia (50), New York (42), California (37), Texas (26) and Missouri (26).  Federal districts in the following states have had more than one federal death sentence returned by juries:  Texas (11), Missouri (8), Virginia (6), Georgia (3), Oklahoma (3), Maryland (2), Louisiana (2), Arkansas (2), Illinois (2), Iowa (2), North Carolina (2), South Carolina (2), California (2) and West Virginia (2).  Of the 61 federal death sentences imposed by juries since 1988, 41 have come from the traditional "death belt" states.  By way of contrast, there have been thirteen federal death-penalty cases tried in New York State involving a total of twenty defendants as follows: seven trials in the Eastern District of New York (Pitera, Dhinsa, Aguilar, Dixon, Wilson, McGriff, as well as James and Mallay), four in the Southern District of New York (Al'Owhali and Mohamed, Quinones and Rodriguez, Williams and Williams as well as Henderson) and two in the Northern District of New York (Diaz and Walker; Matthews, Tucker and McMillian).  Only one federal jury sitting in New York State has returned a death verdict (on January 30, 2007).  The cases where life sentences were imposed include *United States v. Bin Laden, et al.*, a case where two of the four defendants faced the death penalty for their roles in the simultaneous terrorist bombings of United States embassies in East Africa resulting in hundreds of deaths, thousands of injures, and the destruction of two United States Embassies.

9.  I have also been asked by counsel for Damion Hardy[24] to provide information on the number of authorized federal death penalty cases, since 1988, by the state in which each such prosecution was brought.  According to the Project's records, the following compilation accurately sets forth the particular state in which each of the 435 federal death penalty cases authorized since 1988 was prosecuted:

> Alabama (5), Alaska (1), Arizona (6), Arkansas (7), California (37), Colorado (6), Connecticut (3), DC (17), Florida (13), Georgia (8), Hawaii (2), Idaho (1), Illinois (12), Indiana (6), Iowa (4), Kansas (6), Kentucky (4), Louisiana (10), Maryland (22), Massachusetts (4), Michigan (19), Mississippi (3), Missouri (26), New Jersey (3), New Mexico (7), New York (44), North Carolina (8), North Dakota (2),
> Ohio (5), Oklahoma (5), Pennsylvania (16), Puerto Rico (22), South Carolina (3), Tennessee (13), Texas (26), Vermont (2), Virginia (50), West Virginia (7).

Appendix 9, Motion for Evidentiary Hearing And/Or to Expand the Record.(footnotes omitted).  Plainly race matters where the federal death penalty is concerned.

With respect to the gender and race of the victim, newly statistics compiled by the Director of the Federal Death Penalty Resource Counsel Project supports Petitioner's claims.

---

[24]This affidavit was recently prepared for use in another case.  Petitioner provides a photocopy of it as Appendix 9, Morion for Evidentiary Hearing And/Or to Expand the Record.

4.    Attorney General Gonzales reviewed 409 potential capital defendants.  In those cases, there were 19 prosecutions involving white female victims.  Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty.  Of those 409 defendants, there were 67 cases involving white male victims.  Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty.  Of those 409 defendants, there were 323 cases involving non-white victims.  Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5.    Attorney General Ashcroft reviewed 626 potential capital defendants.  However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged.  Of those 623 cases, there were 59 cases involving white female victims.  Of those 59, 34 (58%) defendants were selected for a death penalty prosecution.  Of those 623 cases, there were 105 prosecutions involving white male victims.  Of those 105 prosecutions, 18 defendants (17%) were authorized.  Of those 623 cases, there were 459 prosecutions involving non-white victims.  Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6.  Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial.  Of those 87 defendants, 25 prosecutions involved white female homicide victims.  15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence.  30% (3 of 10) white male victims cases have resulted in a death sentence.  51 non-white victim prosecutions have completed trial.  Five (10%) of these 51 non-white victims have resulted in a death sentence.

7.  Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have completed trial.  Of those, 5 prosecutions involved white female victims.  Juries have sentenced 4 of those 5 defendants to death.  Seven prosecutions have involved white male victims.  Two (29%) of those 7 defendants have been sentenced to a death sentence.  19 non-white victim cases have

59

completed trial.  Three (16%) of those 19 defendants have been sentenced to death.

Appendix 10, Motion for Evidentiary Hearing And/Or to Expand the Record.

These two sets of data demonstrate that an African-American male charged with killing a white female in the South is more likely to receive the death penalty than any other combination of victim/defendant and race/gender.  This is discriminatory and violates the Fifth and Eight Amendments.  *Furman v. Georgia*, 408 U.S. 238 (1972).

As far as Petitioner can determine, the total amount of funds provided for the defense of this case was $162,825.  Expert costs totaled $18,403; attorney fees were $144,421.  This is a very low amount of funding.  It is significantly lower than the national mean for funding such cases.  This reflects a pattern in this District and in this Circuit.  In addition, this case went to trial very quickly, much more quickly than the norm nationally.  The services provided Petitioner, and the amount of time allowed for preparation, fall so far below the prevailing standard of practice that it rendered counsel *per se* ineffective.  *Cronic, supra.*[25]

---

[25]Both appointed trial attorneys have remarked that this case was going to move very fast and was not going to be funded at a high level.  Appendices 1 & 4, Motion for Evidentiary Hearing And/Or to Expand the Record.

In addition, there is a direct correlation between the amount of funds provided for the defense of a case and whether the defendant receives the death penalty. Petitioner believes that the funds provided for his defense were among the lowest in any capital case that proceeded to sentencing nationwide, and certainly his case is in the bottom third in terms of funding. A case with such low funding has a substantially higher chance of ending with a death sentence than does a case with average or higher funding. Such arbitrary factors cannot constitutionally influence the death penalty decision, and violate the Fifth and Eighth Amendments. *Furman, supra.*

**CLAIM IX**

**OTHER INSTANCES OF INEFFECTIVE ASSISTANCE
OF COUNSEL**

The Government incorrectly asserts that Mr. Brown's ineffective assistance of counsel claims, as outlined in Claim IX, are procedurally defaulted because they were not raised on direct appeal. However, "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255." *Massaro v. United States*, 538 U.S. 500, 509 (2003). However, if this Court determines that this claim should have been raised on direct appeal, then Petitioner alleges that his

appellate counsel were prejudicially ineffective for failing to raise the claim, which excuses any default. *Murray v. Carrier*, 477 U.S. 478 (1986). Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

The Government asserts that the issue raised in ¶ 2 of Claim IX, dealing with the legality of a photo-array identification, was adjudicated adversely to Petitioner on direct appeal. However, paragraph 2 does not make any assertion of error but is instead merely a paragraph setting out facts to support later argument. Specifically, paragraph 2 attempts to summarize defense counsel's attempts at attacking the Government's guilt/innocence case.

