# APPENDIX 7

AFFIDAVIT OF JAMES AIKEN

Comes now JAMES EVANS AIKEN, before the undersigned officer duly licensed to administer oaths and swears or affirms as follows:

1. My name is James Evans Aiken and I am over the age of eighteen. The information contained in this affidavit is based on my personal knowledge and I am competent to testify.

2. I received my Bachelor of Arts Degree in 1972 from Benedict College in Columbia, South Carolina. At the time I obtained my degree, I was already employed by the South Carolina Department of Corrections. In 1985, I obtained my Masters Degree in Criminal Justice from the University of South Carolina in Columbia, South Carolina.

3. I am currently the president of James E. Aiken and Associates, Inc., a prison management consulting firm. I began my involvement in various aspects of the correctional systems over 30 years ago. I started my correctional career as a counselor in the South Carolina prison system in 1971. In that capacity as with other positions, I became intimately aware of the behavioral aspects of the prison population and prison policies. Utilizing this background, I was called upon to make assessments of individual inmates to determine their needs and to develop programs and security during incarceration. Also, these interventions provided the basis for successful transition into society when that time arrived. While with the

South Carolina prison system, I was promoted to various posts through out the penal system. Additionally, I was named as Commissioner of Correction for Indiana and served at the pleasure of the Governor in that capacity. I also held the position of Director of the Bureau of Corrections for the United States Virgin Islands. (A copy of my Resume is attached). A common thread through all of these positions was that I was keenly involved in inmate security prison management and classification processes. During my more than thirty-six years in the profession, I would estimate that I have personally conducted thousands of inmate security evaluations and inmate classifications.

4. Classification is the assessment of prisoners for placement within the prison system. Proper classification looks at the characteristics of the offender to include the nature of the offense, prison adjustment, and conviction to determine the proper security level (minimum, medium, maximum) and hence the appropriate institution for that individual. This process had been studied and refined over the past thirty years and is a critical step in managing a safe and secure prison system. While not an exact science, the goal is to properly place each prisoner in an appropriate facility so as to attain the lowest level of probability of endangerment to the prison staff, prison population and the public. In doing this type of analysis, a proper classification must adequately anticipate the likelihood of the offender committing acts of violence in the future, and based on this assessment, place that

offender in an institution that can adequately secure, supervise and manage him. Except for the sentence and type of conviction, an offender who is not likely to be violent in prison or the community, generally is housed in a minimum security institution. One who has instances or higher potential of violent or erratic behavior in his past or the future will be best maintained in a higher security facility. An offender who has a significant, demonstrated history of violence, or who is currently violently acting out, will be confined to a maximum security setting and the behavior is controlled. Finally, an offender who is the worst of the worst, one who exhibits continual violent behavior even in a maximum security prison can be assigned to a "super-max" facility where his contact with other prisoners is minimal, and his contact with staff is strictly regulated (i.e. appropriate security restraints and behavior controls are applied as required).

5. I have been qualified to testify as an expert on future dangerousness, classification, as well as other prison related issues in various courts around the country including South Carolina, Georgia, Florida, Arizona, Maryland, Mississippi, Delaware, Alabama, Louisiana, Indiana, North Carolina, Virginia, Missouri, and New York. I have also been qualified to testify as an expert relative to prison matters in the United States District Courts for the District of Connecticut, Western Virginia, Northern Virginia, Eastern New York, Northern

New York/Vermont, Pennsylvania, Texas, Alabama, Middle Tennessee, South Carolina, Georgia, Ohio, Missouri and the District of Columbia.

6. I have been contacted by counsel for Meier Jason Brown and asked to render an opinion in his case based on my experience in making security classification assessments and anticipating future violent behavior potential and offender security needs. More specifically, I was requested to make an assessment as to the level of endangerment Mr. Brown would pose to staff, other offenders as well as the general public while placed in a confinement setting. I have been provided a number of institutional records that experts and prison officials in the field of classification and prison security management normally rely upon, including: (1) Mr. Brown's jail records from the Chatham County Jail, the Liberty County Jail and Bryan County Jail; (2) Mr. Brown's Georgia Department of Corrections Central File as well as his records from Augusta State Medical Prison and Montgomery State Prison; (3) records from the United States Bureau of Prisons, Federal Medical Center at Butner in North Carolina. In addition, I have been given a social history of Mr. Brown that has been prepared by an investigator working on his behalf. Lastly, I have been provided a copy of the indictment, and a brief summary of the events that led to the charges. I am aware that Mr. Brown has been convicted by a jury of all of the counts in the indictment and that he has been sentenced to death. I take as true all allegations in the indictment and take as

true all the facts which provided the basis for the jury's decision to convict Mr. Brown.

