FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| MEIER JASON BROWN | : | CIVIL ACTION NO. |
| Petitioner, | : | No. 4-07-CV-85(BAE)(GRS) |
| | : | |
| vs. | : | CRIMINAL ACTION NO. |
| | : | 4:03-CR-00001-BAE-1 |
| UNITED STATES OF AMERICA | : | |
| Respondent. | : | CAPITAL HABEAS CORPUS |
| | : | |

PETITIONER'S REPLY TO THE GOVERNMENT'S
COMPREHENSIVE RESPONSE TO MOTION TO VACATE
PURSUANT TO 28 U.S.C. §2255

Comes the Petitioner, by and through undersigned appointed counsel, and respectfully submits the following reply to the Government's Comprehensive Response to Brown's Motion Pursuant to 28 U.S.C. § 2255:

**ARGUMENT**

With respect to most, if not all, of the claims of ineffective assistance raised in the §2255 motion, the Government responded that because they were not raised on direct appeal they are defaulted. *See, e.g.*, DOC # 50 pp. 3, 6 - 10. Petitioner responded that the Government's position finds no support in the law. The precedent in this Circuit for at least a decade prior to Mr. Brown's direct appeal was that "claims of ineffective assistance of counsel raised on direct appeal where

1

a district court did not entertain the claim nor develop a factual record" will generally not be considered. *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002), *citing United States v. Khoury*, 910 F.2d 948, 969 (11th Cir. 1990). Recently, the United States Supreme Court has held the same way. In *Massaro v. United States*, 538 U.S. 500, 509 (2003), the Court held that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255." And after the Government filed its response, the Eleventh Circuit again held that ineffectiveness claims are not usually heard on direct appeal. *United States v. Brown*, ___ F.3d ___ (11th Cir. 2008)(2008 WL 1869727 at *11)(ineffective assistance of counsel claims "we generally will not hear on appeal"), and that claims of prosecutorial misconduct can be raised in §2255 proceedings. *See United States v. Brown*, ___ F.3d ___, 2008 WL 1869727 at 11 (11th Cir. 2008). DOC # 51 pp. 8-9

The Government does not mention this law in its Comprehensive Brief. Indeed, for the most part, the Government says nothing in its Comprehensive Brief about a requirement that claims must be raised on direct appeal, other than in an introductory section where procedural default is mentioned briefly. DOC # 54 p. 13. The Government seems to have conceded the point made by the Eleventh

Circuit in 2008 WL 1869727 at 11 and other controlling cases, and by the

Supreme Court in *Massaro.*[1]

## CLAIM I

### COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE LOCAL PROSECUTORS' AGREEMENT THAT THIS OUGHT NOT TO BE A DEATH PENALTY CASE

The Government did not respond to Petitioner's argument that counsel were

prejudicially ineffective because the manner in which the jurors were advised that

Petitioner had offered to plead guilty necessarily left the impression that the local

prosecutors had refused the offer when the opposite was true. *See* DOC # 51 p.

11.[2]   The stipulation about the plea that was introduced also did not state when the

offer to plead had been made.  The Government argues that because defense

counsel said in closing argument when the offer was made then counsel was not

---

[1]Petitioner does not reply to all arguments raised by the Government's Comprehensive Brief.  For those points not directly responded to, Petitioner relies upon his previously filed pleadings and motions.

[2]The jurors necessarily were left with the mis-impression, one that was capitalized upon in the Government's closing argument, that the local prosecutors rejected the offer to plead guilty in return for a life sentence.  In fact, as the Government puts it, "contingent upon the Attorney General's agreement, the Government agreed to represent that a life sentence would be appropriate."  DOC # 54 p. 17.  The Government did not argue in its Comprehensive Response that this evidence was not mitigating, or that by their actions defense counsel left the sentencers with a materially and harmfully incorrect impression.

ineffective.  But counsel's arguments are not proof, are not stipulated proof, and cannot be considered as proof.[3]

Finally, the Government argues that defense counsel's actions were strategic and thus were not ineffective.  The Government challenges Bell's affidavit (DOC # 53, App. 1 at 12) as "hindsight."  DOC # 54 p. 19.  But this "tactic" was questioned by this Court's *foresight*.  This Court advised counsel before trial that this "tactic" of trying guilt/innocence only to concede guilt, upon conviction, would present an "antagonistic position."[4]  Given this antagonism, and the

---

[3]As the Court instructed the jurors before opening statements, "[l]et me remind you that nothing the lawyers say is evidence. But it is highly worthy of your consideration."  Tr. 551.  And as the Government itself argues at p. 107 of its Comprehensive Brief, defending its closing argument which "liken[ed] a postal inspector to an Army Captain,'"  DOC # 54, this Court "instructed the jury prior to closing arguments that 'anything the lawyers say is not evidence in this case' and that '*[w]hat the lawyers tell you is not binding on you.*'" *Id*. (citation omitted)(emphasis added).

[4]During the September 9, 2003, pretrial conference trial counsel stated that they might introduce at sentencing the the fact that Petitioner had offered to plead guilty in exchange for a life without parole sentence.  The Court responded:

THE COURT: Well, here he is going to plead not guilty.  Then he is going to say, if he is convicted, well, I've been guilty all along, and I've known that, and I would have plead guilty.

MR. DARDEN: I'm not certain that's what we are going to do.

THE COURT: That surely would be a[n] antagonistic position.  But that is not forbidden.

unreasonable manner in which counsel introduced the facts, to whatever degree

counsel's decisions were tactical, the strategy was unreasonable and prejudicial.

## CLAIM II

### COUNSEL UNREASONABLY AND PREJUDICIALLY ADDRESSED THE ISSUE OF THE VICTIM'S HUSBAND'S (AND OTHER FAMILY MEMBERS') AGREEMENT WITH A SENTENCE OF LIFE IN THIS CASE

Counsel for the Government writes that "[a]s an initial matter, Gaglia's

relatives informed the trial prosecutors that they _were_ in favor of seeking the death

penalty." DOC # 54 p. 24 (emphasis in original). This assertion is made without

any supporting documentation or citation to the record. The Government then

argues that had defense counsel cross-examined the victim's family witnesses

about their knowledge of Petitioner's upbringing "perhaps the family members

would have then used that testimony as a springboard to say why Brown deserved

the death penalty." _Id_. p. 27. This, even though this Court had ordered that no

witnesses could testify at sentencing about their views of what the punishment

should be. The Government's unsupported assertions and speculation do not rebut

Petitioner's argument that counsel were ineffective for not asking the victim's

---

PTC at 10.

survivors about obvious mitigation.[5]

With respect to Petitioner's allegation that counsel unreasonably and prejudicially failed to address the issue of the victim's husband's (and other family members') agreement with a sentence of life in this case, the Government argues that counsel could not have been ineffective because the Eleventh Circuit found such evidence "irrelevant and inadmissible" in a different context on direct appeal in this case (DOC # 54 p. 26) and this Court had ruled that it would not "allow any witness to make a recommendation to the jury that you should take his life or spare his life." CV DOC # 51 p. 12; DOC # 54 p. 26. However, and as put in Petitioner's Comprehensive Response (and not responded to by the Government),

---

[5]At note 2 of the Government's Response, the Government stresses that "[g]iven the size of the town and frequent contact with the post-mistress, almost all of the witnesses from Fleming refer to Gaglia [the victim] as 'Ms. Sallie.'" DOC # 54 p. 3, n. 2. Given the small population, many people in the community were also familiar with the Morgan Compound, including the Government witnesses. These victim's family members knew that Meier Brown had "no home base," DOC # 8, Claim II, ¶ 6, knew that the Brown family had "a lot of problems," *id*., and knew that the Brown family and their minister had told the victim's family – during a welcomed visit to their home  - -  that they wished that they could have prevented the offense from happening. *Id*., ¶ 7. But no questions were asked about this at sentencing.

And given the relaxed rules of evidence at capital sentencing, counsel were prejudicially ineffective for not having Postal Inspector T.E. Barnell testify to the results of his own investigation into Petitioner's background. His interviews were similar to the types of interviews conducted by mitigation specialists and produced compelling mitigation.

once the Government argued that the death penalty brought justice to the victim's

family, "[c]ounsel were prejudicially ineffective for not objecting, moving for a

mistrial, and asking to introduce evidence to rebut this portion of the prosecutor's

argument for death."  DOC # 51 pp. 12-13.

