**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**MEIER JASON BROWN**

v.                        **407CV085**
                          **403CR001**

**UNITED STATES OF AMERICA**

**ORDER**

# I. INTRODUCTION

After convicting Meier Jason Brown of robbing and murdering a federal employee within federal jurisdiction, a jury (and thus this Court) sentenced him to death. Doc. # 276, *aff'd*, *U.S. v. Brown*, 441 F.3d 1330 (11th Cir. 2006), *cert. denied*, 127 S.Ct. 1149 (2007). Brown now moves, over the Government's opposition, for 28 U.S.C. § 2255 relief. 407CV085, doc. ## 8, 50, 54. He also moves for discovery and for an evidentiary hearing. Doc. # 52, *as supplemented*, # 66; # 53, *as supplemented*, # 67. The Government opposes those motions too. Doc. ## 55, 56.

# II. BACKGROUND

*Brown* comprehensively details the facts; familiarity with them is presumed here. In a nutshell, Brown murdered postal employee Sallie Gaglia at a post office so he could rob some postal money orders that, posing as a customer, he had just asked her to prepare. *See Brown*, 441 F.3d at 1337-1342. The trial proceeded in two (guilt-innocence liability and penalty) phases. In the first, the jury convicted him of violating 18 U.S.C. § 1111 (murder within the U.S. territorial jurisdiction); 18 U.S.C. § 1114 (murder of a federal employee) and 18 U.S.C. § 2114 (robbery of federal property). *Id.* at 1342. In the second, it sentenced him to death after hearing aggravating and mitigating evidence. *Id.* at 1342-43.

# III. ANALYSIS[1]

## A. Procedural Standards

### 1. *Claims Resolution*

District courts must address § 2255 motions in plenary, not summary, fashion. *Kicklighter v. U.S.*, 2008 WL 2421728 at * 6 (11th Cir. 6/17/08) (unpublished) (a district court should explain the reasoning behind its denial of § 2255 relief in order to provide the appellate court with a sufficient basis for review); *Jernigan v. U.S.*, 180 Fed.Appx. 56, 58 (11th Cir. 2006).

### 2. *Procedural Default*

The procedural default doctrine constrains defendants to fully and timely raise all objections and defenses. Thus,

[a] defendant who fails to object at the trial court level to error he believes the court has committed or fails to raise such objection on appeal is procedurally barred from presenting his objection in a motion subsequently filed under 28 U.S.C. § 2255 absent a showing of cause and prejudice or a fundamental miscarriage of justice. *See United States v.*

---

[1] Some housekeeping notes: First, the Court will refer to the record from Brown's § 2255, civil file (*i.e.*, 407CV085), with the exception of pretrial and trial transcripts from Brown's criminal file, 403CR001, specifically doc. ## 259, 290-295, 298, 301, some of which have been re-filed (as e-filings), doc. ## 365-372.

Second, the Court instructed the parties to say all they wanted to say in no-page-limit *briefs*, and it expressly invited unlimited reply briefs while strictly enforcing *initial* briefing deadlines. Doc. # 49 at 2-3. It also reminded the parties that the practice of spreading arguments over multiple documents, thus requiring judges to flip back and forth between them just to follow an argument, is unacceptable; hence, filing documents like a "traverse" is simply " obsolete." *Id.* at 2. With few exceptions here, then, the Court is addressing only the points and arguments raised in the parties' *briefs*.

*Frady*, 456 U.S. 152, 166-68, 102 S.Ct. 1584, 1593-94, 71 L.Ed.2d 816 (1982); *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir.1994).

*Genge v. U.S.*, 2008 WL 2220629 at * 1 (11th Cir. 5/30/08) (unpublished). "A prisoner collaterally attacking his conviction can establish cause if he can show that some objective factor external to the defense impeded counsel's efforts to comply with the procedural rule." *Id.* (quotes, cites and alterations omitted).

If a defendant fails to show cause, then courts need not go on to determine whether there is prejudice, and vice-versa. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991). But if he does show cause, then he must also show actual prejudice from the alleged constitutional violation, *i.e.* that the errors at his trial "'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (*quoting Frady*, 456 U.S. at 170).

Even if a defendant cannot show cause and prejudice, he may still receive consideration on the merits of his procedurally defaulted claim if he can establish a fundamental miscarriage of justice, *Schlup v. Delo*, 513 U.S. 298, 314-15, (1995), though this is very rare and is commonly recognized where it can be said that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Davis v. Terry*, 465 F.3d 1249, 1253 n. 4 (11th Cir. 2006) (citing *Murray*, 477 U.S. at 496).

Finally, courts "are not required to reconsider in § 2255 motions claims that were raised and disposed of on direct appeal," *Evans v. U.S.*, 218 Fed.Appx. 924, 926 (11th Cir. 2007) (citing *Mills v. U.S.*, 36 F.3d 1052, 1055 (11th Cir.1994)), as they are similarly defaulted. *Id.*

### 3. *Discovery, Evidentiary Hearings*

A § 2255 movant seeking discovery must show good cause. 28 U.S.C. § 2255 Rule 6(a); *Phelps v. U.S.*, 2007 WL 2109244 at * 10 (E.D.Tn. 7/18/07) (unpublished). That can be shown where specific allegations support reason to believe that the movant may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *U.S. v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004). And when an evidentiary hearing also is sought, courts must conduct one "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see also Anderson v. United States*, 948 F.2d 704, 706 (11th Cir.1991) (holding that, unless the record is adequate to show conclusively that the movant's contentions are without merit, the district court must conduct a hearing). On review, the court "must accept all of the petitioner's alleged facts as true and determine whether the petitioner has set forth a valid claim." *Diaz v. United States*, 930 F.2d 832, 834 (11th Cir.1991) (quotation omitted). However, "on habeas a federal district court need not conduct an evidentiary hearing if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel."

*Paez-Ortiz v. U.S.*, 200 Fed.Appx. 946, 948 (11th Cir. 2006)[2]; *see also Tucker v. U.S.*, 275 Fed.Appx. 402, 404 (5th Cir. 2008).

However, bald assertions and conclusory allegations will not suffice. *See Mayberry v.*

---

[2] Evidently for comity reasons, this is a more lenient standard than is the case with similar motions under 28 U.S.C. § 2254. *Teti v. Bender*, 507 F.3d 50, 61 n. 4 (1st Cir. 2007).

*Petsock*, 821 F.2d 179, 185 (3d Cir. 1987) ("Just as bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing ... neither do they provide a basis for imposing upon the state the burden of responding in discovery to every habeas petitioner who chooses to seek such discovery"), *quoted in U.S. v. Lopez*, 2007 WL 3196626 at * 5 n. 4 (E.D.Pa. 10/30/07) (unpublished).

## B. The Merits

### 1. *Ineffective Assistance*

As is par for the course in capital habeas cases, Brown alleges that his two appointed trial lawyers provided him with ineffective assistance of counsel (IAC), so imposition of the conviction and sentence against him violates his Sixth Amendment right to counsel. Doc. # 51. In almost every claim discussed below, Brown enmeshes IAC allegations, so it is somewhat difficult to specify them in an organized format.

In any event, his main IAC charge is poor execution of counsel's sentencing-phase strategy (*i.e.*, counsel failed to competently investigate and present mitigation evidence to the jury).

To that end, trial counsel have both tendered affidavits supporting Brown's IAC claims against them. Doc. # 53, App. 1 & 5. Mental health and other experts, along with a mitigation specialist, have also have chimed in. *Id.*, App. 3 (31 pages of postconviction-gathered, mitigation evidence); App. 6 ¶ 5 (two M.D.'s who "have concluded that Meier Brown suffers from diagnosable mental diseases or defects, and that there is considerable evidence in his background and social history that could be considered mitigating...."); App. 7 (postconviction expert's opinion that Brown would pose no future danger to society if life-sentenced); App. 8 (federal prison system's psychiatric examiner complaining that trial counsel were uncooperative but in any event Brown is not a malingerer or sociopathic and was remorseful).

In both 28 U.S.C. § 2255 and 28 U.S.C. § 2254 (state habeas) proceedings the same IAC questions are asked: Was counsel's performance deficient and if so, did it prejudice the defense to the point where the outcome would otherwise have been different? *Williams, Jr. v. Allen*, ___ F.3d ___, 2008 WL 4224720 at * 15 (11th Cir. 9/17/08); *see also id.* ("In a case challenging a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.") (quotes, cite and alterations omitted); *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008); *Alderman v. Terry*, 468 F.3d 775, 795 (11th Cir. 2006) (Even if defense counsel, in capital re-sentencing trial, were deficient in not presenting more life-history evidence, defendant was not prejudiced).

The same must be said for IAC claims against appellate counsel. *Shere v. Secretary, Florida Dept. of Corrections*, 537 F.3d 1304, 1310 (11th Cir. 2008) (Defendant may establish ineffective assistance of appellate counsel by showing: (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance, defendant would have prevailed on appeal).