Paragraphs 12 - 14 of Claim IX raise the issue of whether trial counsel was ineffective in failing to ensure Diane Brown testified at the suppression hearing. This Court found, based on the evidence presented at the suppression hearing, that Mr. Brown was not in custody. Mr. Brown, in this proceeding, asserts that had this Court heard and considered the testimony of Diane Brown (testimony that was presented at trial, but after which trial counsel did not seek this Court's reconsideration of the suppression issue in light of the new testimony) this Court would have concluded differently *i.e.,* that Mr. Brown was in custody. This is a

critical determination, as the evidence was uncontested that Mr. Brown was not read his *Miranda* warnings before he purportedly confessed.

The Government asserts that the Eleventh Circuit's decision affirming this Court's denial of the motion to suppress settles the issue because the Eleventh Circuit is allowed to review the entire record, including Diane Brown's trial testimony. Doc. # 50 at 10-11. That the Eleventh Circuit was *allowed* to review the entire record does not mean it did. In fact, there is evidence the Court did not. During oral argument a member of the panel specifically questioned[26] appellate counsel as to whether trial counsel sought to have this Court re-consider the motion in light of Ms. Brown's trial testimony - - a question appellate counsel had to answer in the negative.[27]

---

[26]As the Eleventh Circuit does not transcribe oral arguments, Mr. Brown can give no citation for this event only undersigned counsel's recollection of the question being asked during oral argument. Upon this Court conducting an evidentiary hearing or granting Petitioner leave to conduct discovery, this fact can be developed.

[27]There is nothing in the Eleventh Circuit's opinion in this case to indicate that the panel did consider Diane Brown's testimony. In fact she is not mentioned in the opinion. Further, the Court found that Petitioner's version of events (which would have been mirrored by Ms. Brown's account ) were flatly rejected by the magistrate based on determination that the officer's version of events was "sharply different" from Petitioner's unsupported assertions. *United States v. Brown*, 441 F.3d at 1346-47.

Here, competent counsel would have ensured the presence and testimony at a suppression hearing of a person who would have corroborated their client's otherwise unsupported and flatly contradicted version of events.   The centerpiece of the Government's case for guilt was the confession obtained from Petitioner.[28] During the trial, counsel created doubt about the Government's case by showing that the person seen going into the post-office was not wearing the clothing Petitioner was wearing.  The defense theory was harmed because of Petitioner's statement (which also included an admission he was wearing the coat upon which the victim's DNA was found).  Trial counsel's failure to call Diane Brown to the suppression hearing,[29] or in the alternative, to seek this Court's re-consideration of the issue after her trial testimony, was deficient performance.  Had Ms. Brown's testimony been considered by this Court there is a reasonable probability that the Court would have found, under the totality of the circumstances, Mr. Brown had been in custody.  Consequently, law enforcement's questioning him without first

---

[28]Indeed, the Government now contends that evidence of Petitioner's guilt is overwhelming *because of his confession*.  *See* Doc. # 50, at 10 ("evidence against him (including his confession) was overwhelming."

[29]Upon information and belief, trial counsel did subpoena Ms. Brown to the hearing, but when she did not appear, trial counsel did not seek to have her forcibly produced.

st advising him of his *Miranda* warnings would have resulted in the suppression of a damaging statement.

The Government next asserts that paragraphs 16-21 raise "certain issues that his trial counsel did not preserve and that the Eleventh Circuit reviewed for plain error." Doc. # 50, at 11. The Government continues by asserting that the Eleventh Circuit's resolution of the substantive claims under a plain error standard somehow precludes this Court from reaching the merits of the specific ineffective assistance of counsel claim. This is wrong. The plain error[30] standard, as employed by the Eleventh Circuit, is, (1) there was error, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affected "the fairness, integrity or public reputation of judicial proceedings." *United States v. Brown*, 441 F.3d at 1354. Contrary to plain error, *Strickland* prejudice is a much easier burden to satisfy. As Justice Souter has described, the "reasonable probability" standard

> does not require defendants to show that a different outcome would have been more likely than not with the [new] evidence, let alone that without the [new] materials the evidence would have been

---

[30]The plain error standard is an extremely difficult standard and one that is rarely satisfied. *See*, *Maiz v. Virani,* 253 F.3d 641, 676 (11th Cir.2001) ("Plain error review is an extremely stringent form of review.") and *United States v. Swatzie*, 228 F.3d 1278, 1282 (11th Cir. 2000) (error must be significant for Eleventh Circuit "to exercise our rarely-invoked power to correct plain error.").

insufficient to support the result reached. . . the question [is] whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome. . . the continued use of the term probability raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, more likely than not.

*Strickler v. Greene*, 527 U.S. 263, 297-98 (1999) (Souter, J., concurring).[31]

Hence, the Eleventh Circuit's "plain error" review of any claims has absolutely no bearing and sheds no light on this Court's ineffective assistance analysis.  This Court must still consider whether the failure to preserve these claims for appellate review was deficient performance and, if so, whether it resulted in prejudice, *i.e.*, is there a reasonable probability that the result of the appeal would have been different if the issues had been properly preserved.