7. Based on my review of the documents listed above, my assumptions about the facts of the crime, and my thirty-six years of prison experience, it is my opinion that Mr. Brown did not pose a risk of future danger in the prison system when he was sentenced in 2003. This opinion is not based alone upon the level of security that could be provided in incarcerating Mr. Brown but also on Mr. Brown's personal characteristics and background, i.e., my professional assessment on Mr. Brown's personal risk for exhibiting violent behavior while in prison for the remainder of his natural life. It is further my opinion now, and would have been in 2003, that Mr. Brown would appropriately adjust to prison without presenting management problems in any security level while incarcerated.

8. My experience has taught me that the best indicator of future behavior is past behavior and, specifically in the case of prisoners, past prison behavior. This is a window into future behavior while incarcerated. In this case, I was presented with a wealth of information that can be relied upon to accurately better predict and anticipate that Mr. Brown will not exhibit a future danger to staff, other inmates or the community when placed in a prison setting. First, I looked to his personal history in the community. While it is true that Mr. Brown has had a number of convictions, none have been violent prior to this current criminal

violation. There is one incident in Mr. Brown's past where he was involved in a robbery of a local store. However, there was apparently no weapon used or present during the crime and no one received injury as a result of this criminal violation.

9. Another aspect that I gave considerable weight to was that Mr. Brown, although exposed to violence throughout his life, did not engage in it himself. Mr. Brown's early socialization was in an environment that was fraught with violence. In and around his home, Mr. Brown experienced death of loved ones, domestic assaults, detrimental and tragic accidents. It was relatively routine for law enforcement to respond to complaints of criminal matters at the residence. It was reported that siblings would engage in violent domestic fights. Mr. Brown, although raised in the midst of dysfunctional and violence prone environment, did not involve himself in chronic criminal violent behavior.

10. Also important is how Mr. Brown has adapted to prison life. Here again, I have considerable information upon which to base my opinion. Mr. Brown had prior incarcerations before being arrested on the current murder charge. In each prior incarceration, whether at the local jail in pretrial status or after sentencing in county or state prisons, Mr. Brown demonstrated a favorable adjustment to confinement. For instance, when he was incarcerated at the state facility in Columbus, Georgia, he was such a trusted inmate that he was put into a work program that allowed him to work outside of the facility. Mr. Brown, by all

reports, did his job well and complied with all the mandates as set forth by the prison regiment.

11. This adjustment is also remarkable in that he did not involve himself in random or systemic violence against other inmates or staff. Prisons are organized and have command structures containing internal reporting systems whereby staff can report, adjudicate and apply sanctions for transgressions on the part of the prisoner with an in-house tribunal called a disciplinary committee. These reports can entail informal resolution such as a verbal warning as well as extended periods of segregation for punishment and control. Prison institutional violations can range from simply failing to make one's bed to violent activities. It is common, almost routine, for inmates to commit such violations during a period of incarceration that requires referral to the disciplinary committee. However, based upon the records reviewed, Mr. Brown is remarkable in that he has few, if any, referrals, and none for violent behavior.

12. From my review of all of the records, as provided by Counsel, related to his prior incarcerations, I find that Mr. Brown would be classified as well adjusted. The term "well adjusted" reveals that the prisoner has not been involved in random and/or systemic disruptive violent and/or predator behaviors while in confinement status. Examples of prison predator behaviors may involve sexual predator aggression and/or violence, being a "shot caller" (gang or security threat group

leader), demonstrating illicit or criminal power and control over other inmates, controlling contraband activities, lethal attacks upon staff and other inmates, escape using force and amassing weapons for violent predator acts.