## CLAIM III

**COUNSEL UNREASONABLY AND PREJUDICIALLY
ADDRESSED DETECTIVE WOODALL'S CONCLUSION AS A
SEASONED DETECTIVE THAT, FROM THE EVIDENCE
AND MEIER BROWN'S HISTORY, THE VICTIM'S DEATH
WAS NOT PLANNED, AND THAT WOODALL AGREED
WITH THE LOCAL PROSECUTORS THAT LIFE IN PRISON
WAS THE APPROPRIATE PUNISHMENT**

As set forth in Petitioner's Comprehensive Brief at p. 19, DOC # 52, and as

excerpted in the Government's Comprehensive Brief at 33-34, DOC # 54,

Detective Woodall would have testified as follows:

> from all he knew of Mr. Brown and his past, and from the Detective's
> experience as an officer, Mr. Brown was not a violent offender, and
> there was nothing in his past that indicated Mr. Brown would or could
> be a danger to anyone.  Based on his thirty plus years of experience as
> a law enforcement officer, he did not believe that Mr. Brown took the
> knife to the post office with the intention of stabbing anyone.  He
> knew that this crime was completely out of character for Mr. Brown.

The Government argues that "it *appears* that Woodall tried to testify to these

opinions but that that testimony would have contravened the Court's prior ruling."

DOC # 54 p. 34 (emphasis added).  The prior ruling by this Court was not to

allow "'any witness to make a recommendation to the jury that you should take [Brown's] life or that you should spare his life.'" *Id.* at 30. The proposed testimony offered above is not about a recommendation. It is about character, quintessential mitigating evidence under the Eighth Amendment. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."). Woodall knew about character, record, and the individual offense, and counsel unreasonably failed to elicit fully his mitigating evidence.

## CLAIM IV

**DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO CONDUCT THE DILIGENT INVESTIGATION INTO MEIER BROWN'S BACKGROUND AND SOCIAL HISTORY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS REQUIRE**

### A.    Affirmatively Harmful and Incorrect Evidence

Defense counsel introduced evidence from Vanessa Parker that Petitioner took medication in school, that he was in an alternative school, and that he had anger issues. None of that was true about Petitioner; it was true about his brother,

8

Ralton.  The Government argues that "Brown does not support his assumptions with any cites to the record or an affidavit." DOC # 54 p. 38.  In reply, Petitioner has submitted the following affidavit from his post-conviction mitigation investigator, Sara Flynn:

4.  When I initially interviewed Mr. Brown's family on 09/06/07, his cousin, Connie Williams, said Meier had never been on medication a day in his life.  She said that Meier's brother, Ralton Brown, was on Ritalin when he was in school, not Meier.

5.  When I interviewed Ralton Brown on 09/24/07, he said he was diagnosed with ADHD in 3rd or 4th grade.  He took Ritalin twice daily – once at home in the morning before he went to school and once during the school day.

6.  In an interview with Vanessa Montgomery Parker on 10/12/07, she stated the she currently works for the Liberty County Board of Education as a school social worker but she was a teacher until 1992. She calls Meier Brown "Jason." Over the course of the interview she realized and acknowledged that she had testified incorrectly at the sentencing in this case. The testimony that she gave about Meier being angry, taking medication, and going to alternative school was actually about Ralton, not Meier.

7.  Ms. Parker said she met Ralton Brown at the "LEAD School" - Liberty Educational Alternative Division (an alternative school for kids having disciplinary and behavioral problems in the Liberty County school system).  He got there through a tribunal.  He would have committed several infractions and a disciplinary board would have referred him.  (Records would be at the records retention center). She said that Ralton, not Meier, had behavioral problems and showed anger.

8.  She had never met Meier's defense attorneys until she appeared in

court on the day of the sentencing. She had spoken with Mr. Bell on the phone. She did not review Meier's school transcript or do anything to verify her recollections of Meier before testifying.

Affidavit of Sara Flynn, Appendix C, to Supplement to Motion for Evidentiary Hearing and/or to Expand the Record (filed simultaneously with this pleading).

The Government suggests that Parker may have been wrong about medication and alternative school yet correct about Petitioner being an angry child,[6] but that is not the case. No one else described Petitioner as exhibiting anger. The Government writes that another teacher had "characterized" Petitioner as angry. DOC # 54 p. 40. But this teacher did not witness or suspect anger; she simply mused after the fact that if Petitioner committed the offense he must have been suppressing anger for years. This was not a description of Petitioner's character.[7]

---

[6]DOC # 54 p. 40 ("Parker's mistakes related to minor nuances in Brown's early years.").

[7]Ms. Jones was contacted by Petitioner's mitigation specialist in these proceedings and Ms. Jones verified that Petitioner was sad, not angry.

> 27 . . . Linda Jones taught English at Bradwell from 1984-86 and remembers Meier well. Meier failed the ninth grade once and passed the second time because she took pity on him – he had missed too many days when his mother's and grandmother's houses burned in unrelated incidents. Ms. Jones reports that "she got the impression that [Meier] was sad and had no one. She said he was a quiet student and stayed to himself. She said he did not do his homework." When

Finally, the Government writes that "[w]hether Brown was enrolled in alternative school, or took medication for ADHD was insignificant to trial counsel's investigation of Brown's background and social history." DOC # 54 p. 40. This is puzzling. Does the Government mean that it is insignificant for counsel to introduce harmful evidence about the wrong person as a basis for a life sentence? Or that it is not significant for counsel in a capital case to know whether their client took medication or was in alternative school? If this was insignificant to defense counsel then they were *per se* ineffective.

**B.     Incomplete Depiction of the Circumstances of Petitioner's Life**

The comparison of what was available in mitigation is set forth in the Motion to Vacate (DOC # 8 pp. 19-58), and in the affidavits of Sara Flynn. DOC ## 17, 53 App. 3. A comparison of the evidence that was presented at sentencing

---

she contacted Meier's mother to talk with her about Meier's truancy, Sadie did not respond.

28. Sometimes if Jason cut up in her class, Ms. Jones would tell him to come see her on the break. He was always shy and quiet. She cannot imagine Jason killing anyone. He had a nice smile, but he rarely smiled. She really cared about him. He would not take up for himself. She reported, again, that he always looked sad, like no one cared about him. It was almost like "this was supposed to happen to me." She didn't see him in 10th grade.

DOC # 53, App. 3, pp. 19-20.

to the evidence that could have been presented is set forth at DOC # 51 pp. 23-26.

Petitioner contends that when this Court makes the comparison between what was

actually available in mitigation and what was presented, the Court will conclude

that the 2255 record "bears no relation to the few naked pleas for mercy actually

put before the jury."  *Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

### C.    Detective Woodall

*See* Claim III,  *supra*.

### D.    Counsel Unreasonably Failed to Obtain Meaningful Services of a Mitigation Investigator or Mental Health Professional

The Government does not dispute that the mitigation investigator funded by

this Court "never performed the services for which she was hired."  DOC # 54 p.

44.  Yet, the Government writes, without any supporting documentation, that

"Brown's trial counsel pursued every available avenue of discovering and

presenting mitigation evidence," and "ramped up their investigation into

mitigation as sentencing approached."  *Id*. at 46, 50.

Bobbye Gerard, who worked on this case with sentencing counsel Bell, has

stated that because of Blankman's failings "we were scrambling at the end" and it

was "the blind leading the blind."[8]

The Government did not respond to the fact that this Court advised trial counsel that they could use their mitigation specialist to testify about Petitioner's non-future-dangerousness but that because that specialist did not perform, Petitioner was left without such testimony. *See* DOC # 51 pp. 28-29.

## CLAIM V

### DEFENSE COUNSEL UNREASONABLY AND PREJUDICIALLY FAILED TO PRESENT EXPERT MENTAL HEALTH TESTIMONY AND RECORDS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

Defense counsel consulted no experts regarding any mental health capital sentencing issue. The Government does not deny this or seriously dispute that this

---

[8]Ms. Gerard told undersigned counsel the information that is in the unsigned affidavit submitted as Appendix 5 to the Motion for Evidentiary Hearing and/or To Expand the Record. DOC # 53. After Gerard provided this information, undersigned counsel sent this draft affidavit to her. She agreed to review it, sign it, have it notarized, and return it. She has not done so. Repeated efforts to contact her have been unsuccessful.

The Government writes that it "understands that Gerard refuses to sign that affidavit. Thus the Court should strike it and not consider its contents in this proceeding." DOC # 54 at n. 15. The Government carefully does not write that what is in the draft affidavit is untrue.

Since Gerard has information that is relevant to these proceedings, and since the Government has now advised that she will not sign the affidavit, Petitioner seeks by separate motion permission to depose Gerard.

was unreasonable attorney conduct.

### A.     Mental Disease or Defect

The Government writes instead that Petitioner's experts in this proceeding only discuss "drug and alcohol use and dependency." DOC # 54 p. 53.[9]  The Government writes that "testimony regarding illegal substance abuse can just as easily aggravate as mitigate," but acknowledges that "testimony regarding his use of cocaine was given during the sentencing phase."  *Id.* at 53.  The Government introduced Petitioner's repeated DUI offenses as aggravation at sentencing.  If drugs and alcohol were going to be part of the sentencing record, a defense expert on dependency would have helped the defense.