Brown thus must first show that his lawyers failed to meet the standard of reasonableness under prevailing professional norms. *Newland*, 527 F.3d at 1184. Judicial evaluation of counsel's performance is highly deferential, indulging a strong presumption that (a) it was reasonable and (b) counsel made all significant decisions in the exercise of reasonable

professional judgment. *Id.*

No hindsight judgment is permitted, and the review is objective -- whether there was any reasonable justification for counsel's conduct. *Id.* At bottom, Brown must establish that no competent counsel would have taken the action that his counsel did take, *id.* -- that "the course of action taken by counsel would not have been taken by any competent counsel." *Blankenship v. Hall*, ___ F.3d ___, 2008 WL 4191952 at * 16 (11th Cir. 9/15/08).

On top of all that, Brown must prove all facts necessary to show a constitutional violation. *Id.* at * 15 (it is the petitioner's burden to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation); *Wood v. Allen*, ___ F.3d ___, 2008 WL 4215078 at * 25 (11th Cir. 9/16/08) (defendant alleging IAC must affirmatively prove prejudice). Brown, then, must "elicit the facts necessary to prove the claim," *Blankenship*, 2008 WL 4191952 at * 15, and prove "that particular and identified acts or omissions of counsel fell outside the wide range of professionally competent assistance." *Hillary v. Secty.*, No. 07-13854, Slip. Op at 8 (11th Cir. 9/26/08) (unpublished).[3]

Finally, much has been made in recent years about a defense counsel's duty to investigate and present mitigation evidence:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003), quoted in *Wood*, 2008 WL 4215078 at * 23.

It is in light of these standards that the Court now turns to Brown's specific IAC claims.

### a. BROWN'S ATTEMPTED GUILTY PLEA

Brown first contends that his trial lawyers -- Richard Darden and William Bell -- bungled their presentation (to the sentencing jury) of the fact that Brown had attempted early on to plead

---

[3] Complicating the analysis further, IAC claims are interwoven with procedural default. In other words, an IAC claim, if not procedurally defaulted, may constitute cause. *Mize v. Hall*, 532 F.3d 1184, 1191 (11th Cir. 2008). And IAC "adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Thus, a federal habeas court is barred from considering IAC as cause for procedural default of another claim *if* the IAC claim was itself procedurally defaulted, *unless* the movant can show cause and prejudice concerning the default with respect to the IAC claim itself. *Id.* at 452-53.

Here the Government does not argue that Brown's claim that he received ineffective legal assistance at both

phases of his trial (*i.e.*, his general IAC claim) is itself procedurally defaulted, even though he raised no such claim on direct appeal. Doc. # 54 at 13. That's not surprising, as the "failure to raise an ineffective-assistance-of counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. U.S.*, 538 U.S. 500, 509 (2003); *see also U.S. v. Wilson*, No. 07-15819, Slip Op. at 3 (11th Cir. 9/17/08) (unpublished) ("Both this court and the Supreme Court have indicated that it is preferable to decide claims of ineffective assistance of counsel on collateral review").

guilty and thus avoid a death sentence. Doc. # 51 at 9. Counsel, he contends,

> prejudicially (1) failed to inform the [sentencing-phase jury] that the [local] *prosecutors* had agreed to a life sentence, and (2) harmfully informed the jurors that [Brown] had agreed to plead guilty. At sentencing, counsel introduced a stipulation that said only that [Brown] offered to plead guilty. [Doc. # 293 at] 1167. Inasmuch as the jurors knew he had not pled guilty, the only conclusion for the jurors to draw was that the Government said "no." In fact, the local prosecutors said "yes."[4] Additionally, defense counsel unreasonably did not enter a stipulation that said *when* the offer to plead guilty had occurred.

*Id.* at 9 (footnote and emphasis added).

Brown correctly contends that this claim is not procedurally defaulted because it is grounded in his general IAC claim. *See supra* n. 3. Nevertheless, counsel were not deficient here. During his sentencing-phase, closing argument, attorney Darden told the jury:

> This case has never been about guilt and innocence. It never was. [¶] [Brown] confessed from day one. And as you know, he offered to plead guilty in this case in exchange for a life sentence *in December of last year*. We don't want to be here. I didn't want to put the family through this. I didn't want to put you through this. Unfortunately, circumstances bring us to this point. And for that, I apologize.

Doc. # 293 at 1180 (emphasis added). Darden later emphasized that Brown confessed and cooperated, had been remorseful, and

> has accepted responsibility. We now know that he did everything he could to try to plead guilty to this case. He submitted an offer to the government, and said, "look, we won't go to trial. I will do the rest of my life in prison." I will never be released. He has accepted responsibility.

*Id.* at 1189.

The Government did not mention the stipulation in its initial or rebuttal closing. Darden thus made a tactical decision to inform the jury about Brown's attempt to plead guilty in December 2002 -- almost a year before the trial. This tactical decision did not constitute deficient performance; Darden used the stipulation to demonstrate Brown's remorse and acceptance of responsibility for Gaglia's murder. And, he told the jury *when* Brown offered to plead guilty.

It is true, as Brown reminds (doc. # 65 at 3-4), that what the lawyers say in closing argument is not evidence and in fact this Court reminded the jury of that. Doc. # 291 at 551. But: (1) this Court also reminded the jury that what the lawyers say is "highly worthy of your consideration," *id.*; (2) there was no reason for any rational juror to disbelieve *defense* counsel's assertion of *when* Brown offered to plead guilty; and (3) the basic fact (Brown's offer to plead guilty) *was* provided, in the form of very powerful evidence -- a stipulation. So even though the jury was instructed *not* to accept the "when" assertion as evidence, the fact that such bell was very likely not "unrung" with lay people militates against the prejudice showing that Brown must make to win IAC-based relief here.

To that end, so long as a tactical or strategic decision was, in the non-hindsight view, reasonable, the IAC-inquiry ends. *Wood,* 2008

---

[4] This is true, but the the U.S. Attorney General overruled them. Doc. # 54 at 17.

WL 4215078 at * 22. Defense counsel's decision on whether, how and when to present this evidence has not been shown to be objectively unreasonable. A reasonable attorney, for example, may have elected not to super-illuminate the "when" factor during trial (but instead slip it in at closing) since it could have opened the door for the prosecution to rebut with the fact that the U.S. Attorney General himself insisted on greater uniformity nationwide in imposing the death penalty so as to counter claims that regional variations cause arbitrariness in death-sentencings (a claim that Brown himself now makes, *see* Part III(B)(4) *infra*). That fact might have appealed to some of the jurors who were otherwise on the brink of deciding in favor of a life sentence. Slipping the "when" factor into closing argument could be seen as just the right amount of subtlety to maneuver juror emotions toward a life sentence.

Even assuming counsel erred on this point, no IAC-level prejudice can be shown once one takes two steps back from this case to grasp the Big Picture: Brown insisted, as was his right, on denying guilt all the way through the liability phase of his trial. His lawyers thus argued forcefully that someone else committed the crime, the evidence against Brown was insufficient, his confession was involuntary, etc.

Following their guilty verdict, however, the next thing the jury heard out of the same lawyers' mouths was that lo and behold, Brown in fact was guilty, knew he was guilty all along, and even tried to plead guilty from the get-go. That flip-flop might just naturally incense lay people (*i.e.*, the jury) who'd just spent days hearing liability evidence and then deliberating to a verdict. It might even make them think that Brown had just wasted their time (and is just another *lying* criminal) by claiming innocence for the entire first phase of the trial.

Of course, that *is* the system. Someone like Brown unquestionably is entitled to make the Government prove its case against him. Someone like Brown is thus legally entitled to "flip-flop" (claim innocence at the liability phase, then admit that he was guilty all along once in the penalty phase). *Compare Blankenship,* 2008 WL 4191952 at * 3-10 (vile rape/murder death penalty case where counsel, through three sentencing trials, stuck to reasonable, then residual-doubt strategy through both phases and thus risked no flip-flop effect; Blankenship's later IAC claim against them -- for failing to investigate and adduce sufficient mitigation evidence -- was denied in no small part because of their overall "residual-doubt" strategy, which made mitigation evidence less compelling).

Lay emotions and biases exist and cannot be pretended away. Lawyers and judges may be able to accept, at least as an intellectual abstraction, "flip-flopping," alternative pleading in civil cases, and various legal fictions. Lay people, in contrast, typically will not. Indeed, some no doubt vote politicians in and out of office for being "flip-floppers."

This Big Picture reality -- the proverbial elephant in the room -- is something that trial and habeas counsel cannot deny. It also must necessarily inform postconviction, judicial determinations of IAC-level prejudice here, both as to this particular claim (*i.e.*, whether, assuming the "attempted guilty plea" mishandling was an error, such error made any material difference on the trial's outcome given Brown's "flip-flop" effect on the jury), as well as the rest of Brown's IAC claims.