The Government contends that the Eleventh Circuit's resolution of the issue, that (1) it did not have jurisdiction because trial counsel failed appeal the magistrate's order or, in the alternative that (2) the magistrate found that the records did not even mention Petitioner's name, resolves the issue.  The Government is wrong.  The Eleventh Circuit did not have access to the DFACS records like this Court now does.  Had the issue been preserved, and the records

---

[31]Although Justice Souter was discussing the materiality prong of a *Brady* analysis, *Brady* materiality and *Strickland* prejudice are identical.  *Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007).

ultimately made part of the appellate record, the Eleventh Circuit would have been privy to the same information this Court is now privy to (*See*, Doc. 21 - 23, Appendix I to Motion to Vacate). These DFACS files, although not mentioning Petitioner by name, describe the horrific conditions, documented by agents of the State of Georgia, that Petitioner grew up in. This type of information was exactly what trial counsel was attempting to elicit through lay witnesses at the penalty phase of Petitioner's trial. The witnesses, however, could not or would not describe in sufficient detail the squaller and deprivation associated with the "Morgan compound." Had trial counsel preserved the DFACS issue for appeal (by objecting to the Magistrate's order and having the DFACS record made part of the record under seal), there is a reasonable probability that the Eleventh Circuit would have reversed and ordered a new trial with directions to disclose the DFACS records to Petitioner.

Petitioner notes that the Government ***does not*** even attempt to address a number of issues clearly raised in the original Motion to Vacate including:

> ¶ 4 - failure to contact Penny Banks. Ms. Banks would have testified would have testified that there was a vehicle at the post office at the time of the killing - which would indicate someone other than (or in addition to) Mr. Brown was involved (*see* Doc. 34; Appendix P to Motion to Vacate);

¶5 - failure to contact Pastor Alfred Banks - Pastor Banks would have testified about observations about, and statements made by Dean Gregory Carter, indicating he was involved in the killing (*see* Doc. 35; Appendix Q to Motion to Vacate);

¶6 - failure to contact Alford Woods - Mr. Woods would have testified that he was near the post office at the time of the killings and witnessed a white Lincoln occupied by four black males leaving the area at a high rate of speed (*see* Doc. 36; Appendix R to Motion to Vacate);

¶7 - failure to investigate Levi Lecounte - Trial counsel had a document provided to them in discovery indicating Mr. Lecounte drove a white Lincoln (like that seen by Mr. Woods) and was at the post office on presumably the date of the crime. Further, Mr. Lecounte had a significant violent criminal history (*see*, Doc. 37; Appendix S to Motion to Vacate);

¶¶ 8 & 9 - Laboratory Report dated May 27, 2004 - in the discovery provided to trial counsel was a lab report indicating that Caucasian hairs were found on the clothing, body and area adjacent to the victim and that a single negroid hair fragment was found on the transport sheet (*see* Doc. 38; Appendix T to Motion to Vacate); and

¶¶10 & 11 - Affidavit in Support of Search Warrant and Redacted Reports of Interview with CI - These documents (*see*, Doc. 39, 40 & 41; Appendix U, V & W to Motion to Vacate) were presented to trial counsel in discovery but never utilized;[32]

¶22 - Failure to *Witherspoon* qualify Dorothy Rentz;[33]

---

[32] The Government also failed to address ¶ 15, failure to object to instruction that directed verdict on essential element. However, after reviewing the record, Mr. Brown herein withdraws that assertion as trial counsel stipulated that the post office in question was within the United States' jurisdiction.

[33] As there is nothing in the transcript to indicate Ms. Rentz was ever asked any *Witherspoon/Witt* questions, Petitioner is unable to give a citation to the

¶23 - Failure to object to an erroneous jury instruction on mitigating evidence (Tr. 1058);

¶24 - Failure to object to improper closing argument (Tr. 1036);

¶25 - 27 - Failure to object to portions of Matthew Meuller's testimony concerning the results of DNA analysis (Tr. 873-75) and trial counsel's failure to conduct an investigation into Bode Laboratories, Mr. Mueller's employer.  Bode has since been found to have committed numerous errors in their analyses in other cases;

¶28 - Failure to object to the prosecutor's questions to a school teacher which indicated Petitioner's IQ to be 113 when there was no such evidence in the record (or in the records - testing at FMC Butner, revealed a 90 IQ; and the teacher recalled school records indicating a 99 IQ) (Tr. 1130);

¶29 - Trial counsel's failure to know what his client's IQ was and admitting it in closing argument (Tr. 1187); and

¶¶30, 31 & 32 - Trial counsel's closing argument at the penalty phase in which he (1) implored the jury not to forgive Petitioner for the crime (Tr. 1182); misled the jury into believing the victim's family had not forgiven Petitioner when he knew that members of the family, including her widow, had agreed to allow Petitioner to plead guilty for a sentence of life without parole; referred to Petitioner as the "killer" (Tr. 1184); and expressed his dislike for Petitioner by telling the jury that he hated these days (representing someone at the penalty phase of a capital trial) (Tr. 1180).

The Government also asserts that ¶33 is a laundry list of ineffectiveness claims (Response at 12-13) and does not address any of the allegations.  Some of the allegations, especially in light of the information submitted to this Court in

record.

connection with Mr. Brown's Motion for Evidentiary hearing, have merit on their

face, including:

> - Counsel failed to make adequate and timely requests for continuances in order to prepare for trial (Motion to Vacate at 97) - Both trial counsel have indicated they did not ask for continuances when they needed to, *i.e.*, when the mitigation specialist they hired disappeared without doing anything, and when the Government, 10 days prior to trial, gave them a 66 page "Background Investigation" about their client (*see*, Appendix 1 & 4  to Motion for Evidentiary Hearing and/or to Expand the Record);

> - Counsel failed to make sufficient showing of need to obtain funds for expert assistance.   (Motion to Vacate, Doc. 8, at  97) - *See* argument for Claim V, *supra*; and

> - Counsel failed to adequately protect Petitioner's constitutional rights during all stages of Petitioner's trial including, but not limited to, Petitioner's rights under the Confrontation Clause (Motion to Vacate at 100, Doc. 8).  The record in this case is devoid of the information needed to determine if the prosecution utilized their peremptory challenges in a racially or gender motivated manner in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) or *J.E.B. v. Alabama ex rel. T. B*., 511 U.S. 127 (1994).[34]

The Government's failure to address any of the above-mentioned issues is

an admission that these assertions are true.   Regarding ¶¶ 4-11, these documents

relate to trial counsel's defense at the guilt phase of trial.  Trial counsel attempted

to create doubt about whether it was Petitioner who committed the crime by

---

[34]  Mr. Brown is also filing a Motion for Discovery and Motion for Evidentiary Hearing and/or to Expand the Record.  Both Motions should be granted to allow him to develop the record to determine the race and gender of the jurors in the pool and those struck by both sides.

eliciting testimony that witnesses saw a person who was wearing clothing different from that Petitioner was wearing. Further, trial counsel demonstrated that the witnesses who observed and identified Petitioner in and around the post office at the time of the crime were not certain in their identifications. The documents referenced in ¶¶ 4-11 were presented to trial counsel by the Government via discovery. However, trial counsel unreasonably failed to utilize them in defense of Mr. Brown.