13. Records from the Federal Medical Center at Butner, North Carolina, where Mr. Brown was held during the pendency of a mental health examination ordered by the Federal District Court, provide important considerations. When he arrived at that particular institution, the prison officials wanted to place him in general population because he had no documented history of institutional physical violence or community violence other than the charges pending at the time. Although Dr. Johnson's request to place Mr. Brown in general population was originally denied, within a short period of time Mr. Brown was transferred and remained in general prison population without incident for the time he remained at the Butner federal facility. Mr. Brown, consistent with his prior incarcerations, presented no management issues while in general population.

14. Based upon my professional experience of classifying thousands of inmates, as well as securing and managing various criminal populations, it has been shown that people cannot mask behavior for prolonged periods of time. Mr. Brown's prison confinement adjustment demonstrates that he is not a person who would pose an endangerment to staff, the community and inmates while confined.

15. I had been contacted by the attorneys who represented Mr. Brown at trial and I had agreed to consult with them. I conducted a review of the materials and may have provided some preliminary information. However, counsel informed me they could not secure funds for me to provide an expert opinion before the Court. I was not able to provide expert testimony in his criminal proceeding.

16. It is my job and my expertise to make educated assessments of the likelihood that an inmate will harm others and to classify that inmate accordingly. I would classify Mr. Brown as an inmate who would function very well in general population without being a danger to himself or others. As a prisoner serving life without the possibility of parole, his classification level is more restrictive than general population, and he is even less likely to be a danger in that setting

17. The Undersigned will amend this affidavit as necessary.

Further affiant sayeth naught.

JAMES E. AIKEN

Sworn to me this the
9, day of May, 2008.

NOTARY PUBLIC
My commission expires: January 9, 2012

# Resume
# James Evans Aiken

**36 Tsiya Court**
**Brevard, North Carolina 28712**
**(828) 883-9490 Telephone**
**(828) 883-9491 Fax**
jea1assocs@aol.com  e-mail

## Summary of Qualifications:

Mr. Aiken has over thirty-six years experience in correctional administration, facility operations/management, inspection/assessment of facility performance and technical assistance consultations with clients in the United States, Dutch Kingdom, Canada, Costa Rica, Puerto Rico, and U.S. Virgin Islands. He has provided services to federal, state, county and local correctional facilities and jurisdictions in the areas of correctional leadership/organizational development, management of prison disturbances, system productivity, cost containment, enhancing prison security systems, managing the violent youthful offender in adult prisons, gang/security threat group (STG) management, new warden's training, super maximum security facility management training, inmate classification, assessment of prison security/operational performance, prison staffing analyses, reduction of prison critical security events and advising governments relative to prison privatization transactions/productivity. He has been granted court expert status in the states of South Carolina, North Carolina, Indiana, Arizona, Maryland, Florida, New York, Georgia, Virginia, Missouri, Mississippi, Alabama, Louisiana and the United States Federal District Courts in the areas of criminal justice and corrections/prisons.

## Education:

M. A., Criminal Justice, University of South Carolina - Columbia, South Carolina. 1985
B. A., Benedict College- Columbia, South Carolina. 1972

## Employment History:

August 1994 to present, president, James E. Aiken and Associates, Inc. (correctional consultant firm); August, 1992 to August 1994, Director, Bureau of Corrections, United States Virgin Islands and consultant; March, 1989 to August, 1992, Commissioner, Indiana Department of Correction; April, 1987 to March 1989, Deputy Regional Administrator, South Carolina Department of Corrections; May, 1982 to April, 1987, Warden, Central Correctional Institution (state penitentiary) South Carolina Department of Corrections; September, 1979 to May, 1982, Warden, Women's Correctional Center, South Carolina Department of Corrections; September, 1976 to September, 1979, Deputy Warden for Administration, Central Correctional Institution(state penitentiary) South Carolina Department of Corrections; February, 1974 to September, 1976, Deputy Warden for Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections; September, 1972 to February 1974 Administrative Assistant to Warden, Manning Correctional Institution, South Carolina Department of Corrections;

September, 1971 to September, 1972, Social Worker for Substance Abuse Treatment, South Carolina Department of Corrections.