What Petitioner's experts state is that Petitioner was born into an environment where he naturally started drinking alcohol at a very young age as his "birthright."  DOC # 53, App. 5.  He became dependent, which is a mental disease or defect and is mitigating.[10]  Counsel at sentencing introduced drug and alcohol

---

[9]The Government does not argue that anything in the affidavits of  Dr. Israelian or Dr. Agharkar would have been inadmissible at sentencing.

[10]*Rompilla, supra,* 545 U.S. at 382 ("counsel did not look for evidence of a history of *dependence* on alcohol that might have extenuating significance.") (emphasis added).

*use*, but not *dependency*, an illness.  Petitioner never received treatment for this disease and had he "been given a chance to address his substance abuse issues ...this may have been pivotal in changing his life."  This is traditional and compelling mitigation evidence.  *Id*. at p. 4.

Furthermore, these experts vividly explain how Petitioner's dependency, and his personality as a giver, tragically led to the crime in this case:

> At the root of his personality, Mr. Brown is an individual who is very much a "giver" in the sense that whatever he gained or earned was for the benefit of others (his frail mother, his single parent girlfriend.) He is not a self-serving, narcissistic, irreverent, individual void of empathy for others and an inability to form and sustain meaningful relationships.  Indeed, it is probably the strength of his relationship and the relentless desire to care for those he loves that, coupled with the effects of drugs and alcohol, lead to the crime for which he is now sentenced to death.  It could be argued that Mr. Brown is no less a casualty of the depraved, dysfunctional, and damaging family as his cousin Quincy Waye was when he, as a result of negligent care and supervision, drowned in a septic tank at the age of 2.

*Id.*  This is not, as the Government argues,  a "restatement of the same testimony given by the mitigation witnesses."  DOC # 52 p. 54.  Lay witnesses "can merely describe symptoms they believe might be relevant to the defendant's mental state."

*Ake v. Oklahoma*, 470 U.S. 68, 79 (1985).  Experts do more:

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense.  In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury;  they analyze

the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.

*Id*. This did not happen in Petitioner's case due to the unreasonable actions of counsel.[11]

### B     Not a Danger

Finally, four experts and one mitigation investigator opine that Petitioner would not be a future danger.[12]  Defense counsel did not introduce any expert

---

[11]As Petitioner's experts report:

These are serious substance-related disorders which often cause marked impairment and complications.  Furthermore, substance abuse and dependance appear to aggregate in families, which is plainly the case here.  Mr. Brown's addictions were most likely not considered "problems" because everyone in his household and immediate surroundings were using illicit drugs and consuming alcohol regularly.

12.  These substances are known to have disinhibiting effects on cognitive functioning and could cause a person to act in uncharacteristically dangerous and impulsive ways.  In a rapidly escalating situation, a person who suffered the effects of intoxication and/or drug withdrawal would not likely exercise the usual caution and judgment another reasonable person might.

DOC # 51.

[12]The experts are the Government expert, Dr. Johnson (DOC # 53, App. 8), Dr. Israelian (*id.* App. 6), Dr. Agharkar (*id.*), and Mr. Aiken (*id.* App 7).  The

evidence on this issue.  When this Court told counsel their mitigation specialist or mental health expert could testify on this issue, counsel unreasonably did not tell the Court that the mitigation specialist had done nothing and that they had not asked their mental health expert about future dangerousness.

The Government writes that the issue of future dangerousness was "addressed thoroughly during the sentencing phase," directing the Court to 14 pages of transcript.  DOC # 54 p. 54.[13]  The first 12 pages involve the testimony of Alexis Andrews who testified at pp. 1102-1114 of the sentencing transcript.  The first seven pages of his testimony have nothing to do with future dangerousness.  Beginning on page 1109, this witness described his work as a jail administrator at the Liberty County Jail and that Mr. Brown had been an inmate there.  He said that Mr. Brown had been made a trustee because he was "clean" and "had a good attitude and a good disposition."   Mr. Brown "was good in singing" and "we had no problems with him."  Tr. 1111.  This witness did not say one thing about future dangerousness, and his entire testimony about how Mr. Brown acted while in this county jail went from page 1110 through page 1111.  Two pages.

———————————

mitigation investigator is Sara Flynn (*id*. App. 3).

[13]At sentencing the Government more accurately described, in argument, what had been presented by the defense on this issue – "[t]here was not a whole lot of evidence offered with respect to this." Tr. 1176.

The other witness the Government refers the Court to is John Wilcher who was an assistant jail administrator while Petitioner was being held pre-trial in this case. His entire testimony about this issue was to respond "None in my jail, sir," when asked "has he ever engaged in any acts of violence" and "any disciplinary problems whatsoever?" Tr. 1126-27.

This was not a thorough presentation about non-future-dangerousness. Had counsel acted reasonably, compelling expert evidence on the issue would have been available. Petitioner alleged that trial counsel were ineffective in making their request for a future non-dangerousness expert, James Aiken. The Government mischaracterizes Petitioner's claim as a failure "to present Aiken's *credentials*, and that this failure resulted in the trial court's decision to deny additional funds for the expert." DOC # 54 p. 55 (emphasis added). In fact, Petitioner specifically alleged that "[c]ounsel were ineffective in presenting Mr. Aiken's *expertise*, and in failing to advise the Court that Aiken could in fact opine on future dangerousness *based upon Brown's character* or record." DOC # 51 p. 40 (emphases added). The distinction is critical. *Credentials* are defined as "evidence or testimonials attesting to one's right to credit, confidence, or authority." American Heritage Dictionary of the English Language, Third Edition, 1996. *Credentials*, are usually considered to be documents or certificates proving

a person's qualifications.  *See, e.g.,* Oxford English Dictionary, 2nd Edition.  On the other hand, *expertise*, is defined as "skill or knowledge in a particular area" *id.*, and is commonly considered to be synonymous with skillfulness or competence. Clearly, trial counsel provided the Court with Mr. Aiken's *credentials* - - his extensive *Curriculum Vitae* (CV) was submitted to the Court.  This CV outlined Mr. Aiken's *credentials*, but in no manner described what it was that he would or could testify to.

The Government also misconstrues Petitioner's argument when it asserts that "at no point did the trial court decide to deny funds because of trial counsel's presentation of Aiken's credentials."  DOC # 54 p. 55.   Petitioner's claim is that trial counsel failed properly to point out Mr. Aiken's relevant *expertise* in the field of classification and predicting non-future dangerousness *based upon an individual's background.*

Trial counsel, in their original motion for funds, sought the assistance of Mr. Aiken to "render an expert opinion as to the Federal Bureau of Prisons' ability to safely incarcerate inmates and prevent or minimize a risk of escape and risk of harm to other inmates, prison personnel and the community" to demonstrate that Mr. Brown would "not pose a risk of future dangerousness if not sentenced to death."    CR. DOC # 179 p. 1 at ¶¶ 2 & 3.  Mr. Aiken's CV was attached, but no

further argument or proffer in support of the motion was offered.[14]   The

Magistrate Judge denied the motion saying "the Court does not see the need for

expert assistance regarding the risk of defendant's future dangerousness."  CR

DOC #  195.

Trial counsel, in response to this order, filed an Ex Parte Appeal and

Objection to Sealed Order Dated August 14, 2003.  CR DOC # 208.  In that filing,

trial counsel asserted *Kelly v. South Carolina*, 122 S.Ct. 246 (2002) and *Skipper v.*

*South Carolina*, 476 U.S. 1 (1986), dictated that where future dangerousness is

brought into issue, a defendant has the right to hire a non-future dangerousness

expert. CR DOC # 208 at ¶6.  Again, trial counsel failed to outline the testimony

sought other than testimony about the Bureau of Prisons' ability to classify, house

and manage inmates so as to minimize "dangers to fellow inmates and guards, and

assess the likelihood of future violence by a prisoner."

This Court denied the appeal, finding that *Skipper v. South Carolina, supra*,

did "not compel the employment of expert witnesses for *that sort of mitigation*

*evidence*."  CR DOC # 213 (emphasis added).  The Court went on to note that Mr.

_____

[14]Paragraph 4 of the motion merely re-asserts that Mr. Brown would  "not pose a risk of future dangerousness if not sentenced to death; that if incarcerated, there is little or no risk of escape and risk of harm to other inmates, prison personnel and the community."

Brown could offer lay witness testimony on the matter and could also utilize the previously employed mitigation expert and/or psychologist, which the Court determined were "sufficient to enable [Brown] to fully present *this strain of mitigation evidence*." *Id*. (emphasis and footnote added).