Meanwhile, the Court rejects Brown's affidavits. Bell attests "that it was a mistake introducing the stipulation" because he recalled the jurors' "visibly upset" reaction after they

were told of Brown's guilty-plea offer. Doc. # 53, exh. 1 ¶ 12. That is unacceptable hindsight. And the jury foreperson's affidavit was wrongfully obtained. *See U.S. v. Brown*, 2008 WL 2811890 (S.D.Ga. 7/21/08) (unpublished); doc. # 62. This first IAC claim, then, is denied.

### b. MITIGATION EVIDENCE --VICTIM IMPACT

Prior to trial, a U.S. Postal Inspector's Report was furnished to the defense. It revealed that several of Gaglia's family members, including her widower, did not want the death penalty for Brown. Doc. # 51 at 12. On direct appeal Brown complained that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to him that Gaglia's husband was opposed to a death sentence against him. *Brown*, 441 F.3d at 1350. The Government argues that, because Brown raised *that* claim on direct appeal, procedural default bars him from presenting essentially the same claim now, repackaged as an IAC claim. Doc. # 54 at 26.

Even were the claim not procedurally barred, however, it nevertheless fails on the merits because *no* such victim impact evidence is *admissible* in the penalty phase of a capital trial. *Brown*, 441 F.3d at 1351-52. Therefore, counsel could not be found to have slipped below the professional norm on this point.

### c. MITIGATION EVIDENCE -- WOODALL

During the sentencing phase Detective Charles Woodall -- a police detective who interrogated Brown and got him to confess -- testified on Brown's *behalf*. Doc. # 293 at 1159-60. He said he'd known Brown for "probably eight years," described Brown's childhood squalor, and related that he was remorseful during his confession. *Id.*

Little more than that was elicited from Woodall. Effective counsel, Brown now argues, would have had him testify that Brown grew up in a rural family compound where life was short, nasty and brutish, one that was marked by random shootings, murders and hellish happenings (his baby sister, for example, crawled into and then "drowned in the septic tank in the yard"). Doc. # 293 at 1163; *see also* # 51 at 14-19; # 53 App. 2 (Woodall's § 2255-motion supporting affidavit emphasizing that he would have, had he been asked on direct at trial, elaborated a lot more than he did on Brown's "nasty, sordid and disgusting" childhood and adult living environment).

The Government insists that Brown cannot show prejudice, and quotes the *Brown* court's summary of Brown's penalty-phase evidence:

At the penalty phase, Brown presented fourteen witnesses who testified about Brown and his childhood. Those witnesses described the deplorable conditions under which Brown was raised, noting that there were frequent fights in his home, that his parents used drugs, that his father left the home after shooting his stepson when Brown was seven, that a child died at Brown's home after drowning in a septic tank, and that the police were frequently called to break up fights, shootings, and stabbings.

*Brown*, 441 F.3d at 1364, *quoted at* doc. # 54 at 33. Brown responds that a more elaborate recitation, coming from a *law enforcement* officer, very likely would have made a difference to the jury, as trial counsel's sentencing-phase strategy was to show Brown's remorse and seek jury sympathy in light of Brown's squalid upbringing. Doc. # 65 at 7-8.

The Court agrees with the Government (doc. # 54 at 32-22) that other mitigation witnesses

supplied many of the facts that Woodall's post-conviction affidavit now fills in. It is certainly believable that, coming from law-enforcement, such mitigation evidence likely may have more thoroughly resonated with jurors, but it also is believable that, given the variety of sources from which such information flowed (*i.e.*, a good variety of other witnesses, *see* Part III(B)(1)(d) *infra*), the outcome reached here simply would not have been different had counsel performed at the more effective level Brown now demands. This claim, then, is also rejected.

### d. Mitigation Evidence -- Failure To competently Investigate

Brown next argues that counsel were ineffective because they failed to competently investigate his background to support their remorse-sympathy based, penalty-phase strategy. Doc. # 51 at 14-32; # 65 at 8-13. Worse, their presentation was substandard (*e.g.*, they literally introduced mitigation evidence about Brown's *brother*, rather than Brown, so the jury got to hear that Brown was an "angry" rather than "sad" child). Doc. # 51 at 19-23; # 65 at 8-9.

Here courts ask, first, was counsel's investigation of the client's background reasonable? Second, was the strategy selected reasonable? *Blankenship*, 2008 WL 4191952 at * 17. "[I]n evaluating the reasonableness of the investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* (quotes and cite omitted).

In addition to the duty to reasonably investigate avenues of defense (or make a reasonable decision to not do so), counsel's choice of strategy is subject to review, but strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quotes, cite and alterations omitted).

In evaluating counsel's choices, cross-examinational risk must be considered. *See, e.g.*, *Newland*, 527 F.3d at 1216 (Trial counsel's failure to present testimony of family members and former neighbors of defendant in mitigation phase of defendant's capital murder trial was not prejudicial; defendant would have been subjected to a sweeping cross-examination concerning longstanding alcohol abuse, drug addiction, propensity towards violence, and prior five-year imprisonment, and, his responses to the prosecutor's questions could easily have inflamed the jury against him); *Dill v. Allen*, 488 F.3d 1344, 1362 (11th Cir. 2007).

Again, the Court agrees with the Government (doc. # 54 at 34-44) that pretty much all of the mitigation evidence purportedly missed by counsel was, in substance, presented. It perhaps was not as adroitly presented as it is now, in habeas briefs, but the majority of it came out through 14 penalty-phase witnesses, some of whom (thus validating *Newland*'s cross-examination danger) were forced to admit (when cross-examined) to sentence-aggravating facts. *See* doc. # 293 at 1096-1102 (Pelham Brown -- Brown's father -- who testified that he was largely absent from Brown's life, and in fact had to leave the household after shooting Brown's brother Roy, after Roy stabbed Pelham); *id.* at 1102-1114 (Alexis Andrews -- retired county jail official -- she was a neighbor of Brown's family during his childhood; Brown grew up amid "a lot of fights, and a lot of misbehavior, things going like drinking, fighting, drugs ... [a]ll kind of weird activities"); *id.* (there were also shootings and stabbings, the infant drowning in the septic tank, many police visits; Andrews was worried about stray bullets hitting her on her own

property; "it was bad chaotic, very bad" and living conditions were "very poor"; she had to call the police "numerous times"; when Brown spent time in her jail he was "a very good inmate," even qualified as a jail trustee and enthusiastically attended jail religious services); *id.* at 1114-19 (Beverly Bonaparte -- Brown's sister -- Brown cared for his mother, had a quiet nature, was employed but also resorted to crime and thus developed a criminal history; he got into "trouble with somebody else, you know, because he just -- if you ask him to do like that or not do that, you know, he aint' gonna tell you no"); *id.* at 1119-1125 (Joseph Bonaparte, Beverly's husband: Brown is a nice person, will "do anything for you"; took care of his mother; on cross, however, he acknowledged having heard about Brown's 1996 robbery: "Q. So he didn't tell you about jumping on the German woman working behind the desk and grabbing her around the mouth, so his buddies could empty out the till? A. No, sir")[5]; *id.* at 1125 - 26 (Chatham County, Georgia Assistant Jail Administrator John T. Wilcher: Brown has been a good inmate); *id.* at 1126-30 (Linda Jones: was Brown's English teacher from 1984 - 1986, and found him well-mannered but beset by learning difficulties and no parental involvement; remembered a fire at Brown's house and his ensuing school absences; on cross, she acknowledged Brown's 99 IQ, which is average intelligence); *id.* at 1131-1134 (Vanessa Montgomery Parker: his school's social worker, she worked with Brown's mother and assisted with his medication; recalled that he was well-mannered and even-tempered; "[t]here was a little anger, but it wasn't anger directed at me or at the school officials. I don't know whether it was his situation or whatever. But it wasn't a very overt kind of anger, but it was a tenseness sort of anger"[6]); *id.* at 1134-1144 (Patricia Morgan: married to Brown's brother, found the defendant "very sweet, very good natured, down to earth, very funny," and recalled that he moved from Atlanta back to Fleming, Georgia, *i.e.*, the family compound, because he "missed his mother and his family"; back in Fleming, life was hard and chaotic violence the norm; still, she'd never known Brown to be violent, and despite having a criminal history, he deeply cared about his mother and family, and has been a good, reliable brother-in-law); *id.* at 1144-1146 (Steve Murray: a McDonald's hamburger chain manager, he was Brown's boss while Brown worked at a McDonald's as a maintenance man; Brown was a dependable worker who was "very nice" to customers; Murray thus was "shocked"

---

[5] The *Brown* court recounted the evidence on that crime:

> Randy Graham, a former Liberty County Detective, testified that Brown had admitted to committing a robbery at a Liberty County convenience store in March of 1996. He stated that when detectives initially confronted Brown with evidence of the robbery, Brown denied any involvement and only admitted his role after being shown even more evidence confirming his presence during the crime.

*Brown*, 441 F.3d at 1342.