Failure to utilize these documents and the information contained therein (by calling the witnesses to testify) could not be considered reasonable trial strategy, as the information available from these witnesses/documents meshed completely with trial counsel's demonstrated guilt phase strategy to create doubt about who was seen going into the post office. The Government's theory was that Mr. Brown rode to and from the post office on a bicycle. However, Ms. Banks would have testified that at the time of the killing, she passed by the post-office and saw a blue car there. (Doc. 34). Further, Pastor Banks would have testified about his observations of and comments by Dean Gregory Carter that Pastor Banks (and potentially the jury) indicated that Mr. Carter was involved in the killing. (Doc. 35). The testimony of Alford Woods coupled with the information pertaining to Levi Lecounte would have raised further doubt as Mr. Woods, at the time of the

71

crime, observed a white Lincoln leaving the area at a high rates of speed.  (Doc. 36).  It turns out that Mr. Lecounte, a convicted felon with a long history of violent criminal behavior, lived in the area and drove a white Lincoln.  Further, Mr. Lecounte was reportedly at the post office presumably on the date of the killing.  (Doc. 37).  Another fact raising doubt was that in and around the victim were discovered numerous Caucasian hairs.  (Doc. 38).  As this Court is aware, Mr. Brown is African-American.  The presence of Caucasian hairs on the victim's body and in and around the area she was killed obviously raises the specter that a white person committed the murder.  Another bit of relevant information contained in Doc. 38 was the fact that a lone Negroid hair was discovered on the transport sheet utilized to remove the victim's body.  Trial counsel could have used that piece of information, along with the fact that the hair had never been compared to Petitioner's, to demonstrate further doubt.

Trial counsel's failure to ensure that juror Dorothy Rentz was *Witherspoon/Witt* qualified cannot be chalked up to a reasonable trial strategy.  No reasonable attorney would seat a juror he was not sure, upon conviction, could consider a punishment of less than death.  Under any standard of reasonableness, trial counsel's failure to ascertain Ms. Rentz's feelings on the death penalty was deficient performance.  *Strickland v. Washington*, *supra*.  While Petitioner

acknowledges that under normal circumstances he bears the burden of establishing prejudice, he submits that in this instance the risk of prejudice is so great that prejudice should be presumed.[35]

At the penalty phase of Petitioner's trial, the Court gave the following preliminary instruction: "A mitigating factor is any fact or circumstance that might indicate, or tend to indicate, that the sentence of death may not be justified." This instruction, like the Court's questioning during voir dire, presupposes that once a guilty verdict is reached, death is automatically the appropriate punishment and a life sentence can only be imposed if the jurors find mitigation that warrants it. As such, the instruction shifted the burden of proof, in violation of *Sandstrom v. Montana,* 442 U.S. 510 (1979) and *Fracis v. Franklin*, 523 U.S. 1001 (1985). The instruction alone and in conjunction with the Court's voir dire relieved or lessened the Government of its burden of proving that a death sentence is appropriate. The Court's instructions and comments actions deprived Mr. Brown of his rights to due process, equal protection and to be free from cruel and unusual punishments. Trial counsel's failure to object to the court's instruction and voir dire deprived

---

[35]This situation is one of equal risk of prejudice warranting a presumption of prejudice.  *see, e.g., United States . v. Martinez*, 14 F.3d 543 (11th Cir. 1994) (when it is established that jurors consulted extrinsic evidence, the risk of prejudice is so great it is presumed).

Petitioner of his right to effective assistance of counsel. *Strickland v. Washington, supra*.

> During his penalty phase closing, the prosecutor argued:

> The postal inspectors led by Ms. McLendon here, who takes her job seriously, as did every Post Office employee that you saw take this stand, and just like a captain in the United States Army, when they have one of their people down in the field, they're going to bring them back and they're going to do everything they can do lawfully and properly so that justice is done, so that a proceeding like this is conducted by this Judge in a courtroom like this, with equipment like this, so you can make a fair, proper, reasoned, calm decision that follows the law that Judge Edenfield will soon give you . . .

(T. 1036). This argument was improper in at least two ways. First, the prosecutor, was vouching for the credibility of his key witnesses including case agent Marla McClendon. *United States v. Sims*, 719 F.2d 375, 377 (11th Cir.1983) (improper for the prosecution to vouch for the credibility of a Government witness.). Second, the reference to the U.S. Military, while the United States was engaging in the "War on Terror" after the attacks on the World Trade Center, was a deliberate attempt to appeal to the passions and prejudices of the jury. *United States v. Rodriguez,* 765 F.2d 1546, 1560 (11th Cir.1985) (During closing argument, "[a] prosecutor is forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice."). Trial counsel failed to object to this portion of the prosecutor's

closing and thereby rendered ineffective assistance of counsel.  *See Strickland v. Washington, supra*, *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) (counsel ineffective for failing to object to closing argument).

During the trial of the case, the Government introduced the testimony of Matthew Meuller, a DNA expert from Bode Technology Group.  Mr. Meuller had done DNA testing on Government's Exhibit #5, a brown jacket obtained during the search of Sadie Brown's residence.  During the introductory portion of his testimony, the Government elicited that Bode had done some of the DNA work during and after the September 11, 2001, attacks on the World Trade Center.  The elicitation of this irrelevant testimony was a blatant attempt to bolster the expert's credibility and inflame the passions of the jury.  *See  United States v. Rodriguez,* 765 F.2d 1546, 1560 (11th Cir.1985).  Trial Counsel's failure to object to this irrelevant and prejudicial testimony was deficient performance that prejudiced Petitioner.