**Relevant Experience:**
Mr. Aiken has provided direct professional and consultant services in almost every aspect of the correctional field. More specifically, his scope of expertise includes the following:

Director, Bureau of Corrections, United States Virgin Islands
Held the position as Director that encompassed authority and responsibility for the overall administration of the Corrections Bureau for the United States Virgin Islands. Worked closely with other territorial agencies, the legislature, courts and federal governmental agencies.

Mr. Aiken's task was to coordinate a project to re-establish a correctional system which was diminished by overcrowded conditions, escapes, and noncompliance to court orders, corruption, general mismanagement, negative media, gang involvement, work force dysfunction, and public mistrust.

Commissioner, Indiana Department of Correction
The position encompassed the overall administration of the Department of Correction for the State of Indiana, which consisted of forty-six (46) separate adult and juvenile facilities (population 14,000) and parole services (population 3, 490) with an operations budget of $305 Million.

As Commissioner, reported directly to the Governor of the State of Indiana and worked closely with the legislature, other state and federal agencies, the courts and the public. Mr. Aiken's tasks were to establish an operational mission and priority of issues for the agency; establish agency mission goals; develop a new basic employee supervision program; and reorganized daily operations to ensure a more responsive and efficient structure.

His accomplishments included but were not limited to:

*Offender Health Care Delivery:* The department contracted with the Indiana University School of Medicine to provide a medical director for clinical services. Developed and implemented a program to reduce cost and increase the quality of medical care.

*Security:* Created the Division of Security to address agency security needs. Initiated a gang intelligence network to tract and evaluate their activities. Increased contraband control efforts by additional searches, drug testing, use of K-9 units, provided additional training and equipment, and increased prosecution efforts. Designed 650 bed maximum security unit that conforms to modern correctional security management and Court mandates. Conducted meetings with the National Guard, State Police, as well as other mutual aid agencies to coordinate and develop an emergency response and disaster preparedness program. Conducted full response drills to evaluate the agency's response

capability. Evaluated and enhanced escape prevention/apprehension measures. Conducted security audits and inspections of facilities.

*Offender Relations:* Established an Offender Relations Division and appointed a coordinator. This division functions as part of Internal Audits and works in tandem with the Division of Internal Affairs, the Operations Division and the Division of Legislative and Information Services. The task of this division is to resolve offender grievances and complaints that originate from inside the agency and resolve them prior to court involvement.

*Prison Population:*
- Completed site selection, plans and construction of a new maximum security Institution
- Increased community corrections coverage from 35 to 50 counties (from 3,500 to 7,000 clients)
- Established community service/restitution programs
- Established county work release programs
- Established residential treatment programs and created home detention utilizing electronic monitoring
- Created over five hundred (500) new emergency prison beds within the first nine months of tenure

*Juvenile Justice:*
- Reduced Indiana Boy's School population from a high of 670 in 1989 to a low of 380 in 1990
- Conducted comprehensive reviews using several committees of community representatives concerning treatment programs, educational programs and employee training programs
- Established a Research Department at the Indiana Boy's School.
- Group home placements had tripled during 1992.
- Community involvement and recreational programs have been increased at both Indiana Boy's School and Indiana Girl's School.

*Cost Containment:* Developed a plan to increase participative management and input to the budget process. Meetings were held with State Budget Agency personnel on a regular basis in an effort to increase the Budget Agency's participation in the department's budget preparation regarding cost control. Reduced the operational budget of 305 million dollars by 41 million dollars for fiscal year 1992.

Deputy Regional Administrator, Midlands Correctional Region, South Carolina Department of Corrections

Served as the Deputy Chief Administrator for the following:  Directly planned, prescribed and supervised activities of sixteen (16) institutions, including minimum, medium and work release, shock probation (boot camp), restitution centers and maximum security facilities. Also, had general supervision of a ninety-seven (97) million dollar budget, as well as a work force of 2,500 employees. Duties also included policy development and interaction with lawmakers, the community and other departmental agencies concerning long-range agency planning and developing agency future needs. Additionally, made selections of institutional heads, as well as being involved in new facility design, reviewed all use of force actions, and provided supervision to prison wardens during emergency situations and normal operations.