Trial counsel, during a pretrial conference with the Court, again raised the issue of Mr. Aiken arguing (in the presence of the Government[15]) that Mr. Aiken was

> the guy who is on future dangerousness [and] that's the heart of the mitigation in this case. And he has testified in a number of other death penalty cases. He is imminently qualified. And that is the heart of, you know, where we hope that a jury would find to give life without parole instead of death.

CR DOC # 298 p. 7. Nothing further was discussed about Mr. Aiken other than the potential cost associated with his testifying. The Government filed a motion in limine in opposition to Mr. Aiken's testimony (CR DOC # 227) to which trial counsel replied that such testimony was necessary because "[t]he jury cannot evaluate the importance and weight to be accorded to the defendant's prior crimes, or to his supposed imperviousness to rehabilitation or deterrence, *unless it knows*

---

[15]Trial counsel unreasonably failed to conduct this argument *ex parte*. As a result, the Government learned of the defense strategy and took steps, in advance of trial, to thwart it. For instance, the Government filed a motion in limine wherein it opposed the presentation of future non-dangerousness. *See* CR DOC # 227.

*the context in which he will live out the rest of his life if not executed.*  CR DOC #

235  (emphasis added).  Counsel then argued:

> As far as the Government's argument that there is nothing
> "mitigating" about the ability of the Bureau of Prisons to control the
> Defendant, if sentenced to life without parole, given both its capacity
> to control violent offenders and his personal characteristics and
> record as evaluated by Mr. Aiken, the nonexistence of parole is also
> not "mitigating (because it is not a fact of the crime or the offender's
> record or character), but the constitution still requires that a jury be
> told about it. <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994).

CR DOC # 235.   Again, counsel limited Mr. Akin's expertise to the BOP's ability

to manage inmates in the prison setting.

This Court, in reconsidering the issue, noted that "evidence that the

defendant would not pose a danger if spared (but incarcerated) must be considered

potentially mitigating."  CR DOC # 242 p. 5 (quoting *Skipper v. South Carolina*).

However, based on what defense counsel had submitted by way of argument and

evidence, the Court found

> Aiken's testimony is distinguishable from that in issue in *Skipper* . . .
> [because] the evidence proffered here is not about the defendant at
> all, but about the BOP generally.  (DOC # 242).

Thus, this Court denied the defense request for funds to hire Mr. Aiken.

Mr. Aiken could have and would have testified, *based on Mr. Brown's*

*character and record*, that this crime was an aberration, and that Mr. Brown would

not pose a future danger no matter what security level he was assigned.[16]  Further,

Mr. Aiken could have and would have testified about how remarkable it was that

Mr. Brown, who was raised in "an environment fraught with violence" did not

engage in it himself.  Mr. Aiken would have further testified about the years of

experience he had determining whether a person would be a danger in the future,

the criteria upon which he would have based his opinions and the studies and

science that supported those conclusions.  DOC # 53, App. 7.  Such testimony,

from someone as eminently qualified as Mr. Aiken, would have carried

tremendous weight with the jury.  Trial counsel unreasonably failed to adequately

present the expertise of Mr. Aiken to the trial court and counsel's failure

prejudiced Mr. Brown.

### C      The Government Expert, Sally Johnson

In her affidavit, Dr. Johnson states that it was very difficult to get any

information from trial and sentencing counsel in this case.  She also states that in

her expert opinion, and in the opinion of other federal expert employees at FCI

Butner,  Mr. Brown is not a violent person and would not be a danger in a prison

setting.  She states that she remembers this case for these reasons, and for other

---

[16]As Mr. Aiken finds, even at the lowest of classifications, where supervision is minimal and individual freedom is greatest, Mr. Brown would not pose a danger to staff, inmates or the community.

reasons:

> Mr. Brown was not diagnosed with having Antisocial Personality Disorder. Individuals who are diagnosed with Antisocial Personality Disorder (commonly referred to as psychopaths or sociopaths) typically demonstrate a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood and continues into adulthood. They frequently lack empathy and tend to be callous, cynical, and contemptuous of the feelings, rights, and suffering of others. This was not Mr. Brown's presentation, and it is not the picture suggested by his psychological testing.

> 9. Rather, this case suggests a tragic and unfortunate set of circumstances. Despite his difficult living situation growing up, Mr. Brown appeared to have been viewed in his community as a decent person who was not enmeshed in a life of serious crime. He was a likeable and non-manipulative individual who had the ability to express genuine concern and caring for others. (As described in his relationship to his ill mother).

DOC # 53, App. 8.

All of this evidence is compellingly mitigating. Yet defense counsel would hardly speak to Dr. Johnson. Had they – and had they asked the most innocuous of questions (*i.e.*, "How is Mr. Brown doing?"), they could have learned that the Government's own expert thought their client was not a danger.[17]

---

[17]The Government argues that "Brown's counsel did not have access to [Johnson's] report,"  DOC # 54, p. 56, but *they had access to Dr. Johnson* and took no advantage of it.

## CLAIM VI

## THE PROSECUTORS COMMITTED MISCONDUCT IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS

### A.    The postal inspector's mitigating report

The Government does not, indeed cannot, dispute that it compiled a

mitigating report about Petitioner and waited to turn it over until it was too late for

Petitioner's counsel effectively to use it.  Thirteen days before trial, the

Government provided defense counsel with the Postal Inspector Background

Investigation Report that had been prepared 10 months earlier.  DOC # 15.  Either

the Government's months long withholding of the Report was misconduct

warranting relief, or defense counsels' failure to seek a continuance upon its

disclosure was an unreasonable and prejudicial omission, or both.

While the Government does not dispute that the information in the Postal

Inspector Report was material and exculpatory, the Government contends that the

information in the Report was not suppressed because Petitioner knew the

circumstances of his own life and thus "can hardly argue that he was not aware of

these things and consequently unable to obtain this information."  DOC # 54 p. 61.

This is no defense for the Government.

For example, just because a person does not have a violent character does

not mean that he knows that others know this and have told the Government.   In

this case, former employers reported to the Government that "Meier was extremely

quiet and didn't bother people" and had "no violent outrages and seemed very

normal."[18]  He was described as "well mannered and courteous" with "no signs of

violent or erratic behavior."  He was "not a violent man and was a soft-spoken

man."  He "always seemed like a calm, cool, collected guy" and was "*never

fighting or anything like that*."  How did Petitioner possess what his employers

would say to a Government investigator?

His probation officer, Irving Frazier, "[d]escribed Brown as well mannered

and polite.  He said he never witnessed or had knowledge of any violent

tendencies or erratic behavior by Brown."  How did Petitioner possess what his

probation officer said to a Government investigator?

Postal Inspector (PI) Barnell interviewed six teachers from The Bradwell

Institute where Meier went to school between 1984 and 1990 and they all said that

"Brown did not stand out as a troublemaker;"  "If Brown was a troubled student he

would have remembered;" and Brown "never had any discipline problems."  How

did Petitioner possess what his former teachers told a Government investigator?

PI Barnell interviewed a Ms. Lee who stated that Meier worked at the

---

[18]This report can be found at DOC # 15.

Richmond Hill County Services for 4 months in 1988. She said he was courteous, but was terminated because he stole and pawned some tools. Meier worked at the Ramada Inn in Richmond Hill for several months in 2002. PI Barnell contacted Henna Mehta who stated that Meier was extremely quiet and did not bother people, but he was terminated because he did not perform his work satisfactorily. Meier worked for Wallette Proman doing yard work in August of 2002. She told PI Barnell that he was a good worker and she was satisfied with his work, which he performed in the evenings after working at the Ranada Inn. She said he was well-mannered and she saw no signs of violent behavior. Meier worked at Atlanta Underground during late 2002.

Family members of the victim were also interviewed. Ms. Webb told P.I. Barnell that she knew the Brown family and that they "have a lot of problems . . . She said she knows there have been some problems with drugs, fighting among themselves, and alcohol abuse. She said a toddler drowned in the septic tank on the property several years ago." One of them, Richard, she taught in school and she knew "that he had mental problems." "She said she knows a lot of things because Fleming is a small community and 'people talk.'" She said the Brown kids "had no motivation for school, no home base. She said the Morgan (Brown) kids were basically left to their own devices."

27

She also said that "Leo Morgan went to Joe Gaglia's (Sallie's husband's) house after the homicide with Reverend Smith and apologized for the incident. She said Leo told Joe Gaglia that if they had knowledge that Meier Jason would do something like this (the homicide) they would have tried to prevent it from happening."[19]

David Clark, the victim's brother, and Clark's wife Mary, were interviewed by PI Barnell. Mary reported that "all of the Brown kids were expelled a lot and given little supervision." She said that "at one time there were 11 children from the Morgan group on her bus, 11 children on another bus, and still some running around the trailers in diapers." She said "the children never appeared to be taken care of properly with torn clothes, torn shoes, and no coats in the winter time." David Clark said that at the Brown residence they would "always have parties during the week and weekend. He said you can hear the loud music."