[6] Brown says that this is sheer incompetence on defense counsel's part because Parker was relating information about Brown's brother Ralton, not Brown. Doc. # 65 at 8-9. The Government correctly pointed out that Brown cited no supporting evidence to back up this claim. Doc. # 54 at 38. Brown has since filed a hearsay-based affidavit (which this Court rejects on those grounds) to try and fill in that gap. Doc. # 67-4 at 2 ¶ 6. In any event, another mitigation witness -- Brown's English teacher -- mused that, given the crime committed, Brown must have "let an awful lot of anger out at that time that he had penned up from all those years to do something like that." Doc. # 293 at 1129. And some of Brown's own mitigation witnesses testified that he abused drugs while growing up in what one referenced as a "crack house" family compound. Hence, the prejudice of such error, if an error, was minimized to an inconsequential level.

when Brown was charged with murder); *id.* at 1146-1148 (Davis Williams: knew Brown from church, saw him take care of his mother and bring her to church; Brown was "a well-trained child, and a humble child to me"; he had "good manners to his elders"); *id.* at 1150-1152 (B.T. Smith: pastor of the church where Brown's kin attended, urged the jury to spare Brown's life); *id.* at 1152-1158 (Jimmy Wainwright, a subcontractor: has known Brown since Brown was "about fifteen years old," and Brown's family compound "is a crack house" where there is, "at least every weekend something, either arguing, fighting, shooting, stabbing"; Brown's father used crack cocaine in front of Brown; Brown, who worked for Wainwright as a construction framer for "about nine years," also used drugs but was a good, honest, dependable worker; he was shocked when he heard about the murder charges against Brown; however, Wainwright -- on cross -- admitted that he himself had a criminal record for violent crimes); *id.* at 1158- 1159 (Dexter Morgan: Brown's brother, he knows Brown as a "really loving guy"; he urged the jury to spare him); *id.* at 1159-66 (Woodall testimony recounted *supra*).

Brown's argument must be rejected. Again, the IAC standard is quite demanding: Brown must show, without using hindsight, that *no* objectively reasonable, competent attorney would have traveled the road taken. Brown has not made that showing. At most he has simply repackaged the evidence presented in a "should-have-been-done-better" presentation. Example:

> No testimony was offered about how Petitioner came to use drugs and alcohol, even though the state[7] introduced his convictions for driving while intoxicated as aggravation. For example, defense counsel did not introduce evidence that all of the children on the Morgan compound used drugs and alcohol at an early age without adult intervention or correction. They bought beer with their lunch money and used the adults' drugs. Counsel did not introduce evidence that Petitioner began using alcohol and marijuana in the 6th grade at age twelve. Both were readily available to him through his uncles and cousins. Defense counsel did not introduce evidence that as a teenager Petitioner got drunk or high several times a week and that by the age of 18 he was drunk and high on marijuana every day. He also used other drugs regularly, including crack. By the year 2000, he was addicted to crack cocaine. No mitigating evidence about Petitioner's drug and alcohol dependance was presented, although mention of his having used cocaine was made.

Doc. # 51 at 25.

That is simply another way of saying that another lawyer could have done a better job, *not* that the Darden/Bell presentation amounted to error so serious that such "counsel [were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Davis*, 465 F.3d at 1255. The above-cited, mitigation-witnesses' testimony got the basic message across: Brown was raised in a dark, violent, drug-filled, "crack house" environment. Saying it more colorfully and comprehensively in hindsight -- which is what Brown's brief does here -- simply does not meet the IAC standard. And the additional fact now illuminated (*i.e.*, that

---

[7] Current counsel, perhaps used to litigating 28 U.S.C. § 2254 petitions, seem to have forgotten that before the Court is a 28 U.S.C. § 2255 motion -- hence, a *motion* in

a criminal case (albeit packing a parallel civil file for docketing-statistic purposes) -- which makes Brown a defendant or movant, not a "petitioner." And no "state" is present here, only the federal government.

Brown abused alcohol and drugs at an early age, amid siblings who did same), can hardly be said to have constituted a tipping point for the sentencing jury. If anything, the jury likely would have been surprised to learn that Brown had *not* so indulged. Another example:

> Finally, there were examples of Petitioner's loving character that went unmentioned. For example, Petitioner cared for his epileptic Aunt Earnestine. The other children were put off by Earnestine's sour personality and violent tendencies and were frightened by her seizures, but Petitioner learned how best to help her before, during, and after a seizure. This was not presented at sentencing

Doc. # 51 at 26.

Again, the jury heard that Brown had a compassionate side to him, most notably with reference to his mother. It is simply not convincing that failing to mention his kindness to an aunt, too, would have mattered, especially since every time a mitigation witness was called defense counsel ran the risk that such witness could -- on cross -- be asked (and some were) whether they had heard of Brown's past crimes, thought Brown knew the difference between right and wrong, and were aware of his normal-range IQ. This claim, too, fails.

### e. MITIGATION EVIDENCE -- MENTAL HEALTH EVIDENCE

Next, Brown argues that his lawyers were deficient for failing to develop and present mental health evidence to the jury. Two § 2255 affiants, M.K. Israelian, Ph.D, and B.S. Agharkar, M.D., attest, *inter alia*:

> [Brown's counsel] contacted us and asked that we evaluate Mr. Brown. Counsel

wished to know whether Mr. Brown had any diagnosable mental disease or defect and whether there were circumstances about Mr. Brown's mental make-up and social history which were relevant to his culpability and/or which provided mitigating circumstances in a capital sentencing setting. We were provided extensive background materials by counsel for Mr. Meier Jason Brown, *see* Attachment 3, the types of materials that are normally and regularly relied upon by experts in our fields to form and testify to expert opinions. We also each met with Mr. Brown and evaluated him, separately, on January 14, 2008 (Israelian) and November 29, 2007 (Agharkar). [¶] We have concluded that Meier does suffer from diagnosable mental diseases or defects, and that there is considerable evidence in his background and social history that could be considered mitigating within the context of capital sentencing.

Doc. # 51 at 34-35. This evidence is not persuasive, as it goes to *post-conviction* mental health findings (the doctors attest to findings based on their 2007 and 2008 evaluations; the trial occurred in 2003). In any event, these professionals simply rehash the drug and alcohol features that became part and parcel of Brown's life at his family's compound. Consider their "money quote":

> Indeed, it is probably the strength of [Brown's] relationship and the relentless desire to care for those he loves that, coupled with the effects of drugs and alcohol, [led] to the crime for which he is now sentenced to death.

Doc. # 51 at 38 ¶ 15. The jury in this case actually was told -- repeatedly -- that Brown had a gentle, giving side to him, despite having been raised in a dark world of drugs, violence and

crime, and despite the fact that he himself wound up indulging in both (hence, a jury could rationally conclude, he had a good *and* a bad side to him). That there may have been a speculation-based ("it is probably....") explanation for why Brown resorted to violent means to "help" others adds little to the mitigation showing that Brown must show now to prove his IAC claim here.

In fact, Brown now at most supplies an "expert explanation" that, if presented at trial, ran a reasonable risk of being used in a direction *opposite* to what trial counsel sought. With such a "Dr. Jekyll and Mr. Hyde" explanation, the jurors reasonably could have concluded that violent crime, even if borne of "good" motives (here, for something as banal as helping a girlfriend friend pay her bills) is still violent, *unjustifiable* crime that warrants society's ultimate punishment, especially when a murder is so casually committed.[8]

The Court also agrees with the Government that the same result applies here as was reached in *Brown* when Brown complained about this Court's denial of expert funding for related experts in this area. *See Brown*, 441 F.3d at

---

[8] The same may be said for trial counsel's failure to present expert testimony about Brown's "future non-dangerousness" evidence. Doc. # 51 at 39-49 (recounting expert evidence that *could* have been presented to show that Brown likely would not have engaged in any further violence in prison had the jury voted for life with no parole). This is not a recognized "science" and the instant jury heard plenty about Brown's non-violent side, including jailer testimony about how well he obeys commands and that he would be a "model prisoner." It is patently unbelievable that an expert gloss on all of that would have altered the outcome here. Worse, a reasonably competent attorney might want to stay away from over-illuminating that fact, as it is not beyond the realm of possibility that some jurors might then view Brown as such a "follower" or "pleaser" that he could be too easily nudged into killing again -- so society must protect itself by executing him.

1363-65. There is nothing "scientific" about projecting a defendant's *future* conduct; at bottom, it is a gut call that lay people make. Information mitigating in favor of a life sentencing (*i.e.*, that the defendant *may* not kill again) may sound convincing when presented through an expert, but the expert's opinion on such a determination (unlike, say, a medical malpractice expert witness) is simply not required, much less legally indispensable. Brown would have a stronger argument here were it true that his attorneys presented little or no lay testimony on his social history and future non-dangerousness. In fact, however, the Eleventh Circuit found his evidence "copious" on that score. 441 F.3d at 1365.

## 2. *Prosecutorial Misconduct*

### a. INVESTIGATIVE REPORT

Brown next complains that

> a report prepared by the Postal Inspector contained exculpatory information that was not disclosed until thirteen days before trial; the defense was unable effectively to use the information in the report on the heels of trial; and defense counsel unreasonably failed to seek a continuance based upon the late disclosure of the report.