Meuller was also questioned about the probability that the DNA found on the jacket could come from someone other than the victim and he quantified it as one in 25 quadrillion from the Caucasian population, one in 100 quadrillion from the African-American population.  This Court inquired how many people are on Earth, to which Meuller replied 6 billion.  The  Court then commented, "That

would be five times the earth's population." and Meuller replied, "It would be much greater than that. It is roughly like 9 million times the current population." This entire exchange went unobjected to, which constitutes deficient performance. There can be no reasonable trial strategy for not objecting to testing the results of which inextricably point to your client's guilt. Further, the Court's comments pointing out there was no chance the DNA on Petitioner's coat came from anyone else on the face of the earth prevented the jury from harboring (if they were so inclined) any doubt. The prejudice from this deficient performance is patent and Petitioner has established that he received constitutionally ineffective assistance of counsel. *Strickland v. Washington, supra*.

Trial counsel unreasonably failed to object to a line of questioning by the prosecutor that was unsupported by the evidence and for which the prosecutor did not have a good faith basis. The prosecutor asked Linda Jones if she was aware that Meier's supposed IQ was 113. (Tr. 1130). She said "no," that school records indicated an IQ of 99. He asked again: "Were you aware that later on he was tested to have a 113 IQ." *Id.* She again said "no." No evidence of a 113 IQ score was introduced. Further, all evidence that did exist did not give the prosecutor a good faith basis to believe Petitioner had a 113 IQ as the records from FCI Butner indicated an IQ of 90. Trial counsel failed to object not based on

strategy, but because he himself never took the time to learn this critical fact about his client.  As he admitted to the jury, "They talked about my client having an IQ of 113.  And *I don't know if this is the case or not.*"  (Tr. 1187).  Thus, deficient performance is established.  Petitioner was likewise prejudiced by this omission as the jury was led to believe, in the penalty phase of the trial,  that Petitioner was well above average intellectually, instead of at or below average (which is clearly mitigating).  A death sentence can not rest on "materially inaccurate" information *Johnson v. Mississippi*, 486 U.S. 578 (1988), which is exactly what the failure to object allowed to occur here.  Trial counsel were ineffective under the standards first announced in *Strickland v. Washington, supra*.

Trial counsel's own closing argument at the penalty phase of the trial was deficient.  Trial counsel argued:  "We're not talking about forgiveness in this case either.  You know, there is only one person that can forgive that man.  And she's dead.  You can't forgive him. I don't forgive him. *They don't forgive him.*  We shouldn't forgive him."  (Tr. 1182).  Not only did counsel instruct the jury not to forgive (*i.e.*, do not sentence Petitioner to life), he misinformed the jury that the victim's family had not forgiven Meier when they did.   A moment later, counsel referred to Mr. Brown as "the Killer."  (Tr. 1184).  He also informed the jury just how much he disliked representing the "killer" who should not be forgiven when

he said: "I hate these days.  I've done this before and I absolutely hate it."  (Tr. 1180).

Reasonable counsel would not have told the jury *not* to forgive his client. The object of representing a defendant at the penalty phase of a capital trial is to seek a life sentence.  Telling the jury not to forgive the person who they convicted of killing the victim does not advance this purpose.  Indeed, it advances the Government's objective of seeking a death sentence.  Likewise, calling your client a "killer" in no way moves the jury toward imposing life.  Referring to him as a killer rather than as a human being worthy of being spared undermined Petitioner's chances at a life sentence.  In sum, trial counsel's penalty phase closing as a whole failed was unreasonably deficient (even overtly harmful).  The prejudice from such dereliction is patent.  Rather than acting as an advocate for a life sentence, trial counsel assumed the mantle of the prosecution and gave the jury reasons they *should not* spare Mr. Brown's life. This was constitutionally ineffective assistance of counsel.. *See King v. Strickland*, 748 F.2d 1462 (11th Cir. 1984)("Counsel's emphasis on the reprehensible nature of the crime and indications that he had reluctantly represented the defendant were delivered in a manner that probably caused more harm than good."); *Horton v. Zant*, 941 F.2d 1449 (11th Cir 1991)(distancing self from client, asking for life as part of "civic

78

duty," and saying the crime was bad ineffective "given the failure to present mitigation").

All of the allegations in this claim, when considered cumulatively with all of the instances of ineffectiveness throughout this petition, require relief.

**CLAIM X**

**THE GOVERNMENT SUPPRESSED INFORMATION FAVORABLE TO THE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION**

Petitioner specifically alleges that a document first obtained via the Freedom of Information Act, 5 U.S.C. §522, in these §2255 proceedings contained information and evidence materially favorable to the defense, a violation of Petitioner's Fifth, Sixth and Eighth Amendment rights.  Specifically, current counsel discovered a seventeen page document (containing handwritten notations) that appears to be a handwritten draft of Postal Inspector McClendon's Affidavit in Support of a Search warrant.  (*See*, Appendix X to Motion to Vacate, Doc. # 42).  When compared to the actual affidavit that was submitted (*see* Appendix U to Motion to Vacate, Doc. # 39), there are some glaring omissions, one of which demonstrates that the Government was hiding evidence favorable to the defense.

The draft affidavit contained a paragraph that was relevant to Petitioner's penalty phase defense - - that he, through no fault of his own, was raised in chaotic, depraved, and violent environment. Had this document been disclosed, trial counsel could have questioned, and Ms. McClendon would have been forced to testify under oath, that, as it relates to the "Morgan compound":

> It is the collective opinions (sic) of these local law enforcement officers that on nearly every instance there was excessive amounts of alcohol or illegal substances in use by persons residing or visiting the residence. On many of these occasions, the purpose of the visits by law enforcement were for crimes of violence in which weapons were often used to inflict serious harm to other persons at or in the residences. On almost every occasion, persons in the residences routinely flee at the site (sic) of arriving law enforcement officers.