## Warden, Central Correctional Institution, South Carolina Department of Corrections

The previous largest correctional facility in South Carolina with 1800 medium/-maximum/super maximum custody inmates, 530 staff members, and an operating budget of eight (8) million dollars. Served as the chief administrator for the following areas/-activities:  Directly planned, prescribed and supervised all security control and safety activities/operations, as well as, conducted announced and unannounced inspections of the institution. Interviewed, selected and evaluated employee's performance and effected other personnel actions as required. Personally responsible for all activities involving security and treatment staff, as well as, coordinated and supervised all welfare/morale services for inmates. Supervised and coordinated all activities with representatives from non-departmental agencies. Duties also involved emergency preparedness, interpreting all laws, policies, rules and regulations, compliance with court orders (conditions of confinement) and operating procedures for employees and inmates. Studied and analyzed long-range department requirements for institutions, as well as participating in litigation action involving the South Carolina Department of Corrections. Duties also included meeting with the Inmate Advisory Council and acting on recommendations received from the Inmate Grievance Committee, as well as meeting with members of the legislature on matters relating to corrections. Also was responsible for carrying out the capital punishment laws for the state of South Carolina.

## Warden, Women's Correctional Institution, South Carolina Department of Corrections

Served as the chief administrator for the following:  Directly planned, prescribed and supervised all security, control and safety activities and operations, personally responded to all disturbances and emergencies, interviewed/selected and evaluated employee's performance, counseled employees, supervised and coordinated all activities of the security and treatment staff, coordinated ad supervised all welfare and morale services for female inmates including clothing, food service, mail service, visitation, medical services, religious services, educational programs and recreational programs. Supervised the implementation and executing of all laws, policies, rules, regulations and operating procedures applicable to the Women's Correctional Center. Also, studied and reviewed all available records/files on assigned inmates to evaluate their behavioral changes and rehabilitation progress.  Duties included meeting with the Inmate Advisory Council as well as receiving and acting upon recommendations received from the Inmate Grievance Committee.

<u>Deputy Warden/Administration, Central Correctional Institution, South Carolina Department of Corrections</u>

Served as the Institutional Coordinator for the following areas/activities:

Maintenance/construction, boiler room/energy, food service, employee parking, canteen services, Adjustment Committee, mail service, all security systems, transportation, pest control, criminal investigations and emergency response.

<u>Deputy Warden/Institutional Operations, Manning Correctional Institution South Carolina Department of Corrections</u>

Served as the Institutional Coordinator for the following areas:  Youthful Offender Division, medical services, living areas, maintenance/construction, laundry services, visitation, emergency response, security, transportation, food service, commissary, administrative/punitive segregation, officer's quarters, classification teams, inmate interview/correspondence, recreation programs, energy (usage/conservation), Parole Board (prepared parole evaluations), supervision of security staff of fifty-five (55) employees, Chairman of Employee Evaluation Committee, purchasing, inmate pay and Chairman of Adjustment Committee.  Prepared correspondence for the warden, conducted the majority of institutional investigations, coordinated all escape apprehension efforts and remained on twenty-four (24) hour call.

<u>Administrative Assistant/Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections</u>

Responsibilities included vocational rehabilitation, alcoholics anonymous, Project Mate (Paraprofessional Counseling Program), Classification Team #2, Pastoral Care, Drug Abuse Treatment Program, Recreation Program, Occupational Safety and Health Act (O.S.H.A.), Emergency Response, Work Release Program, Education Program, tours, Employee Evaluation Committee member and inmate interviewing/correspondence.

Performed duties of deputy warden in his absence and remained on twenty- four (24) hour call at all times.

<u>Social Worker/Drug Abuse Treatment Program, Manning Correctional Institution, South Carolina Department of Corrections</u>

Responsibilities included conducting group therapy and individualized counseling to offenders with drug problems.  Conferred with the warden and staff to integrate the Drug Abuse Program with other institutional activities. Member of the Adjustment committee and the Warden's Treatment Team.