How did Petitioner possess what the victim's survivors would tell a Government investigator?

---

[19]PI Barnell also interviewed Rev. Booker T. Smith who:

said after the homicide the church had been praying for the Gaglia and Brown families. He said he and others from the congregation went to visit Mr. Gaglia. He said Gaglia was pleasant and asked them to come into his house. Reverend Smith said Gaglia told that them, "What's done is done."

## B.     The closing argument

Apparently agreeing that it would be grossly improper for the Government to refer to Petitioner as "that sorry excuse for a human being," the Government asserts that Petitioner "botch[ed]" his § 2255 argument (DOC # 54, n. 64 & p. 63) because it was Diane Brown, the Government's witness, not Petitioner, who was being labeled "sorry."   The Court should reject this Government argument.[20]

The Government called Diane Brown as one of its most important witnesses.  One of the first things she was asked was whether she had volunteered to serve in the Army.  She testified that she had, and as the questioning continued she testified that she had served as a military police officer overseas, she had served for three years, and she had received an Honorable Discharge.  Tr. 705. She worked after that as a corrections officer in Georgia.  Tr. 706.  She met Petitioner in May of 2002, and they became romantically involved.  Tr. 798-710.

---

[20]The rest of the Government's argument on this point, *i.e.*, that the prosecutor simply "stressed that Gaglia's life had far more value than the relatively small sum of money leading to her demise," DOC # 54 pp. 63-64, and that the prosecutor was not attempting to compare the value of the victim's life to the value of Petitioner's, is also not supported by the record.

The Government then defends what it candidly concedes was a "war on crime" argument by the prosecutor. *Id*. at 68.  Two years after nearly 3000 people were killed in a terrorist strike on this country, the Government urged these jurors to respond to Petitioner the same way the country responded to Al Qaeda.  This is indefensible and grossly unfair.

Thereafter Diane Brown developed financial hardships.  She was charged with obstructing and hindering an investigating officer, she advised her employer of the charges, and she ultimately resigned her job as a correctional officer.  Tr. 711.  This was a "big setback" for her financially - - she was already in bankruptcy, and this made matters worse.  She had bills due, and Petitioner knew that.  Tr.  713.

On November 30, 2002, Petitioner showed Diane Brown three money orders, two in the exact amount of bills that she owed, and one a little over the amount of a third bill.  Tr.  725.  Two days later, on Monday, they went to Diane Brown's bank – where she had banked for 16 years – and cashed one of the money orders.  This transaction was recorded on videotape.  Tr.  728.  At the time she was cashing the money order at her personal bank, she was unaware that the victim in this case had been robbed or killed.  Three days later law enforcement officers came to her residence and asked if she would consent to a search, and she agreed.  Tr. 737.  Based upon her cooperation, significant evidence against Petitioner was obtained and introduced at trial.

In the Government's initial closing argument at sentencing, Mr. Frentzen argued that:

a couple of days later, the man you have to judge – and this will be

back with you in the jury room, but this is a photograph of the man a couple of days later at the bank on December 2nd 2002 with Diane Brown.

And I know you can't see this photograph from here, but this is the man cashing in a 500-dollar postal money order that he had gotten after robbing and killing Sallie Gagila.  And *he's* laughing and enjoying a good laugh as he cashes in that money order.

Is this the face of remorse?

Tr. 1179 (emphasis added).  After defense counsel gave his closing argument, counsel for the Government, Mr. Newman, gave the last argument.  He referred back to what his co-counsel had said about Petitioner on the videotape, and then added his own commentary on what it showed:

And everybody talks about just how much remorse Meir Jason Brown has shown for what is left of Sallie Louise Gaglia.

As Mr. Fretzen has pointed out to you it is **the real Meier Jason Brown** what is shown in the bank video still from the First Union, leering and grinning with Diane Brown, **that sorry excuse for a human being**, as they are cashing in the chips, as they are exchanging the value of Sallie Gaglia's life....

Tr. 1198 (emphasis added).

The Government writes that this excerpt demonstrates "'that sorry excuse for a human being' referred to Diane Brown, not Meir Jason Brown.'" DOC # 54

p. 63.   But the structure of the sentence,[21] and more importantly the context of the argument, reveals that it was Petitioner who was being described, not Diane Brown.  Was Mr. Newman calling "that sorry excuse for a human being" the person the Government said was "leering and grinning" and is "laughing and enjoying a good laugh as he cashes in that money order,"  or the Government's witness Diane Brown–the military veteran with an Honorable Discharge who did not even know the victim had been robbed or killed?

---

[21]The Government's argument seems to be that since "the sorry excuse for a human being" language followed the comma after Diane Brown's name, it must have referred to her.  But there is also a comma before Diane Brown is mentioned. The comma before and after leaves her as simply the person with Petitioner:

> "it is the real Meier Jason Brown what is shown in the bank video
> still from the First Union"

> COMMA

>  who is "with Diane Brown"

> COMMA

>  and this real Meir Jason Brown is "that sorry excuse for a human being."

## CLAIM VII

**THIS COURT AND THE GOVERNMENT VIOLATED PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS BY NOT DISCLOSING THE GOVERNMENT'S MENTAL HEALTH EXPERT'S REPORT**

In her sealed report to the Court, Dr. Sally Johnson detailed that Petitioner does not suffer from an anti-social personality disorder and is thus not a psychopath, and that he was not a risk to others in a prison setting.[22]  The defense

---

[22]Relevant excerpts from Dr. Johnson's reports and Petitioner's progress notes from FCI Butner include the following:

It appears that when Mr. Brown was not incarcerated he was a major source of support for his mother during her later years.

.................

Initially Mr. Brown was placed in the 1E seclusion unit with Mental Health Department as a result of the need for further observation given his current charges.  During the early part of this evaluation it was the administrations decision that the study should take place in that environment.  Eventually, that opinion changed and he was allowed to be integrated into the open population of the mental health unit.  He completed the evaluation in that status....He appeared particularly careful not to put himself in any situation where he could be responsible for someone else's behavior or might get pulled into an altercation.

........

He was able to accurately assess situations around him and to conduct his behavior in such a way as to maintain his own safety and not impose on others.

........

advised the Court and the prosecutor that non-future dangerousness was "the heart

of the mitigation in this case."  CR. DOC # 298, p. 7.  It is a given that the

---

> Available history on Mr. Brown did not support evidence of a
> conduct disorder with onset before the age of 15. There is not
> sufficient evidence that he had a pervasive pattern of disregard for or
> violations of the rights of others since the age of 15, as indicated by
> the identified criteria for diagnosis of Antisocial Personality Disorder.
> He does have a persistent pattern of criminal behavior and the focus
> of his current clinical situation is his adult anti-social behavior, not
> specifically a mental disorder.  Nonetheless, he does not demonstrate
> chronic history of organized criminal behavior; instead he has a
> history interspersed with a variety of relatively minor charges until
> the time of the alleged offenses.
>
> ........................
>
> Review of his behavior while incarcerated indicated [he] does not
> identify that he ever presented as a problematic inmate.  Except for
> minor disciplinary infractions related to housekeeping issues, he has
> no history of problems with staff or other inmates.

DOC # 25.  Progress notes included the following entries:

> He was evaluated as a LOW risk to exhibit behavior that would pose
> a risk of harm to self or others . . . After considering the above
> information, this patient may be housed in open population.
>
> 8/11/03      Pt does not appear to be a management problem.
>
> 8/20/03      Alcohol abuse (provisional)

Appendix 26-29.  The Government's comment that "[i]t is difficult to characterize
as exculpatory a report that concludes that Brown suffered from no mental disease
or defect that might mitigate the punishment against him," DOC # 54 p. 74, does
not do justice to the conclusions reached by the staff at Butner FCI.

34

Government, or some Government employees, possessed significant evidence in support of the defense theory at sentencing and did not disclose it.[23]

The Government argues that a court rule and a court order prohibited the report from being unsealed. DOC # 54 pp. 74-75. The Fifth Amendment guarantees due process of law. It violates due process for the Government to suppress material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963).[24]

---

[23]Defense counsel would have introduced evidence from Dr. Johnson had they been aware of it.

> I have reviewed Appendix K-1, a report prepared by Dr. Sally Johnson from Butner FCI . She was the mental health expert who did the court appointed mental health examination of Mr. Brown for the Government. This report was never disclosed to the defense. Had we known about her report at the time of sentencing we would have either used her testimony or sought the assistance of our own expert. Her report shows that the prison classification and mental health experts believed that Mr. Brown was not a person who would be dangerous in the future in a prison setting.