Doc. # 51 at 50-51. It is undisputed that the report contained background (including arguable mitigation) findings to enable the Government to rebut Brown's sentencing-phase mitigation showing. The complaint here, then, is that trial counsel were squeeze-played by the report's late disclosure. Doc. # 8 at 56 ("It appears that the defense simply read the report, picked some witnesses to testify, and put them on the witness stand"). On a *Brady* claim Brown must

prove that: (1) the government possessed

evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material.

*Davis,* 465 F.3d at 1254. However, this claim is procedurally defaulted because it was not raised on appeal, *Mize*, 532 F.3d at 1191, and Brown shows neither cause nor actual prejudice. Even were it not defaulted, the Court agrees with the Government (doc. # 54 at 59-61) that Brown can show no prejudicial (hence, § 2255-relief-level) error because, with a single exception,[9] the report contains nothing beyond what counsel were able to competently enough present at trial (*i.e.*, that Brown had a pathetic childhood and was polite and respectful, helped his mother -- all while developing a violent dark side that a sympathetic juror perhaps could excuse as an unfortunate    byproduct of the pathetic childhood, etc.). This claim is rejected because the information, while material, in fact was disclosed to the defense. It was late, to be sure, but not shown to be prejudicially so.

**b. CLOSING ARGUMENT**

Brown's next claim requires some factual recapitulation. The trial evidence showed that Brown's girlfriend Diane Brown (no relation) needed money, so Brown murderously obtained the aforementioned money orders for her. Videotape showed Brown with her as they cashed the money orders at Diane's bank (she was then unaware of Brown's crime).  Doc. # 293 at 1179. During sentencing-phase closing argument one of the two prosecutors adverted to

the video depiction of Brown laughing. The second prosecutor followed up, in his closing argument, with this:

As [the co-prosecutor] has pointed out to you, it is the real Meier Jason Brown what [sic] is shown in that bank video still from the First Union, leering and grinning with Diane Brown, *that sorry excuse for a human being*, as they are cashing in the chips, as they are exchanging the value of Sallie Gaglia's life, $1,175, plus what was in here [sic] wallet, equals one human life, who raised two fine boys, who was a wonderful wife to her husband, a wonderful sister to her sisters and her brother, who was the pillar of the community, whose life had *more value than words can ... express*, and who had never harmed a sole in her life.

Doc. # 293 at 1197-98 (emphasis added).

Brown insists the "sorry excuse" and "more value" comments took this case over the line and thus rendered his trial fundamentally unfair, warranting § 2255 relief. Doc. # 51 at 52; # 65 at 29-32. He cites other fragments (*e.g.*, that the jury does not take "marching orders" from Detective Woodall and that, just as the U.S. dealt with Japan's 12/7/41 attack and terrorists' 9/11/01 attacks, Brown's 11/30/02 attack on Sallie Gaglia likewise "demands a response which sanctifies, recognizes the life of [the victim] and says by your verdict of the ultimate punishment that yes, your life has great value..." Doc. # 293 at 1198-99).

Brown must show that all challenged comments, under the totality of the circumstances, were so prejudicial that they rendered his trial fundamentally unfair. 16A WRIGHT & MILLER, FED. PROC., L. ED. § 41:207 (Sept. 2008).    Courts consider whether a prosecutor's comments: (1) tended to mislead the

---

[9] The single exception involved a report on Brown's mother's disbelief that her son killed Sallie Gaglia. However, as the Government notes, that information otherwise came out at trial through other witness testimony. *Id.* at 60-61; doc. # 291 at 669.

jury or prejudice the defendant; (2) were isolated or extensive; and (3) were deliberately or accidentally made. *Id.* Finally, courts consider (4) whether the evidence against the defendant was strong. *Id.* (citing *Spisak v. Mitchell*, 465 F.3d 684, 713-14 (6th Cir. 2006)).

Given the total length of the two prosecutors' closing arguments, it is debatable whether the challenged comments were "isolated" versus extensive, and there is no claim that they were accidentally made. And there was nothing misleading about them. The next issue, then, is whether they are impermissibly prejudicial. Here the aggravation evidence was overwhelming and the challenged comments were within the pale of what prosecutors can and should be able to say about convicted murderers who comprise the scourge of crime afflicting society at large. *See, e.g., Davis v. Kemp*, 829 F.2d 1522, 1527 (11th Cir. 1987) (Prosecutor's closing argument at sentencing phase of murder case, in which he analogized role of jurors to that of soldiers fighting for their country who are sometimes forced to kill in order to preserve country, was not improper); *Brown v. McKee*, 231 Fed.Appx. 469, 480-81 (6th Cir. 2007) (In murder prosecution, prosecutor's closing argument referring to defendant once as a liar, once as a coward, and approximately four times as a snake who slithers on his underbelly, though reprehensible and inappropriate, did not deprive defendant of a fair trial; there was substantial evidence against defendant, including his own trial testimony, in which he admitted being in the car, struggling for the gun, holding the gun, and shooting the gun). This claim, then, also must be rejected.

### 3. *Mental Health Report*

Brown next complains that the Court and Government both violated his constitutional

rights by failing to disclose to him a F.R.Cr.P. 12.2(c)(2) report. Doc. # 51 at 53-54. As Brown explains, he was sent to a federal evaluation facility for a pretrial mental health evaluation -- because defense counsel had indicated that they intended to present mental health evidence at sentencing. *Id.* The report contained useful mitigation evidence, and Brown excerpts some examples:

> Available history on Mr. Brown did not support evidence of a conduct disorder with onset before the age of 15. There is not sufficient evidence that he had a pervasive pattern of disregard for or violations of the rights of others since the age of 15, as indicated by the identified criteria for diagnosis of Antisocial Personality Disorder. He does have a persistent pattern of criminal behavior and the focus of his current clinical situation is his adult anti-social behavior, not specifically a mental disorder. Nonetheless, he does not demonstrate chronic history of organized criminal behavior; instead he has a history interspersed with a variety of relatively minor charges until the time of the alleged offenses.

Doc. # 8 at 53 (quoting the report).

Rule 12.2 governs insanity-type defenses and conditions release of any such report upon a defendant's confirmation that he will, upon conviction of a capital crime, "offer during sentencing proceedings expert evidence on mental condition." F.R.Cr.P. 12.2(c)(2). It is undisputed that Brown did not do that here.

No matter, argues Brown, the rule itself and thus this Court's enforcement of it violates his due process and various other constitutional rights. Doc. # 65 at 36-37. It is not surprising that Brown cites no precedent for this argument. The claim is baseless. It required little effort for

him to comply with the rule (give notice), so his real argument here must be that the notice requirement somehow unduly burdens his constitutional rights to the point that would excuse his failure to comply.

Yet, there is nothing inherently, let alone unduly, burdensome about conditioning release of a *Government* report contemplated by the rules drafters (and thus Congress and the U.S. Supreme Court) upon a defendant's election to declare whether he will proceed with a legal-responsibility excusing, mental health defense. Brown ignores the fact that there were two parties before the Court in this case, and the Government was one of them. It was entitled to notice of an intended defense so that it could have an opportunity to rebut facts adduced thereon. Confirming what *is* going to be presented as an intended defense at trial simply cannot be rationally considered an undue, due-process-violating burden.

For that matter, Brown could not show prejudicial error in any event because the report is a double-edged sword. The very passage that Brown quotes includes this: "He does have a persistent pattern of criminal behavior and the focus of his current clinical situation is his adult anti-social behavior, not specifically a mental disorder." Some jurors could rationally construe that as another way of saying that Brown is "just a criminal." And in one of the report's concluding passages, it says:

Specifically in response to the question of the Court, it is this evaluator's opinion that there is *no* specific mental condition that bears on the issue of punishment in a capital case. Mr. Brown *does not* appear to have *ever* suffered from a mental disease or defect which would render him unable to appreciate the nature and quality or wrongfulness of his acts such as might mitigate the punishment against him.

# 25 at 17, ECF screen page 18 (emphasis added). Had Brown cited to one portion of this report, that may well have opened the door to this passage, which would remind a rational jury that Brown labored under *no* sub-normal IQ or mental defect and thus, had even less to excuse what he did. It is debatable, then, that competent counsel would have used the report at all. This claim therefore is also rejected.

### 4. *FDPA*

Brown next "claims that his death sentence was imposed in a discriminatory and arbitrary manner in that his race, the victim's race and gender, and the amount of funds provided for his defense played a part in the decision." Doc. # 51 at 55. This is a broad-based challenge to the constitutionality of the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598, under which he was prosecuted. He cites statistics on race, regional, etc. variations purporting to show that minorities -- specifically black-on-white criminal defendants -- are unfairly sentenced to death. *Id.* at 60 (such "data demonstrate that an African-American male charged with killing a white female in the South is more likely to receive the death penalty than any other combination of victim/defendant and race/gender. This is discriminatory and violates the Fifth and Eight Amendments. *Furman v. Georgia*, 408 U.S. 238 (1972)"); *see also* doc. # 67-3 (supporting affidavit).