(Doc. 42; Appendix X to Motion to Vacate).

It is now well settled that the suppression evidence favorable to an accused "violates due process where the evidence is material *to either guilt or punishment*, irrespective of the prosecution's good or bad faith." *Banks v. Dretke*, 540 U.S. 668, 669 (2004) (emphasis added), *citing, Brady v. Maryland*, 373 U.S. 83, 87 (1963). The information that Ms. McClendon was willing to testify to under oath before a United States Magistrate judge was clearly material to mitigation and was, in fact, what trial counsel tried to present (albeit ineffectively) at trial. Trial counsel floundered in their attempts to get individuals who were peripherally

associated with Morgan residence to testify to the goings on there.  These witnesses, called by the defense and thereby presumptively there to assist Mr. Brown, were easily discredited.  Inspector McClendon, the Government's case agent, it would be presumed by jurors,  would not offer evidence helpful to the defense unless it was absolutely true.  Therefore, her credibility as a witness for the defense, would be untouchable.[36]

The Government does not contend the information contained in the draft affidavit was not favorable to the defense.    Instead the only claim by the Government is that "Brown cannot show cause or prejudice to overcome this procedural default:  There was no doubt about 'the deplorable conditions under which Brown was raised.'  *Brown*, 441 F.3d at 1364."  Doc. 50 at  14.  First, assuming the Government is asserting the claim is procedurally defaulted because it was not raised on direct appeal, as noted above, claims of prosecutorial

---

[36] Inspector McClendon's testimony, when considered in conjunction with what Detective Woodall would have testified to had he been asked (*see* Appendix 2, Motion for Evidentiary Hearing and Claim III, *supra*), provides incredibly compelling evidence in mitigation that would be unimpeachable.  Had trial counsel acted reasonably and had the prosecution disclosed evidence it was constitutionally mandated to disclose, there is a reasonable probability the jury would not have sentenced Mr. Brown to death.  *Strickland v. Washington*, 464 U.S. 668 (1984), *Kyles v. Whitley*, 514 U.S. 419 (1995).

misconduct can be raised in §2255 proceedings.  *See United States v. Brown*, ___

F.3d ___, 2008 WL 1869727 at 11 (11th Cir. 2008).

However, if this Court determines that this claim should have been raised on

direct appeal and not procedurally defaulted, then Petitioner alleges that his

appellate counsel were prejudicially ineffective for failing to raise the claim which

excuses any default.  *Murray v. Carrier*, 477 U.S. 478 (1986).  Current appointed

counsel was also appointed counsel on appeal, and this may pose a conflict if

counsel must raise and litigate his own ineffectiveness.

### CLAIM XI

**MR. BROWN'S CONVICTIONS AND DEATH SENTENCES
WERE IMPOSED BASED UPON UNRELIABLE DNA
EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND
EIGHTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION**

The Government does not address the merits of this claim whatsoever.

Instead, the Government's only reply is that Petitioner cannot show cause and

prejudice to overcome any procedural default and he cannot show ineffective

assistance of counsel for failure to see problems that occurred after Petitioner's

trial.  Doc. # 50 at 14.  Assuming the Government is asserting the claim is

procedurally defaulted because it was not raised on direct appeal, as noted above,

Claims of prosecutorial misconduct can be raised in §2255 proceedings.  *See*

*United States v. Brown*, ___ F.3d ___, 2008 WL 1869727 at 11 (11th Cir. 2008).

Second, the actions of a Government agent, Bode Laboratories, prevented

Petitioner from discovering the factual basis for the claim at the time of the direct

appeal.   However, if this Court determines that this claim should have been raised

on direct appeal, then Petitioner alleges that his appellate counsel were

prejudicially ineffective for failing to raise the claim which excuses any default.

*Murray v. Carrier*, 477 U.S. 478 (1986).  Current appointed counsel was also

appointed counsel on appeal and this may pose a conflict if counsel must raise and

litigate his own ineffectiveness.

There can be little doubt had trial counsel would have been able to

effectively discredit Mr. Meuller's testimony that it was virtually impossible for

the DNA on the brown jacket to belong to anyone other than the victim.  One can

only imagine the cross-examination of Mr. Mueller had trial counsel been privy to

the fact that "Bode Technology Group analysts failed to identify semen in more

than 20 percent of 2,000 tissues taken from rape crime scenes."  *See*, Illinois:

STATE POLICE CANCEL DNA ANALYSIS PACT, Crime Control Digest, Aug

26, 2005.  As it was, trial counsel created some doubt as to who committed the

crime by pointing out that the person seen going into the post office immediately

before the killing was not wearing the clothes Mr. Brown was wearing

83

immediately before and immediately after the time of the crime.  Trial counsel was also able to impeach the witnesses who later identified Petitioner in a photo line-up.  Had trial counsel been privy to the wide-spread problems at Bode, there is a reasonable probability the jury would have harbored a reasonable doubt and thereby would have been duty-bound to return a verdict of not guilty.

Further, the Government's failure to address the issue on the merits (along with its mistaken assertion of default) mandates that this Court take Petitioner's allegations as true and, unless there is absolutely no possibility his claim could be meritorious, this Court must grant an evidentiary hearing.

## CLAIM XII

**PETITIONER'S CONVICTIONS AND DEATH SENTENCE WERE UNCONSTITUTIONALLY OBTAINED AS A RESULT OF AN UNRELIABLE COERCED CONFESSION IN VIOLATION OF *MIRANDA V. ARIZONA*, AND THE FIFTH, SIXTH, AND EIGHTH  AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COUNSEL INEFFECTIVELY PRESENTED THIS ISSUE**

The Government asserts that this cannot be re-litigated in these §2255 proceedings because the Eleventh Circuit resolved it against Petitioner on direct appeal.  Doc. 50 at 14.  Further, the Government states that it cannot find any language in the Eleventh Circuit's opinion that "pointed out that trial counsel never asked the district court to reconsider its earlier decision in light of [Diane's]

84

testimony at trial. (*Id*.).  However, as averred earlier, it was not in the Eleventh

Circuit's opinion that counsel was questioned about the request to reconsider

(which was never made), it was during oral argument that the Eleventh Circuit

does not transcribe.  However, the fact remains that the evidence adduced at the

suppression hearing is markedly different than that adduced in combination with

Ms. Brown's trial testimony (at least in the fact that Diane Brown's testimony

would have corroborated Petitioner's).