DOC # 53, App. 1 & 4.

[24]The Government does not join issue on due process. Rather, the Government addresses the Fifth Amendment's protections against self-incrimination. DOC # 54 pp. 74-75. The Government also writes that the Eighth Amendment contours of Petitioner's claim "are not immediately apparent." *Id.* at 76. Any judicial process that increases the risk that a death sentence will be imposed despite the existence of evidence that counsels in favor of a lesser sentence violates the Eighth Amendment. *Tennard v. Dretke*, 542 U.S. 274 (2004). A rule or court order that keeps evidence of "the character of the individual offender," *Woodson v. North Carolina*, 428 U.S. 289, 304 (1976), out of the effective reach of the defendant or the sentencer violates the Eighth

35

A court rule or a court order that requires suppression is a part of the Due Process violation, not an excuse for it.

The prosecutors in this case had a duty of disclosure which was not limited to evidence in their actual possession. *Kyles v. Whitley*, 514 U.S. 419 (1995); *see also Strickler v. Greene*, 119 S.Ct. 1936, at n.12 (1999). Government suppression of the results of Petitioner's evaluation at FCI Butner require that the judgment herein be vacated.

## CLAIM VIII

### THE DEATH PENALTY IS IMPOSED IN AN ARBITRARY AND DISCRIMINATORY MANNER UNDER THE FEDERAL DEATH PENALTY ACT (FDPA)

Respondent contends that this Court should disregard the proffered declarations of the Director of the Federal Death Penalty Resource Counsel Project because they are unsigned and were submitted in a different case. Petitioner has remedied these issues by separate motion. Petitioner is also preparing a more detailed response to the Government's arguments on this claim.

---

Amendment. *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *McCoy v. North Carolina*, 494 U.S. 433 (1990).

## CLAIM IX

## OTHER INSTANCES OF INEFFECTIVE ASSISTANCE OF COUNSEL

### A.     Failure to Bring Out Evidence of Innocence

### 1.     Penny Banks

A report turned over by the Government in discovery memorialized an interview with Penny Banks who saw a vehicle parked in the post office parking lot at the time Ms. Gaglia was killed.  This information was consistent with trial counsel's theory of defense - - someone other than Petitioner committed the crime.  The Government does not address Petitioner's assertion that trial counsel was ineffective in failing to use this information at trial other than to claim that the car *appears* to be that of Jennifer Zech and Stephen Nicholls.  DOC # 54 p. 93.  While it may appear to the Government to be the vehicle of Ms. Zech and Mr. Nicholls, to the jury it may have appeared to be something quite different - - the vehicle of the person who killed Ms. Gaglia.  Further, a vehicle at the post office at the time of the killing is entirely inconsistent with the Government's theory at trial - - that Mr. Brown, riding a bicycle, robbed and killed Ms. Gaglia when no one else was in the post office.  Evidence that a vehicle (that did not belong to Ms. Gaglia) was in the parking lot at the time of the killing indicates that: (1) the Government's

theory is completely off as someone else or someone in addition to Mr. Brown was in the post office at the time of the killing; or (2) someone other than Mr. Brown was in the post office when Ms. Gaglia was killed. In either instance, evidence of a vehicle at the post office at the time of the killing would have undermined the Government's case, and trial counsel was ineffective for failing to further explore and present this avenue of defense.

### 2.    Alford Banks/Alford Woods/Levi Lecounte

The Government does not deny that the combination of information contained in these reports was evidence that someone other than Petitioner committed the crime. Indeed, the Government appears to concede that trial counsel performed deficiently by not utilizing this information and merely contends that there was "overwhelming evidence of Brown's guilt" and thus trial counsel could have not rendered ineffective assistance of counsel.[25] However, the evidence of guilt was not such that the jury could not have been moved by the

---

[25]The Government states that because there was overwhelming evidence of guilt, trial counsel could not have performed deficiently in failing to investigate this lead. Clearly, even in the face of overwhelming evidence of guilt, when trial counsel's stated theory of defense was that someone else did the crime, trial counsel had the duty to investigate leads that would support their theory of defense. Thus, failure to do so constitutes deficient performance and Petitioner assumes that the Government intended to argue that trial counsel's failure to investigate this line of defense was not prejudicial to Petitioner.

combination of exculpatory evidence that was either suppressed or that trial counsel unreasonably failed to present. *United States v. Ramirez,* 426 F.3d 1344, 1353 (11th Cir.2005) (The cumulative effect of multiple errors may require reversal of an appellant's conviction where, in combination, those errors prejudice a defendant's right to a fair trial.).

### 3.    Negroid Hair Found on Ms. Gaglia's Transport Sheet

The Government concedes that there was a negroid hair recovered from the sheet used to transport Ms. Gaglia's body from the post office.  The Government focuses its attention on the fact that testing of the hair could have proved that the hair belonged to Mr. Brown.  The Government misses the point.  Trial counsel could and should have introduced evidence of the negroid hair and then pointed out that the Government, with all of its resources, failed to test the hair to determine if it belonged to Mr. Brown.  Trial counsel should have further argued that the Government's reluctance to test this hair demonstrated its uncertainty that Mr. Brown was the actual killer.  Counsel could have argued that had the Government been convinced of Mr. Brown's guilt, testing of the hair would have been a mere formality, one that would have only affirmed Mr. Brown was the killer.  Counsel could have and should have argued that the failure to test this critical piece of evidence demonstrated that the Government was not sure of the

identity of the real killer and that the Government's doubt should equate to a

reasonable doubt in the jury's mind.  Such a method has been recognized as

effective.  *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) ("A common trial tactic

of defense lawyers is to discredit the caliber of the investigation or the decision to

charge the defendant."[26]).

### B.      Plain Error Review on Appeal[27]

Petitioner asserted that trial counsel was ineffective for failing to object to a

number of errors which resulted in the Eleventh Circuit reviewing those errors

under a plain error standard.  The Government is mistaken in its assertion that

*Gordon v. United States*, 518 F.3d 1291 (11th Cir. 2008), stands for the

proposition that if the Eleventh Circuit had rejected the claim under the plain error

standard on direct appeal, that "Brown cannot succeed on a §2255 petition by

repackaging those claims under [ineffective assistance of counsel][28] rubric."

---

[26]*Citing, Bowen v. Maynard,* 799 F.2d 593, 613 (10th Cir. 1986).

[27]Petitioner will only address the Government's Response as to the DFACS records.  Petitioner relies upon his previous pleadings with respect to other issues and does not abandon or otherwise waive those issues.

[28]The bracketed language contained in this quote is because Petitioner assumes that the Government intended to assert that Petitioner could not "repackage" plain error as *an ineffective assistance of counsel claim*.  The complete sentence quoted actually reads: "To the extent that the Eleventh Circuit found no plain error in the claims discussed below, Brown cannot succeed on a

First, for an error to be plain, the reviewing court must engage in a four step

approach.   To establish plain error, a defendant must establish that the district

court committed "(1) error, (2) that is plain, (3) that affects substantial rights, and

(4) that seriously affects the fairness, integrity, or public reputation of judicial

proceedings." *United States v. Deverso,* 518 F.3d 1250, 1255 (11th Cir.2008).

While step (3) is arguably the same as *Strickland* prejudice, to satisfy the plain

error prejudice standard, a litigant must *also* demonstrate the error seriously

affects the fairness, integrity or public reputation of the proceedings.  Thus, plain

error prejudice adds a fundamental fairness component to *Strickland* prejudice.

The Supreme Court has rejected any notion that *Strickland* prejudice

includes a fundamental fairness component.  In *Williams v. Taylor*, 529 U.S. 362

(2000), the state supreme court, in analyzing an ineffective assistance of counsel

claim, held that *Lockhart v. Fretwell*, 506 U.S. 364 (1993), modified the prejudice

analysis of *Strickland v. Washington*, 466 U.S. 668 (1984), to add an fairness

component.  As the Court noted:

> the Virginia Supreme Court read our decision in *Lockhart* to require a
> separate inquiry into fundamental fairness even when Williams is able
> to show that his lawyer was ineffective and that his ineffectiveness
> probably affected the outcome of the proceeding."

---

§2255 petition by repackaging those claims *under plain error* rubric." DOC # 54
p. 97.

*Williams v. Taylor*, 529 U.S. at 394.  The prejudice analysis employed by the Virginia Supreme Court is similar to steps (3) and (4) of plain error review.  The Supreme Court rejected the Virginia Supreme Court's rationale stating "the Virginia Supreme Court erred in holding that our decision on *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d180 (1993), modified or in some way supplanted the [prejudice prongs] set down in *Strickland*."  *Williams v. Taylor*, 529 U.S. at 391.  Thus, as Petitioner originally asserted, and contrary to the Government's assertion in its Comprehensive Response, the prejudice prong of *Strickland* is an easier burden for a Petitioner to satisfy than the plain error prejudice standard.