As for funding, Brown figures that

the total amount of funds provided for the defense of this case was $162,825. Expert costs totaled $18,403; attorney fees were $144,421. This is a very low amount of funding. It is significantly lower than the national mean for funding such cases. This

reflects a pattern in this District and in this Circuit. In addition, this case went to trial very quickly, much more quickly than the norm nationally. The services provided Petitioner, and the amount of time allowed for preparation, fall so far below the prevailing standard of practice that it rendered counsel per se ineffective.

*Id.*

Despite the fact that Brown challenged (on other grounds) the FDPA's constitutionality on appeal, *Brown*, 441 F.3d at 1365, the Government does *not* argue procedural default here, but instead responds on the merits. Doc. # 54 at 76-91.

Nevertheless, the Court concludes that Brown's discrimination-based claims are meritless, as they have been addressed elsewhere (albeit in slightly different form), and nothing new is presented here. *See U.S. v. Sampson,* 486 F.3d 13, 25-38 (1st Cir. 2007) (Neither statistical study indicating race-based discrepancies in capital sentencing nor risk of executing the innocent established the FDPA was unconstitutional on ground that the death penalty was sought based on the race of the defendant and victim and on the locale in which the defendant was charged); *U.S. v. Taylor*, 2008 WL 217115 at * 5-6 (E.D.Tenn. 1/24/08) (unpublished) (*citing McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) ("Apparent disparities in sentencing are an inevitable part of our criminal justice system"); *U.S. v. O'Reilly*, 2007 WL 2421502 at * 14 (E.D.Mich. 8/23/07) (unpublished); *U.S. v. James*, 2007 WL 914249 at * 5 (E.D.N.Y. 3/24/07) (unpublished).

Brown's expert-funding claim also is meritless. The Court agrees with the Government here: "Brown never identifies what expert witnesses he wished to call or what additional time trial counsel wanted to spend in preparation for this case but could not do so because of funding concerns." Doc. # 54 at 91. This claim, too, is without merit.

**5. *Other IAC Claims***

Brown pursued an identification defense (*i.e.*, someone else committed the murder) during the liability phase of the trial. Brown thus faults his lawyers for failing to use witness Penny Banks's testimony that she saw a vehicle parked in the post office parking lot at the time of Gaglia's death (Brown rode a bicycle that day). Doc. # 65 at 37-38. In light of Brown's multiple confessions and overwhelming other evidence against him, *see Brown*, 441 F.3d at 1341-42, this claim fails outright.

The same may be said for Brown's other assorted IAC claims set forth at doc. # 51 at 61-79 and # 65 at 38-43. "Given the overwhelming evidence of Brown's guilt, including Brown's confession, the recovered money orders, and the DNA samples of the victim's blood found on his jacket," *Brown*, 441 F.3d at 1350, along with the video shots of Brown cashing the same money orders, and that his shoes had a tread matching the distinctive footprint the police found on the postal counter, *id.* at 1340, 1342, it simply can not be said that any of the claimed deficient acts and omissions would have altered the outcome of the proceedings were they not committed.

**6. *Search Warrant Claim***

Brown's current counsel says they have

discovered a seventeen page document (containing handwritten notations) that appears to be a handwritten draft of Postal Inspector McClendon's Affidavit in Support of a Search warrant. (*See*, Appendix X to Motion to Vacate, Doc. # 42). When

compared to the actual affidavit that was submitted [to the magistrate judge for a search warrant] (see Appendix U to Motion to Vacate, Doc. # 39), there are some glaring omissions, one of which demonstrates that the Government was hiding evidence favorable to the defense.

Doc. # 51 at 79. Omitted, Brown says, was this paragraph:

It is the collective opinions [sic] of these local law enforcement officers that on nearly every instance there was [sic] excessive amounts of alcohol or illegal substances in use by persons residing or visiting the residence. On many of these occasions, the purpose of the visits by law enforcement were for crimes of violence in which weapons were often used to inflict serious harm to other persons at or in the residences. On almost every occasion, persons in the residences routinely flee at the site [sic] of arriving law enforcement officers.

Doc. # 51 at 80. This, Brown contends, would have constituted powerful mitigation evidence, especially if combined with the Woodall testimony that competent counsel *should* have elicited. Had counsel acted reasonably, Brown concludes, there is a reasonable probability that the jury would not have sentenced him to death. Doc. # 51 at 81 n. 36.

The Court again agrees with the Government. Doc. # 54 at 123-24. First, the material was "omitted," as the Government says, because it was, after all, a *draft* affidavit. Drafters make editorial judgments in light of the intended audience (here, a magistrate judge who would authorize a search warrant), and thus there is nothing nefarious about omitting this information then.

Second, the information contained in it is essentially the same as the other mitigation information availed to and exploited by sentencing counsel. The "impact" to which Brown now adverts (*i.e.*, that hearing the information from law enforcement would have resonated more forcefully with the jury than if heard from lay people) is exaggerated at best.

For that matter, the disputed McClendon passage contained information that was potentially harmful: "On almost every occasion, persons in the residences routinely flee at the site [sic] of arriving law enforcement officers." Doc. # 51 at 80. What current counsel seem to constantly overlook is the reasonable probability that at least some jurors could view such information as *justification* for imposing a death sentence. It is not exactly bizarre for some to believe that criminals beget criminals, and thus "three generations of [criminals] are enough."[10]

_____

[10] Upholding Virginia's castration program for the feeble minded, Justice Oliver Wendell Holmes, in a case that has never been formally overruled, reasoned:

We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Three generations of imbeciles are enough.*

*Buck v. Bell*, 274 U.S. 200, 207 (1927) (cite omitted; emphasis added).

So even if this could constitute *Brady* (*i.e.*, mitigation) evidence, it is not reasonable to conclude that it likely could have constituted a trial tipping point (*i.e.*, that it is so significant that a different outcome would have been probable) had this information been furnished. Nor would it be a demonstrably unreasonable strategy call for a defense attorney to proceed without it. Section 2255 relief is therefore not warranted on these grounds either.

### 7. *DNA Evidence*

During the liability phase the Government adduced DNA evidence from a DNA lab ("Bode Technology," http://www.bodetech.com/) whose competency was publicly challenged in another state. More specifically, Brown alleges:

At trial, the Government presented testimony and evidence that blood was found on the sleeve of a jacket obtained from a search of Petitioner's mother's home. This sample was submitted for DNA testing to Bode Laboratories where it was determined the blood on the coat belonged to the victim, Sallie Gaglia. The Government's expert, Matthew James Meuller, a Bode employee, testified that based on the laboratory's testing, there was a "one in 25 quadrillion from the Caucasian population, one in 100 quadrillion from the African-American population" that the match was in error.

Since that time it has been determined that analysis done at the Bode laboratories is unreliable. *See,* Illinois: STATE POLICE CANCEL DNA ANALYSIS PACT, Crime Control Digest, Aug 26, 2005. Because of Bode's incompetence, the State of Illinois revoked its contract with the company and admitted that approximately 1,200 samples that Bode had previously tested in the criminal context, would have to be retested.

Because it has been determined that testing done at the Bode laboratories is unreliable, critical evidence of Petitioner's guilt is similarly unreliable and a conviction and/or death sentence cannot be predicated upon such unreliable evidence.

Doc. # 8 at 104-05.

In light of the overwhelming other evidence recounted *supra*, this claim is without merit, both standing on its own and as an additional ground in support of Brown's IAC claim.

### 8. *Miranda Claim*

The *Brown* court comprehensively reviewed Brown's *Miranda* claim (that his confessions were involuntary, un-*Mirandized*, etc.) on appeal, *Brown*, 441 F3d at 1343-49, and Brown basically renews it here, arguing that his counsel were ineffective for failing to reargue it during trial (pretrial, a Magistrate Judge of this Court denied it), when Diane Brown, then appearing as a *Government* witness, testified that she felt intimidated by the surge of gun-toting police into her home, where Brown had been located, questioned, and ultimately arrested:

Mr. Brown's testimony [about police conduct which, he has contended, rendered his confessions involuntary and thus excludable] was corroborated at trial by the testimony of Diane Brown, who testified for the government. She testified that the officer kept banging on the door prior to coming in, and that when Mr. Brown opened the door, several officers came in with "guns drawn." (Doc. 292 at 752). "And when I [opened the door], that's when they rushed in. And they – one of them snatched the chair from my dining room table snatched it around and told

Jason to sit there and don't move. . . Oh, it was very frightening." (*Id.* at 753).

Doc. # 8 at 112.