The Eighth Amendment requires that the evidence used to support a death

sentence be reliable.  In *Johnson v. Mississippi*, 486 U.S. 578 (1981) the Supreme

Court invalidated a death sentence because the jury, in that case, was presented

with evidence that was unreliable.  In vacating the sentence, the Court noted,

"more importantly . . .  the jury was allowed to consider evidence that has been

revealed to be materially inaccurate."  *Id*. at 590.  Similar to the jury in *Johnson*,

the conviction and death sentence were based on materially inaccurate information

- - the confession was unreliable.  *Crane v. Kentucky*, 476 U.S. 683, 688 (1986)

("the requirement that the court make a pretrial *voluntariness* determination does

not undercut the defendant's traditional prerogative to challenge the confession's

*reliability* during the course of the trial.").

The reliability of the confession was not litigated on direct appeal and is ripe for review in these proceedings. The confession formed the centerpiece of the Government's case in both the guilt and penalty phase (to the extent it undermined a residual doubt penalty phase defense) and because the confession obtained by the Government was unconstitutionally obtained and therefore unreliable, Petitioner's death sentence must be vacated.

CLAIM XIII

**PETITIONER'S CONVICTIONS AND DEATH SENTENCE WERE IMPOSED BASED UPON UNRELIABLE EYEWITNESS IDENTIFICATIONS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

The Government asserts that the Eleventh Circuit's determination of Petitioner's direct appeal resolved this issue. Doc. # 50 at 15. The Government is mistaken. On direct appeal Petitioner asserted that this Court (and by necessity, the Magistrate Court) erred in failing to conduct an evidentiary hearing on the admissibility of the in-court identifications of Frank Kania and Chris Bowen. The Government is correct in that the Eleventh Circuit did resolve *that issue* adversely to Petitioner. However, the instant claim asserted for the first time in these §2255 proceedings is that the identifications were unreliable and as such, to the extent they contributed to the sentence by undermining a residual or lingering doubt

86

defense strategy, resulted in an unreliable death sentence in violation of the Eighth

Amendment.

**CLAIM XIV**

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO BE
PRESENT AT ALL PROCEEDINGS IN VIOLATION OF THE
FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION**

There can be no question that Petitioner was not present for the pretrial

conference conducted before this Court on September 9, 2003, a mere two months

before his capital trial was to begin.  Similarly, there can be no question as to what

transpired between this Court and counsel during that proceeding - - trial counsel's

announcement that he would not present mental health evidence at the penalty

phase of Petitioner's trial; the manner in which Mr. Brown's offer to plead guilty

was to be presented to the jury; and the manner in which trial counsel and this

Court discussed the ways in which they would work to thwart an ineffective

assistance of counsel claim in §2255 proceedings.[37]

---

[37] Had Petitioner been present and thereby privy to these conversations, he could have lodged his objections.  In addition, had Mr. Brown been present to hear trial counsel and this Court discuss thwarting any post-conviction relief, he would have been warranted in demanding that trial counsel file a Motion to Recuse this Court because of the appearance of impropriety.  *See*, 28 U.S.C. § 455(a)-(b) (A judge should recuse himself under when there is an appearance of impropriety).  Further, the standard of review for a § 455(a) motion "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on

The Government does not contest the factual underpinnings of this claim. Instead, the Government's only response is that because the claim was not raised on direct appeal the claim is procedurally defaulted and that Petitioner cannot demonstrate cause and prejudice. However, Petitioner alleges that his appellate counsel were prejudicially ineffective for failing to raise the claim, which excuses any default. *Murray v. Carrier*, 477 U.S. 478 (1986). Because Petitioner was clearly not present at a critical stage of the proceedings, and his absence was patent from the record below, appellate counsel's performance was presumptively deficient.[38] If the claim had been raised on direct appeal there is a reasonable probability the outcome of the direct appeal would have been different, this Court should grant the writ. *Lockhart v. McCotter*, 782 F.2d 1275 (5th Cir. 1986) (where

_____

which recusal was sought would entertain a significant doubt about the judge's impartiality," *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988). Here, Mr. Brown, upon hearing the comments of this Court and his appointed trial counsel "would entertain significant doubt about [this Court's] impartiality."

[38]Current counsel was also appellate counsel. Undersigned cannot ethically appear as a witness in this case while simultaneously representing Mr. Brown. *See*, State Bar of Georgia Rule 3.7 ("A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness. . . ").

effectiveness of appellate counsel is challenged, the proper focus of the prejudice inquiry is on the outcome of the appeal).[39]

## CLAIM XV

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION VIOLATES THE EIGHTH AMENDMENT**.

The Government asserts that Petitioner is correct that *Hill v. McDonough*, 547 U.S. 573 (2006), permits an inmate to challenge the circumstances of his confinement including a proposed execution method under 42 U.S.C. §1983. (Response at 16).  The Government states nothing further on the issue.

Petitioner believes that 28 U.S.C. §2255 is also an appropriate means for challenging the method of execution.