The Government asserts that the Eleventh Circuit's resolution of the substantive issue vis-a-vis DFACS records raised on appeal settles the issue, because "[a]s contemplated by *Gordon*, Brown cannot meet the prejudice standard required for plain error. . ."  As noted above, plain error review is inapposite to the analysis.  Failure to appeal the quashing of the DFACS subpoena was deficient performance.  Trial counsel obviously wanted the records - - he subpoenaed them - - thus there can be no strategic reason for not pursuing the issue once the magistrate court quashed the subpoena.

The only inquiry is whether Petitioner was prejudiced by trial counsel's

failure.  In these proceedings, Petitioner has tendered DFACS records pertaining to Petitioner's family.  ( DOC # 8 pp. 21-23, Appendix  I, to Motion to Vacate). While the magistrate was correct that the DFACS records contained no mention of Brown's name, as the Court can see, the records detail the horrific conditions in which  Petitioner was raised.  While it is correct that the Eleventh Circuit noted that trial counsel presented the testimony of fourteen witnesses at the penalty phase, some of whom described, in general terms, the Morgan compound, the DFACS records could have given far more detail with the additional benefit of an official imprimatur chronicling Petitioner's troubled upbringing.[29]

### C.    Failing to Object to Definition of Mitigating Circumstances[30]

The Government examines the Court's charge on mitigating circumstances

---

[29]The Government's assertion that there can be no prejudice because "the fact that Brown grew up in horrific conditions has never been in dispute" (DOC # 54 p. 98) ignores the fact that the jury heard only vague, generalized descriptions of the conditions from *lay witnesses*.  Having DFACS records, as was presented in *Williams v. Taylor*, 529 U.S. 362, 395, n. 19 (2003), would have provided official documents, compiled by independent Government officials that "graphically described [Brown's] nightmarish childhood" and  which would have given credibility and significant mitigating flavor to the lay witnesses' testimony.  *Id.*

[30]The Government writes that Petitioner only challenged the Court's definition given in the preliminary penalty phase instructions.  DOC # 54 p. 102, n. 22.  Petitioner thought it obvious that his claim was to both the preliminary instructions and the identical instruction recited in the final penalty phase instructions, and did not feel the need to cite to both (identical) portions of the Court's instructions.

in isolation.  As noted in his Comprehensive Brief, Petitioner alleged that this Court's questioning during voir dire indicated that a death sentence was the default penalty should the case proceed to the penalty phase.  Although the Eleventh Circuit found that any error in voir dire was harmless because of the Court's later instruction to the jury, this analysis did not take into account the Court's definition of mitigating circumstances and therefore is not dispositive of the issue before this Court.  This Court's definition of mitigating evidence coupled with the Court's voir dire would have created in the mind of a reasonable juror, irrespective of the brief curative instruction, a belief that it was incumbent on Petitioner to present mitigating evidence in order to avoid a death sentence.  The combination of the Court's voir dire and its instruction acted to shift the burden of proof to Petitioner.

### D.     Failing to Object to Instances of Prosecutorial Misconduct

### 1.     Closing Argument

The Government asserts that the prosecutor did not vouch for the credibility of its key witness, Postal Inspector McClendon, because it did not "place[] the prestige of the Government behind the witness [with] explicit assurances of the witness's credibility" or "imply[] that evidence not formally presented to the jury that supports the witness's testimony."  DOC # 54 p. 104.  Petitioner does not

44

contend the Government made reference to evidence not formally presented. Petitioner does contend that the prosecutor's argument did "place[] the prestige of the Government behind the witness."  Indeed, arguing that Ms. McClendon's "takes her job seriously . . . just like a captain in the United States Army, when they have one of their people down in the field, *they are going to bring them back and they are going to do everything they can do lawfully and properly so justice is done*" explicitly tells the jury that the prosecutor (*i.e.* the Government) believes that Ms. McClendon's investigation was completely thorough and un-impeachable.  In other words, the prosecutor was vouching for the credibility of the *investigation* of Ms. McClendon, and by so doing, was vouching for the credibility of its own witness.

"Vouching occurs when the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility."  *United States v. Cano*, 289 F.3d 1354, 1365 (11th Cir. 2002)(citation omitted).  Here that is exactly what prosecutor did - - told the jury that the Government believed the investigation conducted was credible.

The Government attempts to justify the improper argument by claiming that it was in response to trial counsel's "insinuation that the Government's case had been sloppily compiled."  DOC # 54 p. 105.  Even if Petitioner attacked the

45

thoroughness of the Government's case, that line of defense is permissible. *Bowen v. Maynard,* 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation."). The Government was not free to make improper argument in response to a legitimate defense tactic.

Contrary to the Government's position, the prosecutor's argument did more than stress the postal inspector's care. It also did more than "remind the jury of the agent's experience." DOC # 54 p. 105. The argument specifically said that Ms. McClendon did "everything [she could] do . . . [to see that] justice is done." By making this argument, the prosecutor expressly informed the jury that he believed the quality of the investigation was credible.

The Government writes that "[i]t is a far leap to go from an Army reference to the War on Terror" *Id*. at 106. The Government fails to examine the argument in context. Taken in context, this argument was made during a trial conducted in November of 2003, eight months after the war in Iraq began and two years into the war in Afghanistan. Venue for the trial was the Southern District of Georgia which encompasses Ft. Stewart, home of the United States Army's 3rd Infantry Division, a unit that regularly deployed troops to the Middle East, many of whom

were killed in action.[31]  And during the trial of the case, the Government's DNA expert testified that he had done work trying to identify the remains of the victims of the September 11, 2001, attack on the World Trade Center.  All of these factors would make the jury more likely to equate the prosecutor's reference to the military as a reference to the War on Terror and would more likely inflame the passions of the jury.

The Government's harmless error analysis is also flawed as the Government examines the complained of arguments in isolation rather than considering the cumulative effect.  *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) ("Even if we were to find any of the above errors, standing alone, to be harmless, their cumulative effect . . . was clearly prejudicial.").  In addition, the evidence of Petitioner's guilt was not a foregone conclusion.  Trial counsel created considerable doubt about the eye-witness identification and whether Petitioner was wearing the Brown coat upon which Ms. Gaglia's DNA was found.  Had trial counsel objected to the prosecutor's closing argument, this Court would have

---

[31]Indeed, a recent National Public Radio report discussed Warrior's Walk, a memorial on Ft. Stewart for soldiers killed in action.  The memorial consists of a long path of Eastern red bud trees with each tree representing a soldier from the 3rd Infantry Division who died since 2003, when the United States invaded Iraq.  By April of 2006, there were over 300 trees in the memorial.  *See* http://www.npr.org/templates/story/story.php?storyId=5367636.

likely sustained the objection and correctly instructed the jury.  Had the Court overruled the objection and counsel raised the issue on appeal, there is a reasonable probability that the Eleventh Circuit would have found the comments improper and prejudicial.  *United States v. Castro,* 89 F.3d 1443, 1450 (11th Cir.1996).  Petitioner was denied effective assistance of counsel.

### 2.   Misrepresenting Petitioner's IQ

There is nothing in the record to indicate the prosecutor had a good faith basis to believe Petitioner had an IQ of 113.  However, the prosecutor's questions to Linda Jones, one of Petitioner's former teachers, suggested that he had information (not presented at trial) indicating Petitioner's IQ was 113.  The prosecutor first asked Ms. Jones if she was aware that Petitioner had an IQ of 113, to which she responded that school records indicated an IQ of  99.  Not satisfied, the prosecutor, again with no record support, asked "are you aware that later on he was tested to have a 113 IQ." CR. DOC #  293 p. 1130.  There was no evidence then, nor is there any now, to indicate Petitioner had an IQ of 113.