The Government generally agrees with these facts. Doc. # 54 at 127-138. Brown's complaint at this juncture is this:

Ms. Brown was subpoenaed to the [pretrial] suppression hearing but for some reason, failed to appear. Trial counsel was ineffective for failing to ensure that Ms. Brown was present to give testimony on this subject.[11] On appeal, Mr. Brown asserted that the reviewing Court should consider Ms. Brown's testimony presented only at trial when reviewing the decision on a Motion to Suppress. However, the Circuit Court pointed out that trial counsel never asked the district court to reconsider its earlier decision in light of Ms. Brown's testimony at trial. Trial counsel's failure to seek the district court's reconsideration in light of the new testimony presented at trial was deficient performance and Petitioner was prejudiced thereby in that had counsel performed competently there is a reasonable probability the outcome of the Motion to Suppress would have been different. If not for the Government being able to introduce evidence of Mr. Brown's purported confession, there is a reasonable probability that the jury would not have returned a verdict of guilty. However, assuming *arguendo* the jury did find Petitioner guilty, without the purported confession there is a reasonable probability that the jury would not have recommended a sentence of death.

*Id.* at 113 (footnote added).

The undersigned has handled this case since the indictment was filed and would not have altered the Court's ruling had, at trial following Diane Brown's testimony, it had been asked to reconsider. Nor is it likely that any judge would have done so, given her demeanor, her intimate involvement with the defendant, and her obvious incentive to exaggerate and lie on his behalf.

For that matter, defense counsel exploited Diane Brown's trial testimony to the defendant's advantage:

These guys are coming in there, as Diane Brown said, with shotguns outside, guns drawn. They go through and clear it. Tell them where to sit. Interrogate them. Reject the first statement, reject the second one. He is worried about the one person he loves more than anybody in the world besides maybe -- with the exception of probably his mother -- is Diane Brown. And he says to them, and it is in the statement, "promise me you won't arrest her if I make this statement." [¶] You hear that. She's facing a potential charge in a death penalty case. That is motivation.

Doc. # 293 at 1022. Brown has shown no error warranting § 2255 relief on these grounds.[12]

---

[11] Counsel subpoenaed her but she failed to appear. Doc. # 302 at 3. Brown does not say what more they should have done.

[12] In *Crane v. Kentucky*, 476 U.S. 683, 636 (1986), a defendant "sought to introduce testimony about the physical and psychological environment in which [his] confession was obtained," in order "to suggest that [his confession] was unworthy of belief," but "[t]he trial court ruled that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible." *Id.* at 684. In reversing, the Supreme Court observed that the circumstances surrounding the making of a confession are often relevant not only to its voluntariness, but also to its credibility. *Id.* at 688. Hence, the blanket exclusion of testimony about the circumstances of the confession deprived Crane of a fair trial. *Id.* at 690. Here, of course,

### 9. *Identification Claim*

Brown's identification claim -- that eyewitnesses who identified Brown as the man they saw at the victim's post office, and who later picked Brown out of a line-up -- were unreliable, doc. # 51 at 86-87, was resolved on direct appeal, *Brown*, 441 F.3d at 1350, and that court's "harmless error" ruling eviscerates any IAC claim that Brown raises here (*i.e.*, since it was harmless error, it cannot be shown to have altered the outcome, and thus Brown cannot show that he was "IAC-prejudiced" by counsel's error).

### 10. *"Pretrial Conference" Claim*

It has been this Court's conviction that many an IAC claim is borne of instances where a trial counsel's client tells *counsel* that he does not wish to testify, then, following conviction, the client claims IAC on the ground that he told counsel he *did* wish to testify. The Court communicated essentially this point at the 9/9/03 pretrial conference in this case, when it stated that it would inquire of Brown, under oath and out of the jury's presence, whether he wished to testify during both phases of his trial. Doc. # 259 (pretrial transcript) at 35-38.

Citing *U.S. v. Parrish*, 427 F.3d 1345, 1348 (11th Cir. 2005) (Under the Due Process Clause, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure), Brown complains that his Fifth and Sixth Amendment rights were violated because he was not present at that conference and various "bench conferences and other critical stages of the proceedings wherein relevant and

critical issues were discussed and decided." Doc. # 8 at 115-16; *see also* # 51 at 87-89; # 65 at 52-53.

A criminal defendant's right to be present at trial is based on the Confrontation Clause of Sixth Amendment, the Due Process Clause of the Fifth Amendment, and F.R.Cr.P. 43. *U.S. v. Novaton*, 271 F.3d 968, 997 (11th Cir. 2001). The Eleventh Circuit

> has stated that "[t]he right of a criminal defendant to be present at all *critical* stages of his trial is a fundamental constitutional right." *Proffitt v. Wainwright*, 685 F.2d 1227, 1260 n. 49 (11th Cir.1982).

*Id.* at 998 (emphasis added). The *Novaton* court applied the harmless error standard, however, and collected cases where a defendant's absence was deemed harmless. *Id.* at 999 (a defendant's absence during evidentiary hearing on motion for new trial; a defendant's unobjected-to absence during time when jury challenges were exercised; a defendant's short absence during closing argument where defendant had attorney present and did not object to proceeding; a defendant's absence during non-substantive portion of jury qualification and during brief colloquy between judge and jury during deliberations; a defendant's absence during portion of *James* hearing on admissibility of co-conspirator hearsay evidence; and a defendant's brief, voluntary absence during the examination of witnesses when the defendant went to the restroom).

At the 9/9/03 pretrial conference only procedural matters were covered; no evidence was taken. In that regard, it is debatable whether a pretrial conference on *procedural* matters rises to a constitutional violation that breaks the harmless-error bar on direct appeal, much less to supports relief on collateral review. *Cf. Clark v.*

---

Brown was free to, and did, introduce (then later exploit, at closing) Diane Brown's "coercion" testimony.

*Stinson*, 214 F.3d 315, 322 (2nd Cir. 2000) (Under New York law, pre-trial hearings where testimony is taken and questions of fact are to be determined are included in the definition of trial, for purpose of a defendant's right to be present at all material stages of trial, but, in the argument of a motion to decide a pure question of law, no right to be present inures to a defendant).

In any event Rule 43 resolves the issue. A defendant need *not* be present at "a conference or hearing upon a question of law," F.R.Cr.P. 43(c)(3); *Counts v. Portuondo*, 2002 WL 562646 at * 9 (S.D.N.Y. 4/16/02) (unpublished). Brown cites no "non-present" moment in the process when anything but matters of law was discussed, and the Court sees no basis for concluding that Rule 43 deprives him of any constitutional rights. The Court therefore rejects this claim, too.

### 11. *Eighth Amendment Claim*

Brown next contends

that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

Doc. # 8 at 117. At the same time, however, he believes

that for two reasons this challenge is not appropriate at this time, or in this pleading.

First, since Petitioner's execution is far from imminent, the question is not yet ripe. Second, since the Supreme Court's decision in *Hill v. McDonough*, [547 U.S. 573] (2006), a challenge to lethal injection can properly be brought in a separate civil rights action under 42 U.S.C. § 1983.

*Id.* (paragraph numbering and formatting omitted). Thus, Brown will litigate this Eighth Amendment challenge in whatever forum is deemed appropriate, and wishes not to waste litigation resources now, so he simply raises the claim now to avoid any waiver problems downwind. *Id.* at 118.

Statute of limitations and laches questions aside, *see Henyard v. Secretary*, ___ F.3d ___, 2008 WL 4328570 at * 2-3 (11th Cir. 9/23/08), the Court agrees with Brown and the Government that this claim can be denied without prejudice to Brown's right to litigate it through a § 1983 proceeding. This claim goes to specific factfinding, as evidenced by *Baze v. Rees*, 128 S.Ct. 1520, 1533-34 (2008) (Risk of improper administration of sodium thiopental, the initial anesthetizing drug in state's three-drug lethal injection protocol that also included pancuronium bromide and potassium chloride, did not render protocol cruel and unusual in violation of Eighth Amendment; protocol incorporated several safeguards including minimum level of professional experience for individuals who inserted intravenous (IV) catheters, requirement for practice sessions, establishment of backup IV lines and other redundancies, and warden's presence in execution chamber) (plurality).

### 12. *Dorothy Rentz*

Brown's next claim goes to juror qualifications. Some background: In death penalty cases potential jurors ("veniremen") are

summoned and questioned about their views on, *inter alia*, the death penalty. That enables counsel for both parties to be better informed when they later exercise their peremptory strikes in sitting the petit jury. This was explained in detail in

> *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), [where] the Supreme Court held that a death sentence "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Later, in *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), the Court refined this standard, holding that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." The Court's opinion in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), made clear that the *Adams* "substantial impairment" test displaced *Witherspoon* as governing law.

*Hightower v. Schofield*, 365 F.3d 1008, 1036 (11th Cir. 2004), *vacated on other grounds*, 545 U.S. 1124 (2005); *see also Brown v. Jones*, 255 F.3d 1273, 1279-80 (11th Cir. 2001) (No prejudice was shown from defense attorney's failure in capital murder prosecution to ask potential jurors during voir dire whether they would automatically vote to impose death penalty upon conviction, precluding ineffective assistance of counsel claim based on that failure; jurors were instructed in penalty phase against basing verdict on prejudice or arbitrary factors, there was no evidence that any juror

was biased in favor of death penalty, and presence of aggravating factors and absence of mitigating factors made case a strong one for capital punishment).