Petitioner also concedes that the Supreme Court has recently the Kentucky lethal injection procedures constitutional because they contained safeguards precluding a substantial risk of harm. *See, Baze v. Rees*, ___ U.S.___, 128 S.Ct. 1520 (2008).  Because these safeguards are not in the current protocols for the imposition of lethal injection in federal cases, the federal system is not substantially similar to the Kentucky Procedures, and, therefore, not constitutional

---

[39]Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

under *Baze*.    The constitutional Kentucky Procedures provide numerous safeguards, oversight, and accountability.  (1)  The Kentucky Procedures provide for greater oversight by requiring, in writing, that each task be performed and completed by the designated person and that the designated person attest to the date and time of when their task was completed. (2)  The Kentucky Procedures explicitly list the preferential sites for IV insertion.  (3)  The Kentucky Procedures explicitly require the IV team members to check for infiltration prior to the chemicals flowing into the inmate's body.  (5)  In recognition of the physical and psychological harm that the inmate endures even prior to the flow of the chemicals, the Kentucky Procedures limit the IV access attempts to one hour. Accordingly if access cannot be accomplished within one hour, a request will be made that the execution be scheduled for a later date. (6) The Kentucky Procedures require that the inmate be unconscious prior to injecting the pancuronium bromide. Kentucky specifically mandates that the Warden first ensure unconsciousness before telling the execution team to "proceed" with the lethal chemicals.  (7)  In addition, the Kentucky Procedures require that if the inmate is not unconscious within 60 seconds of the Warden's direction to "proceed" then the Warden will stop the injection at the primary site and restart the process at the secondary site.  (8) the Kentucky Procedures require 3 grams of

90

Sodium Pentothal.  (9)  The Kentucky Procedures require specific professional standards for the IV team members.  (10)  The Kentucky Procedures require that the members of the execution team and IV team train at least a specific number of times prior to an actual execution.  (11)  The Kentucky Procedures require that the prison be prepared for a situation that a stay of execution is issued after the execution has commenced, and enumerates what safeguards are required.

As outlined in Justice Robert's opinion in *Baze*, the U.S. Supreme Court found the Kentucky Procedures constitutional because of the specifically enumerated safeguards drafted within the procedures.   These safeguards are absent from the Federal Procedures, making their constitutionality undetermined by *Baze*.  The safeguards the Court explicitly relied upon to hold the Kentucky Procedures constitutional are outlined below:

(A)  To avoid a substantial risk of pain, and ensure that an adequate dose of sodium pentothal is delivered to the inmate, the U.S. Supreme Court found that, "the most significant [safeguard] is the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman." Ex. 1 at 16.  Underscoring the importance of these enumerated professional standards, the Court in *Baze* stated that the risk of maladministration is constitutionally objectionable when the administrators of the procedures are not trained and experienced personnel.

(B)  The Kentucky Procedures are constitutional because of the safeguard requiring that the "IV team members, along with the rest of the execution team, participate in at least 10 practice sessions per year…These sessions,

required by the written protocol, encompass a complete walk-through of the execution procedures, including the setting of IV catheters into volunteers."

(C)  Another enumerated safeguard is that the Kentucky Procedures limit the time the IV team has to establish IV access to one hour.  Ex. 1 at 16. There is no time restriction within the Georgia Procedures for obtaining IV access.

(D)  The Court additionally stated that "Kentucky's protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds."

Upon information and belief, the federal execution protocols do not comport with those found to be constitutional in *Baze*, and thus, are not necessarily constitutional.

Mr. Brown acknowledges that this claim might be more appropriately raised in a 42 U.S.C. §1983 action, but because *Hill* appears to leave it as an open question, Mr. Brown raises the issue here and seeks discovery.

**CLAIM XVI**

**PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A  RELIABLE CAPITAL SENTENCING PROCEEDING WHEN JUROR DOROTHY RENTZ WAS SEATED WITHOUT THE TRIAL COURT OR COUNSEL EXPLORING HER ATTITUDES ON THE DEATH PENALTY IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION**

The Government concedes there is a factual dispute as to whether Dorothy Rentz was actually *Witherspoon* qualified or whether the court reporter merely

failed to record said qualification.  Doc. 50 at 16.  The Government's concession

requires this Court to conduct an evidentiary hearing on the issue because there are

facts in dispute.  *Tucker v. United States*, 2008 WL 1874563 (5th Cir. 2008) *citing*,

*Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979) ( "When facts are

at issue in a §2255 proceeding, a hearing is required if: (1) the record, as

supplemented by the trial judge's personal knowledge or recollection, does not

conclusively negate the facts alleged in support of the claim for §2255 relief; and

(2) the movant would be entitled to post-conviction relief as a legal matter if his

factual allegations are true.").

## CLAIM XVII

**PETITIONER WAS DENIED HIS RIGHT TO MEANINGFUL
APPELLATE REVIEW BECAUSE OF AN INCOMPLETE
RECORD COMPILED BY THE DISTRICT COURT IN
VIOLATION OF THE FIFTH, SIXTH AND EIGHTH
AMENDMENTS TO THE CONSTITUTION**

In response to this claim, the Government asserts that because Petitioner

"raised other alleged omissions from the record on appeal, he is procedurally

defaulted from raising the peremptory strike process and Rentz voir dire in these

proceedings.  Doc. # 50 at 17.  Contrary to the Government's assertions, Mr.

Brown did attempt to address the Rentz voir dire issue on direct appeal but this

Court's summary denial upon remand to complete the record prevented Petitioner

93

from perfecting the issue. *United States v. Brown*, 441 F.3d 1330, 1374, n. 18 (11th Cir. 2006).

To the extent this Court believes this issue should have been more fully developed on direct appeal, Petitioner alleges that his appellate counsel were prejudicially ineffective for failing to raise the claim which excuses any default. *Murray v. Carrier*, 477 U.S. 478 (1986). Current appointed counsel was also appointed counsel on appeal and this may pose a conflict if counsel must raise and litigate his own ineffectiveness.

## CONCLUSION

For the forgoing reasons this Court should grant the relief Petitioner has requested.

Dated, this the 12th day of May, 2008.

Respectfully submitted,

s/Jeffrey L. Ertel
JEFFREY L. ERTEL
State Bar No. 249966

FEDERAL DEFENDER PROGRAM, INC.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

ATTORNEY FOR MR. BROWN

94

## CERTIFICATE OF SERVICE

I, hereby certify that this pleading has been electronically filed and served upon counsel for the Government and in addition, a true and correct copy of the foregoing has been served upon counsel for the Government by placing a copy of same in the United States Mail, first class postage prepaid and addressed as follows:

Amy Lee Copeland, Esq.
Assistant United States Attorney
P.O. Box 8970
Savannah, Georgia 31412

Dated, this the 12th day of May, 2008.

s/Jeffrey L. Ertel