The prosecutor's questions, especially the assertion that Petitioner was tested after school and scored 113, led the jury to believe two things: (1) Ms. Jones really did not know much about Petitioner; and (2) Petitioner was of above average intellect.  Both beliefs were erroneous.  Trial counsel's own argument

indicates that his failure to object to this line of questioning was not a strategic

decision - - he did not even know what Petitioner's IQ was.  (*Id*. at 1186-87

("They talked about my client having an IQ of 113.  And *I don't know whether this

is the case or not*.").[32]

### E.    Failure to Seek a Continuance

The Government, in addressing this aspect of Petitioner's ineffective

assistance of counsel claim, omits a critical aspect - - trial counsel failed to seek a

continuance when their mitigation specialist disappeared without having done any

of the work she was supposed to do.  *See* DOC # 53, Appendix 1 (Bell Affidavit)

& 4 (Darden Affidavit).  Regardless of what trial counsel said at the September 9,

2003 pretrial conference and/or the October 2, 2003 status conference, it is

patently unreasonable (and therefor deficient performance) not to seek a

continuance (and other relief) when someone as critical as the mitigation

---

[32]The Government also misses the point when it argues that Darden's argument was "directed toward the threshold eligibility requirements." DOC # 54 p. 114.  Petitioner is not contending the argument was directed at the eligibility requirement.  Rather, Petitioner is contending that trial counsel was ineffective for not objecting to, and then making worse, the prosecutor's misconduct by acquiescing in the assertion that Petitioner was of above-average intelligence.  Further, Petitioner asserts that it is *per se* deficient performance for defense counsel, in a capital case, not to know his client's IQ.

investigator does not investigate or produce.[33]

## CLAIM X

### THE GOVERNMENT  SUPPRESSED INFORMATION FAVORABLE TO THE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION

The Government concedes that the paragraph contained in the draft affidavit was not in the final version and its existence was not disclosed by the Government.  DOC # 54 p. 123.  Further, the Government appears to concede that the information was favorable to the defense.

The Government contends that no *Brady* violation occurred because the paragraph contained information that Petitioner "already ha[d] or, with any reasonable diligence, he [could have] obtain[ed] himself." *Id*.  The Government misses the point.  What is critical to the analysis is Ms. McClendon had personal knowledge of the horrible conditions at the "Morgan compound."  Had trial counsel known that Ms. McClendon was familiar with Mr. Brown's upbringing, they could have elicited this favorable testimony *from the Government's key witness*.  Thus, as was the case with DFACS records (*see* above), the generalized

---

[33]Petitioner also asserts that trial counsel was ineffective in failing to support their Ex Parte Application for Authorization to Obtain Forensic Social Worker (CR. DOC # 174) by informing the Court that Ms. Blankman had not done any of the work she had promised to do.

testimony trial counsel elicited from lay witnesses during the penalty phase would have been bolstered by the state's imprimatur.

## CLAIM XII

**PETITIONER'S CONVICTIONS AND DEATH SENTENCE WERE UNCONSTITUTIONALLY OBTAINED AS A RESULT OF AN UNRELIABLE COERCED CONFESSION IN VIOLATION OF *MIRANDA V. ARIZONA*, AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COUNSEL INEFFECTIVELY PRESENTED THIS ISSUE**

In its Response, the Government provides a lengthy recitation of the facts. To the extent those facts conflict with the facts as outlined in Petitioner's Motion to Vacate, Petitioner relies on his recitation. After detailing the facts and the procedural history before the District Court, the Government notes that this Court denied Petitioner's motion to suppress. DOC # 54 p. 133. However, the Government fails to note that this Court did not, and was not asked to, take into consideration Diane Brown's testimony at trial when deciding the suppression issue. Indeed, this Court denied the Motion to Suppress on September 3, 2003, two months before Diane Brown testified (CR. DOC # 205), and at no time after she testified did trial counsel ask the Court to revisit its earlier decision.

The Government does not remember whether the Eleventh Circuit asked if this Court was asked to consider Diane Brown's testimony in deciding the issue.

51

DOC # 54 pp. 133-34, n. 30. Undersigned counsel, who was at counsel table during the argument, has a clear recollection that the question was asked.

### CLAIM XIV

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO BE PRESENT AT ALL PROCEEDINGS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

The Government contends that the Eighth Amendment is "not implicated" by Petitioner's claim that he was denied his right to be present at the September 3, 2003, pretrial conference. DOC # 54 p. 141. However, as this Court is aware, "death is different" and the Eighth Amendment requires heightened reliability and consequently greater protections in capital cases. *See, e.g., Peek v. Kemp*, 748 F.2d 1479, 1494 (11th Cir. 1986) ("We also recognize that death is different in kind from all other criminal sanctions, and that because of that qualitative difference, there is a corresponding difference in the need for reliability and the determination that death is the appropriate punishment in a specific case.").

The Government also claims that the pretrial conference was not a "critical stage" because Petitioner "was competently and effectively represented by counsel, and his presence 'would have contributed nothing to his opportunity to defend since the matters discussed predominantly involved questions of law.'"

52

DOC # 54 p. 144.  The Government misapprehends the definition of a "critical

stage."   A "critical stage" is "a step of a criminal proceeding, such as an

arraignment, that [holds] significant consequences for the accused." *Valentine v.*

*United States*, 488 F.3d 325, 335 (7th Cir. 2007) (*citing  Bell v. Cone,* 535 U.S.

685, 695-96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)).   The pretrial conference in

question held significant consequences for Petitioner.  It was there that: trial

counsel announced they would not pursue mental health issues; trial counsel

argued for introducing evidence Petitioner offered to plead guilty and the

Government offered argument in opposition (and this Court questioned such a

strategy); and trial counsel and the Court discussed issues that could be raised in a

Motion to Vacate under 28 U.S.C. §2255.  Petitioner was entitled to be present at

all stages of his capital proceedings.

## CLAIM XV

**THE MANNER IN WHICH THE GOVERNMENT WOULD
CARRY OUT PETITIONER'S EXECUTION VIOLATES THE
EIGHTH AMENDMENT**.

The Government's position is that the Supreme Court's decision in *Baze v.*

*Rees*, ___ U.S. __, 128 S.Ct. 1520 (2008), settles the issue as "the federal

[execution] protocol comports with *Baze*."  DOC # 54 p. 148.  In support of this

proposition, the Government includes a chart purportedly showing features of the

Kentucky protocol "which compare favorably to the federal protocol." *Id*. at 150.

The Government's own wording demonstrates that *Baze* does not, *a fortiorari,*

settle the issue in this case. The differences in the federal protocol are significant

enough to make the method of execution used in this case unconstitutional.

Kentucky's provision that only allows one hour of IV access is not addressed at all

in the federal protocol.[34] *Id*. at 150. Similarly, the Government notes that while

Kentucky provides for moving the IV to a secondary site if the inmate remains

conscious after 60 seconds, the federal protocol has no such provision. *Id*. While

Kentucky provides "specific professional standards for team members," the federal

protocol requires use of "qualified personnel" but fails to define what makes one

"qualified." *Id*. at 151. Kentucky requires a specific number of training runs prior

to an actual execution while the federal protocol merely states that personnel shall

have necessary training. *Id*. A more thorough analysis of the federal protocol must

be undertaken by this Court.

---

[34]The Government appears to believe the provision that the inmate can be brought into the execution chamber only 30 minutes before the scheduled execution means that there are only 30 minutes of IV access. However, the cited provision does not deal with IV administration, and an IV could be inserted hours prior to the inmate being brought into the chamber.

## CLAIM XVII

**PETITIONER WAS DENIED HIS RIGHT TO MEANINGFUL APPELLATE REVIEW BECAUSE OF AN INCOMPLETE RECORD COMPILED BY THE DISTRICT COURT IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION**

The Government implies that because the Court asked trial counsel if there were any *Batson* challenges and trial counsel said "no," meaningful appellate review was preserved. DOC # 54 p. 152 ("Although this information is on the record, Brown asks for more."). The Government's assertion that the Court Reporter Act did not require transcription of the peremptory strike discussion and, consequently, Petitioner had no right to the recording of the strikes, misses the point. (*Id.* at 153). Again, "death is different in kind from all other criminal sanctions, and that because of that qualitative difference, there is a corresponding difference in the need for reliability and the determination that death is the appropriate punishment in a specific case." *Peek v. Kemp*, 748 F.2d 1479, 1494 (11th Cir. 1986). Petitioner, an African-American male accused of killing a white woman, was entitled to have the race and gender of the jurors struck by the Government made a part of the record, either by having the court reporter transcribe the strike conference, or by the Court or counsel reading into the record

the strikes used and the race and gender of the stricken juror.[35]

## CONCLUSION

For the forgoing reasons this Court should grant the relief Petitioner has requested.

Dated, this the 12th day of May, 2008.

Respectfully submitted,

*s/Jeffrey L. Ertel*
JEFFREY L. ERTEL
State Bar No. 249966

FEDERAL DEFENDER PROGRAM, INC.
100 Peachtree Street
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

ATTORNEY FOR MR. BROWN

---

[35] For the same reason, the Government's assertion that recording conversations at counsel table is bad practice misses the point.

CERTIFICATE OF SERVICE

I hereby certify that the forgoing has been electronically filed and served

upon Counsel for the Government as follows:

> Amy Lee Copeland, Esq.
> Assistant United States Attorney
> P.O. Box 8970
> Savannah, Georgia 31412

Dated, this the 28th day of July, 2008.


*s/Jeffrey L. Ertel*