Brown's claim here derives from his right to a properly "*Witherspooned*" venire (*i.e.*, the assemblage of potential jurors screened, per *Witherspoon* and *Witt*, to better inform peremptory strikes used to to sit a petit jury):

> During the capital proceedings in this case, this Court determined it would conduct all individual sequestered voir dire of jurors attitudes toward the death penalty. In that regard, the Court, with counsel and the defendant present, individually questioned each juror, with the exception of Dorothy Rentz concerning their attitudes about the death penalty. For some inexplicable reason, Ms. Rentz was never individually brought before the Court, counsel, and Petitioner and asked the *Witherspoon/Witt* type questions required by the Eighth Amendment. Trial counsel were ineffective for not ensuring that this juror was qualified as a juror.

Doc. # 8 at 119; *see also* doc. # 51 at 92-93.

The Government concedes that there is no transcript covering Rentz[13] and thus, Brown is

---

[13] The Court has E-filed the full transcript of this case so that it is key-word searchable. 403CR001, doc. ## 365-72 (these entries in part duplicate the "first-page-only" transcript entries at doc. # 290-295). The transcripts show that at the start of the jury selection, the Court reviewed each side's written objections to potential jurors based solely on their written responses to written questionnaires. Doc. # 365 at 1-18; # 290 at 1-18. The Court then refused to disqualify any potential juror on that basis. *Id.* at 11 ("I'm not going to disqualify any based on what I see").

Of "150 qualified" at that stage (*i.e.*, qualified to be "*Witherspooned*"), the Clerk randomly called the first 75 for voir dire. Dorothy Rentz's name shows up as being

entitled to an evidentiary hearing where the Government will present "trial prosecutor's notes made during jury selection reflecting that the Court subjected Rentz to voir dire." Doc. # 54 at 152. This issue ties into Brown's final claim, addressed in the next section of this Order.

### 13. *Missing Record*

Brown next complains that part of the transcript of this case is missing:

> After voir dire of all of the jurors, the Court and counsel retired to another room outside the presence of the jurors and each side exercised its peremptory strikes. That process was not recorded thereby depriving Petitioner of his right to meaningful appellate review. It also denied appellate courts the opportunity to review challenges under *Batson* [*v. Kentucky*, 476 U.S. 79 (1986)].[14]

As noted above, there is nothing in the record to indicate that Dorothy Rentz was questioned about her views on the death penalty. Inquiry was made of the court reporter who indicated that she had reviewed the tapes (presumably audio) and found no such questioning. Assuming *arguendo*, Ms. Rentz was questioned and that colloquy was not recorded, Petitioner was deprived of his right to meaningful appellate review.

Doc. # 8 at 119-120 (footnotes added); *see also* doc. # 51 at 93-94.

Criminal defendants possess limited constitutional rights to a transcript of the proceedings against them. *See U.S. v. Ofray-Campos*, 534 F.3d 1, 20 (1st Cir. 2008) (A criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial); *Robinson v. Smyth*, 258 Fed.Appx. 469, 471 (3rd Cir. 2007) ("Robinson does not have a constitutionally protected right to a totally accurate transcript of his criminal proceedings"); *Novaton*, 271 F.3d at 993 (When a defendant is represented by a new attorney on appeal, defendant need only show that there is a substantial and significant omission from the trial transcript in the appellate record in order to obtain a new trial); *Campbell v. Metrish*, 2008 WL 360627 at * 9 (E.D.Mich. 2/8/08) (unpublished).

---

[14] called by the Clerk in that first, 75-person group. Doc. # 365 at 15 ("No. 136, Dorothy Rentz"). So does Traci Amick, *id.* at 18 ("No. 175, Tracy [sic] A. Amick"); *see also id.* at 7 (Darden objected to her based on her written responses). Amick never again appears in the voir dire portion of the record, *see* doc. # 365, 366 (doc. ## 290, 291). Neither does Dorothy Rentz -- until she was seated on the jury. Doc. # 366 at ECF screen page 187, paper transcript page 535; doc. # 291 at 535. Amick was not selected as a juror, though no record of her examination exists. Rentz was selected, *id.*, but likewise no record of her examination exists. To the extent that there are any other "Amick" omissions (the Court has not scoured the record for every last name), Brown has waived his claim to complain of same. Meanwhile, the Clerk is directed to E-file, subject to appropriate privacy redaction protocols, the potential jurors' written questionnaire responses.

[14] None of this is true. The record shows that the Court "*Witherspooned*" the veniremen in the jury room, on the record and with all counsel present. The proceedings then moved back into the courtroom, where the parties exercised their jury strikes. Doc. # 291 at 525-34. The parties are left to do that in silence, at counsel's tables, with the bailiff passing a jury list back and forth and each party crosses a juror name off the list. If a *Batson* challenge is made, it must be made before the struck jurors are excused so that the Court can remedy the situation while each struck juror's race is apparent to all parties. If no *Batson* challenge is raised, the struck jurors are released and no record of their race is retained. Here, *no one* made any *Batson* challenges, though the Government noted that Brown exercised 20 of his 22 strikes against whites. *Id.* at 534; *see also id.* at 527. Therefore, there was nothing for the appellate court to review with respect to a *Batson* claim. The Court thus denies this part of Brown's "missing transcript" claim on the merits.

But things change by the time a defendant gets to the collateral-proceeding stage of his case, as demonstrated by this portion of an encyclopedist's recitation:

"Whether or not side-bar colloquy needs to be reported is not a question that can be raised in a Section 2255 proceeding," *Casados v. U.S.*, C.A.5th, 1966, 354 F.2d 688. A court reporter's alleged errors, "if they existed, might properly have been raised on appeal, but such errors are not the subject of consideration in a § 2255 proceeding." *Holt v. U.S.*, C.A.8th, 1962, 303 F.2d 791, 793. "The failure to keep complete records of the criminal proceedings is not of itself an error that could be raised in a motion to vacate sentence under § 2255." *Marsh v. U.S.*, D.C.Okla.1976, C.A.8th, 1962, 435 F.Supp. 426, 430.

3 WRIGHT & MILLER, FED. PRAC. & PROC. CRIM.3d § 595 (2008); *see also DeLuca v. U.S.* 243 F.Supp.2d 982, 985 (E.D.Mo. 2003) ("Petitioner's Reporter's Act claims are properly dismissed without an evidentiary hearing because a naked violation of 28 U.S.C. § 753(b) cannot be raised in a collateral proceeding under § 2255"); Ann., *prejudicial effect of Federal District Court reporter's omissions in recording judicial proceedings, where such omissions constitute failure to comply with Court Reporter Act, 28 U.S.C.A. sec. 753(b)*, 12 A.L.R.FED. 584 § 6[a] (1972) (collecting cases).

Brown is not entitled to collateral relief on his "Dorothy Rentz" and "Missing Record" claims. Put another way, he is too late; these matters should have been raised on direct appeal, and therefore cannot be heard now, on collateral review. Brown, however, once again argues IAC -- that competent appellate counsel would have raised the "Rentz" matter on direct appeal,

doc. # 51 at 94. He also seems to imply that the Court *should* have made a record of *how* the Government exercised its peremptory strikes so appellate counsel could then detect any *Batson* error that trial counsel missed. Doc. # 65 at 55-56.

On his latter point it is significant that trial counsel, who were *right there* and thus able to see the race of any jurors the Government struck, raised no objection. Doc. # 291 at 534. Nor are they alleged to have been ineffective on that score. Hence, this claim is procedurally defaulted and no IAC-based cause can excuse it.

As for the "Rentz" matter, it cannot go unnoticed that one of Georgia's finest lawyers -- *current* counsel -- detected the "Rentz" omission but not the "Amick" omission, which the Court has unearthed *sua sponte*, *see supra* n. 13. If one of the *top* lawyers in the State missed that, how can trial and appellate counsel be deemed ineffective for missing the "Rentz" transcript omission? Thus, IAC-level cause to excuse such waiver (*i.e.*, waiver in the sense that Brown's failure to raise this matter on direct appeal means it is too late to raise it during collateral review) cannot be shown, as it is clear that trial and appellate counsel's omission falls within the range of error that competent (even one of Georgia's finest) counsel might make.

**C. Discovery Motion, Evidentiary Hearing**

Finally, in light of the rulings reached above, the Court concludes that Brown has failed to satisfy the above-referenced, discovery-motion and evidentiary-hearing criteria. Therefore, his motions for discovery and for an evidentiary hearing are denied.

## IV. **CONCLUSION**

Accordingly, the Court *DENIES* Meier Jason Brown's 28 U.S.C. § 2255 motion, doc. # 8, as well as his motions for discovery, doc. # 52, *as supplemented*, # 66, and for an evidentiary hearing, doc. # 53, *as supplemented*, # 67.

This _29_ day of September, 2008.


_B. AVANT EDENFIELD, JUDGE_
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA